IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **GINA CRISCIONE**<br>6093 Creekside Drive<br>Parma Heights, OH 44130<br><br>*and*<br><br>**ESTATE OF DOROTHY MANDANICI**<br>6093 Creekside Drive<br>Parma Heights, OH 44130<br>*Plaintiffs,*<br><br>v.<br><br>**LAURA DIVINCENZO**<br>3004 Waterfall Way<br>Westlake, OH 44145<br><br>*and*<br><br>**SARA THURMER**<br>15428 Shore Acres<br>Cleveland, OH 44110<br><br>*and*<br><br>**EAST PARK RETIREMENT COMMUNITY,**<br>  **INC., AKA EAST PARK CARE CENTER**<br>3004 Waterfall Way<br>Westlake, OH 44145<br><br>*and*<br><br>**CITY OF BROOK PARK**<br>17401 Holland Road<br>Brook Park, OH 44142<br><br>*and*<br><br>**GEORGE SAKELLAKIS**<br>17401 Holland Road<br>Brook Park, OH 44142<br><br>*and*<br><br>**HAROLD DUNCAN**<br>17401 Holland Road<br>Brook Park, OH 44142<br><br>*and* | Case No.: |

| **RYAN WALSH**<br>17401 Holland Road<br>Brook Park, OH 44142<br><center>*and*</center>**THOMAS SENSEL**<br>17401 Holland Road<br>Brook Park, OH 44142<br><div align="right">*Defendants.*</div> | |
|---|---|
| **COMPLAINT (JURY DEMAND ENDORSED HEREON)** | |

**PARTIES**

1. Dorothy Mandanici was a resident at the East Park Care Center from 2017 until 2020, shortly before her untimely death.

2. Plaintiff Gina Criscione was the daughter of Ms. Mandanici. Ms. Criscione was Ms. Mandanici's legal guardian and is the personal representative of her estate.

3. Defendant East Park Care Center is a business that engages primarily in the supply of nursing-home residence and care.

4. Defendant Laura DiVincenzo was the owner of East Park Care Center at the time of Ms. Mandanici's death.

5. Defendant Sara Thurmer was the administrator of East Park Care Center at the time of Ms. Mandanici's death.

6. Defendant City of Brook Park is a political subdivision organized under the laws of the State of Ohio.

7. Defendants George Sakellakis, Harold Duncan, Ryan Walsh, and Thomas Sensel are or were officers of the Brook Park Police Department. They are sued here in their individual capacities.

**JURISDICTION & VENUE**

8.    This Court has original jurisdiction over the Complaint's federal claims under under 28

U.S.C. §§ 1331, 1343, and 2201. The Court has supplemental jurisdiction over the

Complaint's state-law claims under 28 U.S.C. § 1367.

9.    This Court has personal jurisdiction over all Defendants, who reside in or conduct

business in Cuyahoga County.

10.    Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims

took place within this district.

**FACTS**

11.    Ms. Mandanici was a lifelong resident of Brook Park, Ohio, where she raised Ms.

Criscione and her two other children.

12.    Throughout her adulthood, Ms. Criscione was extraordinarily close to her mother. They

would spend hours talking on the phone daily as they cooked, ate meals, and watched

movies.

13.    After a brief stay at Southwest General Hospital, Ms. Mandanici transitioned to long-term

care at East Park Care Center, which Ms. Criscione had selected for her based on its

reputation for caring for patients like her mother, who had been diagnosed with dementia.

14.    When Ms. Mandanici arrived at East Park around April 2017, Ms. Criscione continued to

visit or telephone her mother several times daily, enjoying meals and conversations of

varying lengths with her almost every morning and every evening.

15.    For most of that stay, Ms. Criscione could observe that East Park was providing her

mother appropriate care, but things changed quickly after Defendant Thurmer took over

as administrator of the facility in 2018.

16.     Almost immediately after Defendant Thurmer took over, employees began to leave, complaining that East Park was cutting staff, refusing to issue paychecks for the employees who remained, failing to order supplies they needed, and causing other problems.

17.     Soon after, the long-time employees who knew East Park's patients and understood their needs were replaced largely with contractors who rotated in and out, and routinely failed to even read patients' charts before treating them.

**East Park deploys Ms. Criscione to assist overstretched employees.**

18.     After the change in ownership, Ms. Criscione remained a regular presence at East Park, and most of the regular employees in her mother's building knew her.

