Exhibit A



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
**April 21, 2023 16:37**

By: BRIAN BARDWELL 0098423

Confirmation Nbr. 2837222

| | |
|---|---|
| GINA CRISCIONE, ET AL. | CV 23 976445 |
| vs. | |
| LAURA DIVINCENZO, ET AL. | **Judge:** NANCY MARGARET RUSSO |

**Pages Filed:** 23

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **GINA CRISCIONE**, *et al.* <br> *Plaintiffs,* <br> v. <br> **LAURA DIVINCENZO**, *et al.* <br> *Defendants.* | Case No.: 23-CV-976445 <br><br> Judge Nancy Margaret Russo |
| **AMENDED COMPLAINT (JURY DEMAND ENDORSED HEREON)** ||

## PARTIES

1.  Dorothy Mandanici was a resident at the East Park Care Center from 2017 until 2020, shortly before her untimely death.

2.  Plaintiff Gina Criscione is the daughter of Dorothy Mandanici. Ms. Criscione was Ms. Mandanici's legal guardian and is the personal representative of her estate.

3.  Defendant East Park Care Center is a business that engages primarily in the supply of nursing-home residence and care.

4.  Defendant Laura DiVincenzo was the owner of East Park Care Center at the time of Ms. Mandanici's death.

5.  Defendant Sara Thurmer is or was the administrator of East Park Care Center at the time of Ms. Mandanici's death.

6.  John Does 1-10 are predecessors in interest to East Park Care Center. Their identities could not be discovered by the time of this filing.

7.  John Does 11-20 are successors in interest to East Park Care Center. Their identities could not be discovered by the time of this filing.

8. John Does 21-40 were employees or contractors for East Park Care Center at the time Ms. Mandanici was a resident. Their identities could not be discovered by the time of this filing.

9. Defendant City of Brook Park is a political subdivision organized under the laws of the State of Ohio.

10. Defendants George Sakellakis, Harold Duncan, Ryan Walsh, and Thomas Sensel are officers of the Brook Park Police Department.

**JURISDICTION & VENUE**

11. This Court has jurisdiction under Article IV, Section 4 of the Ohio Constitution and Ohio Rev. Code § 2305.01.

12. This Court has personal jurisdiction over all Defendants, who reside in or conduct business in Cuyahoga County, under Ohio Rev. Code § 2307.382(1), (2), (3), (6), (7), and (8).

13. Venue is appropriate in this Court under Civ. R. 3(C)(3), (6) and (7).

**FACTS**

14. Ms. Mandanici was a lifelong resident of Brook Park, Ohio, where she raised Ms. Criscione and her two other children.

15. Throughout her adulthood, Ms. Criscione was extraordinarily close to her mother. They would spend hours talking on the phone daily as they cooked, ate meals, and watched movies.

16. After a brief stay at Southwest General Hospital, Ms. Mandanici transitioned to long-term care at East Park Care Center, which Ms. Criscione had selected for her based on its reputation for caring for patients with dementia.

17. When Ms. Mandanici arrived at East Park around April 2017, Ms. Criscione continued to visit or telephone her mother several times daily, enjoying meals and conversations of varying lengths with her almost every morning and every evening.

18. For most of that stay, Ms. Criscione could observe that East Park was providing her mother appropriate care, but things changed quickly after Defendant DiVincenzo took over the facility in mid- to late 2018.

19. Almost immediately after Defendant DiVincenzo took over, employees began to leave, complaining that Defendant DiVincenzo was cutting staff, refusing to issue paychecks for the employees who remained, failing to order supplies they needed, and causing other problems.

20. Soon after Ms. DiVincenzo's arrival, the long-time employees who knew East Park's patients and understood their needs were replaced largely with contractors who rotated in and out, and routinely failed to even read patients' charts before treating them.

**East Park deploys Ms. Criscione to assist overstretched employees.**

21. After the change in ownership, Ms. Criscione remained a regular presence at East Park, and most of the regular employees in her mother's building knew her.

