IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| GINA CRISCIONE, et al. | ) | CASE NO. CV 23 976445 |
| | ) | |
| Plaintiffs | ) | JUDGE NANCY MARGARET RUSSO |
| | ) | |
| vs. | ) | **AFFIDAVIT OF LAURA DiVINCENZO** |
| | ) | |
| LAURA DiVINCENZO, et al | ) | |
| | ) | |
| Defendants | ) | |

The undersigned, being duly sworn, states as follows:

1. I am over 18 years of age, a resident of Cuyahoga County, Ohio and have personal knowledge of the facts sworn to herein.

2. I am a named defendant in this lawsuit and I was the President of East Park Retirement Community, Inc. at times relevant to this litigation.

3. Attached hereto as Exhibit 1 is a true and accurate copy of the Report and Decision of the Hearing Officer that East Park received in the Matter of the Discharge of Dorothy Mandanici from East Park Care Center

*FURTHER AFFIANT SAYETH NAUGHT.*

_____
Laura DiVincenzo

*SWORN TO BEFORE ME* and subscribed in my presence this 24th day of July, 2023.

_____
Notary Public

<<HCP #1290796-v1>>

Mara Danielle Oliveras
Notary Public
State of Ohio
Certificate # 2023-RE-863557
My Commission Expires
May 08, 2028

EXHIBIT
B

STATE OF OHIO
OHIO DEPARTMENT OF HEALTH

IN THE MATTER OF THE DISCHARGE : Date of Hearing: May 5, 2020
OF **DOROTHY MANDANICI** FROM :
**EAST PARK CARE CENTER** : Matthew P. Moriarty, Esq.
: Hearing Officer
:

## REPORT AND DECISION OF THE HEARING OFFICER

APPEARANCES:

**Gina Criscione**
*Daughter of Resident*

**Andrew Kinkead**
LONG TERM CARE OMBUDSMAN
*Ombudsman*

**Sara A. Thurmer**
EAST PARK CARE CENTER
*BA, LNHA-Administrator*

**Robin Mellis**
EAST PARK CARE CENTER
*Interim DON*

**Sarah George**
EAST PARK CARE CENTER
*LPN-Unit Manager*

**Brenda Plum**
EAST PARK CARE CENTER
*Social Services Director*

**Danielle Rebrovich**
EAST PARK CARE CENTER
*Administrator-In-Training*



Electronically Filed 07/24/2023 13:34 / MOTION / CV 23 976441 / Confirmation Nbr. 2917030 / BATCH

**INTRODUCTION:**

This is a resident discharge matter. Sara Thurmer, Administrator of East Park Care Center ("East Park"), issued a 30-day discharge notice on April 23, 2020 with regard to Resident Dorothy Mandanici ("NoD"). The notice did not give a target discharge date, but 30 days would be Saturday May 23, 2020. On April 29, 2020, Ombudsman Andrew Kinkead requested a hearing. Subsequently this hearing officer was appointed and a hearing scheduled for May 5, 2020. This matter came on for hearing as scheduled.

Because of the COVID-19 pandemic, the usual pre-hearing and hearing procedures were modified. I issued the scheduling letter by electronic and certified mail on May 1, 2020 and scheduled the hearing for May 5, 2020. The hearing proceeded as scheduled by audio conference call using the ODH dial-in system. The individuals present at the hearing are listed in the Appearances section, above. No one objected to the time or manner of proceeding.

The facility alleges one reason for the request for discharge/transfer; "the resident's welfare and the facility cannot meet the resident's needs." The transfer destination in the NoD is Berea Alzheimer's Center.

**FINDINGS OF FACT:**

Dorothy Mandanici is an 87 year old widow. She has a daughter, Gina Criscione, who is also her Guardian. Mrs. Mandanici was admitted to East Park on April 14, 2017. She has numerous medical diagnosis. For our purposes the key diagnosis, present in the charts from at least the Spring of 2019, is medical/psychiatric -"dementia with behaviors."[1] (See East Park and

---

[1] Dementia with behaviors is ICD (10) coded F 02.81. It means she has a major neurocognitive disorder (dementia), with associated aggressive, combative or violent behavior.

