IN THE COURT OF COMMON PLEAS

CUYAHOGA COUNTY, OHIO

- - -

GINA CRISCIONE, et al.,     )

      Plaintiffs,  )

   vs.                    ) Case No. CV-22-964883

LAURA DiVINCENZO, et al.,  )

      Defendants.  )

- - -

   Deposition of GINA M. CRISCIONE, a
Plaintiff herein, called by the Defendant for
cross-examination pursuant to the Ohio Rules of
Civil Procedure, taken before me, the undersigned,
Cynthia Holderbaum, RPR and Notary Public in and
for the State of Ohio, at the offices of Hanna,
Campbell & Powell, LLC, 3737 Embassy Parkway,
Suite 100, Akron, Ohio, on Thursday, the 6th day
of July, 2023, at 10:00 o'clock a.m.

-----------------------------------------------
    Taken By: Cynthia Holderbaum, RPR
      TRISHA BEBAN YOST, RPR
       1940 Crystal Drive
       Akron, Ohio  44312
        (330) 715-8796
      trisha.yost@gmail.com

```
 1    APPEARANCES:

 2         On Behalf of the Plaintiffs:

 3             Speech Law, LLC

 4         By:  Brian D. Bardwell, Attorney at Law
                1265 West Sixth Street, Suite 400
 5              Cleveland, Ohio  44113-1326
                brian.bardwell@speech.law
 6
           On Behalf of the Defendants East Park
 7         Retirement Community, Inc., Laura
           DiVincenzo and Sara Thurmer:
 8
               Hanna, Campbell & Powell, LLP
 9
           By:  Michael Ockerman, Attorney at Law
10              Emily R. Yoder, Attorney at Law
                3737 Embassy Parkway, Suite 100
11              Akron, Ohio  44333
                mockerman@hcplaw.net
12              eyoder@hcplaw.net

13    ALSO PRESENT:

14             Laura DiVincenzo

15                       - - -

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2
    Exhibit No.                  Page     Line
 3

 4   Defendant's Exhibits A        51       2
     through I
 5   Defendant's Exhibit J         69      22
     Defendant's Exhibit K         96      12
 6   Defendant's Exhibit L        121      16
     Defendant's Exhibit M        141       4
 7   Defendant's Exhibit N        201      18
     Defendant's Exhibits O and P 213      18
 8   Defendant's Exhibits Q and R 239       5
     Defendant's Exhibit S        241      12
 9   Defendant's Exhibit T        242      10
     Defendant's Exhibit U        243       3
10
     Plaintiff's Exhibit 17       244      14
11

12   Examination By:              Page     Line

13
     Ms. Yoder                      4       8
14                                254       1

15   Mr. Bardwell                 244      12

16
                      - - -
17

18

19

20

21

22

23

24

25
```

1                    GINA M. CRISCIONE

2    of lawful age, a Plaintiff herein, called for

3    examination, as provided by the Ohio Rules of

4    Civil Procedure, being by me first duly sworn,

5    as hereinafter certified, deposed and said as

6    follows:

7                    CROSS-EXAMINATION

8    BY MS. YODER:

9      Q.    Can you, please, state your full name.

10     A.    Gina Marie Criscione.

11     Q.    All right.  Miss Criscione, we are here

12   today to take your deposition in the lawsuit

13   that you have filed on behalf of yourself and

14   then on behalf of the estate of your mother.

15   Do you understand that?

16     A.    Yes, I do.

17     Q.    The court reporter's taking down

18   everything that we say so there's a couple of

19   things that I would like you to keep in mind.

20   All your answers must be verbal, no huh-uhs, no

21   uh-huhs, no nods of the head, okay.

22     A.    Yes.

23     Q.    If you forget we'll remind you, all

24   right.

25     A.    Absolutely.

Page 5

1    Q.   If you can wait until I'm done with my

2   question to start your answer, that way we're

3   not talking over each other.  It makes it hard

4   for her when we talk at the same time, and it

5   may make the transcript unclear, okay.

6    A.   All right.

7    Q.   Try to keep your voice up.  We do have

8   the air running, so.  She also has to be able

9   to hear what we're saying, okay.

10    A.   Am I allowed to have a cough drop?  I

11   have bad sinus, I might start coughing, the

12   dryness from talking.

13    Q.   So you can have a cough drop, you can

14   have a break if you need a break.

15    A.   I'll just take it out of my purse now so

16   I can have it so when I'm talking I don't start

17   coughing.

18    Q.   Go ahead.

19    A.   Thank you, appreciate that.

20         I'm ready when you are.

21    Q.   Okay.  I'm not here today to try to

22   trick you or confuse you, okay.  If I ask you a

23   question that you don't understand, please let

24   me know so that I can rephrase it, okay.

25    A.   I totally understand.

1     Q.   And if you answer a question I will

2   assume, one, that you understood the question

3   and, two, that your answer was truthful.  Is

4   that fair?

5     A.   Yes, that's fair.

6     Q.   What's your date of birth?

7     A.   January 23rd, 1956.

8     Q.   And other than Gina Marie Criscione,

9   have you been known by any other names?

10    A.   Well, I was married before.  However,

11  when I was born my father had our name -- they

12  had our named changed back to our original

13  name.  I was born Gina Marie Menage.  My

14  parents changed my name back to Gina Marie

15  Mandanici, and then I married, and now I'm

16  married to Michael Criscione, but I had another

17  marriage.

18    Q.   What was your other married name?

19    A.   Lafazia.

20    Q.   And what were the dates of that

21  marriage?

22    A.   1984, I believe, til 1989 or '90, I

23  can't recollect exactly.  It's a hundred years

24  ago for me.

25    Q.   Your current husband, I saw in your

1  discovery responses that you had two dates for

2  your marriage to him.  Did you marry him twice?

3      A.    Yes, because we're Catholic.

4      Q.    Okay.

5      A.    And we wanted to be married in the

6  Catholic church so we extended that to the

7  Catholic church.

8      Q.    Can you explain that?  I'm not quite

9  sure I follow.

10     A.    Well, when you get married in the

11 Catholic church you need an annulment to

12 remarry someone in the Catholic church.  We

13 both got annulments from our first marriages,

14 took awhile, and then we were working with the

15 priest, Father Jim Stenger, at Mary Queen of

16 the Apostle, and he walked us into a marriage

17 on September 8th, 2013.  We've been together 30

18 years, I think.

19     Q.    What was the date of your original

20 marriage?

21     A.    The first one was the Justice of the

22 Peace with Dean DePiero on -- I try to forget

23 that because we don't count that.  Oh, my gosh,

24 it was April 29th of 2004, I believe, so.

25     Q.    Sure.  Where do you currently live?

1     A.    I live at 6093 Creekside Drive in Parma

2  Heights.

3     Q.    Do you own that residence?

4     A.    Yes, we do.

5     Q.    When did you purchase it?

6     A.    This year.

7     Q.    Do you remember the date?

8     A.    This year.  I do not recall.

9     Q.    How long have you lived there?

10    A.    I do not recall.  It's been awhile.

11    Q.    More than five years?

12    A.    Oh, yeah.  More than ten.

13    Q.    What were your arrangements prior to

14  purchasing the property this year?

15    A.    To rent with the option to buy, that's

16  why we're there.

17    Q.    Was it a land contract?

18    A.    I don't know about that kind of stuff,

19  I'm sorry.  I don't know what that is.

20    Q.    The rent payments that you had been

21  making, did those go towards the purchase price

22  of the property when you purchased it this

23  year?

24    A.    No.

25    Q.    Who lives with you at 6093 Creekside?

1    A.    My husband, Michael J. Criscione.

2    Q.    Anyone else?

3    A.    Two little puppies.

4    Q.    Going back to 2017, has anyone lived

5    there with you other than your husband?

6    A.    Lived with us?  Nobody's ever lived with

7    us.

8    Q.    How many children do you have?

9    A.    Zero.

10    Q.    Does Michael have any children?

11    A.    No.

12    Q.    Did you attend high school?

13    A.    Yes.

14    Q.    Where did you go to high school?

15    A.    Midpark in Middleburg Heights.

16    Q.    Did you graduate?

17    A.    Yes.

18    Q.    What year did you graduate?

19    A.    1974.

20    Q.    Any formal education or training after

21    high school?

22    A.    I went to cosmetology school.

23    Q.    Did you get your certificate or license?

24    A.    Oh, yes.

25    Q.    When did you get that?

1    A.    I can't recall.  I'm old.

2    Q.    When's the last time that you worked in

3    a capacity that would use that license?

4    A.    When?

5    Q.    Uh-huh.

6    A.    When I owned my -- oh, let me think.

7    Can you say that again?

8    Q.    Sure.  So when did you last work as a

9    cosmetologist or use that license?

10    A.    Do you want -- I can't remember when I

11    -- I can't remember.  I can't remember.

12    Q.    Do you remember a decade?

13    A.    Oh, yeah, it's been -- it's been a

14    decade since I used my license.

15    Q.    Okay.  Were you using it in the '90s?

16    A.    Yes.

17    Q.    Okay.  What about the 2000s?

18    A.    I can't remember when I let that license

19    lapse so I couldn't tell you.  I would have to

20    look it up.

21    Q.    When were you last employed?

22    A.    I'm -- last employed?

23    Q.    Yeah.

24    A.    By someone?

25    Q.    Let me ask you this, this may make it

Page 11

1    easier, are you currently employed?

2      A.    We're self-employed.

3      Q.    Tell me about that.

4      A.    I'm part of the company with my husband

5    and two partners.

6      Q.    What's the name of the company?

7      A.    PLS, Power Line Solutions.

8      Q.    What type of an entity is that, is it an

9    LLC, a partnership, do you know?

10     A.    It's an LLC.

11     Q.    When was that formed?

12     A.    I don't recall.

13     Q.    What's the nature of your business?

14     A.    Storm assessment, damage assessment,

15   power outages.

16     Q.    What's your role with PLS?

17     A.    I'm vice-president and I do the

18   marketing, and I handle all the ads and

19   whatnots, computer, graphics and stuff like

20   that.

21     Q.    Okay.  Were you working in the capacity

22   with PLS while your mother was a resident at

23   East Park?

24     A.    Can I ask you something?

25            MR. BARDWELL:  I mean, you'll need

1    to answer the question.

2              THE WITNESS:  Oh, okay, because I

3    don't -- h'mm.  Say it again because it's --

4    BY MS. YODER:

5      Q.   I'm trying to understand, although I

6    know sometimes specific dates are hard to

7    remember, I'm just trying to get an

8    understanding of how long you've been involved

9    with PLS?

10     A.   He was storm assessing with another

11   company, Power Line Assessors, but they broke

12   up and we became PLS, so I don't know when that

13   transition happened.  It happened in -- during

14   the time I was there with my mother, yes.

15     Q.   Were you involved in the prior company --

16     A.   No.

17     Q.   -- Power Line Assessment, is that what

18   you said?

19     A.   No, my husband only.  I wasn't an owner.

20     Q.   What were you doing before you started

21   working for PLS?

22     A.   I can't answer that, there's so much.

23     Q.   Why?

24     A.   I do so much.

25     Q.   Okay.

1    A.    I volunteer time to events and

2   charities, I get involved with reunion

3   gatherings, I do graphic art for people, and I

4   build web pages for people.

5              My husband has an IT tech company,

6   I'll do a lot of graphics for him with that.

7   So I do some computer work.  I do a lot of

8   research.  I just like to keep busy.

9              I have dogs, I train them

10  extensively all the time, so, and I'm pretty

11  busy, so it's a hard question to answer.

12   Q.   What kind of research do you do?

13   A.   Whatever I'm interested in.

14   Q.   For pleasure or for -- is that a job

15  that you have?

16   A.   Oh, I've always done it.  Whatever I'm

17  doing, before I do it I research.  Before I

18  owned my salon I researched it a year before I

19  did that.  Coming here today I researched what

20  it was going to be like, you know.  I just

21  research.

22              If somebody I know has an ailment,

23  I'll research that ailment and try to help them

24  with that, what you're eating is wrong or

25  something like that, you know, but I like to

1    learn.  Every day I'm researching something.

2    The law fascinates me.

3       Q.   Did you do any research for this

4    lawsuit?

5       A.   Did I do any research for the lawsuit.

6    I don't know what you mean by that.  I don't

7    understand that question, how I could answer

8    that.

9       Q.   Okay.  So you just were telling me that

10   you enjoy researching, you do it every day and

11   that the law fascinates you and you research

12   things, everything before you do it, so --

13      A.   I do research things before I do them,

14   yes.

15      Q.   So then my question is, have you done

16   any research related to this lawsuit?

17      A.   I researched and got a good lawyer, that

18   was my research.

19      Q.   So beyond that you haven't done any

20   research?

21      A.   I can't tell -- I can't recall.  I can't

22   remember.  I just can't remember right now.

23      Q.   All right.  So before you were employed

24   by PLS I understand that you're busy in various

25   capacities.  Did you have an employer prior to

1    PLS?

2    A.   Yes, for a short time I worked for

3    Liberty Ford in Parma Heights.

4    Q.   What did you do there?

5    A.   '99 til about 2000.  Sales.

6    Q.   Is that the last employment you had --

7    A.   That was, yes.

8    Q.   You got to let me finish.

9    A.   I'm sorry.

10   Q.   She's going to yell at you.

11   A.   I'm sorry.

12   Q.   All right.  So you did not have any

13   employment from 2000 until you started with

14   PLS, LLC; is that right?

15   A.   I had been very sick.

16   Q.   Tell me about that.

17   A.   It's very complicated and there's a lot.

18   Q.   Well, start with what you can tell me,

19   and if I have questions I'll --

20   A.   I had three consecutive surgeries in

21   2001 on my ovaries, and I had many surgeries

22   before for that, which made me very ill because

23   I'm allergic to medications and just

24   complications.  It would take me a year to tell

25   you everything.

1          I was coming off of medications

2    because I just -- I can't take them.  So I was

3    sick, I couldn't work really.

4      Q.   You said you had three consecutive

5    surgeries on your ovaries.  Did you say you had

6    surgeries before that as well?

7      A.   From when I was 16 I've had female

8    problems.  I would say I had about 10, 12, I

9    don't remember, cysts, tumors, whatnot.

10     Q.   Any other types of surgeries that you've

11   had?

12     A.   Yes.  I've had a lump removed from my

13   breast, I've had cysts removed from my hands

14   and wrists, and that's it unless you call a

15   liver biopsy surgery.

16     Q.   Are you okay?

17     A.   Yeah, good.

18     Q.   From 2001 until you started with PLS did

19   you apply for disability?

20     A.   Yes.

21     Q.   Through Social Security?

22     A.   Yes.

23     Q.   Was that granted?

24     A.   Yes.

25     Q.   When was that granted?

1     A.    I don't recall.

2     Q.    Are you still receiving Social Security

3   disability?

4     A.    No.

5     Q.    When did it stop?

6     A.    I don't recall.

7     Q.    Why was it stopped?

8     A.    I don't recall how they did that, I

9   don't recall.

10    Q.    Can you tell me approximately how long

11  you received Social Security disability?

12    A.    I can't remember those things, no.

13    Q.    Do you recall what the nature of the

14  disability was or which benefits were granted?

15    A.    It was a lot of things, a lot of things,

16  a lot of ailments, different ailments.

17    Q.    What do you recall?

18    A.    I can't recall.  I put these things out

19  of my mind.  I'm better now.

20    Q.    When did you recover, when were you

21  better?

22    A.    Well, it took awhile.  It was a process.

23  I don't know.  I don't know.

24    Q.    Where was your treatment for these

25  issues that you were having from 2001 until --

Page 18

1    A.    I believe Hillcrest Hospital.

2          MR. BARDWELL:  Be sure to let her

3    finish.

4          THE WITNESS:  Oh, I'm sorry.

5    BY MS. YODER:

6    Q.    Anywhere else that you treated?

7    A.    I'm sorry, I didn't hear you?

8    Q.    Anywhere else that you treated for those

9    issues?

10   A.    Those three surgeries you're talking

11   about?

12   Q.    Well, I'm talking about all of these

13   ailments that lead you --

14   A.    All the surgeries through my life when I

15   was 16?

16   Q.    So if you let me finish my question that

17   will help you answer it.

18   A.    I'm sorry.  Okay.  Okay.

19   Q.    So you have said that you were ill,

20   unable to work and filed for Social Security

21   disability and were granted it and then

22   recovered, and so I would like to know the

23   providers and the facilities that you were

24   treating with in that time period that helped

25   you reach the recovery?

Page 19

1    A.    I don't -- I don't recall.

2    Q.    How would we be able to get that

3  information?

4    A.    I gave you -- didn't we give access to

5  the medical records, my medical records?

6    Q.    So you did sign an authorization, but

7  it's hard for me to get medical records if I

8  don't know where to send the authorizations, so

9  that's what I'm trying to figure out.

10    A.    Oh, well, back then I can't remember.  I

11  would have to go back and look it up because

12  I've been to a lot of places for things.

13    Q.    Sure.  So can you get that for us and

14  get the information to your attorney?

15    A.    All the places I went to when I was 16

16  for all my -- is that what I'm understanding?

17    Q.    No, from the time in 2001 when you said

18  you became very ill, from that point forward.

19    A.    Sure, no problem.

20    Q.    Thank you.

21        MR. BARDWELL:  And, Emily, I think

22  that may actually be covered in the

23  interrogatory responses.

24        THE WITNESS:  Uh-huh.

25        MS. YODER:  Okay.  I didn't see it,

1    but okay.

2              MR. BARDWELL:  We'll talk more about

3    it, yeah.

4              MS. YODER:  Sure.

5    BY MS. YODER:

6       Q.   Have you ever been a party to any other

7    lawsuit and by that I mean has anyone ever sued

8    you or have you ever sued anyone?

9       A.   I -- I bit a cherry pit and, yes, they

10   paid for my dental, Giant Eagle or the company

11   that the pie came from.

12      Q.   And when was that?

13      A.   I don't recall.  Broke my tooth.

14      Q.   Was there a lawsuit filed?

15      A.   No.  No, never.

16      Q.   Any other lawsuits that you've been a

17   party to?

18      A.   No.

19      Q.   Have you ever filed for bankruptcy?

20      A.   No.

21      Q.   Other than the charges that are at issue

22   in this lawsuit, the criminal charges that are

23   at issue in this lawsuit, have you ever been

24   charged with a crime?

25      A.   No.

1     Q.    How many times have you applied for

2    Social Security disability?

3     A.    The one time.

4     Q.    All right.  Can you give me your

5    mother's full name?

6     A.    Dorothy Jean Mandanici.

7     Q.    Had she used any other names during her

8    lifetime?

9     A.    Dorothy Jean Kraynak, Grandma Jean.

10    Q.    Any other legal names that she had?

11    A.    Oh, no.

12    Q.    What was her date of birth?

13    A.    June 10th, 1932.

14    Q.    How many children did she have?

15    A.    Three.

16    Q.    So you and then who else?

17    A.    I have a sister and a brother.

18    Q.    What are their names?

19    A.    Jolynn and Dean.

20    Q.    What's Jolynn's last name?

21    A.    Hastings.

22    Q.    How many grandchildren did your mother

23    have?

24    A.    Three.

25    Q.    What are their names and ages?

Page 22

1    A.    They're just -- I can't tell you their

2  ages, I have to go find out, but Taylor and

3  Lauren and Lee.

4    Q.    What are their last names?

5    A.    Lauren is Floyd, Taylor is Mandanici,

6  and Lee is Mandanici.

7    Q.    Your mother was not married at the time

8  of her passing; is that correct?

9    A.    Correct.

10    Q.    She had been diagnosed with vascular

11  dementia; is that right?

12    A.    Correct.

13    Q.    When was that diagnosis?

14    A.    I can't recall, I would have to look it

15  up.

16    Q.    Where would you look for that?

17    A.    I would ask my -- well, sorry, let me

18  think about that.  What was the question again?

19    Q.    When was your mother diagnosed with

20  vascular --

21    A.    When she was first diagnosed.  I can't

22  recall that date.  Where would I look it up?  I

23  could find out, I don't know.

24    Q.    Are you able to give us an approximate

25  year when the diagnosis was made?

1    A.    No.  I can't recall.

2    Q.    Do you know which provider made the

3  diagnosis?

4    A.    No.

5    Q.    Did you ever talk to any of your

6  mother's providers about her prognosis?

7    A.    Yes.

8    Q.    And what did they tell you?

9    A.    I don't understand that question.

10    Q.    So you had indicated that you had spoken

11  with your mother's providers about her

12  prognosis with respect to the dementia.

13    A.    This is all very vague to me, I don't

14  recall.  I don't recall.

15    Q.    So now you don't know if you talked to

16  them about that?

17    A.    I talked to everybody, I just don't

18  recall who or when, I don't recall.  I would

19  have to go look at my notes.  I keep notes on

20  my calendar and diary.  I don't know.

21    Q.    Well, we would ask for those notes then,

22  okay.

23    A.    If I have them.  I don't know.

24            MR. BARDWELL:  We've produced those

25  already.

Page 24

```
 1              THE WITNESS:  Oh, yeah.
 2              MS. YODER:  I didn't see anything in
 3    there about conversations with your providers
 4    so I don't know if that's kept somewhere else.
 5              THE WITNESS:  See, I'm confused.
 6    I'm confused.
 7              MR. BARDWELL:  Sure.
 8              THE WITNESS:  My sister was caring
 9    for my mother at that time, that's why I wasn't
10    sure about that.  When she came with me she had
11    already been in the system so I was following
12    up, that's why I don't know any names.  I don't
13    know what my sister was handling, I would have
14    to talk to her.
15    BY MS. YODER:
16      Q.   When did you take over your mother's
17    care?
18      A.   I can't recall.
19      Q.   Can you tell us approximately?
20      A.   Right before she went in to East Park.
21    When was that?  I would have to look it up.
22      Q.   So she went in to East Park in 2017.
23      A.   Uh-huh.
24      Q.   And that's when you took over?
25      A.   No, it's not like that at all.
```

Page 25

1    Q.    Okay.  What is it like?

2    A.    Me and my sister, we work together and

3    we talk.  I don't know, I can't recall.  You're

4    asking questions that don't pertain to the

5    situation, I have to explain.

6    Q.    So I get to make the determination on

7    what questions to ask and whether they're

8    appropriate or not.

9    A.    I understand.

10    Q.    So you tell --

11    A.    But I don't understand, that's the

12    problem.

13    Q.    So the purpose is not for you to

14    understand why I'm asking the questions but to

15    make sure you understand the question, and

16    saying I don't recall isn't appropriate because

17    you don't think the question's appropriate.

18              MR. BARDWELL:  If she's asking for a

19    time and you know a time, just give her --

20              THE WITNESS:  I don't know times.

21    I'm not good at times, I don't know.

22    BY MS. YODER:

23    Q.    And I understand the specific date may

24    be hard to come up with, but if you could give

25    me it was the early 2000s, any type of general

Page 26

1    timeframe is helpful for us to kind of

2    understand the whole picture.

3      A.    My head is spinning a little bit here.

4    I'm confused of what timeframe time you want.

5      Q.    So I'm trying to figure out when your

6    mother was first diagnosed with dementia, and

7    you don't know that?

8      A.    I can't remember that, yes.

9      Q.    And you told me you don't know because

10   at that time your sister was responsible for

11   her care?

12     A.    Right.  She told me, but I don't

13   remember the time, that's what I'm telling you.

14     Q.    And I understand that.

15     A.    Okay.

16     Q.    So I'm trying to figure out when it is

17   you took over your mother's care.

18     A.    I always was caring for my mother, even

19   when my sister was.  When she wasn't home I was

20   there, I was always caring for her.  The

21   medical part my sister was handling at that

22   time.

23     Q.    When did your sister stop handling the

24   medical part?

25     A.    Never, she was right along with me.

1    Q.    When did you start also --

2    A.    It's not like we split up, she was with

3    me.  I was just speaking I was there, she had

4    to work.

5    Q.    So why is it that you don't know when

6    your mother was diagnosed with dementia?

7    A.    I can't remember.  I don't know, it's

8    been a long time.

9    Q.    So she had dementia for a long time?

10   A.    Uh-huh.

11   Q.    Yes?

12   A.    Yes.

13   Q.    When did she first go in to the nursing

14   home?

15   A.    I'm bad with dates, too busy.  I don't

16   remember the dates she went in to the nursing

17   home.

18   Q.    Do you remember -- go ahead.

19   A.    I do know -- I don't remember.  I don't

20   recall, I don't.

21   Q.    What nursing home was she first a

22   resident at?

23   A.    East Park Care Center.

24   Q.    Where was she before East Park?

25   A.    At my house for a short time.

Page 28

1    Q.    How long was she at your house?

2    A.    Couple of weeks maybe, I'm not sure.

3  Actually I cannot give you a date, I don't

4  remember a time how long, I don't remember.

5  I'm sorry, I just don't remember.

6    Q.    Where was she at before she was at your

7  house?

8    A.    She was -- she was living with my sister

9  in Brook Park.

10    Q.    Jolynn?

11    A.    Uh-huh.

12    Q.    Yes?

13    A.    Yes.

14    Q.    How long was she living with Jolynn?

15    A.    I don't recall, I really don't.  Sorry.

16    Q.    Do you remember her being at Park Center

17  Villa?

18    A.    Yes, for therapy.

19    Q.    Was she living there?

20    A.    No, something happened and she went in

21  the hospital, and they put her there for

22  recovery.

23    Q.    How long was she there?

24    A.    I don't recall.

25    Q.    Any other place that your mother stayed

Page 29

1    as a resident?

2        A.    I don't know if you call that a resident

3    or not because my sister -- we moved my mom --

4    because she was busy and we knew mom wasn't

5    well.  We were having people come to care for

6    her, and then she fell and went in the hospital

7    so she never got to go back home with my sister

8    or me, she went right to East Park, which I

9    picked as the place to be at the time.

10       Q.    So what weren't you sure if -- you said

11   I'm not sure if that counts that she lived

12   there.  What were --

13       A.    She was staying with me for a couple of

14   weeks or I don't know how long before we got

15   her in to East Park.

16       Q.    At the time that your mother was

17   admitted to East Park did she have any

18   diagnoses other than dementia?

19       A.    She had bad knee problems, arthritis,

20   anxiety, AFib.  I can't remember the names of

21   the conditions that she had, all of them,

22   because I don't remember the medical terms, so

23   I don't know.

24       Q.    All right.  Who is your family doctor

25   currently?

1    A.    Currently?

2    Q.    Yes.

3    A.    I hope I can say his name.  Dr. George

4  Saridakis, I think that's how you say it.

5    Q.    Is he with a practice?

6    A.    He's in Parma, yes.

7    Q.    Do you know the name of the practice?

8    A.    UH, is he?  I'm not sure.  UH.

9    Q.    How long has he been your primary care

10  physician?

11    A.    I can't recall.  Long time.

12    Q.    Who was your primary care physician

13  before him?

14    A.    Dr. Loyke.

15    Q.    How do you spell that?

16    A.    L-O-Y-K-E.

17    Q.    Was Dr. Loyke associated with a

18  practice?

19    A.    I believe Dr. Loyke left in -- I don't

20  remember, it's so long ago.  I'm sorry, I would

21  have to go look, I don't remember.

22    Q.    Okay.  Yeah, if you could look for the

23  name of his practice, I would appreciate it.

24    A.    Dr. Loyke?

25    Q.    Yeah.

1    A.    He was in Parma, too, so.  I don't

2    remember who he was with.

3    Q.    Why did you transfer from Dr. Loyke to

4    Dr. Saridakis?

5    A.    Dr. Loyke went to the Service and helped

6    people overseas somewhere and left us, left his

7    practice.

8    Q.    Do you know when that was?

9    A.    No.  He left me with his nurse

10   practitioner for a while, but, but I found Dr.

11   George.

12   Q.    Are you currently seeing a counselor, a

13   psychiatrist, a psychologist and -- go ahead,

14   I'm sorry?

15   A.    I'm interrupting, sorry.  Go ahead.

16   Q.    Any mental healthcare provider?

17   A.    I'm seeing Fritz Klemperer,

18   psychologist.

19   Q.    How long have you been seeing him?

20   A.    27 years maybe.  I'm sorry, that's

21   about, it could be 27, it could be 28, it could

22   be 30, I don't know about that.

23   Q.    When did you first start treating with

24   Fritz Klemperer?

25   A.    I don't recall.

Page 32

1    Q.    I may have asked that wrong.  Why did

2  you first start treating with him?

3    A.    I was very sick, I had to give up my

4  work.  It was very difficult for me when I had

5  to get . . .

6    Q.    Were those all physical illnesses or

7  issues or was there also mental health issues

8  that required you to give up your work?

9    A.    Both.  Mostly physical.  We create, you

10  know, made me sad.

11    Q.    Have you continued to treat with Fritz

12  regularly for the last 27 or so years?

13    A.    Yes.

14    Q.    How often do you see him?

15    A.    By regularly, what do you mean by

16  regularly?  Because regularly means to me I'm

17  seeing him all the time, but sometimes my

18  appointments will be, you know, longer,

19  shorter.  If I need to talk I could call him

20  right now.

21    Q.    So give me an idea of how -- over the

22  last 27 years or so how frequently you've seen

23  him?

24    A.    An idea?

25    Q.    Yeah.

1    A.    At least once a month.

2    Q.    Sometimes more?

3    A.    I do -- I do believe once a month.  I'm

4    trying to remember.

5    Q.    And then sometimes more than once a

6    month?

7    A.    Sometimes.

8    Q.    Any other mental health services that

9    you've received?

10   A.    Yes, I went -- I saw a psychiatrist, and

11   I can't remember his name because I can't take

12   the medication.  So what is his name?  I would

13   have to look up his name.

14   Q.    When did you see him?

15   A.    Again, you got my medical records, and

16   they're in that file, I think.

17   Q.    Actually I don't have any of your

18   medical records.

19        MR. BARDWELL:  Just answer the

20   question that she asks.

21        THE WITNESS:  I don't remember the

22   date, I'm sorry.

23   BY MS. YODER:

24   Q.    Do you have your medical records?

25   A.    Do I have them?

1    Q.    Yes.

2    A.    They're at my fingertips on the

3    computer, I don't have them.

4    Q.    All right.  And you understand they've

5    been requested in this lawsuit?

6    A.    Sure.

7    Q.    Okay.  But they have not been provided.

8    Did you understand that?

9    A.    No, I don't know that.  I don't know

10   what you're talking about.

11   Q.    So I don't have any of your medical

12   records.

13   A.    All right.  Okay.  I'm sorry, I didn't

14   understand.

15         MR. BARDWELL:  Emily, I don't think

16   you guys have actually requested them.

17         MS. YODER:  Okay.  Let's take a

18   break for a minute.

19         (Discussion was had off the record.)

20         MS. YODER:  Just for purposes of

21   clarification on the record, we have confirmed

22   while we were off that medical bills and

23   records have all been requested in Requests for

24   Production of Documents propounded on Miss

25   Criscione.

1          MR. BARDWELL:  And there was

2    objections in response, but, yeah, we'll deal

3    with those off the record I'm sure.

4    BY MS. YODER:

5      Q.   Do you recall when you saw the

6    psychiatrist?

7      A.   No.

8      Q.   Do you remember where his office was

9    located?

10     A.   I can't recall.  Sorry.

11     Q.   How many times did you see the

12    psychiatrist?

13     A.   Once or twice, maybe three times.

14     Q.   Any other providers that you have seen

15    for treatment for mental health issues?

16     A.   Nope.

17     Q.   Before October of 2020 had you ever

18    treated for vertigo?

19     A.   Yes.

20     Q.   Who did you treat with?

21     A.   I don't understand that because -- I

22    don't understand that.  Who did I treat with?

23     Q.   Yep.  What medical providers did you see

24    for vertigo?

25     A.   It goes back to Rhode Island, I don't

1    remember, when I lived in Rhode Island.  I

2    don't remember.

3       Q.    So you've been treating for vertigo for

4    a long time?

5       A.    I only take it as needed.

6       Q.    Take what?

7       A.    Antivert.

8       Q.    Who prescribes that?

9       A.    George, Dr. George.

10      Q.    Do you remember when you were first

11   diagnosed with vertigo?

12      A.    No.  It's not vertigo, it's vestiges

13   migraine, ocular migraine, that's what I first

14   got diagnosed with.

15      Q.    When were you first diagnosed with that?

16      A.    I can't say it but vestiges migraine.

17   You don't get the migraine, you get the

18   spinning.

19      Q.    When were you first diagnosed with

20   migraines?

21      A.    Back in the early -- the mid '80s.

22      Q.    When did you live in Rhode Island?

23      A.    From 1984, I believe, if I can remember,

24   until 1995, I believe, but I would have to look

25   at it.  It's pretty close.  Ten years about,

1    about.

2      Q.    Before October of 2020 had you ever

3    treated for anxiety?

4      A.    That's a hard question.  Before 2020 had

5    I been treated for anxiety?  Yes, I had.

6      Q.    Who did you treat with for anxiety?

7      A.    Dr. Fritz basically.

8      Q.    Anyone else?

9      A.    Before 20 -- I don't recall.

10     Q.    Were you taking any medications for

11   anxiety?

12     A.    Was I?

13     Q.    Yeah, before October of 2020.

14     A.    No.

15     Q.    You had never taken any antianxiety

16   medication?

17     A.    I might have had one given to me and I

18   would get sick.

19     Q.    So who had prescribed antianxiety

20   medications?

21     A.    I don't recall.

22     Q.    When would that have been prescribed?

23     A.    I'm sorry?

24     Q.    When were you prescribed antianxiety

25   medication?

1    A.    From back in Rhode Island, but I don't

2    recall, I really don't.  I don't know what you

3    mean by antianxiety medication, like what are

4    you talking about?  Because I don't take pills.

5    I have one now but I don't take it.  It doesn't

6    help.

7    Q.    So I'm, I guess, having a little bit of

8    a hard time when you're telling me that you

9    don't know what I mean but you have one of them

10   now.

11   A.    I'm prescribed a pill now for anxiety as

12   needed, that's all.  I don't know what you

13   meant by the question.

14   Q.    Okay.  So my question is, before October

15   of 2020 had you ever been prescribed medication

16   for anxiety?

17   A.    I can't remember.  I really can't

18   remember.

19   Q.    Maybe yes, maybe no?

20   A.    I don't think so.

21   Q.    Before October of 2020 had you ever

22   treated for depression?

23   A.    With Fritz.

24   Q.    Anyone else?

25   A.    No.

1    Q.    Had you ever been prescribed any

2   medications for depression?

3    A.    A long time ago.

4    Q.    When was that?

5    A.    I can't recall.  They made me ill, bad

6   reactions, adverse effects.

7    Q.    Before October of 2020 had you ever

8   treated for back pain?

9    A.    I don't recall.

10    Q.    Was that a part of your Social Security

11   disability application?

12    A.    I had hepatitis C at the time I was

13   diagnosed with -- after the surgeries.  I can't

14   remember the time span, but I was cured in

15   2016.  Dr. McCollough, Cleveland Clinic.

16    Q.    Do you know if issues with back pain

17   were part of your Social Security disability

18   application?

19    A.    I don't think back pain was, no.

20    Q.    Before October of 2020 had you ever

21   treated for knee pain?

22    A.    I don't recall.

23    Q.    Had you ever treated for joint pain?

24    A.    Oh, yeah, I have joint pain, but I don't

25   know when I was going in.  I can't remember who

1    I went to.

2      Q.    Who did you treat with?

3      A.    My husband knows the name of him, I

4    don't know his name.

5      Q.    Where is --

6      A.    A lot of different people.  I don't

7    remember, I really don't.  I deal with it now

8    and I work and move ahead and I don't think of

9    those things, so I don't recall those questions

10   you're asking me.

11     Q.    Sure.  So it sounds like though you've

12   treated with a lot of different providers over

13   the years for joint pain?

14     A.    Oh, yes.  Well, for joint pain?  Well,

15   they all know about it.  I don't know.  No.

16     Q.    Have you been diagnosed with or treated

17   for arthritis?

18     A.    Yes, I have rheumatoid arthritis.

19     Q.    When were you diagnosed with rheumatoid

20   arthritis?

21     A.    I don't recall.

22     Q.    Who do you treat with for that?

23     A.    Actually I don't -- jeez, I don't know,

24   I have so many doctors.

25     Q.    I'm sorry, you said I have so many

1    doctors I can't remember, is that what you --

2    just so the record's clear?

3    A.    I don't recall.  The treatments that

4    you're asking me, I do not recall.

5    Q.    Sure, but I want to make sure --

6    A.    There's a lot of them.

7    Q.    Okay.  I want to make sure we have a

8    clear record, that I heard you correctly, that

9    you said I have so many doctors I don't

10   remember?

11   A.    Sometimes I don't remember the doctor's

12   name is what I meant.

13   Q.    But you have a number of doctors?

14   A.    Not now.

15   Q.    You used to?

16   A.    When I needed them.

17   Q.    All right.  Is there a reason that

18   you're unable to remember these things?

19   A.    Yes.

20   Q.    Okay.  What's that?

21   A.    What I'm going through here makes me

22   very upset and distraught, yes.

23   Q.    Meaning the deposition process?

24   A.    Meaning from --

25   Q.    You have to keep your voice up or she

Page 42

1    can't hear.

2       A.    Meaning from when I -- when my mother's

3    healthcare first started to fail.

4       Q.    And that has affected your memory?

5       A.    That has affected my life and my memory

6    because I'm so consumed with so much I can't

7    recall names of doctors, medications.  I have

8    to look at it, you know, there's so many,

9    that's all.

10              My memory's fine, but I can't

11   remember way back, like you're asking me dates,

12   times.  There's a lot of appointments I went

13   to.

14      Q.    Have you treated with any medical

15   provider for memory issues?

16      A.    I don't have memory issues, no.

17      Q.    Why don't you tell me the name of every

18   doctor that you can remember that you've

19   treated with since 2017.

20      A.    Dr. Fritz Klemperer.

21      Q.    Okay.

22      A.    Dr. George.  Since 2017?

23      Q.    Since your mother was a resident at East

24   Park.

25      A.    Oh, Dr. Modi.  Thinking.  I would have

Page 43

1    to look and see if there's any more than that,

2    I can't recall.

3       Q.   If you could do that, I would appreciate

4    that.

5       A.   Going back.

6       Q.   Who is Dr. Modi?

7       A.   He's a cardiologist at Parma Hospital.

8       Q.   When did you first see him?

9       A.   I can't remember the first date I saw

10   him.

11      Q.   Do you remember the year?

12      A.   I'm sorry.  I'm bad with that.  I have

13   to have a calendar in front of me all the time.

14      Q.   Have you treated with a cardiologist

15   other than Dr. Modi?

16      A.   Only if he had someone come in to his

17   office when he was out.  I don't recall.

18      Q.   So other than at Dr. Modi's office --

19      A.   Huh-uh.

20      Q.   -- have you treated with a cardiologist?

21      A.   Huh-uh.

22      Q.   You have to say no.

23      A.   No.  I'm sorry.

24      Q.   Before October of 2020 had you ever

25   treated for wrist pain?

1    A.    Oh, always, always in pain.  I'm always

2    in pain.

3    Q.    From the rheumatoid arthritis?

4    A.    (Witness nods head up and down.)

5    Q.    Yes?

6    A.    Yes.

7    Q.    And I'm sorry, who's your

8    rheumatologist?

9    A.    I can't remember his name because I

10   don't go to him anymore, I don't go to him

11   anymore.

12   Q.    Why don't you go?

13   A.    I'm allergic to the cortisone shots they

14   want to give me, and I opted out of surgery,

15   which I try the natural ways of keeping

16   rheumatoid down, lowering sugar and stuff like

17   that.

18   Q.    What surgery was recommended?

19   A.    I don't know what they were going to do.

20   I have so many problems I don't know what kind

21   of surgery they were going to do.  I have -- I

22   don't know.

23   Q.    Before October of 2020 did you have

24   problems sleeping?

25   A.    Before October 2020?  I'm trying to

1  remember the time span there.  Yes.

2     Q.    Did you talk to your medical providers

3  about that?

4     A.    I don't recall.

5     Q.    Were you ever prescribed any medication

6  to help with your sleeping?

7     A.    No, because -- no.

8     Q.    In the last ten years have you been

9  hospitalized?

10            Well, let me do this --

11    A.    Staying over night or an emergency room?

12    Q.    Let's do this, you said you recovered in

13  2016 from your --

14    A.    From hepatitis C.

15    Q.    So let's go from 2016 forward.  Have you

16  stayed over night in a hospital?

17    A.    I believe I did because of a

18  migraine/vertigo attack.  I'm not sure -- I

19  have to go back and check, I'm not sure, but.

20    Q.    What hospital?

21    A.    It would be Parma.

22    Q.    Parma Hospital?

23    A.    Uh-huh.

24    Q.    Yes?

25    A.    Parma.

Page 46

1    Q.    Since 2016 have you been a patient in

2    the emergency room?

3    A.    Since 2016?

4    Q.    Yeah.

5    A.    Yes.

6    Q.    Tell me what you remember about those

7    visits.

8    A.    I remember the last one I had a bad

9    virus, but before that I don't recall.

10    Q.    When you need to go to the emergency

11    room, where do you go?

12    A.    Parma.

13    Q.    All of your treatment would be at Parma?

14    A.    I would just -- yeah.  They send you to

15    your doctor afterwards, you know.

16    Q.    Sure.  If you needed to go to the

17    emergency department you would go --

18    A.    That's my choice.

19    Q.    You would go to Parma?

20    A.    Yes.

21    Q.    You don't recall being in any other

22    emergency rooms?

23    A.    I might have been, I don't recall.  I

24    don't think so.  I'm not sure.

25    Q.    What other hospitals would you be

1    treated at?

2       A.    I've been in the hospital so many times

3    I cannot recall.

4       Q.    And since 2016 have you been a patient

5    in an ambulance?

6       A.    2016?

7       Q.    Yep.

8       A.    Yes.

9       Q.    Okay.  For what reason?

10      A.    Vestiges migraine.

11      Q.    Is that when you were hospitalized in

12   Parma Hospital?

13      A.    Yeah, they probably kept me sometimes.

14   Sometimes they did and sometimes they didn't.

15   They give me an IV and I'm better.

16      Q.    How many times do you think you've been

17   in an ambulance since 2016?

18      A.    I can't recall.

19      Q.    More than once?

20      A.    I can't recall.  I don't know.

21      Q.    Always would be taken to Parma Hospital?

22      A.    Yes.

23      Q.    Would those ambulance trips all be from

24   your home at 6093 Creekside to the hospital?

25      A.    From 2016?

Page 48

1    Q.   Yes.

2    A.   Yes.

3    Q.   What medications are you currently

4    taking?

5    A.   I would have to look at my Walgreen's on

6    my phone, I don't know.  I don't take them all,

7    but I have my high blood pressure medicine; the

8    little green pill that goes with it for water

9    pill thing, I don't know the name of it; the

10   Antivert but they give it a different name on

11   the bottle; Zofran or Ondansetron to prevent me

12   from vomiting to prevent me from going in to

13   the hospital; this new little pill for my

14   anxiety that's taken as needed.  I have it in

15   my purse, I can look at the name of it.  I only

16   take pills as needed.

17            I take Vitamin D.  I take potassium.

18   I take other mineral pills like, you know, for

19   my eye ocular that my husband gets through a

20   vitamin company for my eyes or for, for my bone

21   joints, strengthens your joints, that type of

22   thing.  I really eat my medicine, I like food

23   and try to be healthy that way.

24   Q.   Who prescribes your medications that

25   you're currently taking?

Page 49

1    A.    Walgreen's.

2    Q.    Who's the physician that prescribes

3  them?

4    A.    Right now it's Dr. George or -- mostly

5  Dr. George I would think.  I don't know if I

6  got any from maybe when I was in the hospital.

7  No, I don't -- just Dr. George, I think.

8    Q.    When were you last in the hospital?

9    A.    That virus I had.

10    Q.    When was that?

11    A.    He remembers, I don't remember the date.

12  Everybody was sick.  It was maybe during COVID,

13  right at the end of COVID, I can't remember.  I

14  don't remember.  I didn't stay.  I was in the

15  emergency with the virus.

16    Q.    Any other prescription medications that

17  you're currently prescribed?

18    A.    Not that I can recall right now.

19    Q.    Let's think back now, I know it's

20  difficult but to March 2020, before COVID what

21  medications were you prescribed?

22    A.    Pretty much the same ones I have except

23  the new anxiety drug.  They gave me that when I

24  was in there for the virus, I think.  I'm

25  thinking, I'm not for sure.  I don't know.

Page 50

1    Q.    So you think that in March of 2020 you

2    would have pretty much been taking the same

3    medications with the exception of the anxiety

4    medication?

5    A.    Everything as needed except the

6    Lisinopril and the high blood pressure

7    medicine, I needed the high blood pressure

8    medicine, but I take everything else as needed.

9    Q.    So you were taking the high blood

10   pressure medication in March of 2020?

11   A.    I don't recall the date I started taking

12   it.

13   Q.    You've been on it for a while?

14   A.    At least -- well, I can't -- more than a

15   year.  More than a year, that's all I can give

16   you.

17   Q.    More than three years?

18   A.    No.  I don't know.  I don't know if -- I

19   really don't know.  When did I start taking my

20   blood pressure?  I don't remember.

21              MR. BARDWELL:  We're about an hour

22   in, whenever you're ready.

23              MS. YODER:  Yeah, we can break now,

24   and we can get some exhibits marked.

25              MR. BARDWELL:  All right.

1          (Short recess was taken.)

2              (Defendant's Exhibits A through I

3              were marked for identification.)

4    BY MS. YODER:

5    Q.   All right.  We have received through

6    discovery what I would describe as calendar

7    entries.  They're just -- there's a date and

8    then there's information that's entered.  You

9    do that on a calendar, is that right, an

10   electronic calendar?

11   A.   Yes.  Yes.

12   Q.   How long have you been doing that?

13   A.   How long.  I always -- I've done it all

14   my life pretty much but not consistently, you

15   know.

16   Q.   How long has it been maintained

17   electronically?

18   A.   Since Google put up that calendar for

19   me.

20   Q.   It's a Google calendar that you use?

21   A.   Yeah.

22   Q.   Do you track all of your appointments on

23   that calendar?

24   A.   I try to.

25   Q.   Do you keep track of appointments

1    anywhere else?

2      A.    My husband has a copy on his calendar.

3      Q.    So he may have dates on his calendar

4    that you don't have on yours?

5      A.    Maybe business dates.

6      Q.    What about for your medical

7    appointments?

8      A.    He usually has them, too.  He takes me.

9      Q.    Would he have your medical -- would he

10   have medical appointments for you on his

11   calendar that would not be reflected on yours?

12     A.    Would he have medical records on his

13   calendar.  Say that again.

14     Q.    So your medical appointments --

15     A.    Uh-huh.

16     Q.    -- would there be any of those

17   appointments on your husband's calendar that

18   are not on yours?

19     A.    Only if there's a mistake, only if he

20   made a mistake.

21     Q.    So the calendar entries that you have

22   given us in discovery, first of all, are they

23   accurate as far as the information contained in

24   those entries?

25     A.    Absolutely.  I just go to the next day.

1    Q.    Pardon?

2    A.    I just go to the next day, absolutely.

3    Q.    Do you like do a week at a time or are

4    you calendering, diarying daily, how is this

5    information getting in there?

6    A.    Well, it depends on what's going on in

7    my life.  If I feel it's important right now I

8    write it down.

9    Q.    Sometimes you go back and update your

10   calendar after the fact?

11   A.    Never.  I'm too busy.

12   Q.    So all of the entries -- well, let's

13   separate this out.  So there's appointments

14   that are on your calendar, right, like doctors'

15   appointments?

16   A.    Uh-huh.

17   Q.    Yes?

18   A.    I'm sorry, say that again.  There's

19   doctor appointments on my calendar, yes.

20   Q.    Those I'm assuming you put in on the

21   calendar when the appointment is scheduled?

22   A.    Uh-huh.

23   Q.    Yes?

24   A.    Yes.

25   Q.    And --

1    A.    When am I going to get that?

2    Q.    As far as you know sitting here today,

3  all of your doctors' appointments are

4  referenced, recorded on your calendar that's

5  been produced.  Fair?

6    A.    Correct.

7    Q.    Then there are other types of calendar

8  entries, which are more like diary entries of

9  what happened that day.  Is that fair?

10    A.    Nope.

11    Q.    No?

12    A.    I don't think I know what you mean.

13    Q.    Where you're just typing in what

14  happened that day, it's not an appointment,

15  it's more of the events of the day?

16    A.    Right, just notes, it's in the notes

17  part.

18    Q.    Right?

19    A.    Uh-huh.

20    Q.    Yes?

21    A.    Yes.

22    Q.    And all the information that you type in

23  the notes is also correct?

24    A.    Always.  My heart is correct.

25    Q.    Those notes, are you typing them in that

1   day or when do those --

2     A.    Usually it's that day, but if I think

3   something happened the day before I might go

4   back and note it, that that happened on this

5   day, but I don't really change anything I

6   wrote.   I write what I'm feeling, what I'm

7   thinking, whatever I need to remember, whatever

8   I want to write.

9     Q.    How far back do you go?

10    A.    Oh, I wasn't doing it for a long time

11  because I got busy, but I started up around the

12  time my mother was having some problems and I

13  wanted to keep a record because I just want to

14  keep a record.

15    Q.    If something happens today and you don't

16  have time to track it in the notes for today,

17  July 6th, how far in the future, like could it

18  be next week, next month you go back and, Oh,

19  wait, I forgot to put this in the notes?

20    A.    Honestly, I stopped tracking when my

21  mother left East Park.   I might have stopped

22  long -- like I just stopped.   I don't write all

23  the time, I write when I need to remember

24  something basically.   When I need to know

25  information -- because I can't remember things,

Page 56

1    I write it down.  I write the day down, I write

2    what happens that day, names, dates, people.

3    Q.    Why did you stop tracking?

4    A.    I got my life back together, tried to

5    move on.  I got -- made myself busy --

6    Q.    The last --

7    A.    -- and we left there.

8    Q.    The last entry we have is from -- with

9    any note is March 11, 2022.

10   A.    That's probably when if that's what you

11   have.

12   Q.    So you haven't made any note entries --

13   A.    I might have wrote something in there

14   about a doctor, about something, a meeting with

15   someone, there might be a little note written

16   down there, but my life has been, you know,

17   pretty good.

18   Q.    So if I'm understanding you correctly

19   then is March 11, 2022 the timeframe when you,

20   to use your words, got your life back together?

21   A.    No.

22   Q.    Okay.  So when was that?

23   A.    Getting, the word is getting my life

24   back together.

25   Q.    Okay.

Page 57

1    A.    Not get, got.

2    Q.    So when did you start doing that?

3    A.    I'm doing that right now, right now.

4    Q.    I'm still not sure I have an answer to

5    this question, and it may just be because I'm

6    wording it poorly.

7              So I'm trying to understand

8    contemporaneously when are you making the diary

9    entries or the note entries, the day it happens

10   or are you going back in time?

11   A.    Never.  The day I write it down, that

12   night I write it down if I think of it in the

13   morning.  Whatever I think of that I need to

14   write down, I write it down at the time I feel

15   it needs to be written down.

16   Q.    Understood, but are you like -- would

17   you ever -- so this morning I wake up and I

18   think, Oh, yesterday something happened.  Would

19   you go in and write what happened yesterday?

20   A.    In the next day?

21   Q.    No, on yesterday's date.

22   A.    Like I said, if I remembered something

23   that I forgot to take a note on that needed to

24   be on -- that it happened on that day, I would

25   go back and write it on that day where it

1    belonged.  So I would refer what happened on

2    that day or -- about that day, whichever, but I

3    have, you know . . .

4      Q.   All right.  I'm going to show you some

5    of these calendar entries.  First one's been

6    marked as Exhibit A.

7                   MR. BARDWELL:  Same thing.

8    BY MS. YODER:

9      Q.   Do you recognize this as one of your

10   calendar entries?

11     A.   I don't remember writing that.  I don't

12   even know what it's about.  When was it?  I

13   can't see, I have bad eyes.

14                   Going to look to see what's up,

15   $150.  I don't even know what that means.  It

16   might have been a note to myself to remind me

17   of something.

18     Q.   So the question is, are these the

19   calendar entries that we've been talking about

20   that you produced in --

21     A.   Looks different on paper, but, yeah, I

22   guess so.

23     Q.   Who is Dr. R. Rubin Gutarts, MS, Inc.?

24     A.   I think he's an eye doctor because I'm

25   about to have eye surgery.

1    Q.    This is dated January 22nd, 2018.

2    A.    Yeah, I was seeing -- if it is my --

3    it's either my eye or my -- because I switched

4    dentist, I don't know his name, but if I'm not

5    mistaken -- I would have to look.  Gutarts I

6    think is my eye doctor.  I don't know, maybe

7    not.  I don't know, it's too long ago.  I don't

8    know, can't remember.

9    Q.    So then you also probably can't tell us

10   what it means when it says, "Going for a look

11   to see what's up"?

12   A.    Nope.

13   Q.    Okay.

14   A.    No clue.

15   Q.    Now, I'm handing you another one of

16   these entries that's been marked as Exhibit B.

17   The Bates number is Criscione 003861.  Do you

18   recognize this as one of your calendar entries?

19   A.    No.  "Taking the assessment online."  I

20   don't remember writing that.

21   Q.    You don't remember writing that or

22   you're saying you didn't write it?

23   A.    I don't -- nobody else would write it

24   but me if it's my calendar.  My husband

25   wouldn't write it, no one else is there.

Page 60

1    Q.    So who's Andrey Stojic?

2    A.    One of my doctors obviously.

3    Q.    And what do you see Dr. Stojic for?

4    A.    I don't remember.  I saw a lot of

5    doctors, they would give me to another doctor,

6    so I don't remember.

7    Q.    Do you remember what was going on with

8    your health in March of 2018?

9    A.    No, can't recall.

10   Q.    Now, I'm handing you what we've marked

11   as Defendant's Exhibit C, Criscione 003901.

12   This is another one of your calendar entries;

13   is that right?

14   A.    Sure.  Foreign to me.

15   Q.    Did you not write this?

16   A.    Might have made a note of somebody I had

17   to look up, a doctor it looks like, I don't

18   know.

19   Q.    So is this a doctor's appointment on

20   December 7th, 2018 at 11:30?

21   A.    Where does it say that?

22   Q.    The start.

23   A.    Oh, 11:30.  Oh, yeah, it could have been

24   with this doctor, yeah.

25   Q.    And who is Dr. Daynelle Dawes?

Page 61

1    A.    I can't recall.

2    Q.    Do you know why you were seeing Dr.

3  Daynelle Dawes in December of 2018?

4    A.    Either for my arthritis or vertigo or

5  eye or whatever problem I had.  I don't

6  remember the doctors back then, no.  Daynelle

7  Dawes?

8    Q.    All right.  Now, I'm handing you

9  Defendant's Exhibit D, Criscione 003924.  Also

10  one of your calendar entries?

11    A.    Looks like I went to Dr. Thompson.

12    Q.    You went to Dr. Thompson on May 28, 2019

13  at 12:15?

14    A.    That's what it says.

15    Q.    And who is Dr. Thompson?

16    A.    Looks like I got -- I don't know.  I

17  can't recall.  I have to go look it up.

18                        (Whereupon, Michael Ockerman

19                         enters the room.)

20  BY MS. YODER:

21    Q.    And you have access to those records,

22  correct?

23    A.    Well, I have notes in my phone, and I

24  can look back at the doctor's phone number.  I

25  don't know if it's still there.

1    Q.    What type of notes do you maintain in

2  your phone?

3    A.    Just my calendar, recipes.

4    Q.    Would your calendar include additional

5  information than what we have here?

6    A.    My calendar now?

7    Q.    On your phone.

8    A.    No, it's the same thing, it's all

9  connected.  It's the same thing.

10    Q.    So what notes would you look at to try

11  to figure out who Dr. Thompson is?

12    A.    Well, I would go to my husband first

13  because he's a genius and he remembers

14  everything, I would usually ask him first, then

15  he would go back and look at the bill because

16  it looks like I paid $1,257, maybe he could

17  find out why I was there and get that

18  information.

19    Q.    All right.  I'm handing you Defendant's

20  Exhibit E, which is Criscione 003925.  This is

21  an entry from your calendar for a doctor's

22  appointment with Troy Frazee on June 3rd, 2019

23  at 12:30?

24    A.    I would have to look that up again.

25    Q.    Well, is this a calendar entry from your

Page 63

1   calendar?

2     A.   Like I said, it doesn't look like my

3   screen, but I guess it is.  It looks different

4   on the screen than on paper.

5     Q.   And who is Dr. Troy Frazee?

6     A.   I would have to look it up.

7     Q.   Do you know why you were seeing Dr.

8   Frazee in June of 2019?

9     A.   I can't recall.

10    Q.   I'm going to hand you what we've marked

11   as Exhibit F.  It's Criscione 003927.

12    A.   I can recall.

13    Q.   Do you know who this -- what that

14   relates to?

15    A.   Yes.

16    Q.   Okay.  Can you tell me?

17    A.   This is Dr. Shih, and he was my -- I

18   seen him for a short time because Loyke wasn't

19   there, he was in and out.  Then Linda Bolz was

20   his nurse practitioner and I would see her when

21   they weren't there, but that's who that is,

22   Parma Hospital, and that was -- could have been

23   about various things.

24    Q.   Was this your primary care physician?

25    A.   I believe -- yeah, I think -- yeah.  I

Page 64

1    really got to go look and ask my husband though

2    because, like I said, I saw a lot of doctors.

3       Q.    But for some reason you saw Dr. Shih on

4    June 11, 2019 at 11 a.m.; is that right?

5       A.    If Linda Bolz is on there I believe I

6    might have been having some issues with my

7    sinus and my ears, and I go in and Linda Bolz

8    would do the swishy thing on me and clean me up

9    and make it better for my vertigo as well,

10   vertigo.

11      Q.    All right.  And next is what's been

12   marked as Defendant's Exhibit G, which is

13   Criscione 003945.

14      A.    No insurance.

15      Q.    So can you read the subject on this one,

16   please?

17      A.    Carol -- "Dr. Carol Slover/cancelled

18   because no insurance for this bitch."

19      Q.    That's what you wrote?

20      A.    Yeah, I must have wrote that.

21      Q.    What were you going to see Dr. Slover

22   for?

23      A.    I can't remember.

24      Q.    And it looks like you had an appointment

25   on November 22nd, 2019 at one p.m. but you

1    canceled that appointment; is that right?

2    A.    Right.

3    Q.    And you don't know why you were going to

4    see Dr. Slover?

5    A.    "Canceled because of" . . .  I don't

6    remember.

7    Q.    All right.  Next is Defendant's Exhibit

8    H, Criscione 003954, an appointment with Dr.

9    Joshua Miller on February 17, 2020 at 8:55

10   a.m.; is that correct?

11   A.    I guess it's correct because it's in

12   here, but I would have to look it up, his name

13   again, to see why I went to him, I'm not sure.

14   Q.    Do you know who Dr. Joshua Miller is?

15   A.    Well, obviously he was one of my

16   doctors.

17   Q.    But as you sit here today, you don't

18   remember who he is?

19   A.    No.

20   Q.    Next is Defendant's Exhibit I, Criscione

21   004136.  Is this for an appointment on January

22   27, 2021 with Dr. Cracian; is that correct?

23   A.    Yeah.  Yeah.  He's the psychologist --

24   psychiatrist that I couldn't think of his name.

25   Q.    Okay.  Why were you treating with a

Page 66

1   psychiatrist in January of 2021?

2      A.    Anxiety.

3      Q.    Who referred you there?

4      A.    Probably -- I don't remember who

5   referred me.

6      Q.    Are you able to remember any names of

7   any other medical providers?

8      A.    It's very hard for me because I just

9   don't remember names.

10     Q.    Who's Dr. Eugene Britton?

11     A.    He's my dentist, was my dentist.

12     Q.    Who's your dentist now?

13     A.    I have a new one, her name is Jennifer

14  Psota in Westlake.

15     Q.    When did you start seeing Dr. Psota?

16     A.    Well, I don't remember the date.

17     Q.    Why did you start -- why did you

18  transfer from Dr. Britton to Dr. Psota?

19     A.    My previous dentist was having family

20  issues and I couldn't get in for a crown, and I

21  had seen Jennifer Psota's father at one time in

22  the past so I picked her to go to to get that

23  annoying crown put back in my mouth.

24     Q.    Since March of 2020 what providers have

25  you treated with at University Hospitals?

Page 67

1    A.    Since when?

2    Q.    March of 2020.

3    A.    I would have to go look.  When you're

4  nervous it's hard to think, I can't . . .

5    Q.    We had asked you to provide the

6  providers in the answers to interrogatories,

7  and the answer I got instead of names is

8  University Hospital.

9    A.    They had the list of all of my doctors'

10  names there, if you access the page you can get

11  their names, my appointments, everything.

12    Q.    But I can't do that.

13    A.    Yeah, yeah, I forgot.

14    Q.    You can do that though, right?

15    A.    Yes.

16    Q.    Okay.  But as you state here, you're not

17  able to give us the names of any of the

18  providers that you saw at University Hospital.

19  Fair?

20    A.    Because some of them are at University.

21  I get mixed up with where they are sometimes.

22    Q.    Well, so regardless of where they are,

23  are you able to identify any of your medical

24  providers that we haven't --

25    A.    Yeah, when I look them up I could tell

1   you why I went to each one, I'll recall their

2   name at that time.

3     Q.    So I'm asking as you sit here right now

4   are you able to identify any of your medical

5   providers?

6     A.    At UH?

7     Q.    Yes.

8     A.    Well, Dr. George.  I don't -- I don't

9   know.  I can't remember.  Very . . .  Dr.

10  Cracian was at the Clinic.  I don't know.

11    Q.    Can you think of any that we haven't

12  already talked about?

13    A.    I thought -- didn't you -- what are you

14  asking me, I'm sorry?

15    Q.    Sure.  I thought you were still thinking

16  if you could think of any of your providers.

17    A.    At UH?  I don't want to say their name

18  if they're not at UH, I don't want to say the

19  wrong name.

20    Q.    Why don't you just tell me any of the

21  providers then regardless of where they may

22  practice.

23    A.    Dr. George.  I know Modi is at Parma.  I

24  think it's just Dr. George.  I don't see Dr.

25  Cracian anymore.  I don't see the wrist doctor

Page 69

1   anymore.

2      Q.    Who is the wrist doctor?

3      A.    I would have to give you that name.

4   It's on the tip of my tongue, too, and I can't

5   think of it.  I went to several people for it

6   for several years, and I have to figure it out,

7   so I don't know.

8      Q.    Who is Debbie Carpenter?

9      A.    Debbie Carpenter was the DON of East

10  Park when I started there.

11     Q.    Did you like Debbie?

12     A.    I thought Debbie was wonderful.

13     Q.    She did a really good job?

14     A.    She did.

15     Q.    You thought she was a great DON?

16     A.    Absolutely.

17     Q.    You trusted her?

18     A.    Absolutely.

19     Q.    And you thought she was a good care

20  provider for your mother?

21     A.    Yes.

22              (Defendant's Exhibit J was marked

23                 for identification.)

24              MS. YODER:  I'll give you what we'll

25  mark as Defendant's Exhibit J.

1              MR. BARDWELL:   Thank you.

2     BY MS. YODER:

3       Q.    Have you seen this document before?

4     It's from August 17th, 2017.

5       A.    I can't read it.

6       Q.    So you --

7       A.    I have contacts.  I really can't read

8     this because I'm having a really hard time, and

9     I'm not comprehending my reading.  I'm having a

10    hard time reading it.  I would have to read it

11    on a computer screen, it would be much easier

12    for me to do.

13      Q.    Okay.  So let me ask you this, you said

14    that you have a migraine right now?

15      A.    An osteo migraine.

16      Q.    Is that impacting your ability to

17    understand my questions?

18      A.    Absolutely not.

19      Q.    Is it impacting your ability to

20    truthfully answer my questions?

21      A.    Absolutely not.  I live my life with

22    this.

23      Q.    Okay.  Now --

24      A.    It goes away in a little bit, it comes

25    and goes.

Page 71

1    Q.    Okay.  With respect to this document

2    that's in front of you, Exhibit J, this relates

3    to an incident in August of 2017 where your mom

4    reported having a broken back as a result of

5    being thrown in her bed.  Do you remember that?

6    A.    My mom -- I'm trying to remember.  I

7    don't remember.  I don't remember this, what my

8    mom had.

9    Q.    Pardon?

10   A.    I don't remember this.

11   Q.    Okay.  I'm going to read it to you

12   starting at the bottom, okay, and then I'll ask

13   you my questions.

14   A.    All right.

15   Q.    So at the very bottom of the page, the

16   last paragraph, "At approximately 10 a.m., the

17   resident's responsible party, daughter, Gina

18   Criscione came to the facility to visit with

19   her mom.  Prior to visiting with her mother,

20   Gina met with this nurse and Kathy Higham, LPN

21   (see attached statement) to review the above

22   concerns, assessments and observations and that

23   as was customary routine, the matter would be

24   fully investigated.

25             Upon reviewing these findings, Gina

1    became very tearful and emotional stating, 'You

2    do not have to tell me these things, I know how

3    my mother is, I'm so sorry.'  She stated that

4    she felt her mother received very good care at

5    East Park and she was thankful for all the

6    staff does for her and her mother.

7            Gina stated that she is aware her

8    mother has dementia but also wanted the staff

9    to know that her mother is also a manipulative

10   person that makes up things.  Gina stated that

11   her mother had been very mean and abusive to

12   her most of her life and that meanness and

13   manipulative behavior continues.  She stated

14   that her mother calls her very frequently and

15   reports things to her that are not true and

16   that this is not a new occurrence.

17           Gina became very emotional and

18   stated that she needs to seek emotional help

19   because of all the issues she is dealing with

20   now with her family and mother."

21   A.    I remember.

22   Q.    You remember --

23   A.    I remember.

24   Q.    Tell me what you remember about that.

25   A.    I remember exactly.  And there was a

1    transition period when my mother moved in, and

2    that's why Debbie is so good.

3              My mother has dementia.  I didn't

4    really know that much about dementia so I

5    studied it.  My mother was having dementia

6    during these mean periods, I didn't understand

7    that.  I understood it and I learned how to

8    deal with her meanness by doing the techniques

9    I learned from YouTube and going to classes at

10   the library for dementia and Alzheimer's.

11             Debbie and I had a heart-to-heart

12   talk.  My mother went through a lot of

13   transitions to get in to East Park, screaming

14   in the night, acting out, whatever.  Debbie

15   handled it, got competent aides that knew about

16   dementia, and it was blissful there for a

17   while, I loved it.

18             Debbie -- this was probably at the

19   beginning, I don't know, but there were times

20   when my mother couldn't push the button to pee,

21   and Debbie put up like a pee schedule.  She

22   always was very good, and the staff was very

23   good with the dementia and the care for my mom.

24             Yes, there were incidents because I

25   see my mother distressed and I'm upset and I

Page 74

1    did get help and I did deal with this, and

2    Debbie and I dealt with it and she, she was

3    wonderful, the staff was wonderful, trained for

4    dementia.

5      Q.   So you said you got help and that's

6    where the reference to you indicating that you

7    need to seek emotional help?

8      A.   Yeah, maybe that's when I went to see

9    Cracian, I don't know.

10     Q.   But you did in August of 2017 --

11     A.   There's those dates again.  I either

12   called Fritz or maybe I did go see Cracian, I

13   can't remember.

14           Like I said, I research.  So I

15   researched anxiety and all this, and I started

16   working out and eating healthier, and I was

17   able to deal with things better, too.

18     Q.   And you at that time told Debbie

19   Carpenter that your mother had been abusive to

20   you?

21     A.   My mom -- we're Italians, we're just

22   that kind of people, but during the dementia,

23   like I said, before I knew she had it she would

24   be loving me one minute, You are beautiful, God

25   I hate you the next.  It's dementia and I

1    understood that.

2            When I understood that, I know now

3    that you have to deal with dementia a certain

4    way, and we ended up at the end it was

5    beautiful with me and her.

6    Q.   So what about the comment here that you

7    told Debbie that your mother had been very mean

8    and abusive to you most of your life, so that

9    would predate the dementia?

10   A.   Well, my mother had a hard life, and,

11   you know, she yelled like mothers do and

12   mothers and daughters fight and whatnot, but we

13   always loved each other and always talked to

14   each other every day, every day.

15           If we yelled we were making up, you

16   know, it's like over.  So, you know, at that

17   moment, in that moment, what I said, I was full

18   of anxiety, who knows, I don't know.  I didn't

19   know how to handle it, I didn't know what to do

20   with my mom anymore, I wanted good care and I

21   got it then.

22   Q.   So you don't disagree with what Debbie

23   has written here, those are things that you

24   said to her?

25   A.   I agree with this whole thing, yeah,

Page 76

1    yeah.  Yeah, I do.

2      Q.   You mentioned that your mom had -- I

3    believe you called them mean periods.  Describe

4    those to me.

5      A.   Get out of here, leave me alone.  I

6    don't want you to be here, that was it.  She

7    would just get a little angry at my sister or

8    she would love me, you know.  Dementia, it's

9    what it does.

10     Q.   Was she ever physical with you?

11     A.   No.  We prayed every day the rosary when

12   I went to see her for the last -- I mean, we

13   always prayed the rosary together and music we

14   listened to.  We had a wonderful time together.

15     Q.   You were aware there were times when she

16   was physical with the employees at East Park,

17   right?

18     A.   I'm aware.

19     Q.   You good?  Are you good to keep going?

20     A.   Oh, am I supposed to keep talking?

21     Q.   No, I thought you were stretching and --

22     A.   I was waiting for your question, I'm

23   sorry.  I'm drifting off.  I didn't get much

24   sleep, I'm sorry.  I'm just kind of . . .

25     Q.   So if you get to a point where you feel

1    that you're unable to understand my questions

2    --

3     A.    I'm totally alert here.

4     Q.    I want to get something out here, okay.

5    I want to --

6     A.    Go ahead.

7     Q.    If we get to a point where you're either

8    unable to understand my questions or answer

9    them truthfully, truthfully, I want you to let

10   me know.

11    A.    Oh, I will.

12    Q.    Because the last thing I want is to sit

13   here all day and then in the future you say,

14   Well, I was tired or whatever and I didn't

15   understand your questions.

16    A.    I'm fine.

17    Q.    Okay.  Well, if that changes you just

18   let me know --

19    A.    I'm fine.

20    Q.    -- and we'll figure something out.

21    A.    I'm good.  We're here.  I'm here.

22    Q.    All right.  Text messages between you

23   and Sara Thurmer have been produced in this

24   litigation.  Are you aware of that?

25    A.    Sure.

Page 78

1    Q.    Have you reviewed those text messages?

2    A.    Recently?

3    Q.    At any time.

4    A.    Yes.

5    Q.    And as far as you know, all of the

6    information in those text messages was an

7    accurate reflection of the text messages that

8    were exchanged at the time?

9              MR. BARDWELL:  Objection.

10             THE WITNESS:  What was the question?

11   Sorry.

12             MS. YODER:  Sure.

13             THE WITNESS:  Say it again.

14   BY MS. YODER:

15   Q.    When you reviewed the text messages --

16   A.    Right.

17   Q.    -- do you have any reason to believe

18   that they've been altered in any way from your

19   original conversations with Sara?

20   A.    No.  I mean, if they were altered, no.

21   Q.    You started a blog in March of 2017

22   called Cries In The Night?

23   A.    Tell Us Your Experience.

24   Q.    So -- I'm sorry?

25   A.    Cries In The Night, Tell Us Your

1    Experience.

2      Q.    Is the name of the blog?

3      A.    Right.

4      Q.    Why did you start that blog?

5      A.    It's not a blog, it's a group page.

6    It's a group for the -- advocate for the

7    elderly, just a bunch of people that have

8    parents they're taking care of.  That's why I

9    found out ways of learning about dementia from

10   other people and stuff like that.

11     Q.    Did you start the page?

12     A.    Yes.

13     Q.    Okay.  Are you -- so there's been posts

14   that have been produced in discovery in this

15   case.

16     A.    Okay.

17     Q.    Are those posts that you authored?

18     A.    I authored all and most posts on that

19   page.  I don't think the comments.

20     Q.    So the comments may be attributed to

21   other people, correct?

22     A.    Correct.

23     Q.    But the actual posts are --

24     A.    Right, I did that.  I'm admin on that

25   account.

Page 80

1    Q.   And as far as you're concerned,

2  everything that you posted on that page was

3  accurate?

4    A.   What do you mean accurate?

5    Q.   Correct, truthful, honestly.

6    A.   I don't usually tell lies, I tell the

7  truth.

8    Q.   Did you tell any lies on your posts on

9  the Cries In The Night page?

10   A.   Never.

11   Q.   I'm going to ask you now some more

12  questions about your calendar entries.

13   A.   Okay.

14   Q.   I noticed that some of the entries are

15  listed as My Pain.

16   A.   I needed a heading, and I was in a lot

17  of pain from my mom and for me.   Sorry.

18   Q.   It's all right.  Do you want to take a

19  break?

20   A.   Oh, boy.

21        MS. YODER:  Okay.  We'll take a

22  break.

23        (Short recess was taken.)

24        (Notary read back as requested.)

25  BY MS. YODER:

1    Q.    Why did you decide to start diarying or

2    calendering about your pain?

3    A.    Well, why?

4    Q.    Uh-huh.

5    A.    When -- let me think about this one.

6    Something was up.

7    Q.    What do you mean by that, something was

8    up?

9    A.    Something was up because I noticed the

10   care dropped drastically.

11   Q.    When was that?

12   A.    When the new management started pretty

13   much.

14   Q.    When was the new management?

15   A.    I don't remember when they came in.

16   Q.    Who was the new management?

17   A.    Laura DiVincenzo sitting next to you.

18   Q.    Do you understand that Ms. DiVincenzo

19   had the same position with East Park the entire

20   time that your mother was a resident?

21   A.    What does that mean?

22   Q.    That there was no new management while

23   your mother was a resident.  Were you aware of

24   that?

25   A.    Well, when the entire staff comes crying

Page 82

1    to me in my room telling me, I'm leaving there,

2    I can't stand the new management, okay, the

3    people that was caring for my mother correctly,

4    okay, that's what happened.

5      Q.    Okay.  Who was it that told you that

6    they can't stand the new management?

7      A.    Okay.  Jeannie Brown, David Riddle,

8    Renee Nagry, Annette Roman, Donna, she's in the

9    kitchen, Donna.  There were various aides, I

10   can't recall their names.

11     Q.    And these people all told you that they

12   were leaving because they can't stand the new

13   management?

14     A.    Ultimately they did.

15     Q.    Hold on.  So --

16     A.    I'm sorry.

17     Q.    -- they told you that they're leaving

18   because they can't stand the new management?

19     A.    Well, there was a buzz.  I was there a

20   lot, and there was a buzz about Laura and the

21   way things were running and empty, empty

22   closets, Depends, my mother's Depends, they

23   never had her size.

24            Tina at the reception desk would --

25   I mean, I've been in cabinets, I've got things,

Page 83

1    I've helped them there.  I was there a lot.

2    They didn't have enough people.  They were

3    telling me that, and I could see, I could see a

4    big difference.

5       Q.   You don't know when that was though?

6       A.   Well, you say she -- that she was always

7    there, so I don't know.  It was when everybody

8    else thought, I guess, there was new management

9    because that's what I heard, there was new

10   management, so, you know.

11      Q.   So what I would like you to do is

12   identify every person who told you there was

13   new management.

14      A.   And Dottie Welch wasn't there anymore.

15   Debbie Carpenter --

16      Q.   Debbie Carpenter told you?

17      A.   -- came in my room and told me that she

18   was going to be leaving and she was very sad

19   but she can't deal with this.

20      Q.   She can't deal with what?

21      A.   What was going on.  They were all pretty

22   much saying the same thing, low supplies, not

23   enough people.  That's why I would be there to

24   feed my mom a lot with my sister, we

25   tag-teamed.

Page 84

1    Q.    Are you able to identify any person who

2   told you that there was new management?

3    A.    Anybody?

4    Q.    Yes.

5    A.    Everybody there.

6    Q.    So specifically --

7    A.    They were all talking about it.

8    Q.    Yeah, I understand.  So specifically who

9   told you --

10    A.    The first time I heard you mean?

11    Q.    -- any -- at any time that said there is

12   new management?

13    A.    The people I named were telling me

14   pretty much because they were leaving.

15    Q.    Did you start making the My Pain entries

16   in your calendar for purposes of the

17   litigation?

18    A.    I didn't know where it was going to go.

19   I was seeking help, working with Sara when

20   things went wrong.  She held my hand through

21   it, It will never happen again, we're going to

22   do this.

23           I thought a new administrator, I've

24   built businesses before, I want to work with

25   this lady because my Mount Alverna opening

1   isn't coming yet, and I'm not going to move my

2   mother like a chess piece with dementia.  I

3   waited it out.  I was hoping and praying that

4   we could get her in to Mount Alverna as soon as

5   possible.  For three years I was waiting.

6     Q.   When did you first try to get your

7   mother in to Mount Alverna?

8     A.   Three years before -- well, when my mom

9   -- the same time I wanted to get in to East

10  Park.  I had choices, I had to pick a nursing

11  home for her to go to, and my first choice was

12  Mount Alverna, my second choice was East Park

13  because of Dottie Welch, it was a five star, it

14  was all good, and it was close to home for me

15  and my sister and brother to visit.

16    Q.   What was the process that you went

17  through at Mount Alverna to try to get your

18  mother in there?

19    A.   Oh, when pain was going on in my

20  calendar --

21    Q.   No, I'm talking about --

22    A.   -- I was walking into Mount Alverna a

23  lot talking to Sandra Kuzar, getting her on a

24  waiting list.  Sandra Kuzar following me for

25  three years letting me know, Jeez, I don't

Page 86

1    think it's going to be another two years, Gina.

2    It will be another one year, Gina.  Oh, hang

3    on, it's only going to be two weeks.  Sorry.

4            And she finally got there, they were

5    going to evict her, and they opened the doors

6    at Mount Alverna.  It was like God sent.

7    Q.   So at the same time that your mother was

8    being placed at East Park you were also trying

9    to get her in to Mount Alverna.  Did that

10   involve --

11   A.   Mount Alverna was full.

12   Q.   I understand that.  Did that involve

13   submitting paperwork?

14   A.   Yes, I filled out for whatever I had to

15   do to get her on a waiting list.  I had to give

16   her information, Social Security, all her

17   information stuff, and they had it ready to go

18   and they were going to call me as soon as a bed

19   came up.

20   Q.   So your mother was on a waiting list at

21   Mount Alverna the entire time she was at East

22   Park?

23   A.   Yes, because the day she was in the

24   hospital they made me choose places, and I

25   choose five star.  I read and looked and that

Page 87

1    was the way it was at that time.

2              I couldn't get in to Mount Alverna,

3    took my second choice.  My third choice was St.

4    Augustine's, I think.

5    Q.    So for the three years your mother was

6    at East Park you continued to follow up with

7    Sandy Kuzar?

8    A.    Kuzar.  I think it's Sandra.

9    Q.    So how were you following up with

10   Sandra?

11   A.    I would call her, I would say, Do you

12   have an idea how long?

13   Q.    Any -- did you exchange any e-mails with

14   Sandra?

15   A.    I would have to look, but I went down

16   there a couple of times to view the place and I

17   got a tour.

18   Q.    Who gave you the tour?

19   A.    I can't remember the person's name that

20   did that.

21   Q.    From the calendar entries that were

22   produced we don't have any entries from August,

23   September, October and then all of November

24   until November 23, 2021.

25   A.    Because --

1          MR. BARDWELL:  Wait for a question.

2    BY MS. YODER:

3      Q.   That's my question, why?

4      A.   Oh, why?

5      Q.   Yeah.

6      A.   Say that again for me, please.  I'm

7    sorry.

8      Q.   There are no entries in your calendar

9    from August, September, October all the way

10   through until November 23rd, 2021.  Why is

11   that?

12     A.   Well, part of my recovery period for me,

13   okay, I had decided that I was just going to

14   move forward with my life, and I threw myself

15   into building an on-line business Life With Me,

16   Gina Marie, made 129 videos and just got

17   totally off the whole East Park thing.  I

18   didn't care if the Ohio Department of Health at

19   that time came at me or tell me things went

20   wrong.  I just said, I'm done, I'm sorry, mom,

21   I'm dying here when it's my life, that's why

22   . . .

23          I'm okay.  I'm sorry, I didn't mean

24   to ramble, but basically that's the story.

25     Q.   What were the 129 videos of?

Page 89

1    A.    About 129, there might be 126, there

2   might be more because I put some on there, I

3   don't know.  Facebook and YouTube were recipes

4   that my mother and I cooked together, recipes I

5   gathered from the family, recipes I researched.

6              I also was researching how to be a

7   video editor, and I'm a videographer and now

8   I'm a digital creator for Facebook.  I get into

9   the editing, that's one of my hobbies, what I

10   do in my spare time, I just threw myself into

11   it and it gave me -- took my mind off of the

12   pain.

13    Q.    Was that helpful for your recovery?

14    A.    It was until October.

15    Q.    What happened in October?

16    A.    I got called by the Brook Park police

17   department, and I was doing all these things I

18   didn't do.  My life fell apart.  I love my

19   mother.

20    Q.    That was October of 2021?

21    A.    I don't know, sometime in October.  I

22   don't know when I got a call from the Brook

23   Park police department telling me that North

24   Park, Laura DiVincenzo from North Park, he said

25   the wrong name, I knew it was from East Park,

Page 90

1    they filed some charges against me, I don't

2    know, because I checked and researched about

3    walking with my signs, and I was just trying to

4    let people know how it was for my mother in

5    there, and I wanted people to listen.

6            I had my Cries In The Night,

7    everybody thought it was great.  I was walking

8    until I didn't want to walk and I got tired,

9    sick, I went to bed, and they evicted my mom,

10   they evicted my mom.

11           I don't know why I brought that up,

12   just ignore that.  I get flashbacks of the

13   awfulness, okay, I'm sorry.  I went through

14   hell and my mother went through hell, my family

15   went through hell.

16   Q.   There's also a gap in the calendar

17   entries, so there's one on November 23rd, 2021

18   and then there's nothing again until March 11,

19   2022.  Do you know why that is?

20   A.   Say those dates again.  I'm going to try

21   to really -- I'm really trying on the dates.  I

22   want you to know I'm not doing this to -- if I

23   knew I'd tell you.  Give me that span again.

24   Q.   November 23rd, 2021 through March 11,

25   2022.

Page 91

1    A.    Okay.  Why did I stop?

2    Q.    There's an entry on November 23rd, 2021.

3    A.    Okay.

4    Q.    And then there's no entries until March

5    11, 2022.  Why that is?

6    A.    Obviously, I was busy doing something

7    else and I didn't have time to record any more

8    pain at that time.  I know I was just, you

9    know, doing what I had to do.

10   Q.    There's a video that I've seen and it's

11   you, it looks to be a -- appears to be you

12   recording yourself while you're driving.

13   A.    While I'm driving?

14   Q.    I believe so.  You're in the car.

15   A.    Never.  I don't drive, number one.  I

16   drove to East Park because it's a hop, skip and

17   jump from my home, but I don't drive because of

18   my arthritis and my blindness and vertigo and

19   all my problems.

20          I'm afraid I'm going to get stuck

21   somewhere and he has to come and get me.  I

22   don't drive that much at all, and I would never

23   drive with my cell phone up like that, I need

24   both hands.

25          I'm wondering if this one is going

Page 92

1    to stop working on me, I just need to pay

2    attention when driving.  I could drive to save

3    my life but I don't because of my conditions.

4    Holding a cell phone up?

5      Q.   Give me just a second here.

6           All right.  Can you see this screen

7    okay?

8      A.   Yes.  That's me.

9      Q.   And that's you in the pink hat?

10     A.   Sure is.

11          MS. YODER:  Okay.

12          (Whereupon, the videotape was

13          played into evidence.)

14   BY MS. YODER:

15     Q.   So what's going on on that video?

16     A.   That's not my video.  Somebody took my

17   video and put music over it and really messed

18   it up because I'm a videographer, my videos

19   don't look like that.

20          That is me, I did post that, my

21   Cries In The Night.  That's the last day I

22   walked with the signs.  I was clearly sick, my

23   eye was blind, I was really sick, high blood

24   pressure, 98 degrees, okay, and I wanted to

25   walk to bring awareness, and it wasn't working,

Page 93

1    three weeks of it it wasn't working.  No one

2    was walking with me.

3           I gave up because I was so sick.  I

4    threw my hands up and that was it, I started

5    doing my videos.  I cried and told my mom, I

6    can't fight for you anymore, I'm just going to

7    forget it.

8    Q.   So you posted that video the last day

9    that you walked in front of East Park?

10   A.   I uploaded to YouTube and I had a link,

11   and I had it on my Cries In The Night page to

12   let people know how I was doing, that I'm done,

13   it's not working.  I put the signs down.

14   Q.   Could you understand what you were

15   saying in the video?

16   A.   Yeah, I know exactly what I said because

17   I looked at the real video when I saw that.

18   The real video -- I made three of them because

19   I think I walked three times or something like

20   that, I'm not sure.  I'm saying, I'm done, I'm

21   so tired.  I can't take this anymore.  I'm

22   going home, and I'm going home to see if the

23   Ohio Department of Health called me yet, and I

24   think I'm done here pretty much basically is

25   what I was saying, and I went home and

1   collapsed.

2          That was a bad day, very hot.  It

3   was like right here now.

4    Q.   And so you have the original video that

5   you posted?

6    A.   Oh, definitely.  I keep my records very

7   good, you know that, I do, I do, very good.

8   You know that.

9    Q.   Is there a reason it hasn't been

10  produced in this lawsuit?

11   A.   I gave you the videos from the YouTube

12  links.

13          MR. BARDWELL:  They were all

14  Facebook stuff.

15          THE WITNESS:  I had to open it and

16  make it listed.  I had them all private, I

17  didn't really want to look at it anymore,

18  didn't want anybody to look at it anymore.

19  BY MS. YODER:

20   Q.   So those are all available on YouTube?

21   A.   Well, you can't go, but I can send you a

22  link.  I don't want to make it public.  You can

23  make it private for just me or unlisted to send

24  it.

25          MR. BARDWELL:  I think if you use

Page 95

1    the -- so we made the productions of the Cries

2    In The Night posts, and I think those will have

3    -- I think like those are printed from the web

4    sites, so I believe you have live links to

5    those videos.  If not, let me know and we can

6    get whatever else.

7              THE WITNESS:  I put my iPad in the

8    car purposely so I can watch, you know, see

9    myself, what I'm doing, and I didn't want any

10   trouble or anybody starting trouble with me.

11   So I had the iPad there that day, that's why

12   that was recorded.

13   BY MS. YODER:

14     Q.   So you were recording from your iPad?

15     A.   I put it in the window to watch me walk,

16   and when I come in the car I would say, I'm

17   done, I'm sorry or I would say something and

18   close it out and drive home.

19     Q.   Do you have the video then of the entire

20   time that you were in front of East Park?

21     A.   Oh, yeah, walking around with the signs,

22   everything, everything.  Nothing happened.

23   People stopped, a couple of people looked at

24   the sign, that's it, nothing really.  I wanted

25   awareness.

Page 96

1    Q.    So you have a video from every day that

2    you were out there?

3    A.    Yes.

4    Q.    Were you driving when you took --

5    A.    I drove that day, and my husband was

6    very worried about me.  He had to work, but I

7    had to do it, I wanted to do it for my mother.

8    Q.    Were you driving while the video was

9    recording?

10   A.    Absolutely not.  I took the video down

11   and drove away.

12                  (Defendant's Exhibit K was marked

13                   for identification.)

14   BY MS. YODER:

15   Q.    All right.  I'm handing you what's been

16   marked as Defendant's Exhibit K.  It's

17   Criscione 004567.

18   A.    March of 2022.

19   Q.    I can read it if that's easier.

20   A.    This is a little bit so I could get it,

21   I can get it.  I'm just slow, sorry.

22   Q.    Okay.

23   A.    I'm sorry.  I can't believe I wrote

24   this.  I don't feel this pain right now.  I

25   feel sorry for them, I pray for them.  I was

Page 97

1    angry.  I was angry.

2       Q.    So when did you write this entry into

3    your calendar?

4       A.    Probably that day.

5       Q.    March 11th --

6       A.    I don't know.

7       Q.    -- 2022?

8       A.    Probably did.

9       Q.    Why don't you go ahead and read what you

10   have written there.

11      A.    "March 11, 2020 was the last time I got

12   to see my mother at that crappy East Park,"

13   that place, East Park.  "I'll always remember

14   the beautiful day that we had together that

15   day.  Thinking we would have many more but they

16   took it away from me.  Not COVID, not the

17   quarantine.  But a Laura DiVincenzo and a Sara

18   Thurmer are assholes!!!!!  God help them.  I

19   know my mother is in a better place now, too

20   bad they had to put her there faster and she

21   needed to be.  They took a communication away.

22   They are evil."

23              Yeah, I went back after she died and

24   wrote that in there because that was the day,

25   the last day I spoke with my mother after she

1    got out of the hospital; dehydration.

2      Q.    And this is the last entry that we have

3    from your diary?

4      A.    That is?

5      Q.    Correct.  Have you made any entries

6    since then?

7      A.    I don't remember, I would have to go

8    look.

9      Q.    Okay.

10     A.    My attorney might have them, I don't

11   know.

12     Q.    And you understood that there were

13   governor's orders that East Park had to follow,

14   correct?

15     A.    It had nothing to do with COVID.  They

16   were stopping my phone calls with my mother.

17   They were told that if they called me they

18   would be fired.

19     Q.    Who was told that?

20     A.    Renee Nagry, Jeannie Brown came to my

21   house, they were friends of mine.  Jeannie came

22   over, cried to me about it, she can't talk to

23   me anymore.  She can call other people's mom

24   but she's not allowed to dial Dorothy's speaker

25   phone.  All they had to do was dial it and

Page 99

1   leave the room and my mom could sit there and

2   hear me.  That's it.

3      Q.   Who told -- anything else?

4      A.   Yeah, there's more, let me think.  Who

5   told you that they were going to fire -- that

6   was Renee, Jeannie, Denise Crozien, nurse

7   practitioner.  I'm sorry, are you waiting for

8   me to elaborate on this or something?

9      Q.   No, I had asked if there was anyone else

10  that told you they would be fired --

11     A.   Oh, I'm sorry.

12     Q.   -- if they made a phone call.

13     A.   I'm thinking of who else would have told

14  me that they weren't allowed to call me.

15          I can't recall anyone else at this

16  time.

17     Q.   Do you know of anyone who was fired?

18     A.   Yes, Denise Crozien, that's the only one

19  that I know of that was fired.

20     Q.   For calling you?

21     A.   I don't know why Denise Crozien was

22  fired, but.

23     Q.   Did you ever ask Denise?

24     A.   They were all told they were going to be

25  fired if they called me, and they had to get my

1   name off their Facebook.  Denise is the only

2   one that didn't get it off my Facebook -- her

3   name off my Facebook.

4           She said to me, quote, Screw them.

5   We're friends outside of here, I'm not taking

6   you off my Facebook, and she got fired.

7   Q.   And as a friend, did you ever reach out

8   to Denise and ask why she had been fired?

9   A.   Denise and I were friends -- well, she

10  was fired along with the doctor.  I believe

11  several people were fired, I don't know.  I

12  didn't pay attention at that point who they

13  were firing.  I was just sad that Denise got

14  fired because she was a great nurse

15  practitioner.

16  Q.   And my question is, do you know why

17  Denise was fired from East Park?

18  A.   I don't know personally.

19  Q.   Did you ever ask her?

20  A.   Her and I talked, we kind of -- I don't

21  remember.  I don't remember.  We talked a

22  little bit back then, and she just -- I don't

23  know.  I don't think she ever told me a real

24  reason.  I more or less assumed that was the

25  reason with the Facebook thing, everybody's

Page 101

1   told and Denise gets fired because she took me

2   off -- she didn't take me off, so it's kind of

3   obvious I thought.

4     Q.   Just so we're clear, you never asked

5   Denise why she was fired?

6     A.   Not really, no.  We assumed.

7     Q.   You continued to receive phone calls

8   from your mother during COVID, correct?

9     A.   The beginning of the doors closing on

10  March 11th at COVID, there were still nurses

11  there that knew how to care for my mother, knew

12  her care plan, and those are the ones that

13  would go behind the back of the administration

14  and call me on their cell phones to talk to my

15  mother or dial her phone for me or whatever.

16  It was before they were threatened, but there

17  was a lot of them -- they would do it

18  automatically.

19         They did this for three years while

20  I've been here.  They know me and my mom talk.

21  Hi.  Good morning, Tina.  Can you turn Golden

22  Girls on for my mom?  Thanks.

23         I'm worried about mom.  Hi, who's

24  taking mom to lunch?  Nobody's here.  I'm going

25  to come take her.  I was in contact with her.

Page 102

1    I would go up there, if I wasn't on the phone

2    with her, three or four times a day.  She liked

3    to talk to me.

4            Do you know I would prepare one of

5    my entire videos I make for YouTube in my

6    kitchen with my filming while my mom was on my

7    speaker phone and they dialed her number

8    because she couldn't dial, and she would talk

9    to me for hours, hours and hours.  They took

10   all that away from us, they did.

11   Q.    So are you saying that there came a

12   point where you no longer had any phone calls

13   with your mother?

14   A.    Read my calendar about -- there's some

15   on my calendar there.  I don't know when it is,

16   but it's like three weeks with no medical

17   reports, no answering, any nurses or anybody to

18   give me any condition my mom's in, and when

19   they did it was vague and when they said they

20   would call back they didn't, and when I tried

21   to reach them back they gave me someone else.

22   It was a runaround for me.

23            They didn't want to tell me anything

24   about my mother as she looked more and more

25   lethargic behind a window, and I wanted to know

1    what my mother's medical condition was.

2              They weren't calling me.  They're

3    not even allowed to dial the phone for her I

4    said and leave it on the table, the speaker

5    phone?  No, because they were afraid I was

6    going to talk to one of the nurses and try to

7    find out my medical information.  They were

8    busy, I understand or whatever they were doing,

9    I didn't know what was going on.

10   Q.   I want to make sure I understand your

11   testimony.  Was there a point when you were not

12   having any phone calls --

13              MR. BARDWELL:  Listen to the

14   question.

15   BY MS. YODER:

16   Q.   -- whatsoever with your mother?

17   A.   Yes.

18   Q.   When?

19   A.   In the middle of COVID when they told

20   everybody not to call me, whenever that was.

21   About three weeks -- I don't know.  I know for

22   about three weeks I was just going crazy not

23   talking to her.

24   Q.   So you're telling us there's a three

25   week period --

Page 104

1    A.    Approximately.

2    Q.    You got to let me finish.

3    A.    I'm sorry.

4    Q.    There's a three week period where you

5    did not have any communication with your

6    mother?

7    A.    None.  I would go to the window and she

8    was lethargic, and I would collapse and go

9    home.  I talked to her sometimes and she wasn't

10   . . .

11   Q.    Okay.  So the question -- are you saying

12   that you would call, they would connect you to

13   your mother but she was lethargic or are you

14   saying the calls were not --

15   A.    I'm all over the place, I'm all over the

16   place, that's the way I am, sorry.

17   Q.    Yeah.

18   A.    In the beginning of COVID they were

19   dialing a little bit.  We don't have enough

20   time, it's COVID, we can't get enough people.

21   Then it was nobody's answering me, and then I

22   have Jeannie at my back door crying to me that

23   they're not allowed to call me anymore, and I

24   don't know if I answered your question or not.

25   Sorry.  Basically that's it.

1    Q.    When did Jeannie come to you?

2    A.    Right at the beginning of COVID there.

3  Oh, Jeannie came over quite a bit.  Well, on

4  and off, not quite a bit.  We're friends.  This

5  is when -- it was during COVID.

6              I was out on the back on my deck,

7  and she came around and started talking to me.

8  I'm not even supposed to be here, I'm not

9  supposed to talk to you, we're all threatened,

10  it's horrible.  I don't want to be there but I

11  have to because I need money, and, you know,

12  that was what it was really pretty much.

13    Q.    All right.  So initially when COVID

14  started you were, although maybe not as

15  frequently, you were still able to have phone

16  calls with your mom?

17    A.    Couple times.  I was trying to all the

18  time.  I kept calling the desk for somebody to

19  dial her number for me, please.

20    Q.    And at some point that stopped and you

21  had no calls whatsoever with your mother for

22  approximately three weeks?

23    A.    Approximately.  I have it on my

24  calendar, I could check the exact date for you

25  because I remember reading the notes, and I was

1    going over everything because it was very hard

2    for me to go over.

3      Q.   So before the speaker phone when you --

4    well, let me ask you this.  Were you talking to

5    your mom, did she have a land line or a cell

6    phone?

7      A.   I paid for a private line myself, and

8    they were denying me of it.

9      Q.   So it was a land line in her room?

10     A.   (Witness nods head up and down.)

11     Q.   Yes?

12     A.   Yes.  We would call her on it, but she

13   can't answer, she couldn't always answer, but

14   the aides, they would be -- if they were in the

15   room cleaning or whatever they would pick it up

16   and go, Hang on, Dorothy, your phone's ringing.

17   That's where she could still hold the phone.

18           Then it got to a point where I had

19   to get a speaker phone, listen to music, that

20   way.  I brought the speaker phone mid COVID, I

21   think, that I had been there, and I put my

22   brother's and my sister's phone number taped to

23   it and said, Please, if you're in the room just

24   dial my mom's number and walk out so I could

25   hear her, we could talk.  Nothing.  Nothing.

1    Q.   You obviously didn't go in to the

2  facility after COVID, correct?

3    A.   When I -- the last time I was at East

4  Park, I think I had collapsed at the door, at

5  the window, I couldn't take it anymore.

6           I went home for -- I went to pick up

7  something they had of mine, they didn't have

8  it, I don't remember, but it was -- I can't

9  remember.  I can't remember.  I was very

10  distraught during this time.  They weren't

11  letting me talk to my mom.

12    Q.   So my question is, after COVID started

13  in March of 2020 visitors were not permitted in

14  the facility, correct?

15    A.   Well, they let my brother in on a

16  Sunday.  Sorry.

17    Q.   Did you go in to the facility?

18    A.   No, I never went in the facility.

19    Q.   What was your mother's phone number?

20    A.   You know, I can't remember offhand.

21    Q.   Do you have records of that somewhere?

22    A.   Somewhere.  I think we have it, don't

23  we?

24           MR. BARDWELL:  (Shrugs shoulders).

25  BY MS. YODER:

1    Q.    When your mom was unable to hold the

2    phone and before you got the speaker phone,

3    would an aide or someone have to stand there

4    and hold the phone for her?

5    A.    No, no, I didn't want them to.  When

6    that happened I brought the speaker phone right

7    away because I didn't want them to have to,

8    they had other people to tend to, I know that.

9              I'm compassionate, I don't want them

10   to be on just my mom.  I understand they have

11   other people, and there's not a lot of people

12   there as it is to accommodate all those people.

13   Q.    And if it were suggested that you did

14   not have any phone calls with your mom for

15   three months, that would not be accurate,

16   correct?

17   A.    Three months?

18   Q.    Yes.

19   A.    No, because she left -- no, because she

20   left on the 21st of May and we had no calls

21   before that, and COVID couldn't have been three

22   months, that's crazy.  Who said that?  I'm

23   sorry, that's too -- I don't think so.

24   Q.    During COVID you were still able to see

25   your mother, like through a door; is that

Page 109

1   right?

2      A.   Well, it started as a door, the front

3   door, and it was so -- you couldn't hear, you

4   couldn't talk, it was horrible.

5           So then they started the window.  I

6   can go on about that, but I -- I go to the

7   window and I could, but I couldn't bear seeing

8   her, what was happening to her so swiftly.

9           We were all concerned, and me, I get

10  upset, and my anxiety, I just got vertigo, I

11  had to go home and go to bed.  I was very sick

12  seeing my mom like that and not being able to

13  do anything for her.

14     Q.   Were you on the East Park campus on

15  September 20, 2020?

16     A.   No, I was sitting at my desk watching

17  church on-line or something like that.  I was

18  talking to people on-line.

19          I have video records and recordings

20  from my Facebook stating timestamped times,

21  where I was at that time, that I was allegedly

22  seen in a white vehicle, which I don't own, at

23  East Park on a Sunday supposedly after

24  whatever.  I don't do that, I don't go to East

25  Park on Sunday, no, I never went there.  It

 1   wasn't me.  It wasn't me.

 2      Q.   What kind of vehicle do you have?

 3      A.   We have a black Escape, and at that

 4   point I probably wasn't driving.

 5      Q.   You're aware though that someone made a

 6   report that they had seen you at East Park?

 7      A.   Yeah, I'm aware.

 8      Q.   Do you know who it was that made that

 9   report?

10      A.   I only know from what I heard.

11      Q.   What did you hear?

12      A.   Couple of girls were outside on their

13   break, and they saw me drive through East Park

14   with a baseball cap, sunglasses in a white

15   vehicle on a Sunday looking for Sara, who

16   doesn't work on Sunday, and it was a pure lie.

17   I was like, A white vehicle?  It was enough.

18   It's public record.  It was on our evidence --

19   it's out there, that's what they claimed that I

20   did.

21      Q.   Do you know why they would do that?  I'm

22   sorry?

23      A.   I'm thinking because there's so many

24   things.  Why they would say that I rode through

25   there?

1                There was a post I was making, and I

2    don't know, like that thing, and someone was

3    running them saying I'm some kind of awful

4    person.  Someone made up, When do East Park

5    aides stand outside and smoke where the cars

6    drive around?  That never happened, they're

7    working, and they smoke out back, so I don't

8    know.  I don't know.

9                I heard hearsay, probably from -- I

10   don't know, I heard it on the evidence, and

11   then I heard -- I don't know how I heard it

12   first off, I really don't.

13   Q.   The question was why people would say

14   that they saw you on campus?

15   A.   Why?

16   Q.   Yeah, if you know.

17   A.   They think I'm a bad person, they think

18   I'm after Sara, they think -- I don't know what

19   they think.  I don't know why anybody would do

20   that to me, I don't.  I would never do that.

21   Q.   You wouldn't have had any reason to be

22   at East Park on September 20, 2020?

23   A.   I never wanted to see that place again

24   when I backed out -- got out of there, never.

25   I had -- I have to tell you.

1 Q. What's wrong?

2 A. Nothing.  It's hard for me to do this,

3 I'm sorry.  I'm trying to do the best I can.

4 Q. The police contacted you on October 1st,

5 2020, they called you; is that right?

6 A. I don't know if it was October 1st.  It

7 was in October.

8 Q. Tell me what you remember about the

9 first time the police contacted you.

10 A. I have a video/audio call of the man

11 that called me if you want it, but he said, I

12 think I said it before, This is Sergeant Blah,

13 Blah, Blah from the Brook Park police

14 department, and we have two ladies down here

15 from East Park, Sara Thurmer and Laura

16 DiVincenzo.  They say you're doing blah, blah,

17 blah, I don't remember exactly, they're filing

18 blah, blah, blah.  I'm like, What?

19     I had just given up everything and

20 was moving on my way, and these guys are

21 pumping it up here, what the heck?  Why?  Maybe

22 -- I don't know.

23 Q. But you have the audio of that phone

24 call?

25 A. Oh, yeah.

1    Q.    What did you tell the officer who called

2    you?

3    A.    I said, That's absurd.  Of course, I was

4    like angry.  My mother is being destroyed there

5    and you're coming after me?  I was beside

6    myself.  I was very upset.

7    Q.    Do you remember anything else that you

8    told the officer?

9    A.    No.  He said I would get a call back as

10   to when I could come down and whatever, I had

11   to come sign papers, I don't remember,

12   something like that, and I did what they said.

13   Q.    You came down and got the charges that

14   were being filed against you?

15   A.    Absolutely.  I abide by the law always.

16   Q.    Did the police ever interview you?

17   A.    The police?  Not really.  I don't

18   remember.  I went there and they told me why

19   they're starting this, and I signed it and I

20   was waiting for a court date and I'm baffled.

21   Q.    Did they ask you anything when you came

22   down to pick up the charges?

23   A.    I walked in the door, no one was around,

24   I beeped the thing.  He came out, he gave me --

25   -- he must have given me papers and I left.  I

Page 114

1  wasn't interacting with the police much at all,

2  not at all.

3    Q.   Did you ever give a statement to the

4  police?

5    A.   I don't recall if I gave a statement to

6  the police.  I don't think so.  I think I just

7  got their stuff and what they were saying about

8  me.

9    Q.   Did you ever tell the police that you

10  were not on the property in September of 2020?

11    A.   If they asked me that I would have told

12  them that exactly.  I don't remember if they

13  asked me that or not.  I was not on the

14  property.

15    Q.   But you don't know if the police ever

16  asked you that?

17    A.   I don't remember if they asked me that.

18  I hardly talked to them, so.

19          I'm getting a headache.

20    Q.   After you went and picked up the

21  charges, what happened next with respect to the

22  criminal case?

23    A.   After I picked up the charges what

24  happened next?  I know I was waiting, waiting.

25  I knew I needed a lawyer to do whatever.

Page 115

1    Q.    What did you do to find your lawyer?

2    A.    I went on-line and I researched.

3    Q.    What did you research?

4    A.    That that was a good place to go at the

5    time.  That was for me.

6    Q.    With respect to the charges, what type

7    of penalty were you facing?

8    A.    Oh, they were saying I was wiretapping,

9    that I was walking on the property, I'm driving

10   in a car that isn't mine, I'm doing videos in

11   the lunch room that I wasn't doing.  I mean,

12   you name it, none of it was right, none of it

13   was me, I didn't do any of that.

14   Q.    So the video that was submitted to the

15   police of you and your mother in the --

16   A.    Lunch room?

17   Q.    -- lunch room, that's not you?

18   A.    The video that was submitted of me and

19   my mother in the lunch room, that's not me.

20   No, that's me.  That's me.

21   Q.    Okay.

22   A.    What are -- what video are you talking

23   about?

24   Q.    The one that was submitted to the

25   police.

1    A.    The one where they said I was speaking

2   with someone on Facebook about how people don't

3   eat at East Park?

4    Q.    Right.

5    A.    That was made up.  I was actually doing

6   this, my mom -- I walked in, there was my

7   mother and two others that were sitting with

8   cold food in front of them, it was 8:00 in the

9   morning or 7:30, I don't know.

10           I told my sister, I'll go feed mom

11   this morning because I knew they didn't have

12   enough people to feed everybody.  I watch them

13   every day.

14           So I go in there and I sit down, I'm

15   feeding my mom.  I have to make them heat up

16   her food because it's cold, and they do.  They

17   were very nice about that.

18           I sat back down and still nobody's

19   feeding anybody, and there's Michelle over

20   there -- I think it was Michelle, an aide in

21   the corner feeding somebody, that's it.  There

22   was all these people around and nobody's

23   around, nobody.

24           So I called my sister, and this is

25   what she saw, this is the true made up video,

1   another made up thing that they have for me,

2   Jolynn, I have her on FaceTime, my sister, I

3   turned the phone around.  I didn't show any

4   residents, I know the law, but I showed feet

5   and floor and mom and talked.

6           I said this, She said I was coaching

7   my mother to tell people on Facebook on a video

8   that people don't get fed at East Park.  My mom

9   didn't even know who I was sometimes, I'm not

10  coaching her.  I'm telling Jolynn, Jolynn, good

11  thing I came down, and I'm showing the feet,

12  look, there's no one in here except one aide.

13  These people aren't getting fed.

14          And then I marched in to Sara

15  Thurmer's office after I fed my mother, I

16  didn't march, I walked in, I'm getting -- and I

17  walked in with my mom in a wheelchair and

18  everything, We're going to go talk to Sara.

19          Sara, if I wouldn't have been here

20  this morning my mother wouldn't have got fed.

21  I just watched Sara George pull two people away

22  from the table that weren't fed and took them

23  back to their room, never even tried to feed

24  them.  I was livid because if I wouldn't have

25  been there that would have been my mom, too.

1   This is what I saw, under oath.

2      Q.   Did you make the video or not?

3      A.   I was on a FaceTime with my sister

4   telling her because we tag-team, we talked all

5   the time about my mom.

6      Q.   So where's the video coming from?

7      A.   No video.  She made a video of me on my

8   phone, and she assumed from what she heard me

9   saying to Jolynn that's what I was doing.

10     Q.   Okay.  Who made the video?

11     A.   One of the girls in the lunch room, I

12  guess, that was videoing me.  I didn't make a

13  video of myself.  I didn't even make a video of

14  the people not being there or of any of East

15  Park, I showed Jolynn on a FaceTime personally

16  between me and her about how glad I was I came

17  there this morning, and I was sick and

18  everything because she couldn't get there, she

19  had to work, so I went and fed my mother.

20     Q.   Who made the video of you?

21     A.   I don't know this video.  Somebody said

22  they did, but I never saw it.  I never saw it,

23  but the minute they told me what it was I knew

24  the day, I knew it was what was going on.

25     Q.   What day was it?

1    A.    It was before COVID because I was in

2    there.  That's all I know.

3              Well, we were always feeding mom one

4    way or the other, Jolynn and me, we tag-teamed

5    sometimes.  Sometimes we weren't there.

6    Q.    So the charges filed against you, what

7    type of penalty were you facing?

8    A.    Criminal penalty.  They were -- oh, on

9    the news they were saying she faces ten years

10   for wiretapping.  I'm like, What?  Or calling

11   Sara 2,000 times.

12   Q.    So my question is, did you ever have any

13   discussions where you understood what the

14   outcome could be with respect to the criminal

15   case, so whether you were going to jail,

16   whether it would be a fine?

17             MR. BARDWELL:  So objection.

18             So you're not going to talk about

19   any conversations that you had with me or with

20   the firm about -- or any other lawyers you

21   talked to about what the outcome of the case

22   could be or what penalty you were facing

23   or what the --

24             THE WITNESS:  Oh, about what I

25   thought it was, okay.  Well --

1    BY MS. YODER:

2      Q.    What could happen to you?

3      A.    Right.  When I found out I was very

4    upset, and I researched, looked things up, of

5    course, but I didn't know what they were

6    talking about, I'm not wiretapping.  I just

7    knew I did no wrong because I researched about

8    putting a camera up in the room anyway, and I

9    really -- I don't know.

10     Q.    Did you research what the penalty could

11   be, like if you could go to jail?

12     A.    I heard what the penalty could be.

13     Q.    What was that?

14     A.    I heard ten years for wiretapping,

15   that's all -- that sticks with me.  I don't

16   really know.  I was very distraught about being

17   accused.

18     Q.    Were you involved in any plea

19   discussions with the Prosecutor?

20     A.    Plea?

21     Q.    Yes.

22     A.    I don't remember.  I don't know what

23   that is, what a plea discussion is.  What is

24   that?

25     Q.    Where they're saying like we will reduce

1   the charges or if you agree to a fine or --

2     A.   No, no plea.

3     Q.   There was never --

4     A.   I think they might -- I don't remember.

5   I don't remember.  I put all of this out of my

6   mind so long ago, sorry, it's hard to bring

7   back up.

8     Q.   Did you do any research on how a plea

9   agreement would impact your future civil case?

10    A.   No.

11    Q.   Did you have any discussions with

12  anyone, other than your lawyer, about how a

13  plea agreement would impact your future civil

14  case?

15    A.   No.

16              (Defendant's Exhibit L was marked

17               for identification.)

18  BY MS. YODER:

19    Q.   All right.  I'm going to hand you what's

20  been marked as Defendant's Exhibit L.  Have you

21  seen this before?

22    A.   I have -- this is a lot of words to me.

23    Q.   Were you aware that Laura DiVincenzo

24  sent an e-mail to Officer Duncan with the

25  attachments on the Facebook posts and explained

1    what had been going on with you?

2       A.   I wasn't aware of it, but I knew they

3    had it.  I don't know how they got it.

4       Q.   And you don't think it was appropriate

5    for Laura to provide this to the police; is

6    that right?

7       A.   I don't really know.

8       Q.   Okay.

9       A.   I really don't.

10      Q.   Let's look through these posts here if

11   we could.  So the first one it looks like a

12   screenshot of, "What are you hiding East Park?

13   Sara, more fun stuff;" is that right?

14      A.   Correct.

15      Q.   Is this a sign you made?

16      A.   Yes, it is.

17      Q.   Is this one of the signs you had outside

18   of East Park?

19      A.   Yes, it is.

20      Q.   When was this sign made?

21      A.   Right before I walked at the -- after --

22   I can't remember dates.  July I want to say.

23      Q.   Of 2020?

24      A.   Yes, around there.

25      Q.   All right.  The next page, what's this?

1    A.    This made me mad, they had it on TV

2   because I look awful, number one, but, number

3   two, it was a fun time I was having with my

4   mother at East Park.  We were doing Snapchat,

5   and they cut a picture out and put it up for

6   God knows what reason to make me look bad, like

7   look at her, she looks crazy.  She's walking

8   around -- you know, I don't know where they got

9   that picture.

10                 I have a million pictures of me and

11   mom doing Snapchat and having fun at lunch, and

12   that's one of them, I have it, and she's cut

13   out of it.

14    Q.    And that's the picture -- so the

15   picture's from July 6th, 2020; is that right?

16    A.    Could be.  The picture is from July 6th,

17   2020?  I probably took it a long time ago,

18   probably before COVID this picture was taken.

19    Q.    But you posted it on July 6th?  I just

20   see July 6th there.

21    A.    I must have.  I must have.  I don't

22   know.

23    Q.    And if you go up before that it says,

24   "Lunch on Mondays and Thursdays.  I'll be

25   walking now, for lunch for the people at East

Page 124

1    Park in hope they feed them."

2      A.    Right.   In my Cries In The Night I was

3    trying to get people to walk with me on Mondays

4    and Thursdays, those were her shower days.

5      Q.    Okay.   When did you post that?

6      A.    I don't remember, I posted a lot of

7    things all over.   I'm all over the internet.   I

8    have many web sites that I work on, but back

9    then I don't remember.

10     Q.    What the next post, when did you post

11    that?

12     A.    Months is an error.

13     Q.    Where does it say months?

14     A.    I don't know.   I don't know what that

15    is.  Wait, three months.  No, they let me talk.

16    I don't know why I said months.

17            The staff would call, yeah, that's

18    right.  That's right except three months.

19     Q.    The question was when was it posted?

20     A.    Oh.   I post so much I could never tell

21    you.

22     Q.    There's no way to tell when this was

23    posted?

24     A.    I can go back -- I don't have the

25    information, I would have to look for it, but.

Page 125

```
 1                You know, I was -- wrote to the Ohio
 2    Department of Health, and with all the posts I
 3    was kind of hoping someone would get in there
 4    and help the people that were still in there.
 5       Q.   What was the outcome of your report to
 6    the Ohio Department of Health?
 7       A.   Years later after COVID they went in and
 8    found absolutely nothing.
 9       Q.   And -- all right.  The next post, when
10    was that posted?
11       A.   Yeah, I did that, I don't know.  I was,
12    I was in there when it was going bad.  I was
13    there before COVID, and I might have posted it
14    before -- well, of course I did.  I don't know.
15       Q.   So this is posted after your mother
16    passed away?
17       A.   Oh, I took it back up and posted it?
18       Q.   It says, "God I miss this lady more than
19    I ever thought"?
20       A.   If I go through pictures I'll use --
21    I'll use pictures often from the past to convey
22    a statement, but.
23       Q.   But the question is when the statement
24    was posted?
25       A.   Right.  The first time I posted it or --
```

1    Q.    No.   This posting right here that we

2    have.

3    A.    Right here?   Well, "Sounds like a

4    failing administration to me."   Could have been

5    any time, I don't know.

6    Q.    How about the next post, when was that

7    posted?

8    A.    I really don't know.

9    Q.    Is there any way to tell when this was

10   posted?

11   A.    It's Life With Me, Gina Criscione,

12   personal page.   I don't know.   I know I'm

13   always praying though.   I don't know when it

14   was posted.

15   Q.    How about the next post, it says Friday

16   at 8:05 a.m. --

17   A.    Did I skip something?

18   Q.    No, you're on the right one.

19   A.    Oh.   The more they held back phone calls

20   the angrier I got, and I could do nothing.

21   This conveys my anger, that's as far as it

22   goes.   I wanted people to know.

23   Q.    When was this posted?

24   A.    It had to be during COVID because it

25   says the communication between us, it ruined

Page 127

1   communication between us, yeah.

2    Q.   So it was after your mother left the

3   facility because it says, "I couldn't get my

4   mother out of here fast enough"?

5    A.   It could be then.

6    Q.   Is there any way to tell when this was

7   posted?

8    A.   I don't know.  I would have to go in to

9   Gina Marie Criscione on Facebook and have to

10   look at it, I don't know if I could find that

11   post.  I don't know.

12    Q.   All right.

13    A.   I'm sorry.  I wish I knew.  Friday at 8

14   a.m.?

15    Q.   What about the next one?  Is this also

16   expressing your anger with the care at East

17   Park?

18    A.   Again, I'm not going to remember what

19   I've posted.  If you knew how much I post you

20   would understand.  I post hundreds of things

21   during the day, and this is so far I don't

22   remember.

23    Q.   Okay.  But -- and I had asked then is

24   this also expressing your anger about the care

25   at East Park?

Page 128

1    A.    Yeah, I was trying to tell people what

2    my mom went through.

3    Q.    All right.  The next is a screenshot,

4    and it states, "Good morning.  Life With Me

5    Gina Marie and Dorothy's voice.  Please join

6    me, I am on a crusade to expose East Park Care

7    Center, in Brook Park, Ohio."  Did I read that

8    accurate?

9    A.    Yes, you did.  I was trying to get

10   people to help.

11   Q.    When did you post this?

12   A.    Can't recall.

13   Q.    At the bottom you say, "I will be taking

14   this to another level."  What does that mean?

15   A.    That means I'm going to take it to the

16   Ohio Department of Health, and I went to the

17   Medical Board and I went to the Nurses Board

18   and I wrote, wrote, wrote reports about this

19   place everywhere.

20   Q.    What happened with the Medical Board?

21   A.    I got nothing, nothing, nothing,

22   nothing, nothing back.

23   Q.    How about the Nursing Board?

24   A.    I don't recall, but I think I got

25   nothing back.  I don't remember.  I wrote, I

Page 129

1   wrote and I got -- I don't remember who wrote

2   back.  I don't remember.

3      Q.   Was there any -- anyone ever that found

4   that there was anything improper going on at

5   East Park in response to what you were sending,

6   what you were writing?

7      A.   What do you mean, another person besides

8   me?

9      Q.   So any other -- like a governing board,

10  the Nursing Board, the Medical Board, ODH.

11     A.   Sherrod Brown, all of them, everybody.

12  I don't even remember who I wrote to.  I took

13  it and I wrote, wrote, wrote.  I wanted help.

14     Q.   Were any of your findings that were

15  submitted, were any of them ever substantiated?

16     A.   Oh --

17            MR. BARDWELL:  Objection.

18            Go ahead.

19            THE WITNESS:  Were they

20  substantiated meaning?

21  BY MS. YODER:

22     Q.   So you submitted a complaint --

23     A.   They all --

24     Q.   Go ahead.

25     A.   They would get back to me.

1    Q.    What would they tell you --

2    A.    The Ohio Department of Health said they

3    didn't find anything.  There was nothing there

4    at the time, they waited too long.  They fixed

5    it all up.

6    Q.    And what other findings did you get

7    back?

8    A.    I don't remember.  I got some e-mails,

9    generic e-mails from the governor, generic

10   e-mails from the officials, of course, and then

11   the Medical Board, I had submitted that.  I

12   know you don't have it, but I could look it up,

13   I don't remember.  They did send something

14   back, the medical doctor.  I never heard from

15   the Nursing Board or if I did I don't remember.

16   Q.    What were the findings of the Medical

17   Board?

18   A.    They didn't find -- I don't know.  I

19   have the e-mail and they state whatever they

20   say, but it was just too late.

21   Q.    All right.  Let's go to the next post

22   that starts with, "Sara Thurmer, do you have

23   bed bugs?  Your nursing home does?  Please take

24   some home with you and dehydrate yourself like

25   to did to my mother three times during COVID."

Page 131

1    A.    My mother dehydrated under her care.  I

2    was angry.  The bed bugs were in place, and

3    they didn't tell me about it.  I found out

4    through a resident.

5              I was kind of mad when I wrote that,

6    and I had nothing on my mind but to try to make

7    it right for mom, and that's what I was trying

8    to do right here, right now.

9    Q.    You're expressing your anger?

10   A.    No, I'm trying to make it right.

11   Q.    So it would make it right for Sara

12   Thurmer to dehydrate herself?

13   A.    No, but at that time I wanted maybe her

14   to feel like my mom, like she was making my mom

15   feel, that kind of thing, similar to that.

16             I don't wish harm to her.  As a

17   matter of fact, I've learned to forgive

18   everybody.  I don't know, I just -- I can't

19   deal with it because I don't deal with anger

20   anymore.  I don't want to be angry anymore,

21   that's what it was.

22   Q.    What about when you posted this, that's

23   what I'm asking?

24   A.    I was angry when I posted that, I could

25   tell.

1    Q.    When did you post it?

2    A.    I don't know.  I'm sorry.

3    Q.    There were never any bed bugs in your

4    mother's room, correct?

5    A.    There were bugs in there but they

6    weren't bed bugs.

7    Q.    All right.  What about the next post,

8    when was that posted?

9          It starts out, "It's time to expose

10   the nasty people in the business of warehousing

11   people in nursing homes."  When did you post

12   that?

13   A.    I don't remember that either.

14   Q.    Were you angry at the time that you

15   posted this?

16   A.    Yeah.  Yeah.  I wasn't angry, I was

17   frustrated more, more frustrated that nothing

18   was being done, no one was listening, people

19   were being whatever in there, and I was more

20   frustrated than angry.

21          I'm not generally an angry person.

22   Everybody gets angry, and if you find out

23   something like this happens to your mother and

24   people aren't answering you you get angry and

25   you write it down, that's how I deal with it.

1    Q.    The more that people didn't listen and

2    respond to you the more frustrated and angry

3    you got?

4    A.    No, the more I knew I was fighting a

5    helpless battle because I looked back at my

6    elderly web site and like nobody's doing

7    anything, like nobody's doing anything I've

8    done.

9            When I left when mom died and I quit

10   walking, I was done.  I was just praying that I

11   would remember the good times with my mom.  I

12   didn't want to do it anymore.  They weren't

13   listening.  That was my way to get people to

14   listen, my writing.

15   Q.    Was this a picture of the clock that was

16   in your mom's room at the bottom of this second

17   --

18   A.    Yes.

19   Q.    When did you take that picture?

20   A.    I snap pictures all the time around my

21   house and everywhere, I don't know.

22   Q.    That picture was taken in your house?

23   A.    Yes.

24   Q.    And do you know -- you don't know when

25   this post was made?

Page 134

1    A.   Well, I probably -- I probably -- I

2    don't.  I had that clock hanging at my home for

3    surveillance for my doggies.

4    Q.   After you got it back?

5    A.   I didn't get it all back.

6    Q.   The clock was returned to you, correct?

7    A.   The clock was returned, but my microchip

8    was missing.

9    Q.   When was it hanging in your house?

10    A.   When I bought it I wanted to try it out,

11    see how it worked.

12    Q.   When did you buy it?

13    A.   Probably -- I didn't know COVID was

14    coming.  I bought it because my mother was

15    consistently not being fed and not hydrated,

16    and I wanted to see if she was being alone a

17    lot.

18         I wasn't thinking they would hurt

19    her, the aides were nice, the ones that were

20    nice at the time, but she was alone a lot in

21    the room, but I didn't see it because it never

22    got hooked up to the WiFi.

23         I was told that by David Riddle in

24    maintenance because a lot of people knew I was

25    doing it.  Sara Thurmer herself told me to do

1   it.

2           I couldn't hook it up to the WiFi

3   because their WiFi is weak and didn't reach

4   that far.

5           I didn't know the microchip had

6   things on it from my home and my husband and my

7   private life, it was a private microchip.  It

8   did go on and keep recording as a microchip and

9   I didn't know that, I thought you had to have

10  it hooked up to the WiFi.  So I didn't know

11  that it was still going and taping people in

12  the room, but I knew where it was, I knew it

13  was only on my mother, and that was it.  It

14  didn't -- it didn't break the law.  So I left

15  it there that day.

16  Q.   What day?

17  A.   The day of COVID.  I got a call from

18  Sara, You have to leave, it's the day I put the

19  clock up.  The clock wasn't working on WiFi.

20          My mom can't see good.  She hated

21  the small clock I had up there, she liked this

22  one.  I said, Mom, I'm going to leave this one

23  here as a clock.  I meant to leave it there

24  just as a clock.  I knew I wasn't going to look

25  at her on it, and I didn't know about COVID

1    coming, and they made me leave that day, and I

2    never saw her again after that in person until

3    later.

4      Q.   Did the microchip record audio?

5      A.   Poorly, very poorly, scratchy, you know.

6    I just wanted to see if she was there a long

7    time by herself because she was getting

8    bedsores, you know.

9      Q.   When did you purchase the clock?

10     A.   On Amazon.  I could go look up my order

11   if you want.

12     Q.   You said you purchased it to have in

13   your home for surveillance for your dogs?

14     A.   No.  No.

15     Q.   You purchased it and then took it in to

16   the nursing home?

17     A.   I was trying it out, and I thought why

18   not?  I can see her from home, see if she's

19   sleeping.  If she's looking upset I'll go over

20   to the home.  I won't have to call them and

21   bother them because they're busy.

22     Q.   And Sara Thurmer told you to do that?

23     A.   Well, yes.

24     Q.   When did Sara tell you that?

25     A.   After my mother's legs were restrained

Page 137

1   in December of 2019 after Christmas, right

2   after Christmas.

3       Q.   So why did you wait until March to do

4   it?

5       A.   Well, because Sara had just been kind of

6   around me more because I have more reports,

7   things are happening.

8            The day that it happened Renee Nagry

9   called me to come in, and Sara came in, she was

10  very nice because she did work with me through

11  things, and I said -- she said, This should

12  have never happened here, we don't restrain

13  here.  I don't know.

14           I honestly wanted to call the police

15  at that point but I didn't.  They were bad.  It

16  was very bad or I wouldn't have reacted like

17  this.  Sara assured me it would never happen

18  again.

19           I called Mount Alverna, When is the

20  opening?  Okay.  I'm trusting Sara to walk me

21  through this here with mom and until I can get

22  her in to Mount Alverna.

23      Q.   So if this event with the restraints

24  happened at Christmas in 2019, why did you wait

25  -- and Sara told you then that you --

Page 138

1    A.    Oh, I walked -- I'm sorry.

2    Q.    -- and Sara told you then to get the

3    camera and put it in your mom's room, why did

4    you wait until March of 2020?

5    A.    It wasn't like -- Sara didn't come to me

6    and tell me put a camera in your mom's room.

7    It was after that event with the legs, and we

8    were in the hallway and we were talking in

9    front of my mom's room or whatever, my sister

10   was there, I had been told by several

11   employees, Why don't you get a camera in there?

12   Go put a camera in your mom's room.

13   Q.    Okay.  What did Sara Thurmer say to

14   you --

15   A.    Sara Thurmer said to me -- I said to

16   Sara -- I came out of the room --

17            MR. BARDWELL:  Listen to her.  Let

18   her finish her question, okay.

19            THE WITNESS:  Okay.

20   BY MS. YODER:

21   Q.    What did Sara Thurmer say to you about

22   the camera in your mom's room?

23   A.    Okay.  I came out of the room, and this

24   was all upsetting, so I said, Sara, can I get a

25   camera in my mom's room?  And she did exactly

1    this, Go ahead.

2      Q.    And that was in December of 2019?

3      A.    That was after -- I believe after that

4    incident.

5      Q.    So December 2019?

6      A.    Yeah, I believe it was December of 2019,

7    right.  Don't -- I'm sorry.

8      Q.    The last page of Exhibit L says, "Read

9    my Google review and tell me what you think of

10   this place?

11         Sara Thurmer, I hope your watching,

12   I am going to slowing expose you for what you

13   really are.  You should have never treated us

14   like that, shame on you.  I have nothing to

15   loose, but your job, you have already ruined

16   your reputation.  How do you sleep?"

17         When did you make those posts?

18     A.    Probably when they weren't answering my

19   phone calls and not giving me my medical

20   records.

21     Q.    So that would be while your mom was

22   still in the facility?

23     A.    I don't know when the date is.  It could

24   have pertained to after -- can't pertain to

25   after.  I don't know, I'm lost.

Page 140

1    Q.   Do you have any idea when --

2    A.   It could have been after.  It could have

3   been after, I don't recall.  I just wanted

4   people to know what's going on.

5              MS. YODER:  Take a break?

6              MR. BARDWELL:  Sure.

7              (Short recess was taken.)

8   BY MS. YODER:

9    Q.   Who's Jeannie Brown?

10    A.   Jeannie Carla Brown was an employee of

11   East Park.

12    Q.   What was her position?

13    A.   She was in the laundry mostly.

14    Q.   You have -- you took some notes that you

15   have in front of you?

16    A.   Yes.  No.

17    Q.   Can you tell me what those are?

18              MR. BARDWELL:  No, she cannot.  It's

19   a note from her attorney.

20   BY MS. YODER:

21    Q.   You didn't write that?

22    A.   No.  It's nothing really.

23    Q.   All right.  Were you aware that Sara

24   Thurmer made a written report to the Brook Park

25   police department?

Page 141

1    A.   Yes.

2    Q.   Okay.  Have you seen that report?

3    A.   Yes.

4              (Defendant's Exhibit M was marked

5              for identification.)

6  BY MS. YODER:

7    Q.   Okay.  I'm going to hand you what's been

8  marked as Exhibit M.

9    A.   Oh, I just foul everything up.

10             MR. BARDWELL:  Yeah.

11             THE WITNESS:  Am I supposed to read

12  that?

13  BY MS. YODER:

14   Q.   Have you read it before?

15   A.   I read it before, yeah.

16   Q.   Okay.  Is there anything inappropriate

17  or improper about Sara submitting this report

18  to the police?

19             MR. BARDWELL:  Objection.

20             THE WITNESS:  I'm sorry, say that

21  again?

22             MS. YODER:  Sure.

23  BY MS. YODER:

24   Q.   Is there anything improper or

25  inappropriate with Sara submitting this

Page 142

1    statement to the police?

2              MR. BARDWELL:  Objection but answer

3    if you know.

4              THE WITNESS:  Yeah.  I don't

5    understand what you mean.  Is there anything

6    improper about what she wrote?

7    BY MS. YODER:

8      Q.   Yeah.  Do you think it's improper --

9      A.   Everything is improper.  I don't agree

10   with anything she wrote or the fact that she

11   went in there.  I never did any of that to her.

12     Q.   And what about Exhibit L, which was the

13   e-mail that Gina -- or that Laura sent?

14     A.   Exhibit L?

15             MR. BARDWELL:  This one.

16             THE WITNESS:  Oh.  What's this for?

17             MS. YODER:  That's what Laura sent

18   to the police.

19             THE WITNESS:  I probably read it

20   back then and just the fact that they were

21   doing it.

22             MR. BARDWELL:  Wait for a question.

23             THE WITNESS:  I'm sorry.

24             MS. YODER:  That's all right.

25   BY MS. YODER:

Page 143

1    Q.    And you don't believe that was proper

2    either for Laura to do that; is that correct?

3    A.    No.  Yes, correct.

4    Q.    And ultimately the criminal case against

5    you is dismissed?

6    A.    Yes.

7    Q.    Okay.  And it was dismissed, do you know

8    why?

9    A.    Without prejudice.

10   Q.    Okay.  Do you know why it was dismissed?

11   A.    Yes.

12   Q.    Why was it dismissed?

13   A.    One of the officers -- I don't remember.

14   I don't remember.

15           Well, I know it was dismissed

16   because I didn't do it and maybe because -- I

17   don't know, I don't remember.  It was dismissed

18   and I was happy, glad it was over.

19   Q.    There is a finding of no probable cause;

20   is that right?

21   A.    Yeah, I guess.

22   Q.    And that was on March 11, 2021?

23   A.    Yes.  March 11th.

24   Q.    I'm sorry, what was that?

25   A.    March 11th, I agree.

Page 144

1    Q.   You received a copy of the complaint

2    with the charges the day that you went down to

3    the police department in October; is that

4    right?

5    A.   Most likely, yes.

6    Q.   Okay.  And you do not believe that the

7    complaint filed against you is sufficient?

8    A.   I was astounded --

9              MR. BARDWELL:  Objection.

10             Go ahead.

11             THE WITNESS:  I was astounded

12   because I just love my mother.  I don't want to

13   hurt anybody, and I was just beside myself.

14   BY MS. YODER:

15   Q.   And the charges that were being brought

16   were not appropriate; is that right?

17   A.   No.

18             MR. BARDWELL:  Objection.

19   BY MS. YODER:

20   Q.   Is that right?

21   A.   Right, they were not appropriate.

22   Q.   You understand that you filed a claim

23   for whistle-blower retaliation, correct, as

24   part of this lawsuit?

25   A.   Yes, retaliation for sure.

1    Q.    Who was retaliated against?

2    A.    Well, me.

3    Q.    Okay.  Anyone else?

4    A.    Me, just me.

5    Q.    Just you?

6    A.    Uh-huh.

7    Q.    Yes?

8    A.    Yes.

9    Q.    And how did they retaliate against you?

10   A.    Right here, (indicating).

11   Q.    You're pointing to Exhibit --

12   A.    Going to the police station and

13   reporting me doing things I never did because I

14   wanted to tell what they really did.

15   Q.    Why did they retaliate against you?

16           MR. BARDWELL:  Objection.

17           THE WITNESS:  Why did they retaliate

18   against me?  Well, they wanted me to stop

19   talking.

20   BY MS. YODER:

21   Q.    So the posts that you were making on

22   social media, they wanted to stop that?

23   A.    In general, just stop talking.

24           MR. BARDWELL:  Objection.

25           Sorry, go ahead.

Page 146

1          THE WITNESS:  Stop saying bad things

2     about them, you know.  I wasn't making it up.

3     BY MS. YODER:

4       Q.   Anything else?

5       A.   Why they were retaliating against me?

6       Q.   Yeah.

7       A.   They wanted me out of there.  They

8     didn't want my mom out of there, they wanted me

9     out of there.

10      Q.   So the criminal charges, which is the

11    basis for the retaliation, were in September --

12    in October of 2020, right?

13      A.   Right, October.

14      Q.   Is that right?

15      A.   Uh-huh.

16      Q.   Yes?

17      A.   The basis for the retaliation, them

18    going down there and reporting me was because

19    -- say that again?  I'm sorry.

20      Q.   It's all right.  Just stick with me here

21    on these questions, okay.

22      A.   Yeah.

23      Q.   All right.  So if -- so what you've said

24    is they retaliated against you by going to the

25    police and then they did that, and I think you

1   just said because they wanted me out of there?

2    A.   Yeah, they evicted my mom because they

3   wanted me to go because I was reporting, I

4   wasn't getting calls, I wasn't hearing from my

5   mother, I wasn't getting medical records, I was

6   in the dark as her legal guardian.

7    Q.   Now, that all happened before they went

8   to the police?

9    A.   Right.

10   Q.   Okay.  So you just testified that the

11  retaliation was them going to the police.

12   A.   The retaliation was them going to the --

13           MR. BARDWELL:  Wait for her to ask

14  you a question.

15           THE WITNESS:  I'm sorry.

16  BY MS. YODER:

17   Q.   Is that correct?

18   A.   I went to the police -- they went to the

19  police because I was talking and walking and

20  carrying on about what went on with my mom, and

21  they probably thought I was never going to quit

22  but I did but they thought I wasn't.

23           They waited until July to October, I

24  don't get that.  If I was harassing Sara so

25  much, why did they wait from July until October

Page 148

1    to come after me or to call the police?  That's

2    retaliation.  They had to work up their fake

3    stories, their fake reports.

4      Q.   Any other way that you were retaliated

5    against?

6                 MR. BARDWELL:  Objection.

7                 THE WITNESS:  Well, any other way

8    besides them going to the police station?

9                 MS. YODER:  Correct.

10                THE WITNESS:  The phone calls being

11   stopped, people being told they can't be my

12   friends anymore and told to get off of my

13   personal life, and they all disappeared in fear

14   of their jobs, more than one person.

15   BY MS. YODER:

16     Q.   Who?

17     A.   Jeannie, Renee.  There's an aide, I

18   can't recall the names right now.  I have to go

19   back to my notes, but there were people that

20   came to me and told me things because we were

21   friends, we would go out, they would come to my

22   house.

23     Q.   Kathy Rummel is a daughter of one of the

24   other residents; is that right?

25     A.   Yes, and a friend of mine.

1    Q.    She submitted an affidavit?

2    A.    Yes, she did, I believe.

3    Q.    You've seen that affidavit?

4    A.    Yes, I have.

5    Q.    Everything in that is true --

6    A.    Yes, it is.

7    Q.    -- as far as you know?

8          MR. BARDWELL:  Stop and let her

9    finish her question.

10         THE WITNESS:  Yeah, I go too

11   quickly, I'm sorry.

12   BY MS. YODER:

13   Q.    Do you have any evidence that other

14   families were treated differently than you were

15   as far as visits with their family members?

16   A.    Do I have -- say that again.

17   Q.    Yep.  Do you have any evidence that

18   other families were treated differently with

19   respect to visits after COVID?

20   A.    Yes.

21   Q.    What was that?

22   A.    Kathy would tell me things.

23   Q.    What would Kathy tell you?

24   A.    Pretty much the same thing.  I can't

25   remember exactly what she told me, but she

1   didn't like what was going down, and she was

2   very sad, too, and her and I went -- originally

3   -- forget it, I'm getting into another story,

4   here's me.

5            Kathy told me after all of like the

6   case, the court case and before this, she

7   called me, she came over, she told me that, My

8   mother died the same way your mother did,

9   underweight drastically and lethargic, and she

10  said she watched her deteriorate in the window,

11  and that's what she told me.

12  Q.   And Kathy wasn't able to go in and see

13  her mom in person either?

14  A.   No.  Well, this was during COVID, nobody

15  was able to go in and see their mother.

16  Q.   Do you have any evidence that other

17  families had -- were given more calls than you

18  were during COVID?

19  A.   Only what Jeannie told me.

20  Q.   What did Jeannie tell you?

21  A.   I'm allowed to call -- she mentioned a

22  resident at the time, I don't remember the

23  name, I'm allowed to call so-and-so's mother

24  for them but they won't let me call your mother

25  for you.

Page 151

1    Q.    Other than that, any evidence that you

2  were treated differently than other families

3  with respect to calls during COVID?

4    A.    That I was treated differently prior to

5  COVID or --

6    Q.    No, during COVID.

7    A.    During COVID I was treated differently?

8          Yeah, I didn't get my medical

9  records, and I kept asking and asking.  I asked

10  the nurse through the window, you know, and --

11  you know.

12    Q.    You did get the medical records though,

13  correct?

14    A.    No, I never got the medical records.  I

15  got them after my mother died.

16    Q.    So did you or did you not ever get the

17  medical records?

18    A.    I got the medical records myself on my

19  own.

20    Q.    From East Park?

21    A.    No.

22    Q.    Where did you get them from?

23    A.    I don't remember.  I ordered them up

24  somewhere, I don't know.  Maybe I didn't get

25  them there at East Park, I don't know where

Page 152

1   they came from, but we weren't speaking or

2   anything.  Nothing was going on between me and

3   East Park, nothing, so I don't know where.

4      Q.   Who would have the East Park records

5   other than East Park?

6      A.   Who would have the East Park records?  I

7   don't know what you're asking me.

8      Q.   I'm trying to figure out where they came

9   from if they didn't come from East Park because

10  you answered interrogatories under oath --

11     A.   I might have called the hospital --

12     Q.   Hold on.

13     A.   -- and got some --

14     Q.   You answered some interrogatories under

15  oath, and you identified two different dates

16  from your answers to interrogatories on which

17  you got the East Park records.

18     A.   Okay.  I --

19     Q.   And now you're telling me --

20          MR. BARDWELL:  Let her finish.

21  BY MS. YODER:

22     Q.   -- you never got records from East Park.

23  So which is it?

24     A.   I never got records for East Park.  The

25  first time I ordered them I didn't get them in

1    a timely fashion.  The second time I ordered

2    them my mom was long gone after I got them.

3    How I got them, I don't remember.  I don't

4    remember how I got them, who they came from.

5              My husband might have ordered them

6    up, I don't remember.  I didn't really -- I

7    don't remember.

8    Q.   So I'm confused because you're saying

9    two different things.  Did you get the records

10   or not?

11   A.   No.  I have them now.  Well, somewhere

12   in the thingy because I had to go retrieve them

13   myself after two faxed statements of releasing

14   my mother's e-mails -- records.

15             Tina had me fax a release twice,

16   then they ran me around, and I never got them.

17             The first time she was in the

18   hospital I wanted them, it took weeks for me to

19   get them.  The second time she was in the

20   hospital she was out of there before I

21   retrieved them myself, and I do not know where

22   they came from.  I don't know who I got them

23   from, I can't remember, but I wasn't

24   corresponding with East Park at that time at

25   all.

1           MS. YODER:  I mean, Brian, are we

2    going to have a problem because --

3           MR. BARDWELL:  I understand what

4    you're saying.  I think -- do you have the

5    interrogatory responses to let her look at

6    maybe?  I think that might refresh --

7           MS. YODER:  This is a very

8    straightforward question, either you got them

9    or not, and she's saying, no, and then she's

10   rambling on and then saying, I finally got

11   them.

12          THE WITNESS:  Well, I thought you

13   asked me if I got them like they gave them to

14   me, no.  I had to get them myself, if that

15   clarifies it for you.

16   BY MS. YODER:

17    Q.   It's a simple question, did you get the

18   records from East Park or not?

19    A.   Yes.

20    Q.   When?

21    A.   I can't recall.

22    Q.   Okay.  How did you get them?

23    A.   After my mom's death.

24    Q.   How did you get them?

25    A.   I don't remember.  I was mourning,

Page 155

1   crying, I don't remember.  I didn't really care

2   about them at that point because my mom was

3   gone when I got them, I think.

4              MR. BARDWELL:  So she's going to

5   give you the question, you need to stop and

6   listen because you're -- I know it is easy to

7   get diverted, but she's going to ask you

8   specific questions and I want you to listen to

9   it and really try to give her an answer to the

10  question that she's actually asked.

11             THE WITNESS:  Okay.  Get it in my

12  head.

13  BY MS. YODER:

14    Q.   Are you understanding my questions?

15    A.   Yes.

16    Q.   Are you able to answer them?

17    A.   If I don't I ask you to repeat it.

18    Q.   Very good.  And are you able to answer

19  them truthfully?

20    A.   Absolutely.

21    Q.   Okay.  We're going to continue going on

22  then, okay.

23    A.   Uh-huh.

24    Q.   Yes?

25    A.   Yes.

1    Q.    All right.

2    A.    Yes.

3    Q.    Any other way that East Park retaliated

4    against you?

5              MR. BARDWELL:  Objection.

6    BY MS. YODER:

7    Q.    We talked about the criminal filing --

8    A.    It wasn't just filing, they put a

9    restraining order on me.  I couldn't go into

10   the city I lived to go to church to see my

11   friends because I was in fear I was going to

12   get a violation of the restraining order for

13   two years, but I did go anyway but it made me

14   very nervous.

15             MR. BARDWELL:  Answer her question.

16             THE WITNESS:  I know.  I know.

17             MR. BARDWELL:  Answer her question

18   after she asks it.

19   BY MS. YODER:

20   Q.    So there was a restraining order that

21   prohibited you from going into the city of

22   Brook Park?

23   A.    No, for being within a certain radius

24   around Sara because they thought I was going to

25   harm her in some way or another.

1    Q.    And are you indicating that you violated

2    that restraining order?

3    A.    Never.

4    Q.    All right.  So I want to make sure that

5    I understand --

6    A.    No, I didn't violate the restraining

7    order.

8    Q.    I want to make sure that I understand

9    this retaliation, okay.  So you told me that

10   East Park retaliated against you, correct?

11   A.    Absolutely.

12   Q.    And they did that by going to the

13   police, correct?

14   A.    (Witness nods head up and down.)

15   Q.    Yes?

16   A.    Yes.

17   Q.    And they did that by restricting your

18   access to your mother, correct?

19   A.    Absolutely.  Thank you, yes.

20   Q.    Anything else that East Park did to

21   retaliate against you?

22              MR. BARDWELL:  Objection.

23              Go ahead.

24              THE WITNESS:  They held back

25   property of mine when they delivered my

1   mother's items.

2   BY MS. YODER:

3       Q.    What did they hold back?

4       A.    Microchip, several -- it sounds petty,

5   but I bought cleaning materials to clean her

6   room because it wasn't always the cleanest.  So

7   I had Clorox wipes, Lysol sprays, and it was

8   during COVID when I put them in there.  They're

9   expensive.  They didn't give any of that back,

10  and the microchip is the most important thing.

11  They can keep the sprays, I didn't get the

12  microchip back because they thought there was

13  something on there to incriminate me, I

14  believe.

15      Q.    Any other way that East Park retaliated

16  against you?

17              MR. BARDWELL:  Objection.

18              THE WITNESS:  I think that's enough.

19  That's all, no.

20  BY MS. YODER:

21      Q.    Were you ever an employee of East Park?

22      A.    No.  No.

23      Q.    Is there something that you're looking

24  at?

25      A.    No, I'm just like nervous.  I can't see

1    it if I looked.

2      Q.   Because if you're looking at things

3    while I'm taking your --

4      A.   No, I can't see it.  I'm just nervously

5    watching because I have nothing to do while

6    you're doing your questioning and I look

7    around.

8      Q.   Okay.  All right.  Let's talk about this

9    SD card, okay.

10     A.   The what?

11     Q.   The memory card.

12     A.   The memory card?

13     Q.   The memory card was in the clock,

14   correct?

15     A.   Okay.  Yes.

16     Q.   Is that right?

17     A.   Yes.  I call it microchips, but I know

18   what you're talking about.

19     Q.   Okay.  And that microchip -- well, so

20   the clock recorded what was going on in the

21   room, and it was saved to the microchip; is

22   that right?

23     A.   Uh-huh.

24     Q.   Yes?

25     A.   Yes.

```
1                MR. BARDWELL:   Objection.

2   BY MS. YODER:

3     Q.   And what does it show on the microchip

4   as far as what was being recorded in the room?

5     A.   My mom's room.

6     Q.   Anything else?

7     A.   My mom and it shows -- before I put it

8   in East Park it shows me and my husband in my

9   kitchen and everything we do in our house

10  throughout the day walking around with

11  whatever, me and him, and a lot of personal

12  stuff is on there from me and my husband's

13  life.

14    Q.   How long was it up in your house?

15    A.   I didn't know it was on there.

16    Q.   How long was it up in your house?

17    A.   Well, if you look at the microchip,

18  that's how long.  I don't know offhand.  I

19  could find out.  I would think maybe a couple

20  weeks maybe, like within a couple weeks at my

21  house.  I think, I'm not sure.  I really don't

22  know.  I've had it awhile.

23                I was not going to put it in, and

24  then I was not going to put it in, and I put it

25  in on March 11th.
```

Page 161

1    Q.   Before it was in the clock where was the

2  microchip?

3    A.   The microchip was always in the clock.

4  It came with the clock, it's part of the deal

5  when you buy it, yeah.

6    Q.   Before March 11th was it ever in your

7  computer?

8    A.   Before March 11th?  No.  I never looked

9  at it on my computer until -- no, never looked

10  at it.

11    Q.   You ordered it from Amazon?

12    A.   Ordered the clock from Amazon.

13    Q.   And the microchip came with it?

14    A.   Yes.

15    Q.   So the microchip was already in the

16  clock when you got it or did you have to put it

17  in --

18    A.   It was in there.

19    Q.   -- and set it up?

20    A.   It was in there.  It might have been in

21  the box, and I had to put it in --

22           MR. BARDWELL:  Let her ask her

23  question.

24           THE WITNESS:  Okay.

25  BY MS. YODER:

1    Q.    So you opened the box, got the

2  microchip, put it in the clock?

3    A.    Yes.

4    Q.    Got it set up, yes?

5    A.    Yes.

6    Q.    You hung it up in your house?

7    A.    In the kitchen.

8    Q.    And then on March 11th --

9    A.    I'm sorry, I moved it around sometimes.

10  I wanted to watch the dogs.  I'm telling

11  stories again, I'm sorry.

12            MR. BARDWELL:  Just stop.

13  BY MS. YODER:

14    Q.    On March 11th, 2020 you took it in to

15  East Park?

16    A.    Yes, the 11th.

17    Q.    That microchip was never in your

18  computer before March 11th, 2020?

19    A.    No.

20    Q.    It was never in anything other than the

21  clock --

22    A.    No.  Brand-new.

23    Q.    Let me just get it out and we'll do

24  that, okay.

25            So the microchip was not -- prior to

1   March 11th, 2020 the microchip was never in

2   anything other than the clock?

3       A.   Correct.

4       Q.   And to suggest otherwise would be

5   completely inaccurate.  Fair?

6       A.   Uh-huh.

7       Q.   Yes?

8       A.   Yes.

9       Q.   Do you have the microchip now?

10      A.   I do not.

11      Q.   Where is it?

12      A.   With --

13             MR. BARDWELL:  We're trying to

14   relocate it.  Yeah, it came back in a tiny

15   envelope and I've moved, but we're trying to

16   find that.

17   BY MS. YODER:

18      Q.   You had it at some point?

19      A.   I did, yes.

20      Q.   And you were able to access it?

21      A.   I couldn't bear to watch my mother, I

22   would cry.  I didn't watch any of it.

23      Q.   But you were able to access to see that

24   it was there?

25      A.   Yeah, I knew it was on there.

1    Q.    When did you get that microchip back?

2    A.    I can't remember the date.  It was --

3    shortly after they filed the complaint I hired

4    Brian, we got the chip back.

5    Q.    From the police department or the

6    Prosecutor?

7    A.    They brought it up to the police station

8    for us at that point.

9    Q.    Who is they?

10   A.    I don't know who, if it was Sara or

11   Laura.  Somebody took it up to the police

12   station and dropped it off.

13   Q.    And the police returned it to you?

14   A.    No, I -- well, I don't remember how it

15   went down, I really don't.  I don't remember

16   how it went down.

17   Q.    You think that was maybe in October of

18   2020?

19   A.    When the police returned it to me?

20   Q.    (Nods head up and down.)

21   A.    I can't recall.

22   Q.    Okay.  Have you done any research on the

23   process for how criminal charges are made?

24   A.    No, I don't think so.  Maybe -- I don't

25   know, I might have.  I might have looked up --

1   at the time I might have been scared and looked

2   it up, but I don't remember.  I was too

3   distraught.

4       Q.   Do you have any understanding of who

5   makes the decision whether to charge someone

6   with a crime?

7       A.   Who makes the decision?

8       Q.   (Nods head up and down.)

9            MR. BARDWELL:  Objection.

10           THE WITNESS:  I don't know, I never

11  had a crime before.  A court?  A court?

12  BY MS. YODER:

13      Q.   Private individuals don't decide to

14  charge another person with a crime.  Is that

15  fair?

16           MR. BARDWELL:  Objection.

17           THE WITNESS:  I don't know what that

18  means.  Private individuals don't charge other

19  people with a crime?

20  BY MS. YODER:

21      Q.   Right.  Like you as a person, you don't

22  have a right to charge somebody with a crime?

23      A.   Oh, no.

24           MR. BARDWELL:  Objection.

25           MS. YODER:  All right.

1    BY MS. YODER:

2      Q.    Part of your complaint is that East Park

3    knowingly made false statements to public

4    officials at the Ohio Department of Health, the

5    City of Brook Park and the Berea Municipal

6    Court during an official proceeding, okay.

7      A.    Say that again.

8      Q.    I'm going to break it down for you,

9    okay.

10     A.    Yeah, I was going to say.

11     Q.    So part of your allegations in this

12   lawsuit are that East Park Defendants made

13   false statements to public officials at the

14   Ohio Department of Health, the City of Brook

15   Park and the Berea Municipal Court during an

16   official proceeding, okay.

17     A.    What they did?

18     Q.    Yeah.

19     A.    I don't know what they did.

20     Q.    So what were the false statements --

21     A.    Oh, the false statements --

22     Q.    -- that East Park made to the ODH, Ohio

23   Department of Health?

24     A.    I wasn't aware they made false

25   statements to the Ohio Department of Health.  I

Page 167

1   wasn't aware of anything that they were doing

2   at that time.

3     Q.   What are the false statements that East

4   Park Defendants made to the City of Brook Park?

5     A.   You mean what's on here?

6     Q.   I mean, what false statements --

7     A.   I'm telling you what false statements,

8   okay.  Oh, everything they say is false, false.

9     Q.   Let's start with this, what proceeding

10  with the City of Brook Park --

11              MR. BARDWELL:  Objection.

12  BY MS. YODER:

13    Q.   -- during which proceeding with the City

14  of Brook Park did East Park Defendants make

15  false statements?

16              MR. BARDWELL:  Objection.

17              THE WITNESS:  The whole time.

18  BY MS. YODER:

19    Q.   You -- what type of a proceeding did you

20  have with the City of Brook Park?

21              MR. BARDWELL:  Objection.

22              THE WITNESS:  What was it, I don't

23  know?  It was a hearing, case, I don't know.  I

24  don't know court terms, so.

25  BY MS. YODER:

Page 168

1    Q.    You went to a hearing?

2    A.    I don't know.  We had court dates, I

3    went, I showed up when I had to go.  That's why

4    I hire my lawyer, and I don't know these

5    things, that's why.

6    Q.    Were there people there from East Park?

7    A.    I didn't see Sara or Laura or anybody

8    from East Park, but I was aware maybe a man was

9    there from their insurance company or

10   something.

11   Q.    Did you ever hear anyone from East Park

12   make a false statement during court?

13   A.    Yes.

14   Q.    Who?

15   A.    The Prosecutor reading what they were

16   saying about me, it was false.

17   Q.    The Prosecutor was making the

18   statements?

19   A.    He was doing his job and saying I did

20   this, I did that.  I didn't do that.

21   Q.    What did the Prosecutor say you did?

22   A.    Oh, jeez.  Let's see, drove through the

23   building with the white car and baseball hat

24   and sunglasses on a Sunday when I was actually

25   at my computer.

Page 169

1            I got to think back.  That I was

2    harassing Sara, telecommunicating, wiretapping,

3    walking on their property.  I was going to -- I

4    don't know, whatever they were saying.  I mean,

5    I wasn't doing any of that.  I was not doing

6    any of that.

7            MS. YODER:  She's looking at notes,

8    I have a right to see them.  She's looking at

9    notes while she's testifying.

10            THE WITNESS:  I'm just folding.

11            MR. BARDWELL:  You don't have a

12    right to look at notes from counsel.

13            MS. YODER:  Well, if she's reviewing

14    it during her deposition --

15            THE WITNESS:  I'm not reviewing any

16    notes.

17            MS. YODER:  You just opened it and

18    read it.

19            MR. BARDWELL:  Stop.  You're not

20    going to talk about what's in here.

21            It's a note to me -- from me to her,

22    it's privileged and you don't get to review

23    privileged documents even if they're looked at

24    during a deposition.

25            MS. YODER:  If she's looking at them

Page 170

1    while she's testifying we absolutely have a

2    right to see it to see what it says.

3                MR. BARDWELL:  I don't believe

4    that's an exception to attorney/client

5    privilege.

6                MS. YODER:  Well, let's keep track

7    of that, and we can have the Court decide on

8    that.

9                THE WITNESS:  I'm sorry, I'm

10   nervously folding.  I'm not even looking at it

11   really.

12               MS. YODER:  Well, you opened it up.

13               MR. BARDWELL:  You're allowed to

14   look at it if you want to.

15               THE WITNESS:  Okay.  I'm sorry.

16   BY MS. YODER:

17   Q.   So the false statements to the City of

18   Brook Park and the Berea Municipal Court were

19   all made while the criminal case was pending.

20   Fair?

21               MR. BARDWELL:  Objection.

22               THE WITNESS:  I don't understand

23   that question.

24   BY MS. YODER:

25   Q.   The allegation is that the East Park

1  Defendants made false statements during an

2  official proceeding.

3    A.   Correct.

4    Q.   And that was through what the Prosecutor

5  was saying that had been reported to him,

6  correct?

7    A.   Yes, he's saying these things.

8    Q.   All of that obviously occurred while the

9  criminal case was pending, right?

10   A.   Correct.

11   Q.   And that -- the criminal case was

12  dismissed on March --

13   A.   11th.

14   Q.   -- 5th -- March 11th?

15   A.   Sorry.

16   Q.   March 11th --

17   A.   Uh-huh.

18   Q.   -- 2021, correct?

19   A.   Yes.

20   Q.   Okay.  Any other false statements that

21  were made by the East Park Defendants?

22            MR. BARDWELL:  Objection.

23            THE WITNESS:  Well, if you look in

24  the public record of their evidence they made

25  to the Court when they were telling stories

1   about me there's little pictures that some of

2   the staff was taking on Facebook of me, like

3   that one you showed, that's all.

4   BY MS. YODER:

5    Q.   All things that occurred during the

6   criminal case, correct?

7    A.   Yeah, while they were making -- yeah,

8   they were -- yes.

9            You're so cute, I can't stand this.

10  She smiles.  Sorry, I'm just tired.

11   Q.   Do you want to take a break?

12   A.   No, I just -- you know, I'm sorry.

13           MR. BARDWELL:  Do you need to eat?

14           THE WITNESS:  I probably do, but I

15  want to get this over with, but I'm trying to

16  slow down and make sure that she gets accurate

17  information.

18           MS. YODER:  Let's take a little

19  break here.

20           THE WITNESS:  I apologize.  Can we

21  go get lunch?

22           MR. BARDWELL:  I think some food

23  might do her well.

24           (Lunch recess was taken.)

25  BY MS. YODER:

1    Q.   Part of your claim here is that East

2   Park used materially false or fraudulent

3   writings, okay.  And you have in -- no, that's

4   all right.  You have in front of you Exhibit M,

5   which is the statement of Sara Thurmer, and

6   Exhibit L, which is the e-mail from Gina

7   Criscione.  Are those the false and fraudulent

8   writings that are at issue in this lawsuit?

9              MR. OCKERMAN:  I'm sorry, you said

10  Gina Criscione.

11              THE WITNESS:  I knew what you meant.

12  BY MS. YODER:

13   Q.   I'm sorry, from Laura DiVincenzo?

14   A.   Yes.

15   Q.   Are there any other false or fraudulent

16  writings that are at issue in this lawsuit?

17   A.   Yes.

18   Q.   Okay.  What are those?

19   A.   I'm not sure, but they came up with a

20  few others once we got in to court.

21   Q.   In the criminal case?

22   A.   Yeah, because I never heard -- they said

23  I was driving around, they didn't have that in

24  court at the time.  I can't remember.  I don't

25  remember really, but I think they just kept

Page 174

1    coming up with untrue statements about me.

2      Q.    All of that was through the criminal

3    case?

4      A.    Right here and then in the court, when

5    we were doing court, I can't remember, but

6    things were coming up, and I would go, I never

7    did that, okay, that kind of stuff, but I can't

8    really remember.

9      Q.    Have there been any false or fraudulent

10   writings that have been used since your

11   criminal case was dismissed?

12             MR. BARDWELL:  Objection.

13             THE WITNESS:  No.

14   BY MS. YODER:

15     Q.    What about false or fraudulent writings

16   that were submitted by East Park to ODH, Ohio

17   Department of Health.

18             MR. BARDWELL:  Objection.

19             THE WITNESS:  I don't know anything

20   about that.

21   BY MS. YODER:

22     Q.    You're not aware of East Park using any

23   false or fraudulent writings in any proceeding

24   with you, Ohio Department of Health?

25     A.    I never saw what they -- I never saw any

Page 175

1    documents so I really wouldn't know.

2      Q.   Okay.  There was a hearing with the Ohio

3    Department of Health related to your mom's

4    leaving East Park; is that right?

5      A.   Eviction, yes.  I got an eviction

6    notice.

7      Q.   They advised -- East Park advised they

8    were no longer able to care for your mother; is

9    that correct?

10     A.   Yes.

11     Q.   And you understood that she was becoming

12   more and more combative; is that right?

13             MR. BARDWELL:  Objection.

14             THE WITNESS:  I don't know for sure

15   what was going on, don't know.

16   BY MS. YODER:

17     Q.   Your mom was in the hospital shortly

18   before she left East Park; is that right?

19     A.   Yes.  My sister and I put her in.

20     Q.   Do you remember when that was

21   approximately?

22     A.   Not offhand but I could find out.

23     Q.   When your mom was in the hospital it was

24   reported that she was having these combative

25   behaviors, correct?

Page 176

1    A.    That isn't why she went to the hospital.

2    Q.    I understand.

3    A.    I'm sorry, say that again.

4    Q.    But while she was at the hospital it was

5    reported that she was having these combative

6    and violent behaviors, correct?

7    A.    Reported by who?  What do you mean?  Who

8    reported to the hospital?

9    Q.    Did you report that to the hospital?

10   A.    I was not at the hospital -- wait a

11   minute, maybe my sister was.

12   Q.    Okay.  Did your sister report that?

13   A.    I'm sure she told them everything that

14   she could, she's a lot like me.

15   Q.    And part of that would have included

16   that your mom -- your mom's behaviors?

17   A.    No, I don't think so.  I don't think she

18   would say she has bad behavior because mom had

19   dementia, and the reason she had bad behavior

20   was because new people were working with her

21   that she was not familiar with.

22   Q.    Would your sister have reported in March

23   of 2020 when she took your mom to the hospital

24   that your mom was combative and that she had

25   been this way for months?

Page 177

1    A.    No, she never reported that.

2    Q.    You understand that that --

3    A.    No, I think East Park reported that.  I

4    don't know where that came from.

5          We had her there because she looked

6    lethargic from being over-drugged and

7    dehydrated.

8    Q.    The hospital records from March of 2020

9    indicate that daughter says that she's

10   combative and that is how she has been for

11   months?

12   A.    I don't remember that.

13   Q.    But certainly if you or your sister was

14   reporting it, that would have been accurate

15   information that you were providing to the

16   hospital?

17          MR. BARDWELL:  Objection.

18          THE WITNESS:  I -- I don't think my

19   sister reported she was combative, she wouldn't

20   have done that.

21   BY MS. YODER:

22   Q.    And the same thing in May when your mom

23   was in the hospital, it was reported again that

24   she was combative and --

25   A.    No, it was dehydration.

Page 178

1              MR. BARDWELL:  You have to let her

2    finish.

3              THE WITNESS:  I'm sorry.

4    BY MS. YODER:

5      Q.   I'm not asking about the reason that

6    she's going to the hospital, I'm asking about

7    information that's being provided to the

8    hospital, okay.

9              So in May of 2020 when your mom went

10   to the hospital, the records indicate that it

11   was reported to the hospital that your mom was

12   combative.  Do you agree that your mom had

13   periods of time when she was combative with her

14   care providers?

15     A.   Yes, I do.

16     Q.   And when you were trying to find a place

17   for your mom to go from East Park, she was

18   turned down at a couple of facilities due to

19   her --

20     A.   Nothing was open, it was COVID.

21             MR. BARDWELL:  You need to let her

22   finish.

23             THE WITNESS:  I know.  I'm not good

24   at this.  I'm so sorry.

25   BY MS. YODER:

Page 179

1    Q.    When you were looking for a new place

2    for your mom to go after she let -- or when she

3    was leaving East Park she was turned down by at

4    least two facilities because of her behaviors,

5    correct?

6    A.    I don't recall that.

7    Q.    If it's in your journal would you

8    dispute it?

9    A.    She was turned down at certain nursing

10   homes when we were trying to move her out

11   because of eviction, is that what you mean?

12   Q.    Because of her behaviors, they couldn't

13   accept her because of her behaviors.

14   A.    I don't remember that.

15   Q.    Okay.  If it was in your calendar from

16   the notes, would that have been accurate if you

17   wrote it?

18   A.    I can't remember really.  It was such a

19   hard time, I can't remember all the details.

20   Q.    And I understand that you don't

21   remember.  What I'm asking is --

22            MR. BARDWELL:  Listen to this

23   question and answer the question that she

24   actually asks you.

25            THE WITNESS:  Okay.

1    BY MS. YODER:

2      Q.    -- if you wrote that in your notes would

3    it have been accurate?

4      A.    Would it have been accurate if I wrote

5    it in the notes?  Not really.

6            She got combative because of

7    reasons.  I'm not saying she just got combative

8    on her own, the reasons she got combative, so

9    it's hard for me to answer that.

10     Q.    If you wrote in your calendar notes that

11   your mom was turned down at two facilities

12   because --

13     A.    Well, maybe it's right if I wrote it in

14   my calendar, yeah.

15     Q.    That's the question.

16     A.    But I don't remember.  I don't remember,

17   I'm sorry.  I have a hard time with the

18   questions.

19            MR. BARDWELL:  Listen to the actual

20   questions she's asking.  She's not trying to

21   trap you or trick you, she's asking you

22   questions.  Listen to them, think about them.

23            THE WITNESS:  Okay.

24   BY MS. YODER:

25     Q.    If it was written on your Facebook page

1    that your mom had been turned down from two

2    facilities due to her behaviors, that also

3    would have been accurate if you were writing it

4    there?

5      A.   I don't know how to answer that.

6              MR. BARDWELL:  Just honestly.

7              THE WITNESS:  If I wrote it in my

8    calendar it must have been what was happening.

9    BY MS. YODER:

10     Q.   Same thing with your Facebook page?

11     A.   Oh, yeah.

12     Q.   Speaking of your Facebook page, you

13   started that page while your mom was at a

14   different facility, correct?

15     A.   Life With Me Gina Marie?

16     Q.   No, the Cries In The Night.

17     A.   Oh, the Cries In The Night?  I don't

18   remember when I actually started it.  I might

19   have started it -- I don't remember when I

20   actually started it.  It has a timestamp there,

21   we can find out.

22     Q.   I'm asking the reason that you started

23   it.

24     A.   I started it because I saw poor care,

25   and I wanted to make things better.

Page 182

1    Q.    And that was at the facility that your

2  mom was at before she went to East Park?

3    A.    Might have been, yeah.

4    Q.    Okay.  You're actually running down the

5  halls videoing with call lights going off, do

6  you remember that?

7    A.    I videoed that they were not -- yes, I

8  remember that, yes.

9    Q.    And that was not at East Park, correct?

10    A.    No, no, no.

11    Q.    How much did you pay for the clock?

12    A.    Oh, jeez.  I would have to look at my

13  receipt because I buy a lot of stuff on Amazon,

14  I'm sorry.

15    Q.    It's all right.

16    A.    I'm trying to think.  Maybe -- I have no

17  idea.

18    Q.    Did it still work when it was returned

19  to you?

20    A.    No, I didn't have the -- well, the clock

21  worked but there was no chip in it.

22    Q.    Okay.  Now you have the chip?

23    A.    No, I don't have the chip.  I don't know

24  where the chip is.

25    Q.    Sorry.  You did have the chip at some

1   point?

2     A.   I had the chip when I left it there, and

3   I never got it back until the police gave it

4   back to us.

5     Q.   And now somewhere between you having it

6   and you trying to give it to your attorney it's

7   missing again, is that what I understand?

8     A.   That's what I heard.  I just heard that,

9   yeah, I guess.

10    Q.   You gave it to your attorney?

11    A.   Yes.

12    Q.   Who intended to cause you mental

13  distress?

14    A.   I don't think anyone intended to cause

15  me mental distress.  I think they were

16  retaliating -- I don't know.  I don't know.  I

17  don't know.

18    Q.   Do you think that anyone did anything

19  that they knew or should have known was going

20  to cause you mental distress?

21              MR. BARDWELL:  Objection.

22              THE WITNESS:  Do I think anything --

23  say that again.

24              MS. YODER:  Sure.

25  BY MS. YODER:

Page 184

1    Q.   Do you think anyone did something that

2  they knew or should have known it was going to

3  cause you mental distress?

4    A.   Oh, yeah, I think they did.  I think

5  there was some.

6    Q.   Who?

7    A.   I think a couple of people that weren't

8  there taking those -- I don't know, I don't

9  know who they were.

10           Like that picture you got that you

11  showed me, they were doing that stuff, and I

12  don't know how.  My video they took and

13  changed, I don't know who did that.

14    Q.   Anything else that anyone did that they

15  should have known was going to cause you mental

16  distress?

17           MR. BARDWELL:  Objection.

18           THE WITNESS:  I would think that

19  what they've done they would think it would

20  cause me mental distress but obviously it

21  didn't, I don't think so.

22  BY MS. YODER:

23    Q.   Who?

24    A.   East Park.

25    Q.   Who at East Park?

Page 185

1    A.   Well, I was dealing with mostly Sara

2  when I couldn't speak with someone on the

3  floor.

4    Q.   What did Sara do that she should have

5  known would cause you mental distress?

6    A.   Well, she did one thing with the text

7  message that put me in distress.

8    Q.   What text --

9    A.   Very, very big mental distress.

10   Q.   Which text message?

11   A.   There's a text message where I was

12  desperate trying to find an answer for my

13  mother, and she said, I'm going to get a DON

14  for you because she always got someone for me

15  and tried to help me out.

16            I get a text bomb right after that

17  that says, More fun stuff from Gina, meaning

18  she was sending and making a joke of my

19  mother's despair with this DON.  She sent the

20  wrong text, she sent it to me instead of the

21  person.

22   Q.   Okay.  Anything else that Sara did that

23  she should have known would cause you mental

24  distress?

25   A.   She walked in here and did this to me by

Page 186

1    reporting things that weren't true that caused

2    me years of mental distress.

3              MR. BARDWELL:  She's pointing at

4    Exhibit M right there.

5              THE WITNESS:  She did this to me,

6    that caused me mental distress on top of what

7    was going on with mom, you know, so it was like

8    layered mental distress.  Oh, yai, yai, yai.

9    Can you write that down?

10              I laugh when I'm nervous, I

11    apologize.  This is very serious, don't get me

12    wrong, this is what happens with me.

13    BY MS. YODER:

14      Q.   If Sara felt threatened, do you not

15    think that she has a right to go to the police?

16      A.   I would think she had every right to go

17    to the -- I don't know, to do what she wanted

18    if she felt threatened, but I wasn't

19    threatening her so I don't know how that

20    happened, I don't know how that came about

21    between us.

22              We were friends, she helped me.  I

23    looked at her as an administration.  I've built

24    businesses and I respected that, and I knew

25    what she was going to fix was right, going to

1   be right.  Wasn't ever.

2     Q.    Anyone else that did something that they

3   should have known would cause mental distress?

4     A.    They restrained my mother's legs in

5   December, it caused a tremendous amount of pain

6   for her and mental distress for me, yes,

7   definitely.  Every time I went there for a

8   wound, a bad wound, I feel it.

9     Q.    Anything else that anyone did that they

10  should have known would cause you mental

11  distress?

12            MR. BARDWELL:  Objection.

13            THE WITNESS:  Yes, Sara George could

14  have told me that the lady down the hall that

15  she put in mom's room had bed bugs before she

16  put the lady in my room.  I had to go ask her

17  about it.  First she told me they were cleaning

18  her room.  She wasn't telling me the truth.

19            The woman resident told me, I'm here

20  because there's bed bugs in my room, and then I

21  approached Sara George and confronted her with

22  that and she finally agreed that that's what

23  they were doing, cleaning bed bugs out of this

24  woman's room.

25  BY MS. YODER:

Page 188

1    Q.   When was that?

2    A.   Oh, jeez, you know me with these dates,

3  I got to think back here.  That was when mom

4  didn't have a roommate because they moved

5  someone in, so I really don't know.

6    Q.   Did your mom have a roommate when you

7  put the clock in her room?

8    A.   I can't remember, but I know they put

9  one in -- if there wasn't they put one in

10  shortly after because I saw a lady in the

11  window when I went to see my mom that was in

12  her room, so I'm not sure if she was in her

13  room or not.  When I put the clock in I don't

14  think, I'm not sure.  They move them around,

15  you know.

16    Q.   Anyone else that did something that they

17  should have known would cause you serious

18  emotional distress?

19           MR. BARDWELL:  Objection.

20           THE WITNESS:  All of them.  They

21  would not call me when I wanted to talk to my

22  mother.  All of them caused me distress.

23  BY MS. YODER:

24    Q.   Anything else?

25           MR. BARDWELL:  Objection.

1          THE WITNESS:  I can't think of

2     anything right now.  Oh, I'm sorry.

3          MS. YODER:  That's okay.

4     BY MS. YODER:

5     Q.   Did you have medical treatment because

6     of the distress?

7     A.   Like I said -- yes.

8     Q.   What conditions, what medical conditions

9     have you had because of this emotional

10    distress?

11    A.   I have generalized anxiety, PTSD.

12    Q.   Who diagnosed you with generalized

13    anxiety?

14    A.   I can't remember.  I've had anxiety.

15    Q.   Who diagnosed you with PTSD?

16    A.   I can't remember.

17    Q.   When were you diagnosed with PTSD?

18    A.   I can't remember.

19    Q.   When were you diagnosed with generalized

20    anxiety?

21    A.   I can't remember because I don't

22    remember.

23    Q.   Have you ever been diagnosed with PTSD

24    before June of 2020?

25    A.   I had a bad childhood.

1    Q.    So is that a yes?

2    A.    I had things happen, yes.  I don't know,

3  what was that question again?

4    Q.    If you had ever been diagnosed with PTSD

5  before June of 2020.

6    A.    I don't even remember.

7    Q.    So maybe yes, maybe no?

8    A.    Maybe yes, maybe no.

9    Q.    And had you been diagnosed with

10  generalized anxiety before June of 2020?

11    A.    Yes.

12    Q.    When?

13    A.    I don't know.  I rack my mind for that

14  day and brain.

15    Q.    Any other medical conditions that you

16  believe were caused because of the emotional

17  distress?

18    A.    I had medical conditions.

19    Q.    What are those?

20    A.    I have rheumatoid arthritis, vestiges

21  migraine, ocular migraine.

22    Q.    Hold on.  You're not claiming that

23  rheumatoid arthritis was caused by East Park?

24    A.    No, I'm not claiming any of it was done

25  by East Park.

1          MR. BARDWELL:  Objection.

2          THE WITNESS:  I'm claiming I got way

3     bad because I wasn't sleeping, I wasn't eating,

4     I was worried, wait, wait, wait trying to get

5     answers.

6     BY MS. YODER:

7       Q.   So what medical conditions are you

8     claiming were caused by East Park?

9          MR. BARDWELL:  Objection.

10          THE WITNESS:  Extensive general

11     anxiety disorder.

12     BY MS. YODER:

13       Q.   Okay.  Anything other than the anxiety

14     and PTSD that was caused by East Park?

15          MR. BARDWELL:  Objection.

16          THE WITNESS:  To my physical being,

17     no, that was enough right there.

18     BY MS. YODER:

19       Q.   Now, what about conditions that were

20     made worse because of East Park, are you

21     claiming anything?

22       A.   When I don't sleep -- because I live

23     holistic, I like to naturally handle my

24     problems.  I don't take to drugs well, and when

25     I don't sleep, I don't eat, I'm not exercising,

1    everything kicks in bad.

2            I could not do this during that

3    time, and with all the stress my conditions got

4    extremely worse to the point where I had to go

5    on high blood pressure medicine.

6    Q.   What conditions got worse?

7            MR. BARDWELL:  Objection.

8            THE WITNESS:  Arthritis, migraine,

9    migraine vertigo, I would vomit in the mornings

10   thinking of why I can't talk to her, headaches.

11   Just it wasn't a good time.

12   BY MS. YODER:

13   Q.   How often were you having migraines?

14   A.   I don't think the actual migraines.

15   Sometimes it turns into vertigo or blindness,

16   but I can get it -- back then I was in -- oh, I

17   got to think back, hang on.

18           When I couldn't oversee what was

19   going on with mom I would just go to bed.  I

20   was so sick, and my sister would try to help me

21   out, whatever, but I would be in bed a lot when

22   I wasn't seeing mom or couldn't.  Just not

23   good, I was not good.

24   Q.   So you were unable to see your mom from

25   March 12th, 2020 because of COVID, right?

Page 193

1    A.    I could see her through the dirty little

2    window they gave me.  I'm sorry, but it was.  I

3    could hardly see her, it was filthy.  I had to

4    lean up and look.

5              I'm talking too much, I'm sorry.

6    What was the question?  I got to get to it.

7    Q.   You said there were times where you

8    couldn't see your mom and you would just lay in

9    bed, so --

10   A.    I wouldn't lay in bed --

11             MR. BARDWELL:  You need to stop, let

12   her ask her question so you can answer it.

13             THE WITNESS:  I feel like we're

14   having a chat, I'm sorry.

15             MR. BARDWELL:  Let her ask her

16   questions so you can answer it.

17             THE WITNESS:  He's going to beat me

18   up.

19   BY MS. YODER:

20   Q.   You said when you couldn't see your mom

21   you would just lay in bed, and I'm trying to

22   figure out the timeframe when you were unable

23   to see your mom.

24   A.    During the time they cut off

25   communication mostly and I didn't get the

Page 194

1    medical records, that's during that time.

2      Q.    When did they cut off communication?

3      A.    I can't remember the day, the very day,

4    but I can look at my calendar, it says on here

5    the day it happened.

6              It was a slow process, COVID came

7    in, people quitting.  It was just an awful time

8    for me to see her like that.

9      Q.    Are you continuing to suffer from

10   generalized anxiety?

11     A.    It's happened since -- yeah, got worse

12   during that time.

13     Q.    And who treats your generalized anxiety?

14     A.    Dr. Fritz, talk therapy and good health.

15     Q.    Who do you -- are you still suffering

16   from PTSD?

17              MR. BARDWELL:  Objection.

18              THE WITNESS:  No, not really.  I

19   have a really good husband, we have a very

20   prayerful life, and we have peace in our life

21   normally, it's very good.  I have a very good

22   life with my husband.

23   BY MS. YODER:

24     Q.    Are you back to your baseline as far as

25   the arthritis?

Page 195

1    A.    What does that mean?

2    Q.    So you had arthritis before any of these

3    issues that you've talked about with East Park.

4    Fair?

5    A.    Oh, yeah.

6    Q.    And then I believe your testimony is

7    that it got worse?

8    A.    It always gets worse when I'm stressed

9    or if I overwork it, you know, but I don't.

10    Q.    So has your arthritis now returned to

11    the point that it was --

12    A.    It never left.  I have rheumatoid --

13         MR. BARDWELL:  You need to stop and

14    listen to her question and answer the actual

15    question she's asking.

16         THE WITNESS:  I know.  Okay.

17         MR. BARDWELL:  There's lots you want

18    to say, but go ahead and give her the

19    information she needs first.

20         THE WITNESS:  I do.  I know.

21    BY MS. YODER:

22    Q.    So you've had arthritis for a long time,

23    correct?

24    A.    Yes.

25    Q.    And part of your claim in this lawsuit

1    is that the arthritis got worse because of

2    things that people at East Park did to you,

3    correct?

4      A.    Correct.

5      Q.    Has your arthritis now returned to the

6    way it was before the things that happened at

7    East Park?

8                MR. BARDWELL:  Objection.

9                THE WITNESS:  Not right now.

10               MS. YODER:  Okay.

11   BY MS. YODER:

12     Q.    What does that mean?

13     A.    Well, I'm going through some stress here

14   so obviously it's going to hurt more when I

15   can't sleep and I can't eat.  Yeah, it will get

16   worse.

17     Q.    So stress from this deposition?

18     A.    Absolutely.  No, from, from -- not just

19   from this deposition but, yes, from the

20   deposition, too, stressful for me.

21     Q.    What else is going on that's stressful?

22     A.    Just going through this whole thing,

23   having to go through all this whole thing.

24     Q.    The civil litigation?

25     A.    No, what I went through with my mother

Page 197

1    and having it in my mind.

2       Q.    You participated in the discharge

3    hearing with the Ohio Department of Health?

4       A.    I don't understand that.  Say it again.

5       Q.    There is a hearing with the Ohio

6    Department of Health because East Park had sent

7    you the letter that your mom was being

8    discharged?

9       A.    The eviction hearing you're talking

10   about?

11      Q.    They said that she was going to be

12   discharged from the facility.

13      A.    They told me I had 30 days.

14      Q.    Right.  And after 30 days she was being

15   discharged?

16      A.    To wherever they could put her.

17      Q.    You participated in that hearing with

18   the Ohio Department of Health, correct?

19      A.    By telephone, yeah.

20      Q.    And you had the right to have an

21   attorney present, correct?

22              MR. BARDWELL:  Objection.

23              THE WITNESS:  I didn't know -- I

24   don't know about that.

25   BY MS. YODER:

Page 198

1    Q.   No one ever told you that you could have

2    an attorney present?

3    A.   At that time, no, now that I'm thinking

4    of it.

5    Q.   You had a right to appeal the Ohio

6    Department of Health's decision, correct?

7              MR. BARDWELL:  Objection.

8              THE WITNESS:  The Ohio Department of

9    Health's --

10             MS. YODER:  Decision to discharge --

11             THE WITNESS:  July -- I don't know

12   if I had it, I don't know if I had it.  Sorry.

13   BY MS. YODER:

14   Q.   Did you appeal the decision of the Ohio

15   Department of Health?

16   A.   No.

17   Q.   How many complaints have you made to the

18   Ohio Department of Health about East Park?

19   A.   Two.

20   Q.   What were the nature of those

21   complaints?

22   A.   I wrote a four page pdf about the nature

23   of my complaints.  It would take me a really

24   long time to explain because there were so

25   many.

1    Q.    When was that submitted to ODH?

2    A.    What was that, one?  The first one or

3  the second one?

4    Q.    The four page pdf that you just talked

5  about.

6    A.    When was it submitted to who?

7    Q.    ODH.

8    A.    The day I made the report on-line to

9  report what was going on at East Park.  The

10  first time I reported anonymously because my

11  mom was still there.

12    Q.    What was the date of the report?

13    A.    I would have to look it up for you.  I

14  really can't -- I don't know.

15    Q.    Do you know what year it was?

16    A.    For the report?

17    Q.    Yes.

18    A.    Well, sure, it was -- well, the first

19  report?

20    Q.    Yes.

21    A.    That was, I believe, the last year she

22  was there, 2020.

23    Q.    2020?

24    A.    Yeah, those are the reports, I believe.

25    Q.    What was the outcome of the first

1   report?

2      A.   I never got one because when you

3   complain anonymously you don't get a report.  I

4   just wanted someone to go in there and check it

5   out.

6      Q.   Do you know if anything was ever done

7   with that report?

8      A.   I do not.

9      Q.   When did you file the second report?

10     A.   That might have been -- I don't

11  remember, but it was after -- I can't remember

12  the date, I would have to look it up.

13     Q.   What was the outcome of that report?

14     A.   I got an e-mail.

15     Q.   What did the e-mail say?

16     A.   Not what I wanted to hear, it was

17  nothing.

18     Q.   What did the e-mail say?

19     A.   I can't remember.  It was a long

20  explanation.

21     Q.   Do you still have that e-mail?

22     A.   Sure.

23     Q.   How many complaints have you filed

24  against other facilities?

25     A.   I filed a complaint against Parkside

1  Villa.

2     Q.    What was the nature of that complaint?

3     A.    I went in to get to see my mother during

4  therapy, and she had a bruise on her knee the

5  size of a baseball.  It was huge.

6     Q.    What was the outcome of that complaint?

7     A.    Because we had left -- nothing, didn't

8  find nothing.

9     Q.    Any other complaints that you filed with

10  ODH?

11     A.    No, just those, I believe.  Yeah, I

12  believe.

13     Q.    Part of what you're seeking to recover

14  as damages in this case is your attorney fees

15  from your criminal case, correct?

16     A.    Correct.

17              MS. YODER:  Okay.

18                  (Defendant's Exhibit N was

19                  marked for identification.)

20  BY MS. YODER:

21     Q.    I'm handing you what's been marked as

22  Defendant's Exhibit N.  These are bills or

23  invoices rather that have been produced in this

24  lawsuit.

25              Have you received invoices from The

1    Chandra Law Firm for representation in the

2    criminal matter?

3      A.   Yes, e-mails.

4      Q.   And it looks like you first initiated

5    services with The Chandra Law Firm on October

6    19, 2020.  Does that sound right?

7      A.   Correct.

8      Q.   And the reason that you retained The

9    Chandra Law Firm was to defend you in the

10   criminal case and to pursue a potential civil

11   claim; is that right?

12     A.   Correct.

13     Q.   Then on it looks like either October

14   27th, 2020 or December 5th, 2020 you paid

15   $2,500 as a retainer for the defense of the

16   criminal charges and a potential related civil

17   claim; is that right?

18     A.   I don't handle the finances, my husband

19   did, but if that's what he paid that's what he

20   paid.

21     Q.   And the purpose of the retainer was for

22   the defense of the criminal case and pursuit of

23   a potential civil claim, correct?

24     A.   Correct.

25     Q.   Are you able to tell us from Exhibit N

1   which of these charges relate to the defense of

2   the criminal case and which of these charges

3   relate to pursuit of a potential civil claim?

4     A.   I don't know, I'll try.

5     Q.   Go ahead and tell us.

6     A.   Say it again.  I don't know court talk,

7   I'm sorry, I don't know.  That's why I have

8   him.  I really don't know what you're asking

9   me.

10    Q.   So --

11    A.   Say it again, maybe I'll try again.

12    Q.   Sure.  From Exhibit N are you able to

13  tell us which charges were for defense of the

14  criminal case and which charges were for the

15  pursuit of a potential related civil claim?

16    A.   No.

17    Q.   Did you have a fee agreement with The

18  Chandra Law Firm?

19    A.   Fee agreement?

20    Q.   Yes.

21    A.   I believe so.  My husband handled that.

22    Q.   Did you sign the fee agreement or did

23  your husband?

24    A.   I probably signed it, but he helped me

25  out doing whatever the financial part was, so I

1    don't really remember.

2      Q.   Was that the agreement for an hourly fee

3    agreement or what we would call like a

4    contingency?

5      A.   I don't remember.

6      Q.   Did you ever talk to Subodh Chandra?

7      A.   I'm sorry, it was a fee agreement.

8      Q.   Did your attorney just tell you that?

9      A.   No, he didn't but I'm thinking and it

10   came to me.  I think it was a fee -- I know

11   he's not on contingency, that's why it came to

12   me.  I'm a little slow, I'm sorry.

13     Q.   What were the terms of the fee

14   agreement?

15     A.   Oh, jeez, I don't remember.

16     Q.   You just know it was a fee agreement?

17     A.   I know he paid it, and he's working --

18   doing what I need, that's all.  I don't

19   remember.

20     Q.   Have you ever met Subodh Chandra?

21     A.   Not in person, no.

22     Q.   Have you talked to him on the phone?

23     A.   No, I have -- no, I have not.  E-mails.

24     Q.   You've e-mailed with Subodh?

25     A.   Maybe.  I'm not sure when we were with

Page 205

1    them, but I'm not sure.

2      Q.    Do you know what his involvement was in

3    your case?

4      A.    Who?

5      Q.    Subodh Chandra.

6      A.    I was dealing mostly with Brian so I

7    don't really know.  I didn't even know that was

8    his first name, I just called him Chandra.

9      Q.    Did you know that an amicus brief was

10   filed in the criminal case?

11     A.    I don't know what that is.

12     Q.    It was a brief prepared by law

13   professors.  Did you know about that?

14     A.    No, I don't remember.

15     Q.    Do you know if you were charged in any

16   way for the drafting of that brief?

17     A.    Charged for the drafting of this brief

18   that I don't know?  No, I'm not sure.  I don't

19   know what you're talking about.

20     Q.    Are you able to tell us from Exhibit N

21   whether you were charged for the drafting of

22   that brief?

23     A.    No.  Sorry.

24     Q.    That's okay.

25     A.    I feel bad, I want to answer you, but.

Page 206

1    Q.   How much has been paid for legal fees?

2    A.   That, again, my husband would know.

3    Q.   And it's his money that's being used --

4    A.   It's our money.

5    Q.   I thought I saw in one of your -- either

6 your calendar entries or your posts that you

7 needed to pay your husband back?

8    A.   I never pay him back.  He gives me money

9 all the time.  That's crazy.  I don't know why

10 I wrote that.  Maybe I didn't understand what I

11 was writing.  I never pay him back.  I haven't

12 paid him a dime ever.

13    Q.   So you don't need to pay him back for

14 the legal fees?

15    A.   My husband?

16    Q.   Right.

17    A.   Absolutely.  It's our money, it was him

18 and it was our life, and this affected him,

19 too.  He lost work.  Yeah, it's both of us

20 together, we're together, we're married, we do

21 everything together.

22    Q.   Do you know a Miss Hinners,

23 H-I-N-N-E-R-S?

24    A.   I might.  I know lots of people, I don't

25 know offhand.

1    Q.    Do you know why her name would appear in

2    any filing in the criminal case on your behalf?

3    A.    Hinners?

4    Q.    Yeah.

5    A.    What's her first name?

6    Q.    Miss is the only thing in this.

7    A.    Hinners?

8    Q.    Yeah.

9    A.    Mystery to me.

10   Q.    Either in your calendar or on your posts

11   you wrote at one point, I have two witnesses

12   that will testify that nurses at night will go

13   out drinking, sleeping, sex in cars.

14   A.    Did I write that, is that what you're

15   asking me?  Yes.

16   Q.    No, you did -- yeah, you did write this.

17   A.    Okay.

18   Q.    Who are the two witnesses?

19   A.    Tricia Tessmer, Jeannie Brown.  Oh,

20   wait, I'm sorry, not Jeannie Brown.  Let me

21   think.  Tricia Tessmer told me about the

22   doings.

23   Q.    And you said two witnesses, so who was

24   the other one?

25   A.    I'm trying to think right now.  That

1    told me about that?

2      Q.    Correct.

3      A.    I can't remember who the other person

4    was, but it was -- I can't remember.

5                    Oh, I know, came to me.

6      Q.    Who is it?

7      A.    I got to think of her name.  She was a

8    night nurse, too.  Desiree was her name.

9    Desiree, I don't know her last name.

10     Q.    She was a night nurse at East Park?

11     A.    Yes.

12     Q.    When?

13     A.    Worked with Tricia whenever Tricia

14   worked, they worked together.

15     Q.    Was Tricia also a night nurse?

16     A.    I don't know what her hours were.  I

17   know that -- yeah, she was there mostly at

18   night but sometimes during the day, I don't

19   know.

20     Q.    Do you know what her position was?

21     A.    Tricia?  Was an aide.

22     Q.    In your calendar notes you indicate that

23   there's a eucharistic minister at your church

24   that wants you in jail.  Who is that?

25     A.    That's the Prosecutor that was at Brook

1    Park.

2    Q.   Who is the Prosecutor?

3    A.   Carol Horvath.

4    Q.   And she's a eucharistic minister at your

5  church?

6    A.   Yes.

7    Q.   And you believe she wants you in jail?

8    A.   Yes.

9    Q.   Why is that?

10    A.   She said something to a friend that

11  works under her at the police department.

12    Q.   What did she say?

13    A.   She said, She's in trouble.  She's going

14  to get prosecuted.

15    Q.   Who did Carol make that comment to?

16    A.   My friend Kevin Rosala.

17    Q.   Do you know when she made that comment?

18    A.   It was during the case.

19    Q.   The criminal case?

20    A.   (Witness nods head up and down.)

21    Q.   Yes?

22    A.   Yes.

23    Q.   You knew -- or do you believe that Carol

24  had something to do with the charges being

25  filed against you?

Page 210

1    A.    Carol?

2    Q.    Carol Horvath.

3    A.    Oh, Carol Horvath.  Carol Horvath.  I

4  don't believe that, no.  I'm sorry, say it

5  again.

6    Q.    Sure.

7    A.    I get like twisted with your questions

8  sometimes, I don't know what you mean.

9    Q.    Do you believe that Carol had something

10  to do with the charges being filed against you?

11          MR. BARDWELL:  Objection.

12          THE WITNESS:  I don't know.  I

13  really don't know.

14  BY MS. YODER:

15    Q.    Other than your attorney fees, are there

16  any other damages that you're seeking in this

17  case?

18          MR. BARDWELL:  Objection.

19          THE WITNESS:  I would like pain and

20  suffering.  It took all of our money that we

21  had to spend on this nonsense they created.

22  BY MS. YODER:

23    Q.    What money did you have to spend?

24    A.    Constantly my husband taking off of work

25  to drive me to go to the courthouse and back

Page 211

1    and the monies that we put into attorneys,

2    whatever that we had to put into this.

3        Q.    So your husband's time off work?

4        A.    A lot of time off work.  He was always

5    with me by my side.

6        Q.    What other out-of-pocket expenses have

7    you had?

8        A.    Well, the reason I'm -- was seeing Gene

9    Britton was because I was grinding my teeth at

10   night because of my anxiety, and I can't wear

11   the brace so I had to replace, file, get one

12   replaced.  It was . . .

13       Q.    Do you know how much you paid Gene

14   Britton?

15       A.    Oh, approximately -- I don't know, over

16   a thousand dollars for the crown.  I don't

17   know.

18       Q.    Any other out-of-pocket expenses that

19   you've had?

20       A.    The second crown couldn't be fixed by

21   Gene so I had to go to Jennifer Psota, and I

22   had that one put in.  It was from grinding.

23       Q.    Have -- and how much did you pay her?

24       A.    Her tooth was $800.

25       Q.    Any other out-of-pocket expenses that

Page 212

1   you've had?

2     A.    I can't think offhand right now.

3     Q.    Well, this is my one chance to ask you.

4   I asked for bills in discovery and I didn't get

5   any, so now this is my one chance to ask you.

6   So if you have other out-of-pocket expenses --

7     A.    Any other than we spoke about?

8     Q.    So you got your attorney fees for the

9   criminal and civil case.

10    A.    Right.

11    Q.    Your dental bills from Dr. Britton and

12  --

13    A.    Psota.

14    Q.    -- Psota, and you mentioned your

15  husband's time off work.

16    A.    Yeah.

17    Q.    Okay.  Any other out-of-pocket expenses

18  that you've had?

19            MR. BARDWELL:  Objection.  Asked and

20  answered.

21            You can tell her again.

22            THE WITNESS:  What do I tell her

23  again?  I don't remember where we're at now.

24            When he does that it throws me off.

25  I love it though.

1           Tell me again what I have to think

2    about.

3                MS. YODER:  What other damages

4    you're claiming in the lawsuit.

5                THE WITNESS:  Oh, damages claiming?

6    You really -- oh.  I can't think right now

7    about what damages.  I don't remember what

8    we've lost because it was just so painful.  I

9    don't remember.

10               Whatever we've told you is pretty

11   much it because I would have told him if it was

12   another thing.

13               MR. BARDWELL:  So don't talk about

14   what we have discussed, all of that is

15   privileged, so.

16               THE WITNESS:  Okay.  I'm sorry.  I'm

17   new at this.

18                   (Defendant's Exhibits O and P were

19                   marked for identification.)

20   BY MS. YODER:

21     Q.   I'm going to hand you what's been marked

22   as Defendant's Exhibits O and P.

23               All right.  So Exhibit O is Bates

24   marked Criscione 003602.  Do you see that in

25   front of you?

1    A.    Yes, I do.

2    Q.    Who took this picture?

3    A.    I did.

4    Q.    When did you take it?

5    A.    When I found spew all over her room from

6    that air conditioning unit.  It was happening,

7    and I finally took a picture.  I kept cleaning

8    it and it kept happening.

9    Q.    So when was the picture taken?

10   A.    I don't recall.

11   Q.    Do you still have -- well, was it taken

12   with your cell phone?

13   A.    Yes, I still have it.

14   Q.    It was taken with your cell phone?

15   A.    Yes.

16   Q.    And there should be a date?

17   A.    There should be a date on that, yup.

18   Q.    All right.  So what is being depicted

19   here?

20   A.    Well, she got moved to this room, and

21   this air conditioning unit just kept putting

22   stuff out.

23   Q.    Do you know what it was putting out?

24   A.    Moldy little dirt she was sleeping on

25   top of.

Page 215

1    Q.   How do you know it was mold?

2    A.   It looked like mold to me.  I don't

3    know, whatever's in the air conditioning that

4    spews out, I don't know what it is.

5    Q.   Did you report that to anyone at East

6    Park?

7    A.   Several times.  I told Dave the

8    maintenance man who was around a lot.

9    Q.   Is Dave the one who is your friend?

10   A.   Yes.

11   Q.   He --

12   A.   Well, he wasn't my friend before I went

13   in there, he became my friend being there all

14   the time.

15   Q.   He would come and do repairs at your

16   house?

17   A.   Yes, he was a handyman.

18   Q.   How many times did you tell Dave about

19   this AC unit?

20   A.   Every time he came in the room.

21   Q.   Did he fix it?

22   A.   Yes, a bunch of -- yes, he did

23   eventually, yes.

24   Q.   Do you know how long after you

25   complained about it if he fixed it?

1    A.    Long.

2    Q.    What's that?

3    A.    It was awhile.  It was a couple months,

4  a month, I'm not sure if.  It was a long time

5  though that I kept cleaning that stuff up.

6    Q.    All right.  Let's look at Exhibit P.

7    A.    Oh, God.

8    Q.    So the first page of Exhibit P is

9  Criscione 003603.  What is this a picture of?

10   A.    My mother.

11   Q.    Who took it?

12   A.    Me.

13   Q.    When did you take it?

14   A.    When I saw that.

15   Q.    What part of her body is this?

16   A.    It's her behind.

17   Q.    When did you first see this?

18   A.    I can't recall.

19   Q.    Do you still have this photo?

20   A.    It happened a lot.  Yes, I do.

21   Q.    And so it would be on your phone?

22   A.    Yes.

23   Q.    And we should be able to tell when it

24  was taken?

25   A.    I hope so.  They timestamp it, right?  I

1    think so.

2       Q.   All right.  Let's go to the next page.

3    This is Criscione 003604.  Who took this

4    picture?

5       A.   I did.

6       Q.   When did you take it?

7       A.    In December because there's a calendar

8    up, but that's the only way I know, I don't

9    remember.

10      Q.   What year?

11      A.   I can't remember.

12      Q.   What's being shown in this picture?

13      A.    I started bottling -- putting bottled

14   waters 1 through 10 in her room because there

15   wasn't enough people to give her water because

16   they were busy all the time, and she couldn't

17   open the cap by herself, and there's the

18   numbers 1 through 9, and I would replace them.

19            She couldn't drink out of the sippy

20   cup they had, and that's why I got her the

21   bottled water.  She's used to drinking out of

22   it.

23      Q.   All right.  The next page, 3605, who

24   took this picture?

25      A.   Yes.

Page 218

1    Q.    Who took this picture?

2    A.    I did, I'm sorry, yes.

3    Q.    When did you take it?

4    A.    I can't remember.

5    Q.    Why did you take it?

6    A.    In those bags are saturated clothes with

7    urine that I used to -- I used to do her

8    laundry, and they were just soaked, soaked.

9    You could wring it out.

10    Q.    Were you aware that there were times

11    when the nurses or the aides would try to check

12    your mother to see if she needed to be changed

13    or to take her to the restroom and she would

14    refuse?

15    A.    I don't know.  I don't get that one

16    because -- say that again.

17    Q.    Yeah.  Were you aware that there were

18    times when the nurses and the aides would try

19    to check your mother to see if she needed

20    changed and she wouldn't let them do that?

21            MR. BARDWELL:  Objection.

22            THE WITNESS:  She had dementia, it

23    could have happened, yes.

24    BY MS. YODER:

25    Q.    Pardon?

Page 219

```
 1    A.   It could have happened, yeah.  It could

 2   have happened.

 3    Q.   Were you aware of that happening?

 4    A.   It didn't happen often that I knew about

 5   it.  It's the first time I'm hearing about it,

 6   to be honest with you.  It might have happened.

 7   She's cute, I miss her.

 8    Q.   Were you aware that there were times

 9   when a nurse or an aide would ask your mother

10   if she needed to use the restroom and she would

11   refuse?

12    A.   I'm not aware of that.  I'm not aware of

13   that at all.

14    Q.   It could have happened though?

15         MR. BARDWELL:  Objection.

16         THE WITNESS:  I want to say more,

17   but I can't explain it.

18         I was aware, but she was supposed to

19   be on a pee schedule, too.  There were times

20   where me and my sister high-tailed it in our

21   cars because we were on the phone with my mom

22   for hours and she's screaming how she's wet and

23   sitting in it, or feces or whatever, and we

24   would rush there.

25   BY MS. YODER:
```

Page 220

1    Q.    So she was supposed to be on a pee

2    schedule, meaning they were --

3    A.    Check her every -- I'm sorry.

4    Q.    And if they go to check her on schedule

5    and she won't let them, they're not able to

6    force her to do anything, correct?

7              MR. BARDWELL:  Objection.

8              THE WITNESS:  Correct, because --

9    yep, correct.

10             MS. YODER:  All right.

11             THE WITNESS:  It's hard to answer.

12   BY MS. YODER:

13   Q.    Let's go to the next, Criscione 003606.

14   Who took this picture?

15   A.    I did.

16   Q.    Okay.  When did you take it?

17   A.    At my home, I don't know when.

18   Q.    Why did you take this picture?

19   A.    These are the clothes I was soaking that

20   I brought home that were totally soaked in pee,

21   and I had to throw some out.

22   Q.    Next page, 003607.  Did you take this

23   picture?

24   A.    Yes, I did.

25   Q.    When did you take this picture?

Page 221

1    A.    I can't really recall.  There was a lot

2  of times I found poop all over the bathroom and

3  cleaned it myself.

4    Q.    So you are indicating that this is poop

5  shown on the top of the toilet?

6    A.    Definitely poop.

7    Q.    How did it get there?

8    A.    Obviously by this picture I would guess

9  someone had her sit down that didn't wipe her

10  on the toilet seat, and the toilet seat was

11  pinching her butt and it was substandard.  I

12  complained about that, too.

13    Q.    Where is the toilet seat pinching her

14  butt?

15    A.    When she sits down, the seat, the way

16  the bar is there, her legs would get in there,

17  and if you sit her fast or whatever, the wrong

18  way, even if she was sitting there waiting for

19  someone to get her off she would say, you know,

20  not all the time, just when they had this bad

21  one in there it was happening.

22          I think they replaced it.  It wasn't

23  any better but it was better than that one.

24    Q.    Did you ever see this happen?

25    A.    Oh, yeah, I was there all the time when

Page 222

1    we were walking her into the bathroom.  They

2    wouldn't allow me to help, but they did ask me

3    to help and I did, I helped a lot.  I would

4    hold her up, hold her up, I'll be right back, I

5    got to go get some Depends or run over there

6    and get some Depends.

7                I'm rambling again, I'm sorry.  My

8    story is so deep in my heart I want to talk,

9    I'm sorry.

10   Q.   Were you ever there when her legs were

11   pinched in the toilet seat?

12   A.   Oh, yeah.  Oh, yeah.  I heard her scream

13   when she sat down.

14   Q.   How long was the toilet seat like this

15   in pictures -- on Page 3607?

16   A.   How long was it like that?

17   Q.   Uh-huh.

18   A.   Until I cleaned it up or I got somebody

19   to look at it and they cleaned it up.  I'm not

20   sure because it happened several times.

21   Q.   How long was it there before you cleaned

22   it or got someone to clean it?

23   A.   I must have got there and she showers or

24   whatever, and I would walk in and find it.  I

25   cleaned the whole room in Clorox wipes when I

1   got there, so I would find it.  I would find it

2   on the walls.

3      Q.   Do you know how long it was there?

4      A.   I don't know.

5      Q.   Next page, 003608.  Who took this

6   picture?

7      A.   I did.

8      Q.   And what's shown on this picture?

9      A.   I walked in one day and it smelled so

10  bad from this room, my mother's room, soiled

11  bedding, towels, whatever was all over.

12           I'm not sure if she had a roommate

13  at the time or not, but I was just disgusted

14  and appalled when I saw this.

15     Q.   Do you know when this was?

16     A.   I can't recall.  Let me look at that

17  table there.  I can't recall the time it was.

18           She did have someone in the room and

19  I'll tell you why, Gertrude was there.  That's

20  Gertrude's side of the room, and that's what I

21  walked into.

22     Q.   So this is not on your mom's side of the

23  room?

24     A.   Well, the room is this big and I smelled

25  it so it didn't matter, but it was not on her

Page 224

1   side of the room, no, it was on Gertrude's side

2   of the room.

3      Q.   Next page, 003609.  Did you take this

4   picture?

5      A.   Many times over and over, yes.

6      Q.   What's shown here?

7      A.    Improperly trained staff that doesn't

8   know how to put on tube socks.

9      Q.   Compression socks?

10     A.   Compression socks rather, yes.

11     Q.   And did you at some point tell them to

12  stop using the compression socks and just prop

13  her feet up?

14     A.   We decided to do that.  Renee thought it

15  was a good idea, too, yeah.

16     Q.   Next page 003610.  Did you take this

17  picture?

18     A.   Yes.

19     Q.   What does this picture show?

20     A.   Feces.

21     Q.   Okay.  When did you --

22     A.    In her bed under her.

23     Q.   Do you know how long it was like that?

24     A.   No.

25     Q.   Next page, 003611.  Who took this

Page 225

1   picture?

2      A.    I did.

3      Q.    Okay.  And what is this a picture of?

4      A.    She constantly would get a yeast

5   infection.  She already had a yeast infection

6   sometimes but it was bad now all the time, and

7   I was -- that's what that is, it's in the

8   crack.  It's from sweating, not being wiped

9   properly, not being dried properly out of a

10  shower, whatever, the moist creates it.

11     Q.    Looks like there's cream on it?

12     A.    Yes, we had to get a cream.  They had a

13  cream that I would put on or they would put on

14  rather.

15     Q.    Next page 003612.

16     A.    It bled, cracked and bled.

17     Q.    There's blood in this picture?

18     A.    It's cracked right here, her skin was

19  cracked.  It was drying up, and I don't know,

20  it looked bloody to me.  Not bleeding but raw I

21  should say, it's raw.

22     Q.    You took this picture?

23     A.    Yep, that's my hand.

24     Q.    Are these pictures, 003611, 3612 and

25  3613, were those all taken on the same day?

Page 226

1    A.    Looks like she's wearing the same thing,

2  yes.

3    Q.    Let's go to 003614.  Did you take this

4  picture?

5    A.    Yes.

6    Q.    What's this a picture of?

7    A.    It's what I walked into again, a smelly,

8  dirty bathroom with garbage on the floor when I

9  went to see my mother.

10    Q.    When was that?

11    A.    A lot.

12    Q.    When was this picture taken?

13    A.    I don't know.

14    Q.    Next page, 003615, what is shown in this

15  picture?

16    A.    You can't see it but another pinching

17  toilet seat and poop, poop particles on the

18  floor.  If you look over to the register

19  there's poop on there.

20          The black lines are not poop, it's

21  some kind of an adhesive that they ripped up,

22  which was really annoying for her to walk over.

23  It's not high but her shoe would stick on it.

24  I don't know, makeshift.  I don't know.

25    Q.    All right.  What about the next page,

1    003616, did you take that picture?

2    A.    More poop on the toilet.

3    Q.    Did you take this picture?

4              MR. BARDWELL:  Wait for her

5    questions, answer the questions.

6              THE WITNESS:  Yes, I did.

7              I saw a picture in my mind and I

8    just moved my mouth, sorry.

9    BY MS. YODER:

10   Q.    And you know this is more feces on the

11   toilet?

12   A.    Yes.

13   Q.    All right.  What about the next page,

14   003617, who took this picture?

15   A.    I did.

16   Q.    And what does this picture show?

17   A.    She was sitting in the middle of the

18   waiting area where they put everybody when

19   they're gathering people after lunch or before

20   lunch or whatever that are running around

21   trying -- what you see between her legs and

22   sitting under her body unfortunately is a Hoyer

23   belt that they left on her after they -- she

24   had to be Hoyered to the bathroom eventually,

25   Hoyered to get changed in the bed, she would

1    get lifted up and changed in the bed, and this

2    Hoyer was still on her like that and --

3      Q.    So you don't think it should have been

4    there?

5      A.    I know.  Renee came over and had a fit

6    and took it off of her.

7      Q.    Did what?

8      A.    I think Renee was there that day, and

9    whoever the nurse that was there that day, Oh,

10   my God, and they took it off.  She shouldn't be

11   sitting on this.

12     Q.    003618, did you take this picture?

13     A.    Yes.

14     Q.    Okay.  What is this a picture of?

15     A.    The same -- let me see.  Just another

16   day, same thing another day with the wet

17   clothes, and I think that's garbage.  I walk in

18   the room and it's there.

19            I don't know -- do you know what, it

20   looks like -- it's just a mess in there they

21   left.  I don't know what that was that day.  It

22   could be wet clothes, it could be garbage, I

23   can't really tell.  I don't remember.

24     Q.    All right.  Next page 003691, did you

25   take this picture?

Page 229

1    A.   Yes, I did.

2    Q.   Why did you take this picture?

3    A.   Well, because we were together that day

4  and it just caught part of a bruise where she

5  was restrained.  It's healing by now, it's

6  starting to heal, I don't know.

7    Q.   How do you know that bruise was caused

8  by her being restrained?

9    A.   Because you see fingerprints and Renee

10  confirmed it with me.

11    Q.   When did you take this picture?

12    A.   This looks like after it all happened,

13  like in the healing process.  I was visiting

14  her, I don't know exactly when.

15    Q.   After what happened?

16    A.   The restrainment of her legs that night

17  in December 2019.

18    Q.   All right.  Next page 003620?

19    A.   This is part of the bruises again.

20         Oops, is that it?  Yeah, these are

21  just -- that's bruises from the restraining.

22    Q.   This is all from the restraining?

23    A.   Yes, because it's on the inside of her

24  leg, and the outside of her leg --

25         MR. BARDWELL:  Listen to her

1  question.

2          THE WITNESS:  I'm sorry.

3  BY MS. YODER:

4    Q.  Why don't you go through and identify

5  which pictures are bruises from the restraint.

6    A.  Okay.  Can't read that number.

7          MR. BARDWELL:  That's going to be

8  3619.

9          THE WITNESS:  19.  3620, 3621.

10          MR. BARDWELL:  Yep.

11          THE WITNESS:  3622, 3623, 3624, and

12  you can see it in 3625, but I'm actually taking

13  a picture of the compression socks put on wrong

14  again on top of the bruise.

15  BY MS. YODER:

16    Q.  So the bruising that we see in 003625 is

17  from the incident in December of 2019?

18    A.  Yes.  Yes.  Both of them.  They're

19  bleeding.  They weren't bruises, they were

20  bleeding, but they were bruises.

21    Q.  Do you want to take a break?

22    A.  No.  It's just hard to look at this.

23  I'm good.

24    Q.  What about 003626?

25    A.  Same thing.

Page 231

1    Q.    When was that picture taken?

2    A.    I don't know.  I took a lot of pictures

3    of her socks put on wrong, but it looks like in

4    this one it might have been -- I'm not sure.

5    Q.    What about 003627?

6    A.    Oh, God.  Is this 27?

7              MR. BARDWELL:  This is 27.

8              THE WITNESS:  This was what they did

9    to her.

10   BY MS. YODER:

11   Q.    How did that happen?

12   A.    I was told Denise Stacey restrained my

13   mother's legs that night by Tina Vondrous, the

14   receptionist.

15   Q.    Denise?

16   A.    Denise Stacey restrained -- I didn't

17   know but when me and my sister would go in my

18   mom would cringe when she came in the room.

19   Q.    And that was in December of 2019?

20   A.    Yes.

21   Q.    Was there just one incident with Denise

22   Stacey?

23   A.    We loved Denise Stacey, she was a good

24   aide.  I don't know what happened.

25             MR. BARDWELL:  Listen to the

Page 232

1   question.

2   BY MS. YODER:

3     Q.   So there was one incident in December of

4   2019 where Denise Stacey restrained your

5   mother?

6     A.   I didn't know it was her then, I found

7   out later, but, yes, this is the only incident

8   her legs were like that, restrained like that.

9   Is that what you're asking?

10    Q.   How many times was your mother

11  restrained --

12             MR. BARDWELL:  Objection.

13  BY MS. YODER:

14    Q.   -- that you're aware of?

15    A.   I don't think they restrained her a lot,

16  I don't know.  I don't know because she had

17  these same bruises when she came out of the

18  shower, she had to be restrained, I don't know.

19  She didn't get them from fighting, I don't

20  know.  I really don't know.  It's just --

21  that's when -- December.  That was bad.

22    Q.   So 003627 is an injury that your mother

23  sustained in December of 2019?

24    A.   Correct.  Right after Christmas, I

25  think.

1   Q.   What about 003628?

2   A.   I think it's the other leg, I'm not

3   sure.

4   Q.   Did you take this picture?

5   A.   I took them, yes.  I took this.

6   Q.   Do you know when it was taken?

7   A.   Like during the week after it happened

8   because it started to bleed and I noticed this,

9   I don't know.

10   Q.   What about the next page 003629?

11   A.   I'm recollecting now as I look at the

12   pictures most of them were taken that day

13   because I remember now when I get like -- I

14   just take a picture, so it could have been the

15   day I went in there to see it, I'm not sure.

16   I'm not sure.

17   Q.   So also related to the December 2019

18   incident?

19   A.   No, this is all the December 2019

20   incident.  I took a lot of leg pictures because

21   it was very severe.

22   Q.   What about 003630?

23   A.   I really can't make that out, but I

24   think it's me doing -- taking a leg picture and

25   it just got blurry, and I didn't take a very

Page 234

1    good picture there, so.  It's like a repeat of

2    the other ones.

3    Q.   What about 003631, what is shown in this

4    picture?

5    A.   Okay.  That's what they said she got in

6    the shower or the bath.  I say shower but it's

7    actually a bath.  I don't know what it is, they

8    put her in it.

9              MS. YODER:  Brian, are you tapping

10   her under the table?

11             THE WITNESS:  No, I'm hitting the

12   thing with my cloddy shoes.  I keep doing that,

13   I'm sorry.

14             MR. OCKERMAN:  Brian, I just saw you

15   hit her foot.

16             MR. BARDWELL:  What?

17             MR. OCKERMAN:  I just saw you hit

18   her foot with your shoe.

19             MR. BARDWELL:  She's moving her

20   foot.

21             THE WITNESS:  I'm going back and

22   forth here.  I'm not --

23             MS. YODER:  Yeah, I'm not talking

24   about the sound, I'm talking about when she's

25   talking and you're kicking her.

Page 235

1          MR. BARDWELL:  (Shrugs shoulders).

2          THE WITNESS:  I'll move over.

3    BY MS. YODER:

4      Q.   All right.  003631 is an injury that she

5    received in the shower is what you were told?

6      A.   Yes.

7      Q.   And when was that?

8      A.   I can't recall.  I think it was during

9    the -- I don't recall.  It was when they were

10   trying to introduce her to two new aides in the

11   shower, that's what it was, but I don't know

12   the date.

13     Q.   Did she become combative at times when

14   they were trying to shower her?

15         MR. BARDWELL:  Objection.

16         THE WITNESS:  If it's new people,

17   she needed to know the people, work into it

18   with them and she's fine, but if you just throw

19   two new people in there with her she might have

20   been hitting herself trying -- she didn't know

21   them, she was scared.

22         They didn't know how to deal with

23   the dementia.  They did -- she always gave

24   everybody a little hard time my whole life.

25   She just -- not that bad.  She never hurt

1   anybody.

2           She got hurt in that shower because

3   she was afraid of the two new people they had

4   in there.  They took Yolanda Yodem off of her

5   shower and put her on the floor because they

6   were short aides so her regular shower girls

7   wasn't there.  They did it two times, two or

8   three times.

9   BY MS. YODER:

10    Q.   And because of her condition with the

11  dementia then, that would cause your mother to

12  become combative?

13          MR. BARDWELL:  Objection.

14          THE WITNESS:  Well, not -- if she

15  doesn't know the people and she's scared, yeah,

16  maybe.

17  BY MS. YODER:

18    Q.   And then at times she would get hurt

19  like we see here in this picture?

20    A.   Right.  She never got hurt like that

21  before though.

22    Q.   003632, did you take this picture?

23    A.   Clothing?  I can't see the number, it's

24  too dark.

25    Q.   The one before that.

Page 237

1    A.   I was looking at that one when I was

2    talking to you.  They're both the same.

3    Q.   So 3631 and 3632 are the same?

4    A.   Yeah.

5    Q.   All right.  So 3633, the picture of the

6    clothing, did you take this picture?

7    A.   Yes, I went in there to see my Clorox

8    wipes.  Yes, I did.

9    Q.   When did you take it?

10   A.   I can't recall.

11   Q.   What is shown in this picture?

12   A.   How I kind of -- I arranged for clothes

13   on a daily basis for the aides so it made it

14   easy for them.  Plus, I was tired of going in

15   and finding her with a striped shirt and

16   flowered pants, things I didn't like on her, so

17   I made an outfit, I would hang it, the aides

18   loved it, they came in, I left notes, that's

19   all.  Monday, Tuesday, Wednesday.

20   Q.   Next page 003634?

21   A.   Comes back to the same one where we had

22   the legs restrained before.

23   Q.   Are these --

24   A.   These are from the same time.

25   Q.   Okay.  Is it maybe a duplicate?

1    A.    Might be.

2    Q.    Why don't you look.  Looks like maybe

3   the rest of these are duplicates.

4    A.    I don't know, I could have put

5   duplicates because I was distraught.  I don't

6   know.

7    Q.    Do you see any photographs left in

8   Exhibit P that are not duplicates of what we

9   already discussed?

10    A.    Do I see any photos in P that are not

11   duplicates of the leg?

12    Q.    No.  So we're on Page 3635, and it looks

13   to me like you've just --

14    A.    Oh, it's the leg.

15    Q.    -- produced the same pictures again.

16    A.    Yeah, they're the same thing.  They're

17   all the same.  I only did one shooting of the

18   legs.

19              MR. BARDWELL:  You've answered the

20   question.

21              THE WITNESS:  I only needed one day

22   of shots, and then I don't go back and take it

23   every day.

24              Turn that over, please.

25              (Discussion was had off the record.)

1              MS. YODER:  Let's take a quick

2    break.

3              MR. BARDWELL:  All right.

4              (Short recess was taken.)

5                (Defendant's Exhibits Q and R were

6                marked for identification.)

7    BY MS. YODER:

8      Q.   I'll hand you what I've marked as

9    Defendant's Exhibit Q.  Did you write this?

10     A.   I want to read it.  Yes.

11     Q.   This is Criscione 003806.  Why did you

12   write this?

13     A.   I didn't read the whole thing, but I

14   know I wrote it.  I wrote it because I was

15   begging them to keep my mom there before --

16   just during COVID and let me move her somewhere

17   where there was a better opening.

18     Q.   Who did you give this to or why did you

19   prepare it?

20     A.   I wrote a lot of things, I don't

21   remember.  A lot of times I cut and paste

22   things into -- if I make a report I'll write it

23   and cut portions.

24     Q.   Do you know if this was a report that

25   was given to someone?

Page 240

1    A.    Okay.  Give me a second to catch up.

2              I don't remember who I wrote it for

3    or who I gave it to, but I'm sure I used it in

4    a report or sometimes I will just write my

5    feelings down, I don't know which one this is.

6    Q.    Let me hand you Defendant's Exhibit R,

7    and I have a problem with the copy so looks

8    like I only have one copy of this.

9    A.    A lot of stuff.

10   Q.    Do you know what this is?

11   A.    "You did not have a topic for me."  I

12   went in to one of the officials, I don't

13   remember, one of the politicians to write, it

14   could have been DeWine, and they didn't have a

15   topic.

16              When I said I cut and paste, because

17   when you make a report with one of them they

18   have a site which you put your words into, so I

19   probably used this for an official report to

20   somebody.  "You did not have a topic for me, I

21   have written to you before."  I was looking for

22   help.

23   Q.    So this might have gone to Governor

24   DeWine?

25   A.    It might have gone to Sherrod Brown, it

Page 241

1   might have gone to -- anybody I could write to

2   that I would think would get in there and help

3   me.

4               MR. OCKERMAN:  What number is it?

5               MS. YODER:  It's Criscione 003796.

6               MR. OCKERMAN:  Thank you.

7               THE WITNESS:  But it doesn't say

8   that on there because I probably could use it

9   for different sites that I copied and pasted it

10  into.  I'm trying not to cry.

11              MS. YODER:  Okay.

12              (Defendant's Exhibit S was marked

13              for identification.)

14  BY MS. YODER:

15    Q.   Handing you what's been marked as

16  Defendant's Exhibit S, and this is Criscione

17  003771 through 003773.  Did you prepare this?

18    A.   I typed it, I believe.  I don't know

19  where it went to.  It might be notes.  Yes, I

20  did prepare it.

21    Q.   And you don't know why you prepared it?

22    A.   I know why I prepared all of them,

23  because I was desperate to find help.

24    Q.   Do you know who this was sent to?

25    A.   It could have been not sent at all, it

1    could have been parts of it sent to wherever

2    they let me put it in, I don't remember, but I

3    know I needed to put my thoughts down so that I

4    got it right when I talked or needed it for

5    whenever.

6      Q.   Do you know when you prepared this?

7      A.   I was just ranting, writing thoughts

8    down it looks like, I don't remember when.  I

9    tried.

10                (Defendant's Exhibit T was marked

11                for identification.)

12     Q.   I'm handing you Exhibit T, which is

13   Criscione 009275 through Criscione 009279.  Did

14   you prepare this?

15     A.   This here what you see, yes.

16     Q.   And who was this prepared for?

17     A.   This was prepared for the Ohio

18   Department of Health.

19     Q.   When was this prepared?

20     A.   The second time I made my report, I

21   believe.  Let me make sure because I did report

22   twice.  I think it's the second.  Yep.  It was

23   when they stopped communication, so.  It was

24   during COVID --

25     Q.   All right.

Page 243

```
 1    A.    -- I believe unless I -- yeah.

 2              MS. YODER:  Okay.

 3                   (Defendant's Exhibit U was marked

 4                   for identification.)

 5   BY MS. YODER:

 6    Q.    I'm going to hand you what's been marked

 7   as Defendant's Exhibit U, Criscione 003802

 8   through 003804.  Did you prepare this?

 9    A.    My dear Lord letter that I never sent to

10   her.  It just made me feel like I did tell

11   somebody what was happening, I believe.

12    Q.    So this is a letter to Laura DiVincenzo?

13    A.    Yeah, in my mind and in my writing, but

14   I never gave it to her.

15    Q.    When did you write this?

16    A.    When I was upset, I don't know when.

17   When I was going over everything, I don't know

18   when really.

19    Q.    Do you know what year?

20    A.    I was writing my emotions down, I don't

21   remember -- well, I remember -- I don't

22   remember what year.

23              MS. YODER:  Okay.  That is all the

24   questions that I have for you.

25              THE WITNESS:  No.  Really?  I'm just
```

1    kidding.  I'm sorry to jammer on with my

2    stories, I could just keep going.

3                 MR. BARDWELL:  I want to follow up

4    with a couple of things, if we could.

5                 THE WITNESS:  I'll get some water.

6                 MR. BARDWELL:  Sure.

7                 MS. YODER:  Hey, Brian, just so you

8    know, we have to be out of this room at 4:30.

9                 MR. BARDWELL:  That will be no

10   problem.

11                      - - -

12   BY MR. BARDWELL:

13     Q.   All right.  Gina, I'm handing you what

14   we've previously marked as Plaintiff's Exhibit

15   17.

16     A.   Oh, me?

17     Q.   Yep, you're Gina.

18                 I'm just making sure that she's

19   aware of this.

20                 All right.  So this is what Sara

21   Thurmer has produced.  It's a record of your

22   text messages.  I think this is what Emily was

23   asking you about.

24                 She had asked you if there was any

25   reason to think there were any deletions or

1    changes to these records.  Have you actually

2    seen this Plaintiff's Exhibit 17 before?

3      A.   No.

4      Q.   No?  Okay.  So do you know what's in

5    Plaintiff's Exhibit 17?

6      A.   I remember some of our text messages,

7    Sara and I, because it was very important to me

8    to know what was happening with my mom.

9      Q.   Okay.  Sitting here today, do you know

10   whether there have been any alterations to the

11   record of your --

12     A.   Never.

13     Q.   -- messages here?  Okay.  Thank you.

14          On September 20th, 2020 you still

15   had not received your records, the medical

16   records from East Park; is that correct?

17     A.   Yes.

18     Q.   Had you received the clock and microchip

19   from them at that point?

20     A.   By September 2020 did I receive the

21   microchip and the clock?

22     Q.   Correct.

23     A.   Yes.

24     Q.   You received the microchip as well?

25     A.   No, I didn't get the microchip.

Page 246

1    Q.   Okay.

2    A.   Wait a minute, we got the microchip

3  after they put it to the police station, so

4  when they went to make the report, the day

5  after I got the microchip.  As far as a

6  timeline, I can't figure it out.

7    Q.   Okay.  September 20th of 2020 --

8    A.   Okay.

9    Q.   -- that was the day that you were

10  reported to have been in the parking lot at

11  East Park --

12    A.   Right.

13    Q.   -- right?

14         As of that time had you received

15  your microchip back yet?

16    A.   I don't think so, but I'm not sure.

17    Q.   Okay.  All right.  Now, I want to make

18  sure we're clear on the requests for medical

19  records that you made.  How many requests for

20  medical records did you make?

21    A.   Well, for two different sets of medical

22  records.

23    Q.   Time out.  All I'm asking is how many

24  requests for --

25    A.   Requests?

1    Q.    -- for Dorothy's medical records you

2    made.

3    A.    I can't count.

4    Q.    For her medical records?

5    A.    I can't count.  I've sent the faxes

6    twice on one time, once on the other, and I

7    kept calling and trying to ask them, Tina,

8    where is my medical records?  So I can't tell

9    you how many times I asked for my medical

10   records.  It was a lot.

11   Q.    All right.  It sounds like you're both

12   talking about requesting records and following

13   up on those requests right now, right?

14            You're saying that you made a

15   request for medical records and then you called

16   to ask if they were ready?

17   A.    No.  Yeah, where are they?  Because they

18   kept going on and on and on.

19   Q.    And you're talking about making a

20   request and you're also talking about following

21   up on those requests?

22   A.    Yes, yes, yes.  So for one --

23   Q.    Time out.

24   A.    -- I made two requests and one I made

25   one request, I think.  I had to send the paper

Page 248

1    twice on the fax I remember.

2        Q.    I want you to listen to the question and

3    just answer the question.

4                  How many requests for medical

5    records did you fax to East Park?

6        A.    Two.

7        Q.    Okay.  The first request that you faxed,

8    did you eventually receive those records?

9        A.    Eventually.

10       Q.    The second request for the records, did

11   you eventually receive those records?

12       A.    Not from them.

13       Q.    Okay.  When your mother was being

14   evicted from East Park there was a hearing with

15   the Ohio Department of Health; is that correct?

16       A.    Yes.

17       Q.    Okay.  Do you know what records East

18   Park provided to the Department of Health in

19   support of their attempt to discharge your

20   mother?

21       A.    They had a stack of papers they

22   supplied, I don't know.  I don't know what they

23   supplied.

24       Q.    Have you reviewed everything they

25   supplied?

1    A.    I went over everything at the time.

2    Q.    Do you know what false statements were

3    in those records?

4    A.    Do I know what false statements were in

5    the records?

6    Q.    Yes.

7    A.    I know there were false statements, I

8    can't remember all of them.  Yeah, I do, I do,

9    a couple.  Let me think, it's coming back to

10   me.

11           They said something about me telling

12   them not to give my mother any more medication

13   or not to give her some medication, and I asked

14   to talk to Dr. Dohar and the new nurse

15   practitioner, Tony.  Neither of them would --

16   nobody would get me in touch with them to find

17   out how my mother was.

18           Tony eventually called me about my

19   mom's hearing aids.  She didn't even hear about

20   why I was really calling, which got me kind of

21   mad.

22   Q.    Have you reviewed your mother's medical

23   records?

24   A.    It's very hard for me to.

25   Q.    Have you reviewed your mother's medical

1   records?

2    A.   Yeah, I have.

3    Q.   Okay.

4    A.   Briefly, not like -- I don't know them

5   like --

6    Q.   I'm sorry, let me ask the question.  Do

7   you believe that East Park mischaracterized

8   your mother's condition at any point in those

9   medical records?

10    A.   Definitely.

11    Q.   Do you believe that East Park

12   mischaracterized your mother's treatment at any

13   point in those records?

14    A.   Definitely.

15    Q.   Okay.  Do you believe that -- all right.

16           You saw the e-mail that Laura

17   DiVincenzo sent to the Brook Park police?

18    A.   The e-mail that Laura DiVincenzo sent,

19   yes, I saw that.

20    Q.   Okay.  All right.  Were there any false

21   statements in there?

22    A.   I got to read it.  You're going to ask

23   me which ones?

24    Q.   Yep.

25    A.   Is this the whole report?

Page 251

1    Q.    That's the whole e-mail.

2    A.    This is the whole e-mail?

3    Q.    Exhibit L is the e-mail with attachments

4  that Laura sent.

5    A.    Okay.  Oh, yeah.

6    Q.    Okay.

7    A.    Yes, I am, I'm very aware.

8    Q.    I'm handing you Defendant's Exhibit M,

9  this is Sara Thurmer's statement.  Take a look

10  in there and tell me if there's anything false

11  in Sara's statement.

12    A.    Yes, there's false statements.

13    Q.    Okay.  Do you believe that Sara Thurmer

14  knew that calling the police on you would cause

15  you emotional distress?

16    A.    Say that again.

17    Q.    Let's step back.  How long had you known

18  Sara Thurmer by the time she called the police

19  on you?

20    A.    How long had I known her --

21    Q.    Uh-huh.

22    A.    -- since the time she called the police

23  on me?  Since she started.

24    Q.    How long was that?

25    A.    Well, she says here she started in 2018

1    in September.

2      Q.    Okay.  At that point do you feel like

3    she had an understanding of the sorts of things

4    that might upset you?

5      A.    Do I have an understanding of what she

6    might have said to upset me?

7      Q.    That's not quite the question.  Take a

8    step back even further then.

9      A.    Okay.  Sorry.

10     Q.    Do you feel -- would it be unfair to

11   characterize you as easily upset?

12     A.    No, I'm not easily upset.

13     Q.    No?

14     A.    I have anxiety, but I usually try to be

15   patient with me and understand them and not

16   judge them.

17     Q.    Okay.  Do you think when Sara did this

18   she wanted to cause you emotional distress?

19     A.    She did.  I don't know if she wanted to

20   --

21     Q.    Do you think when Laura DiVincenzo --

22              MS. YODER:  Hold on.  So let her

23   finish her sentence.  The question is --

24              THE WITNESS:  What did I say?

25              (Notary read back as requested.)

1          MS. YODER:  As long as it's all

2   there, okay.  Go ahead.

3          MR. BARDWELL:  All right.

4   BY MR. BARDWELL:

5   Q.   Do you think that Laura DiVincenzo

6   wanted to cause you emotional distress when she

7   called the police on you?

8   A.   Oh, yeah.

9   Q.   Okay.  Did calling the police on you

10  cause you emotional distress?

11  A.   Absolutely.

12  Q.   Okay.  Do you believe calling the police

13  on you -- let me start over.

14          Do you believe that Laura DiVincenzo

15  calling the police on you was an act of

16  retaliation?

17  A.   Absolutely.

18  Q.   Do you believe Sara Thurmer calling the

19  police on you was an act of retaliation?

20  A.   Absolutely.

21          MR. BARDWELL:  Okay.  All right.

22  That's it for me.

23          MS. YODER:  I have a couple

24  follow-ups based on that.

25                    - - -

1   BY MS. YODER:

2     Q.    I had asked you questions earlier today

3   about information that was submitted to ODH and

4   whether any false information had been

5   submitted, and I believe at that time you told

6   me that you weren't aware of anything false

7   being submitted to the Ohio Department of

8   Health?

9     A.    That they put in.  I didn't understand.

10  Were you asking me -- I don't even understand

11  that.  I don't -- all right.  I wrote a letter

12  to the Ohio Department of Health, right, and

13  you're asking me if I know what they put in

14  with the Ohio Department of Health?

15    Q.    Right.

16    A.    I didn't even know they did that.  I

17  thought I would put the record in and they go

18  check it out, that's how much I knew about it.

19    Q.    Okay.  And now your attorney has asked

20  you questions and now you're telling -- now you

21  do understand?  I don't understand what

22  changed.

23    A.    Understand what?

24    Q.    What was false that was submitted to the

25  Ohio Department of Health.

Page 255

1    A.    I don't know what was submitted false,

2  but I'm assuming it was false because that's

3  what they were doing to me.  So it wasn't going

4  to agree with what I had with the Ohio

5  Department of Health so I figured it would be

6  false, but I never even knew they contacted

7  them, wrote to them, told them anything, I

8  wasn't aware of that.

9            I was on with my life and doing

10  things and being sad, I don't know.  I don't

11  remember them putting that in there.  I don't

12  know anything about it.

13    Q.    The hearing with ODH was sometime in

14  early May of 2020; is that correct?

15    A.    May 5th.

16    Q.    May 5th, 2020?

17    A.    I believe it was May 5th, if I'm not

18  mistaken.

19    Q.    Are you aware of East Park using your

20  mother's medical records for any purpose other

21  than presenting them to the ODH?

22    A.    Using my mother's medical records for

23  something else?

24    Q.    Right.

25    A.    Am I aware of that?  No.

Page 256

1    Q.    Have you ever called anyone -- or called

2    the police on anyone?

3    A.    Have I?

4    Q.    Yeah.

5    A.    The firecracker guys out back, you know.

6    Q.    How many times have you done that?

7    A.    I just did it.  16 cop cars came in my

8    back yard, and they had guns and they arrested

9    all eight guys, so I called the police.

10   Q.    That was probably pretty upsetting for

11   those that had --

12   A.    I couldn't see it and my yard was way

13   back there, I could just see lights going on,

14   looked like a carnival, but for things like

15   that maybe.

16            A solicitor that isn't supposed to

17   be in the neighborhood maybe but not really, I

18   don't call the police much.

19            I called them to see if I could

20   walk.  I have friends in Brook Park, you know,

21   I look at my -- I try not to do anything wrong

22   against the law, never.

23   Q.    Any other times that you can think of

24   that you've called the police to report

25   someone?

Page 257

1    A.    Someone?  Are you talking years back?

2    Q.    Yes, sure.

3    A.    Yeah, I reported a rape.  I witnessed it

4    and I stood in court, and the man was

5    convicted.

6    Q.    Any other time that you made a report to

7    the police?

8    A.    Yes, my mother-in-law's jewelry stolen

9    in Rhode Island on my first marriage, and I set

10   up a sting and caught the girl, got the jewelry

11   back and had her arrested.

12   Q.    Any other time that you've called the

13   police on people?

14   A.    On people?  Only if I see wrong-doings.

15   I like to report what's wrong.  I don't want to

16   get into anybody's business, but when it's

17   hurting people, yeah, I'll report it.

18   Q.    How many times did you go out for drinks

19   with Denise Crozien?

20   A.    Couple times.  Her boyfriend was in a

21   band, and she asked everybody at work.

22   Everybody went usually except Renee, she had to

23   work late or whatever.  I think she might have

24   came once, but I would say two or three, maybe

25   -- two or three, maybe four.

Page 258

1              MS. YODER:  That's all.

2              THE WITNESS:  Are we done?

3              MS. YODER:  We're done.

4              THE WITNESS:  Well, thank you very

5    much.

6              MR. BARDWELL:  Thank you.  We'll

7    read.

8                     - - -

9    (Deposition concluded at 4:10 o'clock p.m.)

10                    - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 259

1          I, GINA M. CRISCIONE, do verify that

2    I have read this transcript consisting of two

3    hundred sixty-one (261) pages and that the

4    questions and answers herein are true and

5    correct with corrections as noted on the errata

6    sheet.

7

8                    ----------------------------------------

9                         GINA M. CRISCIONE

10

11        Sworn to before me a Notary Public in and

12   for the State of ----------, this ---------- day of

13   ------------------------ , 2023.

14

15

16                   -----------------------------------
                     Notary Public in and for
17                   the State of ----------------.

18
     My commission expires ----------------.
19

20

21

22

23

24

25

1                    GINA M. CRISCIONE

2    Page | Line |

3    _____|_____|_____

4    _____|_____|_____

5    _____|_____|_____

6    _____|_____|_____

7    _____|_____|_____

8    _____|_____|_____

9    _____|_____|_____

10   _____|_____|_____

11   _____|_____|_____

12   _____|_____|_____

13   _____|_____|_____

14   _____|_____|_____

15   _____|_____|_____

16   _____|_____|_____

17   _____|_____|_____

18   _____|_____|_____

19   _____|_____|_____

20   _____|_____|_____

21   _____|_____|_____

22   _____|_____|_____

23   _____|_____|_____

24   _____|_____|_____

25

```
 1              C E R T I F I C A T E

 2   STATE OF OHIO,      )
                         )SS:
 3   SUMMIT COUNTY.      )

 4              I, Cynthia Holderbaum, RPR and Notary
     Public within and for the State of Ohio, duly
 5   commissioned and qualified, do hereby certify
     that the within named witness, GINA M. CRISCIONE,
 6   was by me first duly sworn to testify the
     truth, the whole truth and nothing but the
 7   truth in the cause aforesaid; that the
     testimony then given by the witness was by me
 8   reduced to Stenotypy in the presence of said
     witness, afterwards transcribed upon a
 9   computer; and that the foregoing is a true and
     correct transcription of the testimony so given
10   by the witness as aforesaid.

11              I do further certify that this
     deposition was taken at the time and place in
12   the foregoing caption specified, and was
     completed without adjournment.
13
                I do further certify that I am not a
14   relative, employee of or attorney for any of
     the parties in the above-captioned action; I am
15   not a relative or employee of an attorney of
     any of the parties in the above-captioned
16   action; I am not financially interested in the
     action.
17
                IN WITNESS HEREOF, I have hereunto set
18   my hand and affixed my seal of office at Akron,
     Ohio on this 15th day of July, 2023.
19

20

21              ----------------------------------
                Cynthia Holderbaum, RPR and Notary
22              Public in and for the State of Ohio.

23      My Commission expires January 16, 2028.

24

25
```

| | |
|---|---|
| Subject: | Dr R. Rubin Gutarts Ms INC |
| Start: | Mon 1/22/2018 03:15 PM |
| End: | Mon 1/22/2018 04:15 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

6789  Ridge road # 301

Parma Ohio

440-842-4111

going for a look to see what's up... 150 $



CRISCIONE_003859

| | |
|---|---|
| Subject: | Doctor  Andrey Stojic |
| Start: | Fri 3/2/2018 08:30 AM |
| End: | Fri 3/2/2018 09:30 AM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

Terrace level Fairview Hospital

18101 Lorain Ave Suite # 903

216-671-2205

216-671-2205

taking the Assessment onlne



1

CRISCIONE_003861

| | |
|---|---|
| Subject: | Doctor Daynelle Dawes |
| Start: | Fri 12/7/2018 11:30 AM |
| End: | Fri 12/7/2018 12:30 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

(216)844-8200

https://www.uhhospitals.org/find-a-doctor/dawes-danyelle-25812



DEFENDANT'S
EXHIBIT
C
7-6-23

CRISCIONE_003901

| | |
|---|---|
| Subject: | Dr Thompson |
| Start: | Tue 5/28/2019 12:15 PM |
| End: | Tue 5/28/2019 01:15 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

1257.00 Angie spoke to



CRISCIONE_003924

| | |
|---|---|
| Subject: | DR Troy A Frazee |
| Start: | Mon 6/3/2019 12:30 PM |
| End: | Mon 6/3/2019 01:30 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

7232 Pearl Rd

Middle burg hts



CRISCIONE_003925

| | |
|---|---|
| Subject: | Dr. SHIH/Replacing Linda Bolz |
| Start: | Tue 6/11/2019 11:00 AM |
| End: | Tue 6/11/2019 12:00 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |



DEFENDANT'S EXHIBIT
F
7-6-23
PENGAD 800-631-6989

CRISCIONE_003927

| Subject: | Dr Carol Slover/Cancelled because no insurance for this bitch |
|---|---|
| Start: | Fri 11/22/2019 01:00 PM |
| End: | Fri 11/22/2019 02:00 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

5001 Rock side road

4th floor appointment 1:15

Primary Location

Independence Family Health Center

Mail Code IN-40

5001 Rockside Road

Independence, OH 44131

Appointment:216.986.4140Fax:216.986.4923



DEFENDANT'S EXHIBIT
G
7-6-23
PENGAD 800-631-6989

CRISCIONE_003945

| Subject: | Dr Joshua Miller |
| --- | --- |
| Start: | Mon 2/17/2020 08:55 AM |
| End: | Mon 2/17/2020 09:55 AM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |



CRISCIONE_003954

| | |
|---|---|
| Subject: | Doctor Cracian/ virtual |
| Start: | Wed 1/27/2021 02:30 PM |
| End: | Wed 1/27/2021 03:30 PM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

216-587-8335 Option 3 office (spoke Cathy) Zoom meeting 2:30 1/27/2020

-.:~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·:~·~·:-

Do not edit this section of the description.

This event has a video call.

Join: https://meet.google.com/qwx-abaa-ekb

-.:~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·~·:~·~·:-


DEFENDANT'S
EXHIBIT
I
7-6-23
PENGAD 800-631-6989

CRISCIONE_004136

_ 8/17/17 _

### Resident Care Follow Up

### Dorothy 'Jean' Mandanici

### August 17, 2017

Staff reported that upon awakening Jean, as she requests, at 6AM to go to the bathroom, she reported to the STNA, Amanda Pearsall, that she could not get up. The STNA immediately summoned the nurse, Lauren Palmentaro, LPN, to the room. The nurse and the STNA assisted the resident, with verbal cueing to transfer from her reclining chair and Jean said she could not. She stated that her back was broken when someone threw her in the bed and that her arm and shoulder where broken as well and she could not walk. Jean said that it was not either one of those staff but someone else who had cared for her. Amanda explained to the resident that she had been her STNA that night. Amanda also explained that the resident had been assisted by the nurse, Doris Gilbert LPN, around 2AM when the resident had put her call light on to go to the bathroom. Additionally, the STNA reviewed that Mrs. Mandanici had slept in her chair all night, as was her customary sleeping habit. Resident was then assisted, without much physical assistance, to ambulate to the bathroom with her walker, as was her customary routine. Upon interview, staff report that the resident kept her eyes closed for most of this interaction, was calm and did not appear to be in any emotional or physical distress. The LPN assessed the resident, her physical assessment was unremarkable. (See attached statements from STNA and LPN)

At 9AM, upon interviewing staff, I then interviewed the resident. Mrs. Mandanici thought she had a good night and slept well. She stated, "Why are you asking me this? Did something happen?" I informed her that I was asking her about her night because staff had reported that she informed them that she had a broken back, shoulder and arm and that she had reported that someone had thrown her in the bed. Mrs. Mandanici stated she did not remember saying that and that she thought she was "ok". The resident also stated that she usually slept in her chair and did not remember being in the bed. The resident did report that she felt cold and had a lap blanket over her arms. She denied wanting the temperature adjusted on the heating/air conditioning unit in her room. She was agreeable to a physical assessment. Upon assessment, no evidence of trauma, ecchymosis, redness etc. were identified. Her ROM was unchanged and she denied any discomfort with the exception of some stiffness, as her baseline, to the right shoulder. Mrs. Mandanici denied any concerns related to staff and went on to discuss that it was her shower day. The resident was pleasant, in no distress and appeared well rested and cooperative. ROM and assessment completed with Restorative Nurse Debbie Dodson. (See attached statement)

A call was placed, and a message left for Doris Gilbert, LPN to discuss her interactions and observations of the resident this night.

A call was placed to Seana Rutherford, CNP to review the above.

Dottie Welch, LNHA was informed of above and that continued investigation, follow up and report to POA was in progress.

At approximately 10 AM, the resident's responsible party, daughter, Gina Criscione came to the facility to visit with her Mom. Prior to visiting with her Mother, Gina met with this nurse and Kathy Higham, LPN (see attached statement) to review the above concerns, assessments and observations and that as was customary routine, the matter would be fully investigated.  Upon reviewing these findings, Gina bec


DEFENDANT'S EXHIBIT
J
7-6-23
PENGAD 800-631-6989

very tearful and emotional stating "you do not have to tell me these things I know how my Mother is, I'm so sorry". She stated that she felt her mother received very good care at East Park and she was thankful for all the staff does for her and her mother. Gina stated that she is aware her mother has dementia but also wanted the staff to know that her mother is also a manipulative person that makes up things. Gina stated that her mother had been very mean and abusive to her most of her life and that meanness and manipulative behavior continues. She stated that her mother calls her very frequently and reports things to her that are not true and that this is not a new occurrence. Gina became very emotional and stated that she needs to seek emotional help because of all the issues she is dealing with now with her family and mother. She stated that she is so appreciative of staff assisting with her mother because she knows that she and her family are not able to do so. Emotional support was provided to Gina and Gina assisted with implementing a plan of care for her mother. Also reviewed signs, symptoms and daily care and issues that arise with residents with dementia and the stressors of having a loved one with dementia.   Gina is in agreement with psychiatric follow up for her mom and agrees that her mom is probably clinically depressed. She feels a psychiatric consultation would be appropriate, as her mom has had untoward reactions to antidepressants in the past. Gina then went to visit her Mom. During this visit she reported to this nurse that her Mom is "fine and she is saying she just had a bad dream last night". Gina did not feel that her Mom had any emotional or physical trauma this past evening. Gina requests that her Mom's order for Melatonin be discontinued as this may be contributing to her "bad dreams". Gina was informed that this would be reported to the PCP/CNP.

Spoke with Seana Rutherford, CNP today at approximately 11AM. All resident statements and assessments, staff interviews and POA statements, requests were reviewed. CNP in agreement with benefit of psychiatric consultation and in discontinuing Melatonin per daughter's request. Gina is aware. Psychiatric follow up to be arranged by this nurse and ongoing assessment and plan of care changes will occur in coordination with IDT and resident's POA.

*DCarpenter RN*

Debbie Carpenter, RN

Director of Nursing

August 17,2017

| Subject: | My Pain |
| Start: | Fri 3/11/2022 12:00 AM |
| End: | Sat 3/12/2022 12:00 AM |
| Show Time As: | Free |
| Recurrence: | (none) |
| Meeting Status: | Not yet responded |
| Organizer: | ginamarie321@gmail.com |

March 11, 2020 was the last time I got to see my mother at that crappy place EAstpark. I'll always remember the beautiful day that we had together that day. Thinking we would have many more but they took it away from me. Not Covid not the quarantine. But I Laura divinsenzo and a Sara Thurmer assholes!!!!!!! God help them. I know my mother is in a better place now, too bad they had to put her there faster and she needed to be. They took a communication away. They are evil



CRISCIONE_004567



DEFENDANT'S EXHIBIT

7-6-23

## East Park Retirement Community

Laura DiVincenzo <ldivincenzo@epretire.com>

Mon 9/28/2020 5:32 PM

**To:** Harold Duncan <hduncan@cityofbrookpark.com>
**Cc:** Thomas Sensel <tsensel@cityofbrookpark.com>

📎 13 attachments (3 MB)

IMG_2624.jpg; IMG_2626.jpg; IMG_2625.jpg; IMG_2769.jpg; IMG_2818.jpg; image0000.jpg; image0000 (1).jpg; IMG_3225.jpg; IMG_2590.jpg; Screen Sh.jpg; Resized_2.jpg; Resized_2 (1).jpg; Resized_2 (2).jpg;

Hello Sergeant Duncan,

I have attached social media posts by Gina Criscione displaying telecommunication harassment and a pattern of conduct intended to inflict mental distress on East Park employee Sara Thurmer,  our nursing home administrator.

To provide you with some background, Ms. Criscione's mother, Dorothy Mandanici, was a resident at East Park Care Center from April 2017 to May 2020.  Contrary to Ms. Criscione's assertions in her posts, the decision to move her mother was not made by Ms. Criscione. On May 23, 2020, Mrs. Mandanici was discharged from East Park Care Center to Mt. Alverna skilled nursing facility after a hearing conducted by the Ohio Department of Health. The hearing officer found in favor of East Park's determination that it could no longer provide the level of care required for Mrs. Mandanici. Ms. Criscione did not appeal that decision. According to the posts of Ms. Criscione,  her mother passed away at Mt. Alverna several weeks later.

Also, in multiple posts, assertions that medical records were not provided to Ms. Criscione are also false.

Ms. Criscione was her mother's legal guardian.  During the three year period of her mother's residence, Ms. Criscione complained constantly about her mother's care.  She was told repeatedly that she was free to move her mother any time, but never did.  Before the lockdown of nursing homes due to Covid 19, Ms. Criscione was at the facility on almost

a daily basis, and then also called repeatedly during the day and night to inquire about her mother. Sometimes calling ten or more times per day (a copy of phone records is available}.

Sara Thurmer became the Licensed Nursing Home Administrator in September 2018. Because of the attention sought by Ms. Criscione, Ms. Thurmer provided her with her personal cell phone number, which resulted in Ms. Criscione texting her at all hours of the day and night, including when Ms. Thurmer was in Europe on vacation.

Ms. Thurmer holds a state license and has worked as an administrator in several facilities in the Cleveland area. She has been contacted by several people in the industry who have seen these posts. Ms. Criscione is blatant in her harassment attacking Ms. Thurmer's reputation and professional standing, causing Ms. Thurmer mental distress.

In addition to online harassment, Ms. Criscione has been seen picketing outside of the facility on Elmdale on several occasions. One of the attachments is one of her picket signs mentioning Ms. Thurmer, which she also posted online.

On the morning of Sunday, September 20, 2020, at approximately 9:00 am, employees witnessed Ms. Criscione driving on the grounds of East Park Retirement Community, where "No Trespassing" signs are posted.

The attachments and videos show fifteen separate acts thus far, establishing Ms. Criscione's pattern of conduct which she herself describes as a crusade where she has nothing to lose.

East Park has approximately 120 elderly residents on the property. Having Ms. Criscione escalating her behavior by coming onto the property is a major concern, since it is unknown what else she is capable of.

Please contact me for any further information or with any questions you might have.

You can reach Sara Thurmer at (216) 267-7229, and she is available to speak to you at the facility during normal business hours and on some weekends.

https://www.facebook.com/1170794577/videos/10224350384605149/?
extid=jX8FRdJ1GC1zUkZj

https://www.facebook.com/1170794577/videos/10224314333983906/?
extid=9qURh6mPJLzgAgMU

## Gina

I miss her and I will never stop
exposing East Park Care
Center.

www.facebook.com

Thank you,

Laura DiVincenzo, President
East Park Retirement Community

CRISCIONEFU00089



 Verizon 🛜      10:08 AM      🔵 80% 

# Done                  Edit

 **Gina Marie Mandanici Criscione**    ···
3h · 🌐

Lunch on Mondays and Thursdays. I'll be walking now, for lunch for the people at East Park in hope they feed them...

 **Gina Marie Mandanici Criscione** 
Jul 6 · 🌐





‹           **Replies**



**Gina Marie Mandanici**    · 1h   ···
**Criscione**     Aut

Thank you so much, my sweet mother
died on June 20th I managed to move
her. She arrived at Mount Alverna on
State road on May22,  bruised and
dehydrated and with injuries that East
Park told me were healed. She went
from 130 pounds to 97 pounds,
because of East Park. She died
peacefully too soon with loving people
around her at MT Alverna. Thank God.
But for three months EP would not let
me talk on the phone to my mother,
they actually told staff if they called
me for mom, they would be fired. we
watched her decline rapidly through a
dirty window....Yes the sweet little
Administrator Sara Thurmer. She
better run she better hid the ODH is on



better run she better hid the ODT is on her ars right now...

👍 Like    💬 Reply    2 😢

📷    Write a reply...    GIF    🙂

 Verizon 🛜     10:08 AM     ≭ 80% 🔋

**Done**               **Edit**

 **Gina Marie Mandanici Criscione**
4h · 🌐

Good morning
Life with Me Gina Marie's fight for moms rights.
God I miss this lady more than I ever thought I
could miss anyone ❤️

I will find justice for mom and all the others in
East Park Care Center that are not being cared
for with a failing Administration.

Did I tell you they had to ask certain staff to hold
their pay checks and some checks bounced. I
heard it from a horses mouth. Sounds like a
failing administration to me.



CRISCIONE_DEFT00036



😊❤️😢 4                    5 Comments · 1 Share · 62 Views

👍 Like                              ↗ Share

**Gina Marie Mandanici Criscione**      ...

More



✕   Gina Marie Mandanici Criscione



feeling hopeful with **Grace Miziker** and 5
**others**.
6d · 🌐

Good morning
Life With Me Gina Marie's morning thoughts:

Good morning Covid is still in the air folks ❤️ Wake
us up from this bad dream. Lord give us the stamina
to survive in this world today.

When mom passed away and went to a way better
place on Saturday, June 20th, 2020, at 6:05 pm, I then
had no time to even think about Covid and what was
really going on out there in this world.
now...
I had to come back to the real world after we lost
mom, and out of the nursing home drama and
despair and pain we were being put through by East
Park Care Center. That's over now. I pray the Lord is
handling them right now as I pray for them. God
knows the system is shot.

Normal?  No one really talks about normal anymore.
🙁 This is normal now. 🙂

CRISCIONE_DEF_000036

I guess I am taking this Covid Crisis day by day like everyone else. Making the best of shopping and wearing your facial covers and standing back from who you would normally run up to and hug, and limiting trips and places to go to... boo hoo.

 TFW 📶 🛜     9:48 AM     88% 🔋

 **Gina Marie Mandanici Criscione**

Friday at 8:05 AM · 🌐

Just another day at E. Puke Care Center, in Park Ohio. Never put your parents in here it is scum of the earth. I couldn't get my mother out of here fast enough. The name of the place is E. Park Care Center in Brook Park Ohio administrator Sara Thurmer she sucks. She ruined communication between me and my mother she's lying a bitch. There I said it I'm still waiting for results from the ODH, thanks for listening to the vent.



CRISCIONE_DEF_00040



East Park Memory Care…

OVERVIEW    REVIEWS

All    administration 3

**Gina Criscione**
7 reviews

★ ★ ★ ★ ★    2 weeks ago

Words can not express…East Park Care Center ….
8 East Park Circle…my mother was dehydrated
and severely bruised during Covid quarantine. She
went downhill fast with the horrible
administration and care givers at this broken
down dump. I moved mom to a WAY BETTER
PLACE and my mother died with wounds on her
that East park told me were healed. Much more to
expose but there is not enough room here to tell
you the entire report. I'll be back after the ODH
gives me their reports! My mother weighed 130
on March 11th, and by May 22, the day I moved
her, she was only 100 pounds and dehydrated.
This place is bad…the worst of the worst!~ as you
can see one thing was did not know how to put
compression socks on my mother, EVER.  This



was nothing to the restrained leg bruises. I never got the medical records I had asked for Sara.



Gina Marie Mandanici Criscione
7h · 🌐

Good morning
Life with me Gina Marie and Dorothy's voice:

https://www.facebook.com/groups
/CriesInTheNight/

Please join me, I am on a crusade to expose
East Park Care Center, in Brook Park Ohio. They
are doing wrong behind closed doors. If you or
a family member or a friend want to voice this
along with my Group, please join our Group to
PROTECT the sick, and dementia , and
Alzheimer Residents locked up in Quarantine
right now.  WE know not what goes on behind
East Park, in Brook Park's closed doors...They
never answered my calls for over a month, they
with held her medical records form me.
Power is in numbers, I need people to walk the
walk with me. Now, with this Covid, I hear more
Cries In The Night than ever, coming from my
friends here who experienced this with their
families...Who's game. I will be taking this to
another level. Hold on folks East Park is in for a



RIDE, I HAVE NOTHING BUT TIME ON MY
HANDS. In the name of my good mother and
with all the prayer I have in me.... I want
"Dorothy's LAW":
For nursing homes to provide information and
medical records to the families in DUE TIME,
when Requested by fax, as East Park, I



another level. Hold on folks East Park is in for a RIDE, I HAVE NOTHING BUT TIME ON MY HANDS. In the name of my good mother and with all the prayer I have in me..... I want "Dorothy's LAW":

For nursing homes to provide information and medical records to the families in DUE TIME, when Requested by fax, as East Park, I requested this over and over again. They gave me NONE. It's too late now, mom had passed. I know now she was over drugged and abused by negligence.  I will voice this until someone listens!

God bless every one of the poor people in that place now, we need to act fast, who's gonna walk this with me?

Just sayin'
Good Lord Jesus Christ, take away the fear and the pain of all the sick and injured in nursing homes today that do not provide adequate care and communication for our loved ones and respect for the families. Amen ❤️

  

🕐 🛜 ⏸ 77% 🔋 10:31 AM

← Gina Marie Mandanici Cris… 🔍

 **Gina Marie Mandanici Criscione**
11m · 🌐                               •••

Sara Thurmer do you have bed bugs, your nursing home does?... Please take some home with you and dehydrate yourself like to did to my mother three times during Covid! Just sayin a passing thought.  Pass it on Brook Parkers, and keep your parents home out of East Park and safe right now ❤️ I have a investigation going on right now! yes I do. And if your parent is suffering and your family gets no medical records, lots of things, one being compression sock never put on properly by Yolanda her shower girl even. She sucked too.  Then you better report them to the ODH NOW! Thank you for listening to my rant, my mother suffered, our family suffered During Covid and even before at this rat hole.  and I won't let go.
I miss you mom, they escalated your passing

them to the ODH NOW! Thank you for listening to my rant, my mother suffered, our family suffered During Covid and even before at this rat hole.  and I won't let go.

I miss you mom, they escalated your passing of dementia, by not knowing how to handle dementia. So sorry momma, I will expose them as best I can, here ya go>>>> biggest thing going there right now is Poor Care. Ask my friends with parents still in there.

 18                                                           19 Comments

👍 Like                                      💬 Comment

 **Gina Marie Mandanici Criscione** Author
Thank you for listening, we need to vote that rat hole to be torn down. they are torturing people like me and mom. I am not alone here, I am just not afraid to talk!

Like · Reply · 9h                                          2

 **Debby Henderson**
My heart is breaking for you

Like · Reply · 8h                     1

 **Gina Marie Mandanici Criscione** Author
aw ty, my poor momma , i cry 😢

Like · Reply · 4h

 Write a reply...                       

 Like           Share

 **Gina Marie Mandanici Criscione**          · · ·
9h · 🌐

It's time to expose the nasty people in the business of warehousing people in nursing homes. Speaking now for the folks that can not speak. For my mother, who tried to tell me, to get her out of there, as I watched through a dirty window her decline daily with poor care during Covid Quarantine. The isolated Demented and Alzheimer patients and residence in poorly Administrated facilities, locked down with shades closed and not communicating with families of the residence.. That's East Park Care Center in Brook Park.
Please join Cries in the Night * Tell us your nursing home experience





# BROOK PARK POLICE DEPARTMENT
## 17401 HOLLAND ROAD
## BROOK PARK, OH 44142
### 216-433-1234 / FAX 216-362-3222

I, SARA A. THURMER DO HEREBY MAKE THE FOLLOWING
(PRINT NAME)

STATEMENT OF MY OWN FREE WILL AND ACCORD CONCERNING Gina Criscione

WHICH OCCURRED ON/AT East Park Care Center + Social Media

ON THE _____ DAY OF 2020 AT _____ A.M. _____ P.M.
(MONTH/YEAR)

I have been working as the Administrator of East Park Care Center since September 2018. Dorothy Mendantici was a resident at East Park Care Center. Gina Criscione is her daughter. During the entire residency of Dorothy Mendantici at EPCC, I made myself completely available to Gina, by providing her with my cell # as I did for any resident, family member & loved ones. Gina did take advantage of this and would call me excessively. I would address & resolve her issues/concerns right away to ensure her that her Mother's care was in place & alleviate those anxieties for her. The recent actions from Gina have caused great distress in my life both personally and professionally. Her actions are harassment. I believe she is determined to cause me harm and I feel very threatened by her.

SIGNED: Sara C. Thurmer      DATE OF BIRTH: 8/25/1958
ADDRESS: 15428 Shore Acres Drive
HOME PHONE #: 216-224-4428      CELL #: Same as home #
SSN# OR DRIVER'S LICENSE #: RF347212      DATE: 10/1/2020 TIME: _____

OFFICER: Tracey      ACCIDENT/COMPLAINT #: 20-077559



DEFENDANT'S
EXHIBIT
M
7-6-23

CRISCIONE000026   DEFT000026



# INVOICE

Invoice # 1811
Date: 12/03/2020
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 10/19/2020 | Brian Bardwell | | | $295.00 | $29.50 |
| 10/24/2020 | Brian Bardwell | | | $295.00 | $147.50 |
| 10/24/2020 | Brian Bardwell | | | $295.00 | $59.00 |
| 10/24/2020 | Brian Bardwell | | | $295.00 | $59.00 |
| 10/24/2020 | Brian Bardwell | | | $295.00 | $737.50 |
| 10/25/2020 | Brian Bardwell | | | $295.00 | $914.50 |
| 10/25/2020 | Brian Bardwell | | | $295.00 | $118.00 |
| 10/28/2020 | Brian Bardwell | | | $295.00 | $88.50 |
| 10/28/2020 | Brian Bardwell | | | $295.00 | $88.50 |
| 10/28/2020 | Brian Bardwell | | | $295.00 | $88.50 |
| 10/29/2020 | Brian Bardwell | | | $295.00 | $472.00 |



Page 1 of 3

CRISCIONE_009280

Invoice # 1811 - 12/03/2020

| Date | | | Rate | Total |
|---|---|---|---|---|
| 10/29/2020 | Brian Bardwell | | $295.00 | $88.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $147.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $324.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $29.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $29.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $177.00 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $206.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $29.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $88.50 |
| 10/29/2020 | Brian Bardwell | | $295.00 | $29.50 |
| 10/30/2020 | Brian Bardwell | | $295.00 | $767.00 |
| 10/30/2020 | Brian Bardwell | | $295.00 | $118.00 |
| | | | Total | $4,838.00 |

## Expenses

| Date | Notes | Rate/ Price | Total |
|---|---|---|---|
| 10/31/2020 | | $433.27 | $433.27 |
| | | Expenses Subtotal | $433.27 |
| | | Subtotal | $5,271.27 |
| | | Total | $5,271.27 |
| | | Payment (12/05/2020) | -$2,500.00 |
| | | Balance Owing | $2,771.27 |

CRISCIONE_009281

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1811 | 12/03/2020 | $5,271.27 | $2,500.00 | $2,771.27 |
| | | | Outstanding Balance | **$2,771.27** |
| | | | **Total Amount Outstanding** | **$2,771.27** |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| | | | | **IOLTA Balance** | **$0.00** | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009282



THE
CHANDRA
L A W   F I R M   L L C

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

# INVOICE

Invoice # 1876
Date: 02/08/2021
Due Upon Receipt

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 11/01/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/01/2020 | Brian Bardwell | | 2.30 | $295.00 | $678.50 |
| 11/01/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 11/01/2020 | Brian Bardwell | | 1.40 | $295.00 | $413.00 |
| 11/01/2020 | Brian Bardwell | | 0.70 | $295.00 | $206.50 |
| 11/02/2020 | Brian Bardwell | | 1.50 | $295.00 | $442.50 |
| 11/02/2020 | Brian Bardwell | | 1.70 | $295.00 | $501.50 |
| 11/02/2020 | Brian Bardwell | | 3.50 | $295.00 | $1,032.50 |
| 11/04/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/06/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |

CRISCIONE_009283

Invoice # 1876 - 02/08/2021

| Date | Name | | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/06/2020 | Brian Bardwell | | 0.30 | $295.00 | $88.50 |
| 11/10/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/10/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/10/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/10/2020 | Brian Bardwell | | 0.60 | $295.00 | $177.00 |
| 11/11/2020 | Hannah Elson | | 6.70 | $150.00 | $1,005.00 |
| 11/11/2020 | Brian Bardwell | | 0.40 | $295.00 | $118.00 |
| 11/11/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 11/11/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/11/2020 | Brian Bardwell | | 0.70 | $295.00 | $206.50 |
| 11/11/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/12/2020 | Hannah Elson | | 0.10 | $150.00 | $15.00 |
| 11/12/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/12/2020 | Brian Bardwell | | 0.80 | $295.00 | $236.00 |
| 11/12/2020 | Brian Bardwell | | 0.70 | $295.00 | $206.50 |
| 11/12/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 11/12/2020 | Brian Bardwell | | 2.90 | $295.00 | $855.50 |

CRISCIONE_009284

Invoice # 1876 - 02/08/2021

| Date | Name | | Hours | Rate | Amount |
|------|------|---|-------|------|--------|
| 11/12/2020 | Brian Bardwell | | 0.80 | $295.00 | $236.00 |
| 11/12/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/12/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/12/2020 | Brian Bardwell | | 0.70 | $295.00 | $206.50 |
| 11/12/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 11/12/2020 | Brian Bardwell | | 0.60 | $295.00 | $177.00 |
| 11/13/2020 | Hannah Elson | | 0.50 | $150.00 | $75.00 |
| 11/13/2020 | Brian Bardwell | | 1.50 | $295.00 | $442.50 |
| 11/13/2020 | Brian Bardwell | | 0.40 | $295.00 | $118.00 |
| 11/17/2020 | Subodh Chandra | | 0.30 | $525.00 | $157.50 |
| 11/19/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 11/19/2020 | Brian Bardwell | | 0.30 | $295.00 | $88.50 |
| 11/19/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 11/19/2020 | Brian Bardwell | | 0.80 | $295.00 | $236.00 |
| 11/19/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |

CRISCIONE_009285

| | | | | | |
|---|---|---|---|---|---|
| 11/20/2020 | Brian Bardwell | | 0.30 | $295.00 | $88.50 |
| 11/25/2020 | Brian Bardwell | | 0.10 | $295.00 | $29.50 |
| 12/24/2020 | Brian Bardwell | | 1.60 | $295.00 | $472.00 |
| 12/24/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 12/24/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 12/24/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 12/24/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 12/25/2020 | Brian Bardwell | | 1.70 | $295.00 | $501.50 |
| 12/28/2020 | Brian Bardwell | | 1.20 | $295.00 | $354.00 |
| 12/28/2020 | Brian Bardwell | | 1.20 | $295.00 | $354.00 |
| 12/28/2020 | Brian Bardwell | | 2.00 | $295.00 | $590.00 |
| 12/28/2020 | Brian Bardwell | | 0.30 | $295.00 | $88.50 |
| 12/29/2020 | Brian Bardwell | | 0.50 | $295.00 | $147.50 |
| 12/29/2020 | Brian Bardwell | | 0.20 | $295.00 | $59.00 |
| 12/29/2020 | Brian Bardwell | | 0.60 | $295.00 | $177.00 |
| 12/29/2020 | Brian Bardwell | | 3.20 | $295.00 | $944.00 |
| 12/29/2020 | Brian Bardwell | | 4.40 | $295.00 | $1,298.00 |
| 12/30/2020 | Brian Bardwell | | 2.00 | $295.00 | $590.00 |
| 12/31/2020 | Brian Bardwell | | 1.60 | $295.00 | $472.00 |
| 12/31/2020 | Brian Bardwell | | 1.70 | $295.00 | $501.50 |

CRISCIONE_009286

Invoice # 1876 - 02/08/2021

| Date | Name | | Hours | Rate | Total |
|---|---|---|---|---|---|
| 12/31/2020 | Brian Bardwell | | 0.30 | $295.00 | $88.50 |
| 02/01/2021 | Subodh Chandra | | 0.30 | $550.00 | $165.00 |
| 02/01/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 02/02/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 02/02/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 02/03/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 02/03/2021 | Brian Bardwell | | 2.10 | $315.00 | $661.50 |
| 02/03/2021 | Brian Bardwell | | 0.60 | $315.00 | $189.00 |
| 02/04/2021 | Brian Bardwell | | 0.30 | $315.00 | $94.50 |
| 02/04/2021 | Brian Bardwell | | 1.40 | $315.00 | $441.00 |
| 02/04/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 02/04/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 02/04/2021 | Brian Bardwell | | 0.80 | $315.00 | $252.00 |
| 02/05/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |

ices Subtotal $18,608.50

## Expenses

| Date | Notes | Rate/ Price | Total |
|---|---|---|---|

CRISCIONE_009287

Invoice # 1876 - 02/08/2021



| | | |
|---|---|---|
| 11/30/2020 | $383.51 | $383.51 |
| 12/31/2020 | $274.82 | $274.82 |
| 01/28/2021 | $614.55 | $614.55 |

| | |
|---|---|
| Expenses Subtotal | $1,272.88 |
| Subtotal | $19,881.38 |
| Total | $19,881.38 |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1876 | 02/08/2021 | $19,881.38 | $0.00 | $19,881.38 |
| | | | Outstanding Balance | $19,881.38 |
| | | | Total Amount Outstanding | $19,881.38 |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| | | | IOLTA Balance | | $0.00 | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009288



# INVOICE

Invoice # 1929
Date: 04/19/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 03/01/2021 | Brian Bardwell | | 0.40 | $315.00 | $126.00 |
| 03/02/2021 | Brian Bardwell | | 1.40 | $315.00 | $441.00 |
| 03/02/2021 | Brian Bardwell | | 0.80 | $315.00 | $252.00 |
| 03/02/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 03/02/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/02/2021 | Brian Bardwell | | 0.30 | $315.00 | $94.50 |
| 03/02/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/03/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/03/2021 | Brian Bardwell | | 0.40 | $315.00 | $126.00 |
| 03/04/2021 | Subodh Chandra | | 0.20 | $550.00 | $110.00 |
| 03/04/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |

CRISCIONE_009289

| 03/04/2021 | Brian Bardwell | | 0.40 | $315.00 | $126.00 |
|---|---|---|---|---|---|
| 03/04/2021 | Brian Bardwell | | 1.00 | $315.00 | $315.00 |
| 03/04/2021 | Brian Bardwell | | 0.30 | $315.00 | $94.50 |
| 03/04/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 03/04/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/05/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/05/2021 | Brian Bardwell | | 2.40 | $315.00 | $756.00 |
| 03/05/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 03/05/2021 | Brian Bardwell | | 1.60 | $315.00 | $504.00 |
| 03/05/2021 | Brian Bardwell | | 0.70 | $315.00 | $220.50 |
| 03/05/2021 | Brian Bardwell | | 0.70 | $315.00 | $220.50 |
| 03/05/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 03/05/2021 | Brian Bardwell | | 0.90 | $315.00 | $283.50 |
| 03/05/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/06/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 03/07/2021 | Brian Bardwell | | 0.60 | $315.00 | $189.00 |
| 03/07/2021 | Brian Bardwell | | 0.70 | $315.00 | $220.50 |
| 03/08/2021 | Brian Bardwell | | 0.40 | $315.00 | $126.00 |
| 03/09/2021 | Brian Bardwell | | 0.90 | $315.00 | $283.50 |
| 03/09/2021 | Brian Bardwell | | 0.60 | $315.00 | $189.00 |
| 03/09/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/09/2021 | Brian Bardwell | | 0.30 | $315.00 | $94.50 |
| 03/09/2021 | Brian Bardwell | | 1.30 | $315.00 | $409.50 |
| 03/10/2021 | Shelia Degraffinried | | 0.20 | $150.00 | $30.00 |
| 03/10/2021 | Subodh Chandra | | 0.10 | $550.00 | $55.00 |

Invoice # 1929 - 04/19/2021

| 03/10/2021 | Brian Bardwell | | 1.30 | $315.00 | $409.50 |
|---|---|---|---|---|---|
| 03/10/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 03/10/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 03/10/2021 | Brian Bardwell | | 2.20 | $315.00 | $693.00 |
| 03/10/2021 | Brian Bardwell | | 2.70 | $315.00 | $850.50 |
| 03/10/2021 | Brian Bardwell | | 0.70 | $315.00 | $220.50 |
| 03/10/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/10/2021 | Brian Bardwell | | 0.50 | $315.00 | $157.50 |
| 03/10/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/11/2021 | Subodh Chandra | | 0.30 | $550.00 | $165.00 |
| 03/11/2021 | Brian Bardwell | | 0.20 | $315.00 | $63.00 |
| 03/11/2021 | Brian Bardwell | | 0.90 | $315.00 | $283.50 |
| 03/11/2021 | Brian Bardwell | | 1.00 | $315.00 | $315.00 |
| 03/12/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 03/18/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| 03/23/2021 | Brian Bardwell | | 0.10 | $315.00 | $31.50 |
| | | s Subtotal | | | $9,841.50 |

**Expenses**

| Date | Notes | Rate/ Price | Total |
|---|---|---|---|
| 03/31/2021 | | $248.08 | $248.08 |
| 03/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the | $295.73 | $295.73 |

CRISCIONE_009291

engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of March, 2021.

| | |
|---|---:|
| **Expenses Subtotal** | **$543.81** |
| **Subtotal** | **$10,385.31** |
| **Total** | **$10,385.31** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |

| | |
|---|---:|
| **Outstanding Balance** | **$30,101.22** |
| **Amount in Trust** | **$0.00** |
| **Total Amount Outstanding** | **$30,101.22** |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |

CRISCIONE_009292

Invoice # 1929 - 04/19/2021

**IOLTA Balance**          **$0.00**

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009293



# INVOICE

Invoice # 1957
Date: 06/09/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

### Services

| Date | Attorney | Notes | Quantity | Rate | Total |
|------|----------|-------|----------|------|-------|
| 05/11/2021 | Brian Bardwell | ███████ | 0.20 | $315.00 | $63.00 |
| 05/11/2021 | Brian Bardwell | ███████ | 0.10 | $315.00 | $31.50 |
| 05/11/2021 | Brian Bardwell | ███████ | 0.30 | $315.00 | $94.50 |
| | | | | s Subtotal | $189.00 |

### Expenses

| Date | Notes | Rate/ Price | Total |
|------|-------|-------------|-------|
| 04/30/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of April, 2021. | $451.52 | $451.52 |
| 05/31/2021 | ███████ | $15.56 | $15.56 |
| 05/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of May, 2021. | $451.52 | $451.52 |

CRISCIONE_009294

Invoice # 1957 - 06/09/2021

| | | |
|---|---|---|
| Expenses Subtotal | | $918.60 |
| Subtotal | | $1,107.60 |
| Total | | $1,107.60 |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |

| | |
|---|---|
| Outstanding Balance | $31,208.82 |
| Amount in Trust | $0.00 |
| Total Amount Outstanding | $31,208.82 |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |

| | |
|---|---|
| IOLTA Balance | $0.00 |

CRISCIONE_009295

Invoice # 1957 - 06/09/2021

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009296



THE
CHANDRA
L A W   F I R M   L L C

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

# INVOICE

Invoice # 1976
Date: 07/14/2021
Due Upon Receipt

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|-------------|-------|
| 06/30/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of June 2021. | $468.13 | $468.13 |

| | Subtotal | $468.13 |
|---|---|---|
| | Total | $468.13 |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |

CRISCIONE_009297

Invoice # 1976 - 07/14/2021

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |
| | | | **Outstanding Balance** | **$31,676.95** |
| | | | **Amount in Trust** | **$0.00** |
| | | | **Total Amount Outstanding** | **$31,676.95** |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| | | | **IOLTA Balance** | | **$0.00** | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009298



# INVOICE

Invoice # 2003
Date: 08/05/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|------------|-------|
| 07/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of July 2021. | $475.15 | $475.15 |

| | | |
|---|---|---|
| | **Subtotal** | **$475.15** |
| | **Total** | **$475.15** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|-----------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009299

Invoice # 2003 - 08/05/2021

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |

| | |
|---|---|
| Outstanding Balance | $32,152.10 |
| Amount in Trust | $0.00 |
| Total Amount Outstanding | $32,152.10 |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |

| | |
|---|---|
| IOLTA Balance | $0.00 |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009300



# INVOICE

Invoice # 2023
Date: 09/02/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|-------------|-------|
| 08/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of August 2021. | $482.28 | $482.28 |

| | | |
|---|---|---|
| | Subtotal | **$482.28** |
| | Total | **$482.28** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009301

Invoice # 2023 - 09/02/2021

| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |
| | | | Outstanding Balance | $32,634.38 |
| | | | Amount in Trust | $0.00 |
| | | | Total Amount Outstanding | $32,634.38 |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| | | | IOLTA Balance | | $0.00 | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009302



THE CHANDRA LAW FIRM LLC

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

# INVOICE

Invoice # 2059
Date: 10/19/2021
Due Upon Receipt

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|-------------|-------|
| 09/30/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of September 2021. | $481.69 | $481.69 |

| | | |
|--|--|--|
| | Subtotal | **$481.69** |
| | Total | **$481.69** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $5,000.00 | $14,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009303

| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |

### Interest On Other Invoices

| Original Invoice | Due On | Amount Due | Payments Received | Balance Due |
| --- | --- | --- | --- | --- |
| 2023 | 11/02/2021 | $6.14 | $0.00 | $6.14 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
| --- | --- | --- | --- | --- |
| 2059 | 10/19/2021 | $481.69 | $0.00 | $481.69 |

|  |  |  | Outstanding Balance | $33,122.21 |
| --- | --- | --- | --- | --- |
|  |  |  | Amount in Trust | $0.00 |
|  |  |  | Total Amount Outstanding | $33,122.21 |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
| --- | --- | --- | --- | --- | --- | --- |
| 10/27/2020 |  | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 |  | $2,500.00 | $2,500.00 |
| 12/05/2020 |  | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 |  | $0.00 |

|  |  |  | IOLTA Balance |  | $0.00 |  |
| --- | --- | --- | --- | --- | --- | --- |

### Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
| --- | --- | --- | --- | --- | --- | --- |
| 12/05/2020 |  | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 |  | $2,500.00 | $2,500.00 |
| 12/05/2020 |  | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related | $2,500.00 |  | $0.00 |

CRISCIONE_009304

Invoice # 2059 - 10/19/2021

|  |  | civil claims--00001 |  |  |  |
|---|---|---|---|---|---|
| 12/06/2020 | Clio Payments deposit |  |  | $2,771.27 | $2,771.27 |
| 12/06/2020 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 |  | $0.00 |
| 04/07/2021 | Clio Payments deposit |  |  | $5,000.00 | $5,000.00 |
| 04/07/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 |  | $0.00 |

|  |  |
|---|---|
| **Business Balance** | **$0.00** |
| **Total Account Balance** | **$0.00** |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009305



# INVOICE

Invoice # 2110
Date: 11/11/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|------------|-------|
| 10/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of September 2021. | $451.74 | $451.74 |

| | | | Subtotal | **$451.74** |
| | | | Total | **$451.74** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|-----------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $8,000.00 | $11,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009306

Invoice # 2110 - 11/11/2021

| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |
| 2059 | 10/19/2021 | $481.69 | $0.00 | $481.69 |

## Interest On Other Invoices

| Original Invoice | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2023 | 11/02/2021 | $6.14 | $0.00 | $6.14 |
| 2023 | 12/02/2021 | $6.02 | $0.00 | $6.02 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2110 | 11/11/2021 | $451.74 | $0.00 | $451.74 |

| | |
|---|---|
| **Outstanding Balance** | **$30,579.97** |
| **Amount in Trust** | **$0.00** |
| **Total Amount Outstanding** | **$30,579.97** |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |

| | |
|---|---|
| **IOLTA Balance** | **$0.00** |

## Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |

CRISCIONE_009307

| 12/05/2020 | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| 12/06/2020 | Clio Payments deposit | | | $2,771.27 | $2,771.27 |
| 12/06/2020 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 | | $0.00 |
| 04/07/2021 | Clio Payments deposit | | | $5,000.00 | $5,000.00 |
| 04/07/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 | | $0.00 |
| 10/19/2021 | Clio Payments deposit | | | $3,000.00 | $3,000.00 |
| 10/19/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $3,000.00 | | $0.00 |

|  | **Business Balance** | **$0.00** |
| --- | --- | --- |
|  | **Total Account Balance** | **$0.00** |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009308



**INVOICE**

Invoice # 2181
Date: 12/05/2021
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|------------|-------|
| 11/30/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of November 2021. | $458.52 | $458.52 |

| | | |
|--|--|--|
| | Subtotal | **$458.52** |
| | Total | **$458.52** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|-----------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $8,000.00 | $11,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009309

| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |
| 2059 | 10/19/2021 | $481.69 | $0.00 | $481.69 |
| 2110 | 11/11/2021 | $451.74 | $0.00 | $451.74 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2181 | 12/05/2021 | $458.52 | $0.00 | $458.52 |
| | | | Outstanding Balance | $31,026.33 |
| | | | Amount in Trust | $0.00 |
| | | | Total Amount Outstanding | $31,026.33 |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| | | | IOLTA Balance | | $0.00 | |

## Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| 12/06/2020 | | Clio Payments | | | $2,771.27 | $2,771.27 |

CRISCIONE_009310

| | deposit | | | | |
|---|---|---|---|---|---|
| | deposit | | | | |
| 12/06/2020 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 | | $0.00 |
| 04/07/2021 | Clio Payments deposit | | | $5,000.00 | $5,000.00 |
| 04/07/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 | | $0.00 |
| 10/19/2021 | Clio Payments deposit | | | $3,000.00 | $3,000.00 |
| 10/19/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $3,000.00 | | $0.00 |

|  | **Business Balance** | **$0.00** |
|---|---|---|
|  | **Total Account Balance** | **$0.00** |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009311



**INVOICE**

Invoice # 2286
Date: 01/09/2022
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/Price | Total |
|------|-------|-----------|-------|
| 12/31/2021 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of December 2021. | $465.39 | $465.39 |

| | |
|---|---|
| Subtotal | **$465.39** |
| Total | **$465.39** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|-----------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $8,000.00 | $11,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009312

Invoice # 2286 - 01/09/2022

| | | | | |
|---|---|---|---|---|
| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |
| 2059 | 10/19/2021 | $481.69 | $0.00 | $481.69 |
| 2110 | 11/11/2021 | $451.74 | $0.00 | $451.74 |
| 2181 | 12/05/2021 | $458.52 | $0.00 | $458.52 |

## Interest On Other Invoices

| Original Invoice | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2023 | 11/02/2021 | $6.14 | $0.00 | $6.14 |
| 2023 | 12/02/2021 | $6.02 | $0.00 | $6.02 |
| 2059 | 12/19/2021 | $6.14 | $0.00 | $6.14 |
| 2023 | 01/01/2022 | $6.10 | $0.00 | $6.10 |
| 2059 | 01/18/2022 | $6.01 | $0.00 | $6.01 |
| 2023 | 01/31/2022 | $6.17 | $0.00 | $6.17 |
| 2059 | 02/17/2022 | $6.09 | $0.00 | $6.09 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2286 | 01/09/2022 | $465.39 | $0.00 | $465.39 |

| | |
|---|---|
| Outstanding Balance | $31,534.39 |
| Amount in Trust | $0.00 |
| Total Amount Outstanding | $31,534.39 |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related | $2,500.00 | | $0.00 |

CRISCIONE_009313

Invoice # 2286 - 01/09/2022

| | | | civil claims--00001 | | | |
|---|---|---|---|---|---|---|
| | | | | **IOLTA Balance** | **$0.00** | |

## Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| 12/06/2020 | | Clio Payments deposit | | | $2,771.27 | $2,771.27 |
| 12/06/2020 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 | | $0.00 |
| 04/07/2021 | | Clio Payments deposit | | | $5,000.00 | $5,000.00 |
| 04/07/2021 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 | | $0.00 |
| 10/19/2021 | | Clio Payments deposit | | | $3,000.00 | $3,000.00 |
| 10/19/2021 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $3,000.00 | | $0.00 |
| | | | | **Business Balance** | **$0.00** | |
| | | | | **Total Account Balance** | **$0.00** | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009314



# INVOICE

Invoice # 2355
Date: 02/02/2022
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/Price | Total |
|------|-------|------------|-------|
| 01/31/2022 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of January 2022. | $472.38 | $472.38 |

| | | |
|---|---|---|
| | Subtotal | $472.38 |
| | Total | $472.38 |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $8,000.00 | $11,881.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009315

| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 09/02/2021 | $482.28 | $0.00 | $482.28 |
| 2059 | 10/19/2021 | $481.69 | $0.00 | $481.69 |
| 2110 | 11/11/2021 | $451.74 | $0.00 | $451.74 |
| 2181 | 12/05/2021 | $458.52 | $0.00 | $458.52 |
| 2286 | 01/09/2022 | $465.39 | $0.00 | $465.39 |

### Interest On Other Invoices

| Original Invoice | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2023 | 11/02/2021 | $6.14 | $0.00 | $6.14 |
| 2023 | 12/02/2021 | $6.02 | $0.00 | $6.02 |
| 2059 | 12/19/2021 | $6.14 | $0.00 | $6.14 |
| 2023 | 01/01/2022 | $6.10 | $0.00 | $6.10 |
| 2059 | 01/18/2022 | $6.01 | $0.00 | $6.01 |
| 2023 | 01/31/2022 | $6.17 | $0.00 | $6.17 |
| 2059 | 02/17/2022 | $6.09 | $0.00 | $6.09 |
| 2023 | 03/02/2022 | $6.25 | $0.00 | $6.25 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2355 | 02/02/2022 | $472.38 | $0.00 | $472.38 |

| | | |
|---|---|---|
| Outstanding Balance | **$32,013.02** |
| Amount in Trust | **$0.00** |
| Total Amount Outstanding | **$32,013.02** |

### IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |

CRISCIONE_009316

| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
|---|---|---|---|---|---|---|

| | | | | **IOLTA Balance** | **$0.00** | |
|---|---|---|---|---|---|---|

## Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
| 12/06/2020 | | Clio Payments deposit | | | $2,771.27 | $2,771.27 |
| 12/06/2020 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 | | $0.00 |
| 04/07/2021 | | Clio Payments deposit | | | $5,000.00 | $5,000.00 |
| 04/07/2021 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 | | $0.00 |
| 10/19/2021 | | Clio Payments deposit | | | $3,000.00 | $3,000.00 |
| 10/19/2021 | | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $3,000.00 | | $0.00 |

| | | | **Business Balance** | **$0.00** | |
|---|---|---|---|---|---|
| | | | **Total Account Balance** | **$0.00** | |

Please make all amounts payable to: The Chandra Law Firm LLC

CRISCIONE_009317

Invoice # 2355 - 02/02/2022

Payment is due upon receipt.

CRISCIONE_009318



# INVOICE

Invoice # 2516
Date: 04/07/2022
Due Upon Receipt

The Chandra Law Building; 1265 West 6th Street, Suite 400
Cleveland, Ohio 44113-1326

Gina Marie Criscione
6093 Creekside Drive
Parma Heights, OH 44130

## Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001

## Defense of criminal charges brought by Sara Thurmer and potential related civil claims

| Date | Notes | Rate/ Price | Total |
|------|-------|-------------|-------|
| 03/31/2022 | This is an interest charge for nonpayment (1.5% per monthly) under the engagement agreement. Per your engagement agreement, payment is due upon receipt of invoices and interest charges accrue if invoices are not paid within 30 days. The interest charges have been calculated through the end of March 2022. | $479.15 | $479.15 |

| | Subtotal | $479.15 |
|--|----------|---------|
| | Total | $479.15 |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 1876 | 02/08/2021 | $19,881.38 | $8,500.00 | $11,381.38 |
| 1902 | 03/05/2021 | $4,834.53 | $0.00 | $4,834.53 |
| 1929 | 04/19/2021 | $10,385.31 | $0.00 | $10,385.31 |
| 1957 | 06/09/2021 | $1,107.60 | $0.00 | $1,107.60 |
| 1976 | 07/14/2021 | $468.13 | $0.00 | $468.13 |

CRISCIONE_009319

Invoice # 2516 - 04/07/2022

| | | | | |
|---|---|---|---|---|
| 2003 | 08/05/2021 | $475.15 | $0.00 | $475.15 |
| 2023 | 10/02/2021 | $482.28 | $0.00 | $482.28 |
| 2110 | 11/11/2021 | $451.74 | $0.00 | $451.74 |
| 2181 | 12/05/2021 | $458.52 | $0.00 | $458.52 |
| 2286 | 01/09/2022 | $465.39 | $0.00 | $465.39 |
| 2355 | 02/02/2022 | $472.38 | $0.00 | $472.38 |
| 2059 | 03/08/2022 | $481.69 | $0.00 | $481.69 |
| 2487 | 03/08/2022 | $479.46 | $0.00 | $479.46 |

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2516 | 04/07/2022 | $479.15 | $0.00 | $479.15 |

| | |
|---|---|
| Outstanding Balance | $32,422.71 |
| Amount in Trust | $0.00 |
| Total Amount Outstanding | $32,422.71 |

## IOLTA

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 10/27/2020 | | Initial retainer received 10/27/20 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |

| | |
|---|---|
| IOLTA Balance | $0.00 |

## Business

| Date | Type | Notes | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| 12/05/2020 | | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | | $2,500.00 | $2,500.00 |

CRISCIONE_009320

Invoice # 2516 - 04/07/2022

| 12/05/2020 | Payment for invoice #1811 | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,500.00 | | $0.00 |
|---|---|---|---|---|---|
| 12/06/2020 | Clio Payments deposit | | | $2,771.27 | $2,771.27 |
| 12/06/2020 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $2,771.27 | | $0.00 |
| 04/07/2021 | Clio Payments deposit | | | $5,000.00 | $5,000.00 |
| 04/07/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $5,000.00 | | $0.00 |
| 10/19/2021 | Clio Payments deposit | | | $3,000.00 | $3,000.00 |
| 10/19/2021 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $3,000.00 | | $0.00 |
| 03/22/2022 | Online payment deposit | | | $500.00 | $500.00 |
| 03/22/2022 | Linked payment for Gina Marie Criscione | Criscione, Gina--Defense of criminal charges brought by Sara Thurmer and potential related civil claims--00001 | $500.00 | | $0.00 |

| | | | **Business Balance** | **$0.00** | |
|---|---|---|---|---|---|
| | | | **Total Account Balance** | **$0.00** | |

Please make all amounts payable to: The Chandra Law Firm LLC

Payment is due upon receipt.

CRISCIONE_009321

Everyone at East Park all knew I was waiting for Mount Alverna to open for three years; I was not about to move mom like a chess piece, I wanted to move her once. They were throwing her out in COVID and cut off contact and would not provide me even with her health records after she was released from hospital BOTH times. The second time we asked hospital if she could go into their physic unit, just to get her out of East Park … and they said she did not belong there she had dementia. So then East Park tried to help me find another place for mom during covid. They wanted to place her in horrible home for drug rehab people, when they just said she needed a Geri Unit, and then will be willing to place her anywhere during Covid? … They wanted me gone. I filed a ODH report in July 2020.

I was working with an Ombudsman during that time, Andrew, That spoke to Sara for me, "I was begging" to keep mom at East park until the opening come up at Mount Alverna.  Sandra the admissions director told me only a few more days and an opening would be there for my mother… But the Owner told Sara and Sara told the ombudsman and the Ombudsman told me NO, MOM must move in the dead of Covid! How cruel…….. They are retaliating against me because I report things. These records are not putting the family's side of the story down. They lie about things they say I said. I never said to stop compression socks on mom… I told them they needed to train someone to get them on mom correctly, I have tons of pictures of her swollen legs from them putting mom's socks on wrong…., she had A-fib and this manor of the way their untrained aids were putting them on were causing more havoc for mom's heart then help. Every day I went to put mom's socks on the right way, the way the doctor told me to do it, no one was listening, and they never had a DON on staff very long, a revolving door it was.

The retaliation is proven when they waited from Jun 20th, 2020 after mom died till October to come after me for harassment? Proven wrong in court, and dismissed, I think Laura and Sara came at me personally 4 months later to report me tot the police department because I was protesting legally and shouting to all about their wrong doings. My mother was demented like many others, that yell on occasion. There was a woman screaming constantly across the hall from mom. and the staff told me they did not know why my mother was being evicted when others are worse than mom …

This Report on my mother's health that east Park gave you is their view and lies. I can't sleep nights, because they took the last months of mom's life and pulled her family right out of it by stopping all communication. All my life I have spoken to mom for hours on the phone daily. That's a fact! Other residents were still getting and making calls, My mother was singled out and they were told not to call me my brother or sister,, they called none of us for her. She could not dial…….. They made calls for me daily for three years now suddenly mom is cut off, MOM DIED From a broken heart, I was with mom and my sister and brother daily one of us were there. She felt abandoned and died sooner because of East parks actions against me and I will never sleep thinking otherwise! Neither will my family.

And I had been communicating with my mother all along every day for YEARS, she felt abandoned all of a sudden. We were not there, she could not here us or see us., not one call, not on Face time, not nothing, not even reports from the doctor as I asked over and over for…only me but the people that took care of her at Mt Alverna my sister and my husband all believe she would have lived a lot longer, even the aids and nurses that were my friends at East park told me this.  She died sooner because of the neglect and retaliation they had against me. She died sooner. Much sooner. I lose sleep nights knowing they are still doing this to others.



DEFENDANT'S EXHIBIT
Q
7-6-23
PENGAD 800-631-6989

CRISCIONE_003806

You did not have a topic for me, I have written to you before, only getting a generic letter back. I have a ton of complaints and I could write a book. I did with the ODH and Nursing, I complained. East Park Care Center in Brook Park is corrupt, and I have reported them. They escalated my mother death by the Administrator ordering no phone calls are to be answered on moms' room and no one can dial for her. Mom needed help with talking to me on the phone. I put a speaker phone in and they will not take my calls. They have shut all the blinds around the building so families cannot go up and see their loved ones as it was before. East Park Care Center, in Brook Park, only allow visits at the front door foyer, they made no changes to accommodate the families and the resident's door.

EAST PARK CARE CENTER cut off communication with me and mom and my family and mom BIG TIME. I asked repeatedly for moms medical records (sent in fax requests to EPCC, to receptionist Tina as requested to get records) I keep good records myself and have proof) I never got her records they kept avoiding me and it's easy behind the closed doors you have created to protect our parents. They are not protected by being isolated. We should have been able to go in and be with mom. Covid and East Park took precious time from me and my mother. East Park made it worse. When you isolated them in quarantine, you should have allowed one family member to see them. Don't you know Demented people need routine, it is essential, this needed to be handled differently. Their minds slipped faster because there was no plan, you thought you were protecting them, but they are dying from broken hearts and hidden neglect.

By the time we moved mom, it was too late. She was dehydrated once again when she arrived at Mount Alverna. She was also covered in bruises and the wounds Robyn the wound nurse from EAST PARK CARE CENTER told me were healed were not healed at all. She lied to me. Mount Alverna took my mom off the UNGODLY AMOUNT of 850 MG of Depakote, for her "BAD BEHAVIOR" that EPCC painted her with. I saw mom go from hell to heaven in Mount Alverna. They were wonderful, so different from EPCC, in Brook Park. No comparison. Mount Alverna saved mom from horrible care. I never knew care could be so good. I could not even get in Mount Alverna to see mom until she was dying, but they called me three times a day about moms health and they tried to connect us many many times that last month with mom by Face Time and calls. How wonderful it was to see a compassionate nursing home with professional people caring for my mother in her final days.

EAST PARK CARE CENTER had a nurse Rene, she would Face time me for mom behind the backs of the administration that ordered not to call us. Rene's Cell phone was taken from her at a meeting and my number was deleted, she was told not to call me for my mom, or she would be fired. So were the others. I know because my friend was at that meeting. She works there, two friends, her and a guy too who works there, both told me the same thing, the proof is in the pudding. I had little to no communication with my mom then for over two months, during Covid.

They fired my mom's Nurse Practitioner because we were friends and I can prove that too. The New NP that EPCC that was assigned to mom, never returned my calls for months and neither did the NEW doctor they appointed mom during the Quarantine. Sara Thurmer the Administrator ordered all staff not to call me for my mom and nurses not to talk to me. All I wanted was mom's results for her tests and medical records, and as Legal Guardian I was not supposed to wait for months and never got them. Isn't there a law against hold info from family, especially the daughter and legal Guardian? My mother's medical records, I needed because they were not giving me moms health and mental reports... I was



DEFENDANT'S EXHIBIT
K
7-6-23
PENGAD 800-631-6989

locked out completely! It was three whole months without seeing mom, grueling. We were tortured as well.

EPCC hid and did not answer my calls ever. I left message after message to find out how my mom was and nothing. I would get the wound nurse on the phone (Robyn Milles) that they called a DON when they did not have one. That position had a revolving door. I know this because I have had mom at EAST PARK CARE CENTER for three years. I was hands on with my mom, I was there all the time and if I was not my sister or brother was. EAST PARK CARE CENTER did not evict mom for bad behavior they wanted me gone, I was a liability to them. They used my mother's dementia behavior to evict us.

I moved my mom out on May 22nd, she spent months of torture because of EPCC, in hospital 2 times for dehydration, they were not feeding her or giving her water or moving her. We saw when we did get to go to window that they were not even changing her clothes let alone moving her. she looked awful. When she got to the new place, which I waited on a waiting list for 3 year for mom, (it finally came up, thank the Lord) Mount Alverna Village she was only 97 pounds and was covered in bruises and on 850 mg of Depakote. Absurd. She weighed 130 when I left her on March 11th. She went to hospital 2 times for dehydration at East Park Care Center.

The Administration wanted to evict us, because I was hands on with mom and EAST PARK CARE CENTER did not like the fact, I was friends with staff. They clearly retaliated against us and mom suffered because of it and are getting away with this. Retaliated against me and mom, after the hearing when she was being evicted for no reason. Long story, but if you have time you can call me. There is so much corruption at East Park.  I had a hearing because of the eviction, not wanting to move mom during the Covid at 1st. They all lied, my mom was not combative at all, she was demented and over drugged and neglected and her communication with us was CUT OFF COMPLETELY with us. Mom thought we'd abandoned her.  I have a Face Book Web Page Cries In The Night * Tell Us Your Nursing Home Experience. My story is on there. I don't sugar-coat anything. I tell the truth.

I know I am rambling and repeating myself so I will end this here, there is so much more, they lied at my hearing of eviction and the Ombudsman was no help whatsoever. I disheartened with everything in this country right now. But when it comes to mom, I will keep speaking for her. If you have any companion at all send someone over to East Park Care Center, inside in Brook Park, Ohio and stop what they are doing behind closed doors. Ask the ODH to allow you to read my report. It' has everything in it. I only gave you a few things here.

I will be walking in front of East Park Care Center every Monday and Thursday from 12:00 pm for one hour with truthful signs in honor of Dorothy my mom. That was mom's shower time and lunch time that we spent together for hours, even though I was there sometimes daily.

I want, Dorothy's Law, in honor of my mom and other moms and dads with dementia to protect the ones that cannot speak for themselves. For me to expose the administration in the memory of my mom will help the others suffering inside as we speak.

CRISCIONE_003797

current nursing home should be able to provide the same care that the proposed "new" facility would provide.

Actually, the second nursing home may be no better — or may be worse — than the first one. A resident who fights an eviction, wins and stays may find themselves          receiving more respect and better care.

DON'T LET THE RESIDENT BE BLAMED FOR HAVING DEMENTIA Many attempted evictions boil down to criticizing the actions of a resident with dementia. But nursing homes exist to serve persons with dementia. In good dementia care, the nursing home pays close attention to the resident's needs and actions, and uses the care planning process to meet those needs

Problem #2: Failing to Take Care Planning Seriously WHAT YOU HEAR: "THE NURSING STAFF WILL DETERMINE THE CARE THAT YOU RECEIVE." THE FACTS: THE RESIDENT AND RESIDENT'S FAMILY CAN PARTICIPATE IN DEVELOPING A CARE PLAN.

DON'T LET THE RESIDENT BE BLAMED FOR HAVING DEMENTIA Many attempted evictions boil down to criticizing the actions of a resident with dementia. But nursing homes exist to serve persons with dementia. In good dementia care, the nursing home pays close attention to the resident's needs and actions, and uses the care planning process to meet those needs.

In general, a resident's complaints should lead to the nursing home improving its care, rather than evicting the resident. Also, a resident has a right to make requests and complaints without retaliation.14

WHAT YOU HEAR: "YOU MUST MOVE OUT BECAUSE YOU ARE REFUSING MEDICAL TREATMENT." THE FACTS: A RESIDENT HAS A RIGHT TO REFUSE MEDICAL TREATMENT. BY ITSELF, REFUSAL OF TREATMENT IS NOT AN ALLOWABLE REASON FOR EVICTION.

A nursing home resident, like any other person, has a constitutional and common-law right to refuse medical treatment. For that reason, an eviction cannot be based solely on a resident refusing treatment.

CARE GIVER MEETING EAST PARK NOVEMBER 21, 2019 10 AM   The last one! Going through the reports I find mom had insomnia as well, I was never told that? Every time I called the floor nurse told me she slept good, that was the1st time I knew this.

Notes: started trying to converse with new practitioner on March 13th…….March 14th called front desk talked to Tina receptionist and asked her to have Toni NO to call me again….

March 17 th I asked Louise DON, for a test UTI, never heard results? I had to call and ask them Calls are getting fewer and far between, finding out they limited moms calls and are not answering like before??? before???



CRISCIONE_003771

I asked continuous for reports and paperwork/ reports for my mom's care, and her blood work and never received Calls are getting fewer and far between, finding out they limited moms calls and are not answering like before???

During this covid19, mom has had DTI on her bottom, and a foot wound on her heal, she became lethargic and I wanted paperwork on her blood work and testing because I was not getting answers. It took just about 4 weeks before they gave me that info. I was told 24 hours after I send my faxed request.

March 24th I asked them again to fax me all of her blood work and testing that the new nurse practitioner did. Because the girl her name is Tony never called me as requested. Louise was singing and dancing around the answers of my mothers testing , I got no straight answer. Louise drooped the ball with me and answers several time and I did caught her in lies to me, AT one time Sara the administrator told me to text her directly, not to go to Louise any longer, this concerned me this is the DON?...... So I'm in the process of getting her test results and I have two nurses that will look it over and let me know what they find. I asked them to check for a UTI or fluid in her lungs. Because she's acting awfully lethargic and nonresponsive too often

Got the records on 4/7 finally

East Park mission statement

Thank you for your interest in East Park Retirement Community. We are situated on twelve acres, nestled in a residential neighborhood in Brook Park, Ohio.

As a Continuing Care campus, we feature senior living arrangements which allow our residents to adapt to changes in their needs without necessarily changing locations, so that they may continue to live in a familiar place under the care of competent staff who know them well.

We offer a range of senior living options. Beginning with Independent Living in an apartment to Standard Assisted Living with 24 hour assistance at the Inn, and on to Premier Assisted Living featuring 24 hour nursing support and a Premier Assisted Living/Memory Care available option. Rehabilitation and Skilled Nursing are available at our Care Center. We provide attention and care to match the individual needs of our residents.

We focus on person-centered care and strive to maintain as much of a home-style environment as possible. We encourage our residents to become as socially involved as they wish, while respecting individual choice.

CRISCIONE_003773

I am Gina Marie Criscione, 1st daughter and legal Guardian for my mother Dorothy J Mandanici. This is our true story. The names are mentioned to not protect the culprits. The Culprits, The Administration. No need for lobbying for cameras, we need to address this problem at the TOP. If we have a failing Administration and weak staff, untrained, unguided staff of nurses and aids because of it.

Then we have abused residents, neglected residence, and unhappy staff. With little to no communication between the Nursing Home and families, this system is so broken. We need to change this to provide the best care ever for our loved ones. Open up and step forward NOW. Our story and how EPCC ruined my mom and family over three months of torture.

WE recently moved my mother from East Park Care Center in Brook Park, Ohio, (EPCC, Mom was there for 3 years) to another Nursing home , Mount Alverna, on State Road on Friday, May 22. My sister JoLynn was able to be with her on the move to the new nursing home and thought that mom (Dorothy J Mandanici) looked awfully thin, and dehydrated and lethargic and mom had never been covered in so many bruises. There is so much to tell, I can write a book. But the main reason I am doing this is because when we moved my mom, my sister, JoLynn noticed bruises all over mom's body, enough to make JoLynn physically sick. Mom was thinner than ever when my sister saw her. At this time, during this Covid quarantine, EP wanted us to leave the nursing home, because they said mom had bad behavior. They gave us 30 days and we appealed with a hearing and lost. They had painted my mom's reports with bad behavior and that they could not handle her. They never spoke to me about this and I got no help or consulting from any doctor as to meds for mom. Mom's condition was never reviewed with me, they just asked us to leave. So, we tried to find a place for mom, and God's Grace gave us an opening at Mt Alverna, there I had mom on the waiting list for 3 years. Thank God.

When I do get to sneak a talk to a floor nurse at EP, they tell me different stories, each nurse. Sarah George the Unit Manager, who is who I was trying to reach, never returns calls. The regular nurses for mom, Rene Negry and others say my mom is just like every other dementia patient, and they loved mom - that she was never a problem. Yet the Administration tells us we must leave because mom is out of control, they painted her with bad behavoor.

We went to the dirty window that East Park provided for us to see mom during this quarantine. Mom was always lying in bed, which she never did before, all the time, she did not look combative at all ever, far from it. Mom looked terrible, weak and not speaking to us through the small crack in the window that they provided for us to see mom and her head was always down.

The front desk lied to us many times, Tina, telling us mom was in activities, when we were right at her window watching her lay in bed all day long DURING THE CALL. They were not telling us what was going on, ever. Caught in lies, one nurse would say one thing and I would finally get another to talk to me about moms care and I would get conflicting answers. ==I needed moms health reports and records and they were avoiding me.==

Below are just a few incidents that were occurring at EP while mom was staying there. My mother had been here for three years, and when the administration changed, new owners, Laura Divinsenzo, and Robert Nemez things got horrible.

Most of the staff, before Covid quarantine when I was in there were very unhappy with the new owners, they said things about the new owners, and I noticed the staff, both nurses and aids, leaving by the handfuls, quitting. They were having a hard time getting staff at EP. The administrator, Sara Thurmer, once asked me, "Do you know any nurses, we need a DON (director of nursing)?" The Administrator, of my mother's care center… was asking me if I know a nurse for the position? … They needed a DON, it's a revolving door for the DON at EP.



DEFENDANT'S EXHIBIT
7
7-6-23
PENGAD 800-681-6989

They have had 4 DON's since the new owners came. Mom would have injury after injury, and Sara the Administrator tried to make things better for mom. To no avail.

We liked EP for mom for two years, but something is wrong there now. Now we are glad we found a good place for mom. EP had their wound nurse, ) Robyn Mellis, playing as DON temporarily, until they find yet another one, (Director of Nursing) Robyn had a hard time just keeping up with moms wounds yet taking the position of Director of Nursing whenever someone would quit that position or get fired from that position.

Having mom at EP so long I made a lot of friends that work at EP. As I grew up in Brook Park and I know lots of people, I knew some of the other residence families because I went to school with them and their moms and dads were in EP too. It was very nice the first 2 years. Nothing like this has ever occurred where the staff from EP had report to me secretly and privately, until now. The staff is telling me everything; they were fired or quit, and they find me and come to me on FB messenger and find me to tell me things like, "How's your mom Gina?" "Get your mom out of there!" "The nurses and aids are drinking and sleeping in their cars and having men there for sex during night shift in parking lot during evening and early morning hours!" "Nice to your face and treat mom horrible behind your back." I am hearing this from people that were fired or quit East Park.I was frightened for mom at this point and wanted to move her out. The employees of EP told me so much … I was in fear of mom being at EP another minute. I was happy to move mom at this point, even though her behavior was not bad, mom was acting out at times because of the changes with quarantine with her Vascular Dementia and not being able to hear me, see me or feel our love next to her.

More than 4 former staff, aids and nurses, from EP that a have contacted me in the past month to tell me what goes on in there - and it's not pretty. These were good aids and nurses that loved my mom and took good care of her and left because some were just not getting paid in a timely fashion, their pay checks were bouncing. This is first-hand news from an employee. They confirmed the bed bug thing that has been ongoing at EP. Sarah George the head nurse came to me one day when I was visiting mom, she said another resident Lolli would be sharing a room with mom for temporary. I asked why? Sarah George told me, "we are cleaning Lolli's room". Lolli told us different, Lolli told us she was moved to mom's room because she had bed bugs. Sarah George lied to me, and I confronted her on this, and she confirmed they were cleaning Lolli's room because of bed bugs. She lied to me all the time. Sarah George is one of the nurses that said she would get back to me several times when I was concerned about mom, and she hid and never called me back.

==highlight==I stopped all communication with everyone from EP when mom left, my business is finished with them, except for an overcharge in our billing, that was never invoiced. We have a lawyer handling that. As we must move on with good care for mom at Mt Alverna. But I felt the need to report this. I am not making this up and I do have witnesses.==

==highlight==I had asked EP to send me medical records. On March 10th, after mom's dehydration visit to Southwest Hospital, It took them 4 weeks to get those records, because no one was answering my questions about mom,== by no one I mean her doctor, Dr Dohar. That was around March 10th I had asked for them over and over again, after mom was released from Southwest General Hospital. Just days before the quarantine at the nursing home. Mom went to Southwest General Hospital because of dehydration. They kept making excuses and 4 weeks later I got the medical records. ==highlight==Doctor Dohar, never returned my calls or even talked to me.== He was newly appointed as moms doctor after the Quarantine came. He hardly saw mom and yet signed the Eviction papers that falsely stated mom had behavior problems.

I was distraught, I could not see mom and they were cutting off communication, except for when I called to speak to any nurse that was with mom if by chance one answered the phone, in

the wee hours of the morning. And I had no medical records to view. We were desperate, not knowing. Then they said I was calling too much. But I was getting no answers. Our entire family was fearful mom was not being cared for properly during Covid.

EP stopped communicating with us. The nurses, doctors and aid I listed were all on staff during my mother's stay. Nurse Louise Darling, DON for the moment, was fired the 3rd day into the quarantine. When Darling the nurse fed mom, mom was not eating. Mom was frightened of her. When the Covid quarantine started in EP things got worse. People quit and were fired. The staff was changing. They lessened calls and my communication with my mother and for my entire family. I know of other families with parents in EP that were treated this way too. EP told me that they were just too busy to call me for my mother because mom cannot dial-in on her own. Sara Thurmer, Administrator of EPCC (who had given me her private number and told me not to listen to Louise Darling the DON - to come straight to her.) So, I did. Sara told me I could only call there once a day. I called a lot because the new nurse practitioner and Dr Dohar were not answering my calls about my mother's current condition and her meds. Dr Dohar wanted to drug my mother and I said to call me about this, and he did not. I needed to discuss mom and her meds and he did not call me back - he just prescribed a med for mom. They made up a story that I refused meds for mom. That is absurd! I said that I needed to discuss the meds for mom and they never answered me - at all. I Wanted answers about mom's condition. She was looking worse and worse through the window to me, my sister and my brother. Mom looks drawn, lethargic and pale - thin and her eye was swollen shut. I had to bring these observations to their attention through the window. My mother was diagnosed with an eye infection. It turned out that they put mom on 850 mg of Depakote, which after we moved mom to Mount Alverna, that's the 1st thing they did, was take her off all that meds she did not need! What in the heck was Dohar thinking?

Dr Dohar and the nurse practitioner were assigned to my mother a few days after the COVID19 quarantine. EP fired my mom's regular doctor and nurse practitioner when the pandemic started. I was shocked. The new doctor and nurse practitioner were never introduced to me. The new doctor and/or nurse practitioner never contacted me personally about my mother; even after I had left several messages at the front desk with Tina the receptionist. I have a diary of notes on all the times and days if you need them - there are so many but I can print and send to you upon request. I wanted to discuss mom's meds and behavior because when COVID19 came they cruelly took my Demented mom and stuck two new agency aids (that my mom did not know, with out easing her into this situation) to shower or bathe mom . My mom had a hard time with the bath and shower. It took us a long time to get her to trust Yolanda Odem, who was her regular shower girl. They pulled Yolanda off showers to work on the floor because they had no aids. When they did this, mom had a hard time in the shower with new people. So, mom freaked out. They blamed my mom and said she was uncontrollable, and the staff could not handle her. We all know dementia patients need routine and they handled that horribly. My mother came out of two of those two showers, and she was fighting the new people. They are supposed to be able to handle dementia, and they did not. Mom was injured because of it. I used to have to go into the bathroom with the aid and mom to get her used to the new people. They did not take that under consideration and mom was injured. Then they did the same thing to mom the next shower. EP did not handle mom with care and understanding her dementia demands and mom was injured again.

On another note: the first week into the quarantine EP introduced Skype calls. EP then took that away from us. We had that ONE TIME, and never offered it again. We had literally NO contact with my mother with the exception of a few nurses and aids that were compassionate, and they got in trouble for answering mom's phone when it was ringing. These staff members

were told not to call me for my mother; by the orders of Sara Thurmer, administrator. I have friends that work there and they tell me everything. Sara did not like that so she cut off all communication with me and mom as it was. My sister and family as witnesses. I could not even get a call back from her doctor or nurse practitioner – ever! I was in the dark about my mother's increased meds. I called numerous times – all of which I have documented in my notes with dates and times I called. There were too many to include here; all with no answer as to how my mother was. This was weeks of torture for all the family - and mom.

I would not have called all the time if I knew what was going on with her meds, her showers, her care in general. Our last care meeting was November of 2019. Since then, EP never sat down with me to discuss mom's issues, and they were not answering me. I would scramble all over calling nurses on the floor getting bits and pieces of info on my mom's condition.

Meanwhile, my brother, sister and I were visiting through a filthy window to see that she was not looking well. My sister and I called EP and asked them to send mom to the Southwest General Hospital, May 17th, to have her checked out. After they gave her fluids, they then sent mom back to EP. Obviously, that's why she was lethargic: no fluids. This just tells us that EP was not properly giving mom water when she needed it, I can vouch for that because it happened when I was able to visit her. HAVE SEEN IT WITH MY OWN EYES. Going in to see mom in the past and finding her with her mouth dried shut together, a raspy voice … dry, no fluids. I used to take bottled water in and number it so I could tell if they gave her water. Why was she in hospital on March 8th? When they sent her, she was dehydrated … they don't have enough staff to hold mom's water bottle for her, mom can't find it herself. Since that incident, I called EP several hundred times to get more records for mom and they never gave them to me - once again. I have photos of all mom's injuries during the quarantine. I took through the window or got off of a Face Time photo/ picture. Deep Tissue Injuries on her bottom, her right heel sore was a big issue requiring a special boot that she was supposed to be wearing, and an infected eye. If you need them, I can provide photos of injuries due to not moving her.

God graced us with an opening somewhere else and we did move mom. She is doing much better and we are so relieved to move her from this crumbling administration at East Park Care Center.

I hope with my notes you can review EP as I fear for the residents that are under their care at this time. We are moving on, but if you have any questions about all of this please call me. I want to make it better for people, and not see families to have to go through this type of torture.

Since I wrote this letter to the ODH, my mother Dorothy J Mandanici has passed away on June 20, 2020, peacefully at Mount Alverna. Too bad the opening came after three years, we waited. But mom's Bruises were all healed, and she even came to life after they revived her when she arrived on May 22 with fluids and took her off all the unneeded meds, Mom had NO behavioral disturbances at Mount Alverna. I was told by staff, that if they had her sooner, she may have lived longer and sure would have had a better quality of life. East Park Care Center in Brook park did not provide anything for my mom but distress and torture for our dear mother and her whole family. I am sending this, because I am desperate for someone to go in and check this place out, East Park Care Center in Brook Park failed my mother and is failing others as I write this. Please help. Thank you for listening and I hope this gets to the right people.

Mom weighted 131 pounds, on March 11 and 97 pounds by the time I got to see her at Mount Alverna.

I am Gina Marie Criscione and I speak the truth. I sent this same letter to the ODH, I don;t know what else to do to make it better for that way East Park Care Center is treating the residence

Families. I am not alone here, I have friends that moved their parents out that are afraid to speak. This is for my mother, this is her voice, this is her story, God rest her soul.
440-503-4326
Dorothy J Mandanici's Legal Guardian and daughter

CRISCIONE_009279

Dear Laura,

I do hope I find you well today, I pray for your soul every day. I pray harder for the residents at EPCC.

You need to know that I was not going to even come after EP after the investigation of the ODH with lawsuits, I had retired that idea July of 2020.

I had given up and moved on in July, after my walks to draw awareness to your horrible place East Park Care Center. ... You drummed up some trouble for yourself, sorry. You should have let me walk my true talk and go home.  You drew attention to your horrible place (EPCC) by coming after me through the Brook Park Police and your friends Sacket and HORVATH (MY HIGHSCHOOL FRIEND).  I wanted, someone to listen, but I thought you would make things better for EP, not worse by attacking me and retaliating against me making me seem to others I am the criminal here. I knew it would come out in the wash. I know your lies would catch up with you. They did, thank the Lord.

Yes, Laura darling,. I was letting the whole thing GO in July of 2020 (hehe, dumb ass), and if you and Sara had not come after me with lies about me to the Brook park Police,. None of this would be happening, and when the ODH reports come in about all of your doings and incompetent staff, and lies you created, I was going to turn my head never to look back and continue building a business I had started online in July. And that's what I did. I HAD MOVED on, trying to forget the pain, and suffering my mother endured, and her family for months.

Then you opened the can of worms in OCTOBER (months after my mother had died) and came at me through the Brook Park Police Station to protect yourself using Sara Thurmer as your little puppet. By the way how are you two getting on these days? Friends still after the dance in the courtroom with Sacket and Bardwell? You really should have showed up it was quite the circus. My attorney making your Sacket jump through hoops over yours and Sara's lies. I enjoyed listening to my attorney proving my innocence in the Berea Courtroom.

I wanted my life back and did not want to look at my mother's many wound pictures (happenings at EPCC) ever again after my walks. I prayed for peace. I was forgiving and praying and moving on, that's what good Catholics do. Then out of the blue, I got a call from the police officer in October. I must laugh now because you brought this all on yourself. 4 months later you waited, why to think up some good lies to try to convict me?

YOU, Laura, would have been rid of me, my findings and reports and exposure about EPCC, by telling the truth.  Because that is all I was guilty of, telling the truth. You blew it Laura. You should have spent more time taking care of the residents and paying your staff, your supply bills and running a good place, then Covid Came and you really had problems. I heard mom was one of your problems, so you got rid of her. But Laura I know you were trying to really get rid of me really it is so obvious. I'm a whistle blower...Oh well your plan with Sara backfired and now you are in the spotlight. You did it to yourself, know that. You started the whole thing; you should have talked with me.

All I wanted was answers and good care for my mother, which she had before you took ownership. Good care is a given with most nursing homes. I felt we had died and went to heaven when mom was moved to Mount Alverna in May of 2020 dehydrated once again coming from EPCC along with her



DEFENDANT'S
EXHIBIT
U
7-6-23
PENGAD 800-631-6989

CRISCIONE_003802

frightened disposition and bruises. No comparison your care was awful and killed my mom. I know of animal shelters that treat the families and animals better than you have displayed in the way your run EPCC. My mother suffered dearly, but you will always remember Dorothy J Mandanici. I hope her name rings in your head for the rest of your life. For it was not me speaking out, it was her voice. I remember her begging me at the end with your care, in the end, "GET me out of here"

She is out and in a better place now, she died too quick because of your poor and unthinkable care.


So I need you to know Laura, that you created your own messes, and I do hope you find yourself getting into another investment, you made a poor choice and destroyed a 5 star nursing home when you became owner, good job. Looks like nursing and law are not your forte'.

I want you to always remember this in honor of my dear wonderful mother Dorothy J Mandanici, that on August 21st, I started forgetting about the bad that happened to mom and focusing on my life by making over 100 videos and trying to build a new online business. I had to move on it was destroying me that no-one would listen about what had happened to my dear mother, I am not a well person and this drama was making me sick… No one was listening to me, and I gave up, moved on … yes I was not looking back. I said what I had to say and closed the door on this…….. You brought it all back out, (by trying to charge me with lies) and you created the stir right into the media. WOW You did this to yourself. I was very happy that you brought attention to what was going on in your place EPCC. I guess my walking was heard after all…. I knew I did no wrong. You don't have to be a lawyer to read the laws. I was within my every right as a guardian with legitimate reports about poor care. Sara could not protect you any longer, your nursinghome was out of control. People quitting by the handfuls. Most of your staff were my friends for 1 and 1/2 years before you ever got there as owner. They all told me why they left and what was going on in your place. Some ate in my home and did side work for me in my home for years. You did not like them being friends with me, so you cut off communication. How down right mean is that?  Asking them to take me off their Facebooks, or they would be fired. I only wanted good care and seeing all mom's good care givers quit was heart wrenching as I watched your place go downhill daily along with my sister and others.


I walked in July with my little signs that I made my self, legally speaking the truth about my mom and what EPCC did to my mom and her family, under your care as owner in July of 2020.  I wanted to tell mom's story in hopes someone would save the people still inside in your secret little perfect prison of warehousing people.

Walking and talking to bring awareness to your… beyond horrible care giving.


I was sick and falling over with heart ache pain and my arthritis pain, high blood pressure and heart palps, on the verge of migraine and vertigo walking in front of, not near or on the property, but legally walking alone in that 98-degree heat in July 2020. No-one was listening to me, so I thought, but you were I found.  My writings to the ODH had all been submitted… I was waiting and waiting for them to

CRISCIONE_003803

find what was going on in your closed doors of poor care. I walked just 2 or three times, maybe four, I can't remember, but the last walk, I spent a week in bed very ill from it...

When I left my mother Dorothy J Mandanici on March 11th she was feeling better from a hospital stay from dehydration that your staff had created by not giving her food and water. We laughed and sang that day. She declined through the window before our eyes during Covid Quarantine. While you hid and lied. mom lost tons of weight... I tried calling doctors and nurses to no avail, but you stopped my mother and her family's communication... How could you? You stole precious time from my mother and broke her heart, made her think we did not care about her, you are right next to the devil in my book, I pray for you.

You did not have enough trained people to service my mother's needs ever. Or anyone's needs, I have witnessed this and watched you ruin a 5-star little friendly nursing home. Not to mention the place had turned into a dump with bedbugs. I lived there with mom whenever I could and so did my sister and brother, so we know exactly how you ran this place down. I watched and many of the staff were personal friends. Sara Thurmer was your puppet. She played a good friend and turned on me and lie to try to save what was really going on in your establishment under your care and ownership.


 On August 21st, 2020 I started a food frenzy of videos on my YouTube and Facebook.  Over 100 videos, that I cooked filmed and edited and posted I was very for months...busy not paying attention you at all...... and That was the day I was never looking back. Now I have big attorney fees and a broken-down sad home and family and sick dogs because of the stress and anxiety you created in our lives.

Can you live with yourself is my question? Dorothy J Mandanici and Gina Criscione are in much better places now in our lives. I hope you can pull yours together and tell the truth and move yourself out of the nursing home business, It's just not for you.

With blessings and prayers for forgiveness,

Gina Marie Mandanici Criscione


FYI

 I have more friends in Brook park then you thought.  Many supporters to my cause. Many. My mother was a good resident too, you ruined her final days in Brook Park. Sadly, I pray for you

Say hello to Carol for me. I miss her sitting on the sidelines being jealous of me in high school at the Midpark Games she remembers me the cheerleader. Everyone knew me I was very popular and well liked and still am in the Brook Park Community as you witnessed. My friends in Brook Park remember Gina Mandanici and they know my mother too. My cousin was mayor once upon a time and still works for the city. My friends are on council and even work in the department. We have been a part of Brook Park since 1961.. I will continue to donate to the small churches and organizations and fund raisers and support their local businesses. Because most of these people in Brook Park are my good old friends. I just wish we could have been friends too .

CRISCIONE_003804

**Conversation between Administrator's iPhone (+12162244428) and Gina C.
(4405034326)**

16/07/2019, 16:36 (Viewed 16/07/2019, 16:38)

Gina C. (4405034326)

good afternoon Sara it's been a while, I hope you're having a good day. I just got a call
from JoLynn, My sister whojust got to EAstpark and mom was soaked through to the
pad on her chair. This can only mean she's gone several times in that depends. Once
again someone needs to check her more often please thank you

16/07/2019, 16:39

Administrator's iPhone (+12162244428)

Ok so did she say anything to the nurse?

16/07/2019, 16:50 (Viewed 16/07/2019, 16:51)

Gina C. (4405034326)

No she won't she just washed mom up I think And changed her

16/07/2019, 16:51

Gina C. (4405034326)

But she called me and she was pretty upset the way she found mom

16/07/2019, 16:54

Administrator's iPhone (+12162244428)

Ok Renee will call you shortly

16/07/2019, 16:54

Administrator's iPhone (+12162244428)

I just talked to her

16/07/2019, 17:02 (Viewed 16/07/2019, 17:10)

Gina C. (4405034326)

Ty

16/07/2019, 17:11

PLAINTIFF'S
EXHIBIT

**17**

Administrator's iPhone (+12162244428)

CRISCIONE_009059