19.     East Park was short-staffed on multiple occasions after Defendant Thurmer's arrival.

20.     On some of those occasions, East Park employees used Ms. Criscione or her sister to perform work or services.

21.     For instance, East Park employees repeatedly asked Ms. Criscione to fetch fresh linens from the laundry room.

22.     East Park employees repeatedly asked Ms. Criscione to pull supplies for them from the supply closet.

23.     East Park employees repeatedly asked Ms. Criscione to assist her mother in the bathroom.

24.     East Park employees repeatedly asked Ms. Criscione to supervise nearby patients while nurses ran other errands.

25.     Defendant Thurmer asked Ms. Criscione to assist her in finding and recruiting a new director of nursing.

26.     Because they wanted to help their mother and her neighbors, Ms. Criscione and her sister
        agreed to perform these tasks.

27.     East Park accepted compensation from Ms. Mandanici and other parties to perform these
        tasks.

**Ms. Criscione reports instances of suspected neglect**

28.     Despite her efforts to supervise and assist East Park's care for her mother, Ms. Criscione
        noticed that various issues with her mother's care were going unaddressed after Ms.
        Thurmer's arrival, and she began hearing about problems from East Park staff members
        and from the families of other residents. For instance:

        a.      Ms. Mandanici's dentures repeatedly went missing. On one occasion, an aide
                found them in another patient's mouth; on another occasion, Ms. Criscione found
                them embedded in her mother's back.

        b.      The air conditioner in Ms. Mandanici's room would blow black chunks of mold
                into her bed.

        c.      East Park regularly left Ms. Mandanici unattended for so long that Ms. Criscione
                and her sister would find her sitting in urine. On dozens of occassions, she had
                been left unattended so long that the urine had soaked through her adult diaper,
                through her clothes, and into her chair or bed.

        d.      Because Ms. Mandanici was left stationary in her own urine for so much time and
                with such frequency, she developed severe pressure ulcers on her buttocks.

        e.      Employees repeatedly left urine-soaked clothes lying around Ms. Mandanici's
                room and mixed in with other laundry.

        f.      Ms. Criscione repeatedly discovered fecal matter on toilet lids, sheets, and other
                surfaces when she entered the room.

g.      Staff routinely placed compression socks on Ms. Mandacini improperly, causing

        edema in her legs and threatening to aggravate her atrial fibrillation.

h.      Staff repeatedly failed to properly dry Ms. Mandanici after her showers, leading

        to yeast infections that spread across her groin.

i.      On one occasion, Ms. Criscione found her mother sitting in her wheelchair while

        still tangled in the harness from her Hoyer lift, which was wedged in her buttocks

        and twisted between her legs.

j.      On another occasion, Ms. Criscione discovered large bruises on her mother's legs.

        Although staff initially said Ms. Mandanici had bumped into something, Ms.

        Criscione later learned that aides had injured her mother while improperly

        restraining her. Because the bruises were not properly treated, one of them

        eventually began oozing blood.

k.      Although dementia patients require rigid schedules and familiar caregivers, East

        Park continued to cut staff so sharply that Ms. Mandanici eventually received care

        primarily from rotating agency aides. On more than one occasion, using

        unfamiliar aides resulted in Ms. Mandanici panicking during a shower and

        injuring her arm.

l.      Eventually, aides began refusing to give patients food or even water on request.

        East Park allowed Ms. Mandanici to become so dehyrdated that Ms. Criscione

        and her sister were eventually forced to call an ambulance to transport her to a

        hospital.

m.      East Park repeatedly prescribed and overprescribed drugs for Ms. Mandanici. Ms.

        Criscione complained about those drugs and warned that those drugs would cause

unacceptable side effects. She demanded to be notified before any changes in her

mother's prescriptions, but East Park continued to increase medication without

consent and aggravated her conditions.

29.     Ms. Criscione was aware of many of these issues through her own personal observation,

but many employees were also discreetly alerting her to other problems.

30.     On behalf of Ms. Mandanici, Ms. Criscione repeatedly reported these issues directly to

East Park and demanded better care.

31.     Ms. Criscione likewise disclosed East Park's neglect in postings online and in reports to

the Ohio Department of Health.

32.     Many of East Park's employees and contractors likewise reported suspected cases of

neglect to East Park supervisors.

**Instead of resolving reports of suspected neglect, East Park retaliates against
the reporters.**

33.     Rather than resolving these problems, Defendant Laura DiVincenzo, Defendant Thurmer,

and Defendant East Park Retirement Community, Inc. ("the East Park Defendants")

began to retaliate against those who complained about them.