22. East Park was short-staffed on multiple occasions after Ms. DiVincenzo's arrival.

23. On some of those occasions, East Park employees used Ms. Criscione or her sister to perform work or services.

24. For instance, East Park employees repeatedly asked Ms. Criscione to fetch fresh linens from the laundry room.

25. East Park employees repeatedly asked Ms. Criscione to pull supplies for them from the supply closet.

26. East Park employees repeatedly asked Ms. Criscione to assist her mother in the bathroom.

27. East Park employees repeatedly asked Ms. Criscione to supervise nearby patients while nurses ran other errands.

28. Defendant Thurmer asked Ms. Criscione to assist in finding and recruiting a new director of nursing.

29. Because they wanted to help their mother and her neighbors, Ms. Criscione and her sister agreed to perform these tasks.

30. East Park accepted compensation from Ms. Mandanici and other parties to perform these tasks.

**Ms. Criscione reports instances of suspected neglect**

31. Despite her additional efforts, Ms. Criscione noticed that various issues with her mother's care were going unaddressed after Ms. DiVincenzo's arrival, and she began hearing about problems from East Park staff members and from the families of other residents. For instance:

    a.    Ms. Mandanici's dentures repeatedly went missing. On one occasion, an aide found them in another patient's mouth; on another occasion, Ms. Criscione found them embedded in her mother's back.

    b.    The air conditioner in Ms. Mandanici's room would blow black chunks of mold into her bed.

    c.    East Park regularly left Ms. Mandanici unattended for so long that Ms. Criscione and her sister would find her sitting in urine. On dozens of occassions, she had been left unattended so long that the urine had soaked through her adult diaper, through her clothes, and into her chair or bed.

d.     Because Ms. Mandanici was left stationary in her own urine for so much time and with such frequency, she developed severe pressure ulcers on her buttocks.

e.     Employees repeatedly left urine-soaked clothes lying around Ms. Mandanici's room and mixed in with other laundry.

f.     Ms. Criscione repeatedly discovered fecal matter on toilet lids, sheets, and other surfaces when she entered the room.

g.     Staff routinely placed compression socks on Ms. Mandacini improperly, causing edema in her legs and threatening to aggravate her atrial fibrillation.

h.     Staff repeatedly failed to properly dry Ms. Mandanici after her showers, leading to yeast infections that spread across her groin.

i.     On one occasion, Ms. Criscione found her mother sitting in her wheelchair while still tangled in the harness from her Hoyer lift, which was wedged in her buttocks and twisted between her legs.

j.     On another occasion, Ms. Criscione discovered large bruises on her mother's legs. Although staff initially said Ms. Mandanici had bumped into something, Ms. Criscione later learned that aides had injured her mother while improperly restraining her. Because the bruises were not properly treated, one of them eventually began oozing blood.

k.     Although dementia patients require rigid schedules and familiar caregivers, East Park continued to cut staff so sharply that Ms. Mandanici eventually received care primarily from rotating agency aides. On more than one occasion, using unfamiliar aides resulted in Ms. Mandanici panicking during a shower and injuring her arm.

l.      Eventually, aides began refusing to give patients food or even water on request. East Park allowed Ms. Mandanici to become so dehyrdated that Ms. Criscione and her sister were eventually forced to call an ambulance to transport her to a hospital.

m.     East Park repeatedly prescribed and overprescribed drugs for Ms. Mandanici. Ms. Criscione complained about those drugs and warned that those drugs would cause unacceptable side effects. She demanded to be notified before any changes in her mother's prescriptions, but East Park continued to increase medication without consent and aggravated her conditions.

32.    Ms. Criscione was aware of many of these issues through her own personal observation, but many employees were also discreetly alerting her to other problems.

33.    On behalf of Ms. Mandanici, Ms. Criscione repeatedly reported these issues directly to East Park and demanded better care.

34.    Ms. Criscione likewise disclosed East Park's neglect in postings online and in reports to the Ohio Department of Health.

35.    Many of East Park's employees and contractors likewise reported suspected cases of neglect to East Park supervisors.

**Instead of resolving reports of suspected neglect, East Park retaliates against the reporters.**

36.    Rather than resolving these problems, the East Park Defendants began to retaliate.

37.    East Park retaliated against workers who reported neglect at its facilities by taking adverse employment actions against them.

38.    East Park likewise retaliated against Ms. Mandanici and Ms. Criscione.

39. They began by attempting to cut Ms. Criscione off from her mother and from the staff members caring for her.

40. Around March 2020, Defendant Thurmur called a meeting with East Park staff members and instructed them not to communicate with Ms. Criscione.

41. Defendant Thurmur ordered them to stop taking Ms. Criscione's calls, to block her on social media, to avoid her in personal interactions, and to refuse to put her phone calls through to her mother.