Resident Exhibits) East Park is licensed for long term care and can handle what Ms. Thurmer referred to as "low to low moderate" dementia patients.

East Park submitted one PDF as an exhibit prior to the hearing, a collection of notes from the fall of 2019 up until early May, 2020. Most are from nurses, therapists or STNAs. (See notes in East Park exhibit on: 2019: 11/20, 12/13, 12/23; and 2020: 1/6, 2/27, 3/14, 3/26, 4/16, 4/17, 4/18, 4/19, 4/28, 4/30.) Some are from representatives of doctors (PCP and Geropsychiatry), such as physicians' assistants or nurse practitioners. Also, there was a separate physician's note appended to the NoD. After the hearing East Park submitted additional Geropsychiatry notes from the Spring of 2019 into early 2020. The notes collectively paint a picture of a resident who started with occasional bouts of aggression, mostly verbal, and who slowly over time became increasingly more aggressive and difficult to redirect. In the last five months she has become increasingly verbally and physically abusive to staff, is sometimes combative, sometimes refuses to co-operate, is sometimes difficult to feed, and sometimes refuses her medications. (See East Park Exhibits and Dr. Dohar letter of 4/23/20.) At the same time, she has been prescribed and given increasingly large doses of Depakote.[2] It appears from the prescription pads provided by East Park that Mrs. Mandanici probably started her Depakote prescription in the third week of May, 2019. It was 125mg once daily.

I find approximately eighteen instances of encounters with GeroPsych Associates. From the outset until early 2020 these were considered counseling visits. Here is a snapshot of the findings:

June 14, 2019 - Mrs Mandanici was unable to engage in ordinary verbal interaction and engaged in repetitive questions.

---

[2] Depakote is an anti-convulsant use to treat seizures, as well as migraines and manic episodes in bipolar disorder. It is also used in some Alzheimer's patients to control various "behaviors." It is unclear who first prescribed it, or when.

3

June 19, 2019 - The staff reported that she was "still combative at night with care and verbally abusive." Her Depakote was changed to twice daily.

June 28, 2019 - They noted her as being polite and engaging but wasn't able to engage in ordinary verbal interaction. Because of her forgetfulness, she engaged in repetitive questions, a pattern which carries forward into future visits.

July 25, 2019 - She presented to the therapists as confused and agitated. She was disoriented and difficult to reorient. Ms. Criscione was present at the session and reported that her mother had been resistant to bathing.

August 14, 2019 - There wasn't a significant change in her behaviors, and she was still yelling out and getting agitated.

August 22, 2019 - Mrs. Mandanici was confused but pleasant.

September 5, 2019 - At this visit, Ms. Criscione was present and reported that her mother had been combative in the evenings with the staff.

September 11, 2019 - The staff reported that she was yelling out and cursing. Medication compliant and re-directable. She was somewhat irritated and not cooperative with the therapists.

September 20, 2019 - She was confused but pleasant

October 4, 2019 - At that visit, she was confused, but pleasant, although there were some problems in communication. She was, understandably, concerned about her forgetfulness.

October 18, 2019 - The history reveals that the patient had become more aggressive, threatening and physically intimidating. She was unable to engage in ordinary verbal interaction, her communication was complicated by verbal abuse.

November 1, 2019 - Mrs. Mandanici was warm and friendly, but there were communication problems in the counseling session.

4

November 15, 2019 - Mrs. Mandanici "presented as angry and rude." She was "...unable to engage in ordinary verbal interaction." They also noted some social inappropriateness and combativeness with the staff. The notes also contained a reference to the fact that the patient struggles with "intense emotions like anger." At that point, counseling sessions were to continue

January 1, 2020 – Notes say Mrs. Mandanici was not dangerous, but was irritable and agitated. Depakote had helped moderate her "behaviors." The doctor, through the P.A., increased the dose to 250 mg. twice a day, which is double the dose and double the frequency of its inception eight months before.