34.     East Park retaliated against workers who reported neglect at its facilities by taking

adverse employment actions against them.

35.     East Park likewise retaliated against Ms. Mandanici and Ms. Criscione.

36.     They began by attempting to cut Ms. Criscione off from her mother and from the staff

members caring for her.

37.     Around March 2020, Defendant Thurmur called a meeting with East Park staff members

and instructed them not to communicate with Ms. Criscione.

38.     Defendant Thurmur ordered them to stop taking Ms. Criscione's calls, to block her on social media, to avoid her in personal interactions, and to refuse to put her phone calls through to her mother.

39.     Defendant Thurmur went as far as taking employees' phones and deleting Ms. Criscione's number to ensure they couldn't report any more problems to her.

40.     Ms. Criscione sought to continue closely monitoring her mother's condition, but she was severely limited in her ability to do so.

41.     Soon after, Ms. Mandanici suddenly needed to be hospitalized.

42.     Also in March 2020, Ms. Criscione requested her mother's medical records from East Park so she could evaluate its treatment of her mother.

43.     East Park refused to produce those records.

44.     Not long after, East Park prohibited Ms. Criscione from entering the facility and instructed employees not to connect Ms. Criscione's phone calls to her mother. Ms. Criscione was relegated to visiting her mother through a bedroom window.

45.     Medical professionals have long known that social isolation has adverse health effects.

46.     That body of research has only grown more robust over the last several decades, and it has been largely undisputed for the last half century that a lack of regular contact with family or friends can seriously diminish a patient's cognitive condition.

47.     Acting on behalf of Ms. Mandanici, Ms. Criscione alerted East Park officials to these concerns, warning that isolating her mother threatened to accelerate her cognitive decline and cause all manner of other physical problems.

48.     East Park ignored those warnings, and its employees continued to limit Ms. Criscione's ability to contact her mother.

49. East Park furthered its retaliation around April or May 2020 by initiating eviction proceedings against Ms. Mandanici, relying on false statements that she was a threat to its nurses and false statements about her medical history, symptoms, and treatment.

50. The isolation from her daughter left Ms. Mandanici feeling alone, abandoned, and confused.

51. Both her physical and cognitive condition began to decline rapidly—and predictably—as Ms. Criscione raced to find a new home for her mother before East Park's eviction date.

52. All the while, East Park continued to endanger Ms. Mandanici's health by keeping her isolated and by failing to provide her adequate food and water.

53. In the last eight to ten weeks of Ms. Mandanici's stay at East Park, that lack of food and water caused her to lose approximately a quarter of her body weight.

54. When Ms. Criscione was finally able to move her to a new home at Mt. Alverna, Ms. Mandanici weighed only 97 pounds.

55. Although Mt. Alverna provided far better care, Ms. Mandanici arrived there too late. Her condition had already irreversibly deteriorated, and she died soon after on June 20, 2020.

### Ms. Criscione continues to blow the whistle on East Park; East Park continues to retaliate against her

56. Even after Ms. Mandanici died, East Park and its officials continued to retaliate against her and her daughter for blowing the whistle on them.

57. They continued to refuse to produce medical records that would have allowed Ms. Criscione to evaluate the quality of care they provided.

58. They confiscated property that Ms. Criscione had placed in her mother's room and never returned it to her, despite her demands.

59.     Months after Ms. Mandanici's death, Defendant DiVincenzo discovered that Ms.

        Criscione had reported the conditions at East Park to the Ohio Department of Health and

        discussed them online.

60.     Based on those communications, Defendant DiVincenzo and Defendant Thurmer

        conspired with officials at the City of Brook Park to silence Ms. Criscione.

61.     Defendant DiVincenzo complained to the City on September 28, 2020, that Ms.

        Criscione had attacked Ms. Thurmer's reputation and professional standing, and that

        "people in the industry" had seen her posts.

62.     Ms. Criscione has a First Amendment right to criticize Ms. Thurmer's reputation and

        professional standing.

63.     Defendant DiVincenzo likewise complained that Ms. Criscione was "seen picketing"

        against East Park.

64.     Ms. Criscione has a First Amendment right to picket against East Park.

65.     Defendant DiVincenzo falsely stated that Ms. Criscione had returned to drive around East

        Park months after her mother's death.