42. Defendant Thurmur went as far as taking employees' phones and deleting Ms. Criscione's number to ensure they couldn't report any more problems to her.

43. Ms. Criscione sought to continue closely monitoring her mother's condition, but she was severely limited in her ability to do so.

44. Soon after, Ms. Mandanici suddenly needed to be hospitalized.

45. Also in March 2020, Ms. Criscione requested her mother's medical records from East Park so she could evaluate its treatment of her mother.

46. East Park refused to produce those records.

47. Not long after, East Park prohibited Ms. Criscione from entering the facility and instructed employees not to connect Ms. Criscione's phone calls to her mother. Ms. Criscione was relegated to visiting her mother through a bedroom window.

48. Medical professionals have long known that social isolation has adverse health effects.

49. That body of research has only grown more robust over the last several decades, and it has been largely undisputed for the last half century that a lack of regular contact with family or friends can seriously diminish a patient's cognitive condition.

50.   Acting on behalf of Ms. Mandanici, Ms. Criscione alerted East Park officials to these concerns, warning that isolating her mother threatened to accelerate her cognitive decline and cause all manner of other physical problems.

51.   East Park ignored those warnings, and its employees continued to limit Ms. Criscione's ability to contact her mother.

52.   East Park furthered its retaliation around April or May 2020 by initiating eviction proceedings against Ms. Mandanici, relying on false statements that she was a threat to its nurses and false statements about her medical history, symptoms, and treatment.

53.   The isolation from her daughter left Ms. Mandanici feeling alone, abandoned, and confused.

54.   Both her physical and cognitive condition began to decline rapidly—and predictably—as Ms. Criscione raced to find a new home for her mother before East Park's eviction date.

55.   All the while, East Park continued to endanger Ms. Mandanici's health by keeping her isolated and by failing to provide her adequate food and water.

56.   In the last eight to ten weeks of Ms. Mandanici's stay at East Park, that lack of food and water caused her to lose approximately a quarter of her body weight.

57.   When Ms. Criscione was finally able to move her to a new home at Mt. Alverna, Ms. Mandanici weighed only 97 pounds.

58.   Although Mt. Alverna provided far better care, Ms. Mandanici arrived there too late. Her condition had already irreversibly deteriorated, and she died soon after on June 20, 2020.

**Ms. Criscione continues to blow the whistle on East Park;
East Park continues to retaliate against her**

59.   Even after Ms. Mandanici died, East Park and its officials continued to retaliate against her and her daughter for blowing the whistle on them.

60. They continued to refuse to produce medical records that would have allowed Ms. Criscione to evaluate the quality of care they provided.

61. They confiscated property that Ms. Criscione had placed in her mother's room and never returned it to her, despite her demands.

62. Months after Ms. Mandanici's death, Defendant DiVincenzo discovered that Ms. Criscione had reported the conditions at East Park to the Ohio Department of Health and discussed them online.

63. Based on those communications, Defendant DiVincenzo and Defendant Thurmer conspired with officials at the City of Brook Park to silence Ms. Criscione. Ms. Criscione does not know the dates on which the Defendants entered into this conspiracy.

64. Defendant DiVincenzo complained to the City on September 28, 2020, that Ms. Criscione had attacked Ms. Thurmer's reputation and professional standing, and that "people in the industry" had seen her posts.

65. Ms. Criscione has a First Amendment right to criticize Ms. Thurmer's reputation and professional standing.

66. Defendant DiVincenzo likewise complained that Ms. Criscione was "seen picketing" against East Park.

67. Ms. Criscione has a First Amendment right to picket against East Park.

68. Defendant DiVincenzo falsely stated that Ms. Criscione had returned to drive around East Park months after her mother's death.

69. Defendant DiVincenzo sought to have Ms. Criscione prosecuted for telecommunications harassment based on her online statements.

70.   As evidence of this harassment, she turned over copies of Ms. Criscione's statements that frightened her the most.

71.   Those statements included:

    a.    "What are you hiding, East Park?"

    b.    "Lunch on Mondays and Thursdays. I'll be walking now, for lunch for the people at East Park in hope they feed them."

    c.    "This place is bad… the worst of the worst!"

    d.    "Read my Google review and tell me what you think of this place?"