January 10, 2020 – Notes indicating that by then, counseling had been " terminated because patient's cognitive impairment prevents further benefits." That note is electronically signed by a psychologist and a mental health therapist. It is clear, therefore, that at least in the eyes of those professionals, Mrs Mandanici had deteriorated

January 29, 2020 – The staff reported the baseline behaviors with no significant change. Specifically, she had ongoing behaviors and was resistant to care at times. She was not listed as being dangerous. It was believed at that point that the Depakote might be helping some of her aggression and agitation.

February 26, 2020 - The history from the staff included reports of her yelling and being "snarky," but "nothing unusual for her." At that point, they believed that her behavior had improved since starting Depakote.

Because of the COVID-19 pandemic and the State-issued orders, the last in-person visits for family at East Park were approximately March 13, 2020. Ms. Criscione testified that her last visit with her mother in person was March 11, 2020.

5

The Resident's exhibit is a two-page progress note written by a nurse practitioner on March 19 & 24, 2020. In it she writes that "nursing reports no behavioral issues." It is not clear whom she interviewed, but the nursing notes and incident reports listed above were happening before and after this notation. On March 20th, Ms. Criscione declined to approve further psychiatric services.

By April 29th Ms. Criscione reversed course and approved psychiatric services. The record states that "... She said she now realizes that her Mom needs psychiatric intervention for herself and others She said she did not realize how bad things had gotten." (See progress note, 4/29/20.)

The Geropsychiatrist's P.A. saw Mrs. Mandanici on April 29th and wrote notes. She was listed as not dangerous on the form, but the narrative notes said that "R behavior is causing her distress to the point where it is difficult to give the proper care such as bathing and dressing...." Mrs. Mandanici's Depakote dose was increased yet again, in an effort to better control her behaviors. (She was now on 250 mg. three times a day.) Finally, on April 23rd, the Medical Director, Dr Dohar, wrote a letter to Ms. Criscione, recommending transfer to "a more appropriate setting."

The primary East Park witness regarding Mrs. Mandanici's condition was Sarah George, LPN, the manager of the unit in which Mrs. Mandanici lives. She has seen a number of changes over the last five months, all of which have already been mentioned. These encounters tend to occur at the time of showering or other patient care, and they have increased in frequency. When asked, Ms. George could not rule in or rule out the possibility that the isolation because of the pandemic precautions was having deleterious effects on Mrs Mandanici's condition. Ms. Thurmer testified that Mrs Mandanici presented a level of aggression that was beyond the capabilities of East Park to effectively and safely manage her care.

6

Ms. Criscione testified at length about her mother's condition, her inability to get feedback from the doctor or the nurse practitioner from East Park, and her perception that the COVID-19 isolation was probably causing her mother's decline and that her mother was improving on the latest medication adjustments. Although on the one hand she was very complimentary of East Park in many respects, it was obvious that she was deeply disappointed in the lack of caregiver meetings since the end of 2019. At one point she testified that she was unaware that many of the outbursts described in East Park's exhibit had even occurred. She questioned the wisdom of taking her mother out of East Park in the middle of a "world crisis."

The testimony from Ms. Thurmer was that Berea Alzheimer's Center is a 50-bed, long-term care facility exclusively for Alzheimer's Disease residents, with special care programs and locked units. Unfortunately, they do not currently have beds available. Therefore, according to Ms. Plum, they explored another option – The Heights – which also has a dedicated dementia unit. East Park and The Heights have exchanged information regarding Mrs. Mandanici and East Park is awaiting word on bed availability. Finally, Ms. Criscione has looked into a facility called Mount Alderna which she believes might be able to take care of her mother's needs

## LAW AND DECISION:

Resident discharge cases involve weighing evidence. Resident discharge cases are also often a matter of balancing the rights and of the resident with those of the home This is less a case about resident rights than it is about balancing the homes rights against the preferences of the family. I conclude that East Park met its burden of proof on its rationale for discharge/transfer.