66.     Defendant DiVincenzo sought to have Ms. Criscione prosecuted for telecommunications

        harassment based on her online statements.

67.     As evidence of this harassment, she turned over copies of Ms. Criscione's statements that

        frightened her the most.

68.     Those statements included:

        a.      "What are you hiding, East Park?"

        b.      "Lunch on Mondays and Thursdays. I'll be walking now, for lunch for the people

                at East Park in hope they feed them."

    c.      "This place is bad… the worst of the worst!"

    d.      "Read my Google review and tell me what you think of this place?"

69.    Defendant DiVincenzo then directed Defendant Thurmer to prepare a written statement claiming that she felt "very threatened" by Ms. Criscione's public disclosures that East Park was neglecting its patients.

70.    Based on those complaints, Defendant City of Brook Park initiated a criminal prosecution of Ms. Criscione.

71.    The City was aided by Defendants City of Brook Park, George Sakellakis, Harold Duncan, Ryan Walsh, and Thomas Sensel ("the Brook Park Defendants"), who gathered evidence that Ms. Criscione had criticized East Park and its employees to support criminal charges against her:

    a.      Knowing that Ms. Criscione's speech was protected under the First Amendment, Defendants Duncan and Sensel gathered information from the East Park Defendants they could use as a pretext to retaliate against Ms. Criscione.

    b.      Knowing that Ms. Criscione's speech was protected under the First Amendment, Defendant Duncan called Ms. Criscione in an effort to intimidate her into ending her criticism of Ms. Thurmer and East Park.

    c.      Knowing that Ms. Criscione's speech was protected under the First Amendment, Defendant Sakellakis directed and assisted Defendant Thurmer in preparing complaints against Ms. Criscione.

72.    Based on her protected speech, the City and its officers approved criminal charges against Ms. Criscione based on her speech and conduct from May 23, 2020 through the October

15, 2020: one count of telecommunications harassment and one count of menacing by stalking. Authentic copies of those complaints are attached as Exhibits 1 and 2.

73.    Both charges are first-degree misdemeanors carrying a maximum penalty of six months in jail and a $1,000 fine.

74.    The statute of limitations on those charges expired on October 15, 2022.

75.    After the City approved those charges on October 15, 2020, Defendant Walsh required Ms. Criscione to make a trip to the station house where they would issue her a citation and initiate her prosecution for those crimes.

76.    As a result of those charges, the Berea Municipal Court entered a restraining order barring Ms. Criscione from further discussing her suspicions that East Park had neglected her mother and other patients, and restricting her ability to travel.

77.    Counsel for Ms. Criscione alerted Carol Horvath, the City's law director, to the First Amendment defects in the case, but she and Peter Sackett, the City's prosecutor, refused to drop the charges. Mr. Sackett pressed forward with the prosecution and sought to have Ms. Criscione imprisoned for criticizing Ms. Thurmer and East Park, despite knowing that he was falsely characterizing the facts and law of the case to the court in order to secure a conviction.

78.    Ms. Criscione filed a motion to dismiss the charges based on those First Amendment defects and the lack of probable cause.

79.    The court granted that motion and dismissed the case without prejudice on March 11, 2021. An authentic copy of that judgment is attached as Exhibit 3.

80.  Ms. Criscione's counsel sought assurances from the City that it would not refile the charges, but Mr. Sackett held open the possibility of refiling charges against her until the statute of limitations had lapsed.

**Plaintiffs suffered injuries as a result of Defendants' misconduct**

81.  Ms. Mandanici and her family repeatedly warned the East Park Defendants about the deficiencies in their care, but the East Park Defendants refused to address the problems they raised.

82.  Ms. Mandanici suffered injuries and died as a result of their reckless, intentional, or willful or wanton misconduct.

83.  The protection order entered against Ms. Criscione limited her ability to freely travel and to advocate against East Park.

84.  The threat of incarceration caused Ms. Criscione severe emotional distress and required repeated visits to medical professionals to manage resulting heart and blood-pressure problems.

85.  Ms. Criscione incurred tens of thousands of dollars in attorneys' fees defending herself against the criminal charges she faced.

86.  As a direct and proximate result of Defendants' actions, Ms. Criscione has suffered and continues to suffer economic and non-economic damages for which they are liable.