72.   Defendant DiVincenzo then directed Defendant Thurmer to prepare a written statement claiming that she felt "very threatened" by Ms. Criscione's public disclosures that East Park was neglecting its patients.

73.   Based on those complaints, Defendant City of Brook Park initiated a criminal prosecution of Ms. Criscione.

74.   The City was aided by the Brook Park Defendants, who gathered evidence that Ms. Criscione had criticized East Park and its employees to support criminal charges against her.

75.   Based on her protected speech, the City and its officers approved criminal charges against Ms. Criscione: one count of telecommunications harassment and one count of menacing by stalking.

76.   Both charges are first-degree misdemeanors, each carrying a maximum penalty of six months in jail and a $1,000 fine.

77.  After approving those charges on October 15, 2020, police officers required Ms. Criscione to make a trip to the station house where they would issue her a citation and initiate her prosecution for those crimes.

78.  As a result of those charges, the court entered a restraining order barring Ms. Criscione from further discussing her suspicions that East Park had neglected her mother and other patients and restricting her ability to travel.

79.  Counsel for Ms. Criscione alerted the City to the First Amendment defects in the case, but its prosecutor, Peter Sackett, and his supervisor, Law Director Carol Horvath refused to drop the charges.

80.  Ms. Criscione filed a motion to dismiss the charges based on those First Amendment defects and the lack of probable cause.

81.  The court granted that motion and dismissed the case without prejudice on March 11, 2021.

82.  Ms. Criscione's counsel sought assurances from the City that it would not refile the charges, but the prosecutor held open the possibility of refiling charges against her until the statute of limitations had lapsed.

**Plaintiffs suffered injuries as a result of Defendants' misconduct**

83.  Ms. Mandanici and her family repeatedly warned the East Park Defendants about the deficiencies in their care, but the East Park Defendants refused to address the problems they raised. Ms. Mandanici suffered injuries as a result of their reckless, intentional, or willful or wanton misconduct.

84.  The threat of incarceration for complaining about her mother's care caused Ms. Criscione severe emotional distress and required repeated visits to medical professionals to manage resulting heart and blood-pressure problems.

85. Ms. Criscione incurred tens of thousands of dollars in attorneys' fees to defend herself against the charges.

86. As a direct and proximate result of Defendants' actions, Ms. Criscione has suffered and continues to suffer economic and non-economic damages for which they are liable.

87. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**Ms. Criscione's injuries were the result of municipal policy**

88. Ms. Criscione's prosecution was not the result of rogue employees of the City. Rather, it was the result of City policies or customs made by employees whose edicts or acts represent official policy.

89. For instance, an employee of the City's Law Department—believed to be either Law Director Carol Horvath or prosecutor Peter Sackett—directed the police to prepare charges against Ms. Criscione consistent with Ms. DiVincenzo and Ms. Thurmer's requests.

90. Likewise, the decision to charge Ms. Criscione was the result of the City's deliberate indifference to First Amendment rights and its failure to adequately train and supervise its employees on the protection of those rights.

91. Further, Ms. Horvath's approval of Mr. Sackett's prosecution of Ms. Criscione constituted a ratification of his actions.

### CLAIM 1
### SURVIVORSHIP ACTION
### (AGAINST THE EAST PARK DEFENDANTS)

92. Plaintiffs re-incorporate all the preceding allegations.

93. Ms. Mandanici died on June 20, 2020.

94. The East Park Defendants' wrongful acts, neglect, or default caused Ms. Mandanici's death, along with pain and suffering before her death.

95. The East Park Defendants' wrongful acts, neglect, or default would have entitled Ms. Mandanici to maintain an action and recover damages if death had not ensued.

96. Ms. Mandanici was survived by Ms. Criscione and two other children.

97. Ms. Mandanici's survivors suffered damages as a result of her death.

## CLAIM 2
### WRONGFUL DEATH
### (AGAINST THE EAST PARK DEFENDANTS)

98. Plaintiffs re-incorporate all the preceding allegations.

99. The East Park Defendants' wrongful acts, neglect, or default caused Ms. Mandanici's death.

100. Ms. Mandanici would have been entitled to recover damages for those acts were she alive today.

## CLAIM 3
### VIOLATIONS OF THE NURSING HOME BILL OF RIGHTS
### (OHIO REV. CODE CHAPTER 3721)
### (AGAINST THE EAST PARK DEFENDANTS)

101. Plaintiffs re-incorporate all the preceding allegations.

102. The Nursing Home Bill of Rights protects a resident's right to—among other things—adequate and appropriate medical treatment and nursing care, a safe and clean living environment, unrestricted communications with family, and unrestricted access to property.