*Notice*

7

I first turn to the requirement for reasonable and appropriate notice to the resident. From a procedural standpoint it is undisputed that the NoD in this case was dated April 23, 2020, and that the Resident, through the Ombudsman, timely requested a hearing. The daughter/guardian and Ombudsman "appeared" at the hearing as agreed upon. Thus, there was adequate notice from a procedural, or timing standpoint.

*Level of Care and Transfer Destination*

The discharge or transfer of a nursing home resident is generally governed by Ohio ORC §§ 3721.13 and 3721.16. Both allow for transfer if "the welfare and needs of the resident cannot be met in the home." (See, for example, ORC 3721 13(30)(a).) The statute recognizes the simple fact that residents sometimes decline in ways which eventually drives their care needs beyond those the facility can safely and effectively provide.

There are numerous records available, ranging between the Spring of 2019 to the Spring of 2020. During that time, Mrs. Mandanici has always carried the diagnosis of dementia with behaviors. Her condition varied from visit to visit, but it is clear that early on in that period she had bouts of at least verbal aggression. She was started on Depakote by May, 2019. The family was aware of this from their participation in therapy sessions.

There is substantial evidence that Mrs. Mandanici's situation has worsened over time, marked by increasing anger, verbal and physical aggression, ever-increasing doses of Depakote, and some resistance to therapies. (Mrs. Mandanici's Depakote went from 125 mg. once a day in May, 2019, to 250 mg. three times daily in April, 2020, a doubling of the dose and a tripling of the frequency.) According to Ms. Thurmer, as well as Dr. Dohar, she needs a level of Alzheimer's Disease care higher than East Park can provide. The last Geropsych record tends to corroborate this.

8

That evidence was not effectively refuted by the Resident's representatives. The exhibit the Resident's family and Ombudsman rely upon is dated a month before the notice of discharge was issued. It was written by a nurse practitioner. It is not clear how much of the chart she read, or which nurses told her that there were "no behavioral issues." Regardless, subsequently four important things happened: first, there were additional, documented instances by the staff of aggressive or abusive behaviors, second, even Ms. Criscione admitted that her Mother had deteriorated by mid-March, at the time she agreed to further mental health visits; third, the psychiatrist's P.A. visited again April 29th, noted the increased behaviors, and increased the Depakote again; and fourth, the Medical Director, presumably the supervising physician over the nurse practitioner who wrote the March 19th and 24th notes, sent Mr. Criscione a letter regrettably announcing that the situation had become untenable, and a transfer was needed. I find those four events significant, and to outweigh the charted statements of the NP in March. By the end of April there were two different medical professionals commenting on how difficult it was becoming to care for Mrs. Mandanici, and one, the doctor, recommended a transfer.

Ms. Criscione was very concerned about East Park releasing her mother during a "world crisis." Clearly the COVID-19 pandemic has disrupted a lot of ordinary life, but it has not disrupted everything. There is no legal impediment to a transfer. There was no evidence that either the transfer itself or any of the three discussed facilities posed any higher risk of contracting COVID-19 than Mrs. Mandanici currently faces. There was no proof that the pandemic-induced isolation rules have caused Mrs. Mandanici's decline in emotional control. In fact, many of the events presented in the medical records pre-date the mid-March, 2020 pandemic lockdown.

Ms. Criscione wanted any decisions put off until the end of the COVID-19 lockdown, but the statutes do not provide me the power to fashion such a remedy. Furthermore, there is no

9

evidence of when the lockdowns will end, or that the outcome here would be any different at the end of that period. This situation is horrible for everyone, and elderly parents benefit from direct family contact. But whether Mrs. Mandanici is in East Park or any other facility in Ohio makes no difference in the ability of the family to be in direct contact, because for now the facilities do not control those decisions. According to the weight of the medical evidence, aside from the inconvenience of a transfer, Mrs. Mandanici will be in a better care setting for her problems than the one in which she now resides. There is no evidence she will be harmed by a transfer.