87.  Defendants acted willfully, egregiously, maliciously, in bad faith, and in a wanton or reckless manner. They took adverse actions against Ms. Mandanici and Ms. Criscione to retaliate against them for exercising their rights under the First Amendment and state law, they fabricated factual bases for taking those actions, they knew that doing so was unlawful, they knew that doing so was likely to injure Plaintiffs, and they did so in hopes

of injuring Plaintiffs. Their conduct is worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**Ms. Criscione's injuries were the result of municipal policy**

88.  Ms. Criscione's prosecution was not the result of rogue employees of the City. Rather, it was the result of City policies or customs made by employees whose edicts or acts represent official policy.

89.  For instance, an employee of the City's Law Department—believed to be either Director Horvath or Mr. Sackett—directed the police to prepare charges against Ms. Criscione consistent with Ms. DiVincenzo and Ms. Thurmer's requests.

90.  Further, Director Horvath was deliberately indifferent to the violation of Ms. Criscione's First Amendment rights; even after receiving notice of Mr. Sackett's infringement on those rights and fielding a request to intervene, she acquiesced to his misconduct, refusing to exercise her supervisory authority over him, refusing to train him to avoid such infringements, and refusing to otherwise exert sufficient control to prevent such infringements.

91.  Likewise, the decision to charge Ms. Criscione was the result of the City's deliberate indifference to First Amendment rights and its failure to train and supervise its employees on the protection of those rights.

92.  Further, Director Horvath's approval of Mr. Sackett's prosecution of Ms. Criscione constituted a ratification of his actions.

**CLAIM 1**
**SURVIVORSHIP ACTION**
**(AGAINST THE EAST PARK DEFENDANTS)**

93.  Plaintiffs re-incorporate all the preceding allegations.

94.  Ms. Mandanici died on June 20, 2020.

95. The East Park Defendants' wrongful acts, neglect, or default caused Ms. Mandanici's death, along with pain and suffering before her death.

96. The East Park Defendants' wrongful acts, neglect, or default would have entitled Ms. Mandanici to maintain an action and recover damages if death had not ensued.

97. Ms. Mandanici was survived by Ms. Criscione and two other children.

98. Ms. Mandanici's survivors suffered damages as a result of her death.

<div align="center">

**CLAIM 2**
**WRONGFUL DEATH**
**(AGAINST THE EAST PARK DEFENDANTS)**

</div>

99. Plaintiffs re-incorporate all the preceding allegations.

100. The East Park Defendants' wrongful acts, neglect, or default caused Ms. Mandanici's death.

101. Ms. Mandanici would have been entitled to recover damages for those acts were she alive today.

<div align="center">

**CLAIM 3**
**BREACH OF CONTRACT**
**(AGAINST THE EAST PARK DEFENDANTS)**

</div>

102. Plaintiffs re-incorporate all the preceding allegations.

103. The East Park Defendants contracted with Plaintiffs to assist Ms. Mandanici with her activities of daily living and with her social, emotional, nutritional, hygiene, housekeeping, and medical needs.

104. The East Park Defendants breached that contract by their failures to provide that assistance, including, but not limited to:

   a.   Their failure to provide adequate assistance with her activities of daily living.

   b.   Their failure to provide adequate assistance with her social needs.

   c.   Their failure to provide adequate assistance with her emotional needs.

    d.      Their failure to provide adequate assistance with her nutritional needs.

    e.      Their failure to provide adequate assistance with her hygiene needs.

    f.      Their failure to provide adequate assistance with her housekeeping needs.

    g.      Their failure to provide adequate assistance with her medical needs.

105.    Ms. Mandanci suffered damages as a result of the East Park Defendants' breach of their contract, up to and including her death.

106.    Those injuries were foreseeable results of the East Park Defendants' breach of contract.

### CLAIM 4
### VIOLATIONS OF THE NURSING HOME BILL OF RIGHTS
### (OHIO REV. CODE CHAPTER 3721)
### (AGAINST THE EAST PARK DEFENDANTS)

107.    Plaintiffs re-incorporate all the preceding allegations.

108.    The Nursing Home Bill of Rights protects a resident's right to—among other things— adequate and appropriate medical treatment and nursing care, a safe and clean living environment, unrestricted communications with family, and unrestricted access to property.

109.    The East Park Defendants' negligent and intentional conduct resulted in violations of these and other rights Ms. Mandanici enjoyed under the Nursing Home Bill of Rights.