103. The East Park Defendants' negligent and intentional conduct resulted in violations of these and other rights Ms. Mandanici enjoyed under the Nursing Home Bill of Rights.

104. Ms. Mandanici suffered damages as a result of the East Park Defendants' conduct.

## CLAIM 4
### MALICIOUS PROSECUTION
### (AGAINST ALL DEFENDANTS)

105.   Plaintiffs re-incorporate all the preceding allegations.

106.   Defendants acted maliciously in instituting or continuing Ms. Criscione's criminal
       prosecution.

107.   They manufactured allegations against her in an effort to silence her and protect their
       business.

108.   Ms. Criscione's criminal prosecution was not supported by probable cause.

109.   Her online speech and picketing were protected by the First Amendment and not
       evidence of any crime.

110.   Ms. Criscione's criminal prosecution terminated in her favor.

111.   The Berea Municipal Court dismissed all the charges brought against her.

## CLAIM 5
### ABUSE OF PROCESS
### (AGAINST ALL DEFENDANTS)

112.   Plaintiffs re-incorporate all the preceding allegations.

113.   In the alternative, Defendants set a legal proceeding in motion with probable cause by
       initiating criminal charges against Ms. Criscione.

114.   Defendants perverted that proceeding to accomplish an ulterior purpose for which the
       proceeding was not designed—including the purpose to silence Ms. Criscione, protect
       their reputation, and generate additional profits.

115.   Ms. Criscione was directly injured by the wrongful use of process.

116.   Among other injuries, she suffered serious physical and mental-health consequences as a
       result of the prosecution, and she incurred substantial debts.

## CLAIM 6
### WHISTLEBLOWER RETALIATION (OHIO REV. CODE § 3721.24)
### (AGAINST ALL DEFENDANTS)

117.    Plaintiffs re-incorporate all the preceding allegations.

118.    Ohio Rev. Code § 3721.24 forbids retaliation on the basis of a report of suspected abuse, neglect or exploitation of a resident of a nursing home.

119.    Ms. Mandanici and Ms. Criscione each made good-faith reports of suspected abuse, neglect, or exploitation of a resident at East Park.

120.    Both complained about the quality of care East Park was providing, as that care threatened to and did result in serious physical harm to East Park's residents.

121.    Defendants retaliated against Ms. Mandanici and Ms. Criscione for making those good-faith reports of suspected abuse, neglect, or exploitation.

122.    That retaliation included isolating Ms. Mandanici from her daughter, refusing to produce her medical records, confiscating Ms. Criscione's personal property, and filing criminal charges against Ms. Criscione.

## CLAIM 7
### ELECTRONIC-MONITORING DISCRIMINATION (OHIO REV. CODE § 3721.65)
### (AGAINST ALL DEFENDANTS)

123.    Plaintiffs re-incorporate all the preceding allegations.

124.    Ohio Rev. Code § 3721.65 forbids retaliation on the basis of a resident's decision to authorize the installation and use of an electronic-monitoring device.

125.    Ms. Mandanici authorized the installation and use of an electronic-monitoring device in her room.

126.    Shortly after learning about that decision, Defendants initiated proceedings to discharge Ms. Mandanici.

127.  The decision to discharge Ms. Mandanici and prosecute her daughter was in retaliation for that decision.

## CLAIM 8
### FALSIFICTION
### (AGAINST ALL DEFENDANTS)

128.  Plaintiffs re-incorporate all the preceding allegations.

129.  Under Ohio Rev. Code § 2921.13, "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made … in any official proceeding [or] with purpose to mislead a public official in performing the public official's official function."

130.  Defendants knowingly made false statements to public officials at the Ohio Department of Health and the City of Brook Park during an official proceeding with purpose to mislead them in performing their official functions.

## CLAIM 9
### INTIMIDATION (OHIO REV. CODE § 2921.03)
### (AGAINST ALL DEFENDANTS)

131.  Plaintiffs re-incorporate all the preceding allegations.

132.  Under Ohio Rev. Code § 2921.03, "[n]o person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, a party official, or an attorney or witness involved in a civil action or proceeding in the discharge of the person's the duties of the public servant, party official, attorney, or witness."