That brings us to the only other layer of analysis regarding East Park's burden of proof: the propriety, or the substance of the notice of discharge. There is a substantive law safety net which protects residents from being transferred to a facility or residence which cannot provide the level of care required. Even though that is not the real issue here, it is worthwhile analyzing the statutory framework.

Under the provisions for "Residents' Rights," ORC § 3721.13 (A)(3) states that:

> (A) The rights of residents of a home shall include, but are not limited to, the following:
> 
> \* \* \*
> 
> (3) Upon admission and thereafter, the right to adequate and appropriate medical treatment and nursing care and to other ancillary services that comprise necessary and appropriate care...
> This care shall be provided without regard to considerations such...
> source of payment for care.

More importantly, ORC § 3721.16, specifically says what that notice must contain (" notice of a proposed transfer discharge shall be in accordance with this section.") The notice of proposed transfer under § 3721.13(A)(30)(e), thus, must comply with § 3721.16, specifically, here, (A)(2)(c) and (A)(3). Those sections state that:

> (2) The notice required under division (A)(1) of this section shall include all of the following:
> 
> (a) The reasons for the proposed transfer or discharge;

10

> (b) The proposed date the resident is to be transferred or discharged;
>
> (c) Subject to division (A)(3) of this section, a proposed location to which the resident may relocate and a notice that the resident and resident's sponsor may choose another location to which the resident will relocate;
>
> (A)(3) states
>
> (3) The proposed location to which a resident may relocate as specified pursuant to division (A)(2)(c) of this section in the proposed transfer or discharge notice shall be capable of meeting the resident's health-care and safety needs. The proposed location for relocation need not have accepted the resident at the time the notice is issued to the resident and resident's sponsor

East Park proved all the elements required here. The notice here designates as the transferee location a specialized dementia facility. If it does not have bed availability by discharge there is a backup plan, and Ms. Criscione is actively seeking yet a third option (her preferred option). East Park is, in short, transferring Mrs. Mandanici to a higher level of care, which is exactly what the statute contemplates. While the family may prefer East Park and change is always difficult, they have no legal defense to discharge/transfer under these circumstances, while East Park has the right to transfer for reasons ultimately for the protection of the resident.

A question arose at hearing about the timing of a discharge. The statute, O.R.C. § 3721.16 provides, in pertinent part, that "The notice shall be provided <u>at least thirty days in advance of the proposed transfer or discharge</u>, unless any of the following applies..." (emphasis added) East Park did not prove any of the exceptions which follow that sentence. Thus, under a plain reading of the statute, the discharge cannot happen until thirty days after the NoD, which I compute as Saturday May 23, 2020. That is reasonable and in keeping with the statutory purpose of providing the resident and the home adequate time in which to explore appropriate, safe, mutually agreeable transferee options.

11

**CONCLUSION:**

East Park met its burden of proof at the hearing and may discharge/transfer Dorothy Mandanici under two conditions (1) not until on or after May 23, 2020, and (2) to a facility capable of taking care of her health and safety needs. Pursuant to O.R.C. § 119.12 and the Ohio Administrative Code, either the resident or East Park may appeal this decision to the Court of Common Pleas of Cuyahoga County, Ohio.

_____
Matthew P. Moriarty, Esq.
Hearing Officer

## CERTIFICATE OF SERVICE

A copy of the foregoing has been served upon the following this 7th day of May, 2020:

*Via Electronic & Certified Mail*
Gina Criscione
6093 Creekside Drive
Parma Heights, OH 44130

*Via Electronic & Regular Mail*
Andrew Kinkead, Ombudsman Specialist
LONG TERM CARE OMBUDSMAN PROGRAM – 10A
2800 Euclid Avenue, Suite 600
Cleveland, OH 44115

*Via Electronic & Certified Mail*
Sara A. Thurmer, BA, LNHA,
Administrator
EAST PARK CARE CENTER
8 East Park Circle
Brook Park, OH 44142

_____
Matthew P. Moriarty, Esq.
Hearing Officer