110.    Ms. Mandanici suffered damages as a result of the East Park Defendants' conduct.

### CLAIM 5
### MALICIOUS PROSECUTION
### (AGAINST ALL DEFENDANTS)

111.    Plaintiffs re-incorporate all the preceding allegations.

112.    Defendants acted maliciously in instituting or continuing Ms. Criscione's criminal prosecution.

113.    They manufactured allegations against her in an effort to silence her in violation of her
First Amendment rights and protect East Park's business.

114.    Ms. Criscione's criminal prosecution was not supported by probable cause.

115.    Her online speech and picketing were protected by the First Amendment and not
evidence of any crime.

116.    Ms. Criscione's criminal prosecution terminated in her favor.

117.    The Berea Municipal Court dismissed all the charges brought against her.

### CLAIM 6
### ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

118.    Plaintiffs re-incorporate all the preceding allegations.

119.    In the alternative, Defendants set a legal proceeding in motion with probable cause by
initiating criminal charges against Ms. Criscione.

120.    Defendants perverted that proceeding to accomplish an ulterior purpose for which the
proceeding was not designed—including the purpose to silence Ms. Criscione in violation
of her First Amendment rights, protect their reputation, and generate additional profits.

121.    Ms. Criscione was directly injured by the wrongful use of process.

122.    Among other injuries, she suffered serious physical and mental-health consequences as a
result of the prosecution, and she incurred substantial debts.

### CLAIM 7
### WHISTLEBLOWER RETALIATION (OHIO REV. CODE § 3721.24)
### (AGAINST ALL DEFENDANTS)

123.    Plaintiffs re-incorporate all the preceding allegations.

124.    Ohio Rev. Code § 3721.24 forbids retaliation on the basis of a report of suspected abuse,
neglect or exploitation of a resident of a nursing home.

125. Ms. Mandanici and Ms. Criscione each made good-faith reports of suspected abuse, neglect, or exploitation of a resident at East Park.

126. Both complained about the quality of care East Park was providing, as that care threatened to and did result in serious physical harm to East Park's residents.

127. Defendants retaliated against Ms. Mandanici and Ms. Criscione for making those good-faith reports of suspected abuse, neglect, or exploitation, all of which were protected by the First Amendment.

128. That retaliation included isolating Ms. Mandanici from her daughter, refusing to produce her medical records, confiscating Ms. Criscione's personal property, and filing criminal charges against Ms. Criscione.

### CLAIM 8
### FALSIFICTION (OHIO REV. CODE § 2921.13)
### (AGAINST ALL DEFENDANTS)

129. Plaintiffs re-incorporate all the preceding allegations.

130. Under Ohio Rev. Code § 2921.13, "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made … in any official proceeding [or] with purpose to mislead a public official in performing the public official's official function."

131. Defendants knowingly made false statements to public officials during an official proceeding with purpose to mislead them in performing their official functions.

a. The East Park Defendants knowingly made false statements to public officials at the Ohio Department of Health, the City of Brook Park, and the Berea Municipal Court during an official proceeding with purpose to mislead them in performing their official functions.

b.    The Brook Park Defendants knowingly made false statements to public officials at the the the City of Brook Park and the Berea Municipal Court during an official proceeding with purpose to mislead them in performing their official functions. For instance, the individual officers knowingly advanced the East Park Defendants' false statements through the police department and to the Law Department, which knowingly used those false statements in the Berea Municipal Court. All this was done with the intention of misleading the court so that it would ratify their efforts to punish Ms. Criscione for exercising her First Amendment rights.

## CLAIM 9
### INTIMIDATION (OHIO REV. CODE § 2921.03)
### (AGAINST ALL DEFENDANTS)

132.    Plaintiffs re-incorporate all the preceding allegations.

133.    Under Ohio Rev. Code § 2921.03, "[n]o person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, a party official, or an attorney or witness involved in a civil action or proceeding in the discharge of the person's the duties of the public servant, party official, attorney, or witness."

134.    Defendants knowingly used a materially false or fraudulent writing with malice, bad faith, wantonness, or recklessness, in an attempt to influence public servants in the discharge of their duties:

a.    The East Park Defendants knowingly used a materially false or fraudulent writing with malice, bad faith, wantonness, or recklessness, in an attempt to influence the

public servants at the Ohio Department of Health, the City of Brook Park, and the Berea Municipal Court in the discharge of their duties.

b.     The Brook Park Defendants knowingly used a materially false or fraudulent writing with malice, bad faith, wantonness, or recklessness, in an attempt to influence other public servants at the City of Brook Park and the Berea Municipal Court in the discharge of their duties. For instance, the individual officers knowingly advanced false statements provided to them by the East Park Defendants through the police department and to the Law Department, which knowingly used those false statements in the Berea Municipal Court. All this was done with the intention of influencing the court so it would ratify their efforts to punish Ms. Criscione for exercising her First Amendment rights.