133.    Defendants knowingly used a materially false or fraudulent writing with malice, bad

faith, wantonness, or recklessness, in an attempt to influence the public servants at the

Ohio Department of Health and the City of Brook Park in the discharge of its duties.

CLAIM 10
INTERFERENCE WITH CIVIL RIGHTS
(AGAINST ALL DEFENDANTS)

134.    Plaintiffs re-incorporate all the preceding allegations.

135.    Article I, Section 11 of the Ohio Constitution protects Ms. Criscione from retaliation

based on the exercise of her right to "freely speak, write, and publish [her] sentiments on

all subjects."

136.    Under Ohio Rev. Code § 2921.45, "[n]o public servant, under color of the public

servant's office, employment, or authority, shall knowingly deprive, or conspire or

attempt to deprive any person of a constitutional or statutory right."

137.    Under Ohio Rev. Code § 2923.03, "[n]o person, acting with the kind of culpability

required for the commission of an offense, shall … (1) Solicit or procure another to

commit the offense; (2) Aid or abet another in committing the offense; (3) Conspire with

another to commit the offense in violation of section 2923.01 of the Revised Code; (4)

Cause an innocent or irresponsible person to commit the offense."

138.    Defendants knowingly solicited another to deprive Ms. Criscione of her right to freely

speak, write, and publish her sentiments, including by their request that the City of Brook

Park and its officers criminally charge Ms. Criscione for criticizing them and by asking

the Ohio Department of Health to approve its eviction of Ms. Mandanici.

139.    Defendants knowingly aided or abetted another in depriving Ms. Criscione of her right to

freely speak, write, and publish her sentiments, including by participating in the City's

investigation and prosecution.

140. Defendants conspired with another to deprive Ms. Criscione of her right to freely speak, write, and publish her sentiments, including by coordinating with the City in its efforts to investigate and prosecute her and by coordinating with the Ohio Department of Health to evict Ms. Mandanici.

141. Defendants caused an innocent or irresponsible person to deprive Ms. Criscione of her right to freely speak, write, and publish her sentiments, including by causing the Ohio Department of Health to approve a retaliatory eviction, and by causing the Berea Municipal Court to bring her up on charges and restrain her from speaking about Defendants.

### CLAIM 11
### CONVERSION
### (AGAINST THE EAST PARK DEFENDANTS)

142. Plaintiffs re-incorporate all the preceding allegations.

143. The East Park Defendants wrongfully took control of Plaintiffs' property by seizing their camera and memory card.

144. Ms. Criscione demanded the return of the property.

145. The East Park Defendants never gave her the memory card.

146. Plaintiffs were injured by the lost use of their property.

### CLAIM 12
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

147. Plaintiffs re-incorporate all the preceding allegations.

148. Defendants knew that subjecting Ms. Criscione to a criminal investigation and prosecution would cause her serious emotional distress.

149. Defendants' conduct—including but not limited to perverting the criminal-justice system to cover up their neglect, protect their reputations, and increase their profits—was extreme and outrageous.

150. Defendants' conduct proximately caused Ms. Criscione serious emotional distress.

### CLAIM 13
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### RETALIATORY ARREST
### (AGAINST THE BROOK PARK DEFENDANTS)

151. Plaintiffs re-incorporate all the preceding allegations.

152. At all times relevant to the Complaint, Ms. Criscione was exercising her clearly established rights under the First Amendment, including her right to free exercise of religion, her right to freedom of speech, her right to freedom of the press, her right to assemble, and her right to petition the government for redress of grievances.

153. The Brook Park Defendants sought to interfere with and impose sanctions for Ms. Criscione's exercise of those rights by subjecting her to criminal prosecution, seeking a restraining order preventing her from speaking further, and attempting to have her imprisoned.

154. Prosecuting Ms. Criscione injured her by restraining, preventing, and impairing the exercise of her rights.

155. Actions such as those taken against Ms. Criscione are likely to chill a person of ordinary firmness from continuing to exercise those rights.

### CLAIM 14
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### MALICIOUS PROSECUTION
### (AGAINST THE BROOK PARK DEFENDANTS)

156. Plaintiffs re-incorporate all the preceding allegations.

157.    Ms. Criscione was criminally prosecuted for engaging in activities protected under the First and Fourteenth Amendments.