<div align="center">

**CLAIM 10**
**INTERFERENCE WITH CIVIL RIGHTS**
**(AGAINST ALL DEFENDANTS)**

</div>

135.     Plaintiffs re-incorporate all the preceding allegations.

136.     The First Amendment protects free exercise of religion, freedom of speech, freedom of press, and the right to petition the government for redress of grievances. Article I, Section 11 of the Ohio Constitution protects Ms. Criscione from retaliation based on the exercise of her right to "freely speak, write, and publish [her] sentiments on all subjects."

137.     The Fourteenth Amendment protects the right to equal protection of the laws.

138.     Under Ohio Rev. Code § 2921.45, "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." Under Ohio Rev. Code § 2307.60, any person injured by such a criminal act may recover full damages in a civil action. The Brook Park Defendants, under color of their office, employment, or

authority, knowingly deprived Ms. Criscione of her First Amendment rights and other statutory rights.

139.    Under Ohio Rev. Code § 2923.03, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall … (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense; (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code; (4) Cause an innocent or irresponsible person to commit the offense."

140.    Defendants knowingly solicited another to deprive Ms. Criscione of her rights, including by their request that the City of Brook Park and its officers criminally charge Ms. Criscione for criticizing them and by asking the Ohio Department of Health to approve its eviction of Ms. Mandanici.

141.    Defendants knowingly aided or abetted another in depriving Ms. Criscione of her rights, including by participating in the City's investigation and prosecution.

142.    Defendants conspired among themselves to retaliate against Ms. Criscione for her exercise of her rights to free speech and equal protection. The East Park Defendants coordinating with the Ohio Department of Health to evict Ms. Mandanici in retaliation for reporting unlawful conditions at East Park. And they coordinated with the Brook Park Defendants to build support for criminal charges against Ms. Criscione, prepared charging instruments, and carried out a criminal prosecution intended to silence her.

143.    Defendants caused an innocent or irresponsible person to deprive Ms. Criscione of her First Amendment rights, including by causing the Ohio Department of Health to approve a retaliatory eviction, and by causing the Berea Municipal Court to bring her up on charges and impose a criminal protection order against her.

**CLAIM 11**
**CONVERSION**
**(AGAINST THE EAST PARK DEFENDANTS)**

144.    Plaintiffs re-incorporate all the preceding allegations.

145.    The East Park Defendants wrongfully took control of Plaintiffs' property by seizing their
        camera and memory card.

146.    Ms. Criscione demanded the return of the property.

147.    The East Park Defendants never gave the memory card back to her.

148.    Plaintiffs were injured by the lost use of their property.

**CLAIM 12**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST ALL DEFENDANTS)**

149.    Plaintiffs re-incorporate all the preceding allegations.

150.    Defendants knew that subjecting Ms. Criscione to a criminal investigation and
        prosecution would cause her serious emotional distress.

151.    Defendants subjected Ms. Criscione to a criminal prosecution for exercising her right to
        free speech while she grieved her mother's death.

152.    Defendants pursued this prosecution simply to protect the East Park Defendants'
        reputations and profits.

153.    Defendants' conduct was extreme and outrageous.

154.    Defendants' conduct proximately caused Ms. Criscione serious emotional distress.

**CLAIM 13**
**CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983**
**RETALIATORY ARREST**
**(AGAINST THE BROOK PARK DEFENDANTS)**

155.    Plaintiffs re-incorporate all the preceding allegations.

156. At all times relevant to the Complaint, Ms. Criscione was exercising her clearly established rights under the First Amendment, including her right to free exercise of religion, her right to freedom of speech, her right to freedom of the press, her right to assemble, and her right to petition the government for redress of grievances.

157. The Brook Park Defendants sought to interfere with and impose sanctions for Ms. Criscione's exercise of those rights by subjecting her to criminal prosecution, seeking a restraining order preventing her from speaking further, and attempting to have her imprisoned.

158. Prosecuting Ms. Criscione injured her by restraining, preventing, and impairing the exercise of her rights.

159. Actions such as those taken against Ms. Criscione are likely to chill a person of ordinary firmness from continuing to exercise those rights.