158.    The Brook Park Defendants maliciously prosecuted and continued to prosecute Ms. Criscione in the absence of probable cause.

159.    The Brook Park Defendants made, influenced, or participated in the decision to prosecute Ms. Criscione.

160.    There was no probable cause for the criminal prosecution of Ms. Criscione.

161.    Ms. Criscione suffered deprivations of her liberty and irreparable harm because of that prosecution.

162.    Ms. Criscione's prosecution resolved in her favor.

### CLAIM 15
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### ABUSE OF PROCESS
### (AGAINST THE BROOK PARK DEFENDANTS)

163.    Plaintiffs re-incorporate all the preceding allegations.

164.    In the alternative, the Brook Park Defendants set a legal proceeding in motion with probable cause by initiating criminal charges against Ms. Criscione.

165.    The Brook Park Defendants perverted that proceeding to accomplish an ulterior purpose for which the proceeding was not designed—including the purpose to silence Ms. Criscione, protect their reputation, and generate additional profits.

166.    Ms. Criscione was directly injured by the wrongful use of process.

### CLAIM 16
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### FALSE ARREST
### (AGAINST THE BROOK PARK DEFENDANTS)

167.    Plaintiffs re-incorporate all the preceding allegations.

168. The Brook Park Defendants arrested Ms. Criscione based on her exercise of her First Amendment rights.

169. The Brook Park Defendants knew they lacked probable cause to arrest Ms. Criscione.

170. No officer could have reasonably believed there was probable cause to seize or arrest Ms. Criscione.

## CLAIM 17
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS: 42 U.S.C. § 1983
### EQUAL PROTECTION
### (AGAINST THE BROOK PARK DEFENDANTS)

171. Plaintiffs re-incorporate all the preceding allegations.

172. In criticizing East Park on social media and engaging in other activity protected by the First Amendment, Ms. Criscione was exercising her clearly established constitutional and statutory rights.

173. Countless similarly situated people whose messages have different content have been free to do so without interference from the City of Brook Park and its officers.

174. The Brook Park Defendants' purpose in prosecuting Ms. Criscione was to retaliate for the exercise of her constitutional and statutory rights.

## CLAIM 18
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS—42 U.S.C. § 1985(3)
### (AGAINST ALL DEFENDANTS)

175. Plaintiffs re-incorporate all the preceding allegations.

176. The Brook Park Defendants conspired with each other and with the Berea Municipal Court and its employees with the purpose of depriving Ms. Criscione of the equal protection of the law as she exercised her constitutional and statutory rights.

177. The Brook Park Defendants' purpose in this conspiracy was to deprive Ms. Criscione of equal privileges and immunities of the law, and to prevent or hinder authorities from securing to all persons the equal protection of the rights Ms. Criscione sought to exercise.

178. In reaching their agreement, the Brook Park Defendants were motivated by a discriminatory animus against Ms. Criscione, targeting her because of the content of her speech and her opposition to those with relationships to members of the conspiracy.

## PRAYER FOR RELIEF

Plaintiffs therefore respectfully request the following relief:

A. Enter judgment in Plaintiffs' favor on all claims for relief;

B. Declare that Defendants' acts and conduct constitute violations of Article I, Section 11 of the Ohio Constitution and of the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1983 and 1985(3);

C. Award injunctive relief barring further retaliation against Plaintiffs;

D. Declare that Defendants are liable for damages on all claims brought against them;

E. Award full compensatory damages of more than $25,000, including, but not limited to, damages for pain and suffering, mental anguish, and emotional distress that Plaintiffs have suffered and are reasonably certain to suffer in the future;

F. Award punitive and exemplary damages for Defendants' egregious, willful, and malicious conduct;

G. Award pre- and post-judgment interest at the highest lawful rate;

H. Award reasonable attorneys' fees and all other available costs of suit; and

I. Award all other relief in law or equity that the Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
1265 West Sixth Street, Suite 400
Cleveland, OH 44113-1326
216-912-2195 Phone/Fax
brian.bardwell@speech.law

*Attorney for Plaintiffs Gina Criscione and Estate of Dorothy Mandanici*

## CERTIFICATE OF SERVICE

I certify that on April 21, 2023, this document was served on opposing counsel as provided by Civ. R. 5(B)(2)(f).

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
*Attorney for Plaintiffs Gina Criscione and Estate of Dorothy Mandanici*