**CLAIM 14**
**CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983**
**MALICIOUS PROSECUTION**
**(AGAINST THE BROOK PARK DEFENDANTS)**

160. Plaintiffs re-incorporate all the preceding allegations.

161. Ms. Criscione was criminally prosecuted for engaging in activities protected under the First and Fourteenth Amendments.

162. The Brook Park Defendants maliciously prosecuted and continued to prosecute Ms. Criscione in the absence of probable cause.

163. The Brook Park Defendants made, influenced, or participated in the decision to prosecute Ms. Criscione.

164. There was no probable cause for the criminal prosecution of Ms. Criscione.

165. Ms. Criscione suffered deprivations of her liberty and irreparable harm because of that prosecution.

166. Ms. Criscione's prosecution resolved in her favor.

### CLAIM 15
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### ABUSE OF PROCESS
### (AGAINST THE BROOK PARK DEFENDANTS)

167. Plaintiffs re-incorporate all the preceding allegations.

168. In the alternative, the Brook Park Defendants set a legal proceeding in motion with probable cause by initiating criminal charges against Ms. Criscione.

169. The Brook Park Defendants perverted that proceeding to accomplish an ulterior purpose for which the proceeding was not designed—including the purpose to silence Ms. Criscione in violation of her rights, protect their reputation, and generate additional profits.

170. Ms. Criscione was directly injured by the wrongful use of process.

### CLAIM 16
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### FALSE ARREST
### (AGAINST THE BROOK PARK DEFENDANTS)

171. Plaintiffs re-incorporate all the preceding allegations.

172. The Brook Park Defendants arrested Ms. Criscione based on her exercise of her First Amendment rights.

173. The Brook Park Defendants knew they lacked probable cause to arrest Ms. Criscione.

174. No officer could have reasonably believed there was probable cause to seize or arrest Ms. Criscione.

## CLAIM 17
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### EQUAL PROTECTION
### (AGAINST THE BROOK PARK DEFENDANTS)

175.    Plaintiffs re-incorporate all the preceding allegations.

176.    In criticizing East Park on social media and engaging in other protected activity, Ms. Criscione was exercising her clearly established constitutional and statutory rights.

177.    Countless people have engaged in conduct similar to Ms. Criscione's without engaging in the same kinds of protected conduct, and they have been permitted to do so without interference from the City of Brook Park and its officers.

178.    The Brook Park Defendants' purpose in prosecuting Ms. Criscione was to retaliate for the exercise of her constituational and statutory rights.

179.    There was no legitimate, important or compelling government interest in prosecuting her.

## CLAIM 18
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS—42 U.S.C. § 1985(3)
### (AGAINST ALL DEFENDANTS)

180.    Plaintiffs re-incorporate all the preceding allegations.

181.    Defendants conspired with each other and with the Berea Municipal Court and its employees with the purpose of depriving Ms. Criscione of the equal protection of the law as she exercised her constitutional and statutory rights.

182.    Defendants' purpose in this conspiracy was to deprive Ms. Criscione of equal privileges and immunities of the law, and to prevent or hinder authorities from securing to all persons the equal protection of the rights Ms. Criscione sought to exercise.

183.    In reaching their agreement, Defendants were motivated by a discriminatory animus against Ms. Criscione, targeting her because of the content of her speech and her opposition to those with relationships to members of the conspiracy.

**PRAYER FOR RELIEF**

Plaintiffs therefore respectfully request the following relief:

A.  Enter judgment in Plaintiffs' favor on all claims for relief;

B.  Declare that Defendants' acts and conduct constitute violations of Article I, Section 11 of the Ohio Constitution and of the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1983 and 1985(3);

C.  Award injunctive relief barring further retaliation against Plaintiffs;

D.  Declare that Defendants are liable for damages on all claims brought against them;

E.  Award full compensatory damages of more than $25,000, including, but not limited to, damages for pain and suffering, mental anguish, and emotional distress that Plaintiffs have suffered and are reasonably certain to suffer in the future;

F.  Award punitive and exemplary damages for Defendants' egregious, willful, and malicious conduct;

G.  Award pre- and post-judgment interest at the highest lawful rate;

H.  Award reasonable attorneys' fees and all other available costs of suit; and

I.  Award all other relief in law or equity that the Court deems equitable, just, and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave., Suite 400
Cleveland, OH 44103
216-912-2195 Phone/Fax
brian.bardwell@speech.law

*Attorney for Plaintiffs Gina Criscione and Estate of Dorothy Mandanici*